**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GENE R. ROMERO, et al. | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.    01-3894 |
| ALLSTATE INSURANCE COMPANY, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM</u>**

RONALD L BUCKWALTER, S.J.                                          July 28, 2010

Currently pending before the Court are the Motion of Plaintiffs, Gene R. Romero, *et al.*,

for Leave to File a Second Amended Complaint, the Response of Defendants Edward M. Liddy,

Allstate Insurance Company, and The Allstate Corporation (collectively, "Allstate"), Plaintiffs'

Reply Brief, and Defendants' Sur-reply Brief.  For the following reasons, the Motion is granted

## I.    **FACTUAL AND PROCEDURAL HISTORY**[1]

Plaintiffs' putative class action, which has been pending since August 1, 2001, alleges

that Allstate had originally employed a substantial number of insurance sales agents with the

promise that they would have a "guaranteed income" and lifetime "financial security" through a

compensation package that included a pension, profit sharing, and other employee benefit plans.

(Am. Compl. ¶ 1.)  In the 1990s, Allstate sought to get out from under the financial burden of

---

[1]  The facts recited herein are taken from Plaintiffs' Amended Complaint and, for purposes of the
pending motion, are accepted as true by the Court.  <u>Winer Family Trust v. Queen</u>, 503 F.3d 319,
331 (3d Cir. 2007)

this promise by attempting to persuade these employee agents to convert to independent contractor status, under the pretext that this status would give them more "entrepreneurial freedom" and a capacity for greater earning power. (Id. ¶ 2.) When only a few of the employee agents voluntarily relinquished their benefits, Allstate's President and Chief Executive Officer, Edward M. Liddy, announced, in November 1999, that Allstate was instituting a "group reorganization program," under which approximately 6,300 employee agents would have their employment contracts terminated by June 30, 2000. (Id. ¶ 3.) These employee agents and would be permitted to remain with Allstate as independent contractors only if they signed a release waiving their statutory and common law rights (the "Mass Termination Program"). (Id.) Allstate also imposed a moratorium on rehiring the employee agents to fill sales and customer service positions for the company. (Id.) This Mass Termination Program, either intentionally or in effect, allowed Allstate to replace older employee agents with younger hires. (Id. ¶ 6.) To further evade legal accountability, Allstate presented the employee agents with an choice: (a) sign a prepared General Release and Waiver Agreement ("Release") that waived the employee agents' right to challenge the legality of Allstate's conduct, and be permitted to either remain with Allstate as an independent contractor or leave Allstate and receive certain specified payments; or (b) not sign the Release and have their long-term relationship with Allstate severed entirely with none of the specified payments. (Id. ¶ 11.) Given these limited alternatives, over ninety-nine percent of the 6,300 employee agents signed the Release. (Id.)

Several hundred of these employee agents, however, subsequently put Allstate on notice of allegations of class-wide age discrimination and/or retaliation by filing timely charges with the Equal Employment Opportunity Commission ("EEOC") and equivalent state agencies. (Id. ¶

20.)  The EEOC issued a ruling in which it characterized Allstate's conduct as "threats, coercion, and intimidation" and concluded that the Release was in violation of the ADEA.  (Id. ¶ 12.)  In light of the EEOC's finding, Plaintiffs initiated the action in federal court on August 1, 2001, and, on October 18, 2001, Plaintiffs filed their First Amended Complaint, which has been the operative complaint ever since.  The First Amended Complaint set forth seven Counts, as follows:

> Count I sought a declaratory judgment (both individually and for the class) declaring the Release invalid under Section 510 of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1140, the Age Discrimination in Employment Act, 29 U.S.C. § 623, and common law.
>
> Count II alleged individual and class claims of interference with employment and retaliation in violation of Section 510 of ERISA with respect to the Plaintiffs' attainment and receipt of pensions and benefits under various employee benefit plans.
>
> Count III alleged individual and class claims for retaliation in violation of Section 510 of ERISA.
>
> Count IV claimed "Discriminatory Termination and Retaliation in Violation of 29 U.S.C. § 623(a) and (d)" for both individuals and the class.
>
> Count V asserted individual and class claims for breach of the R830 contract, which governed the employment relationship between Allstate and a subclass of Plaintiffs.
>
> Count VI alleged individual and class claims for breach of the R1500 contract, which governed the employment relationship between Allstate and a different subclass of Plaintiffs.
>
> Count VII set forth individual and class claims for breach of fiduciary duty.

(Id. ¶¶ 132-189.)

Discovery began in April 2002 and, over the course of the next several years, the parties engaged in extensive motion practice, including the filing of cross-motions for summary

judgment and the debate over class certification issues. On March 30, 2004, the Honorable John Fullam, of the United States District Court for the Eastern District of Pennsylvania, entered a Declaratory Judgment holding, in part, that the Releases signed by the employee agents were voidable so long as the employee agents tendered back all benefits received in connection with signing those Releases (the "tender back" requirement). Romero v. Allstate Ins. Co., Nos. CIV.A. 01-3894, 01-6764, 01-7042, 2004 WL 692231, at *3-4 (E.D. Pa. Mar. 30, 2004). Plaintiffs filed a timely motion for reconsideration challenging only the propriety of the "tender back" requirement imposed by the Court. While that reconsideration motion was still pending, Defendants filed a second motion for summary judgment in December of 2005, as to all of Plaintiffs' underlying causes of action. That motion remained undecided until March 2007, when Judge Fullam announced his intentions to reverse his original finding as to the validity of the Releases. Romero v. Allstate Ins. Co., Nos. CIV.A.01-3894, 01-6764, 01-7042, 2007 WL 906158, at *1 (E.D. Pa. Mar. 21, 2007). Ultimately, on June 20, 2007, Judge Fullam held that he erred in his 2004 Declaratory Judgment and vacated that decision. Romero v. Allstate Ins. Co., 01-3894, 01-6764, 01-7042, 2007 WL 1811197, at *1 (E.D. Pa. Jun. 20, 2007). He further granted summary judgment in Allstate's favor on the entirety of Plaintiffs' Amended Complaint. Id.

On November 26, 2007, Plaintiffs appealed this ruling to the United States Court of Appeals for the Third Circuit. Reviewing the history of this case, the Third Circuit noted that Plaintiff had not received the benefit of full discovery as to issues regarding the validity of the Releases, and determined that these issues were dispositive as to the rest of Plaintiffs' claims. Romero v. Allstate Ins. Co., 344 Fed. Appx. 785, 793 (3d Cir. 2009) ("plaintiffs had a relative

short period of class discovery, and . . . are entitled to discovery that is responsive to their requests related to the specific release-related issues the plaintiffs raised with the district court in their response to its March 21, 2007 Order."). The court went on to order that the District Court allow additional discovery and briefing, fully address whether the Releases are valid, and if the Releases are deemed valid, decide all of the underlying claims and issues. Id. at 794.

On January 29, 2010, after remand from the Court of Appeals, this case was reassigned to the docket of the undersigned. Plaintiffs filed their current Motion to Amend the Complaint on April 23, 2010, and Defendants responded on May 21, 2010. Both parties submitted supplemental briefing, making the Motion now ripe for this Court's consideration.

## II. DISCUSSION

At issue is Plaintiffs' Motion for Leave to File a Second Amended Complaint, which seeks to include three discrete amendments, as follows: (1) the substitution of Joseph L. Benoit for "holdout" plaintiff Douglas F. Gafner, Sr., who is now deceased and whose claims against Defendants were settled on a confidential basis while the matter was on appeal; (2) clarification that Plaintiffs assert a disparate impact claim under the ADEA insofar as they have alleged that over ninety percent of the employee agents subject to the Mass Termination Program were age forty or older as of November 16, 1999; and (3) amplification and correction of certain factual averments to specifically include allegations that Defendants made misrepresentations to induce Plaintiffs and other employee agents to sign the Release.

Federal Rule of Civil Procedure 15(a) sets out the standard for granting leave to amend a complaint when, as is the case here, a responsive pleading has been served: "a party may amend the party's pleading only by leave of court or by written consent of the adverse party." FED. R.

Civ. P. 15(a).  The Rule clearly states that "leave shall be freely given when justice so requires." Id.  Nonetheless, the policy favoring liberal amendments is not unlimited.  <u>Dole v. Arco Chem. Co.</u>, 921 F.2d 484, 487 (3d Cir. 1990).  A district court may deny leave to amend a complaint where "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party."  <u>Lake v. Arnold</u>, 232 F.3d 360, 373 (3d Cir. 2000) (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)).  "While a District Court has substantial leeway in deciding whether to grant leave to amend, when it refuses this type of request without justifying its decision, this action is 'not an exercise of its discretion but an abuse of its discretion.'" <u>Id.</u> (quoting <u>Foman</u>, 371 U.S. at 182).

Defendants rely on each of these bases for seeking denial of the Motion for Leave to Amend.  Specifically, they argue that:  (1) it is futile to allow Joseph Benoit to be substituted for the late Mr. Gafner as the proposed representative of the "holdout" subclass since the numerosity requirement of Federal Rule of Civil Procedure 23 cannot be met for that class; (2) Plaintiffs unreasonably delayed, without explanation, in seeking to add both the disparate impact claim and the misrepresentation allegations; and (3) permitting the proposed amendments at this stage is prejudicial to Defendants.  Alternatively, Defendants contend that Plaintiffs' have failed to meet their burden due to the sheer volume of amendments coupled with their lack of explanation for the vast scope of the changes.  The Court addresses each of Defendants' arguments individually.

### A.    <u>Futility</u>

Defendants' challenge to Plaintiffs' first proposed change relies on an allegation of futility.  The court may deny leave to amend, among other reasons, on the basis of the futility of

the amendment.  See Foman, 371 U.S. at 182.  "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted.  Holst v. Oxman, 290 Fed. Appx. 508, 510 (3d Cir. 2008).  The futility analysis on a motion to amend is essentially the same as a Rule 12(b)(6) motion.  Id.  The trial court may thus deny leave to amend where the amendment would not withstand a motion to dismiss.  Massarsky v. Gen. Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983).  Given the liberal standard for the amendment of pleadings, however, "courts place a heavy burden on opponents who wish to declare a proposed amendment futile."  Aruanno v. New Jersey, No. CIV.A.06-296, 2009 WL 114556, at *2 (D.N.J. Jan. 15, 2009).  "If a proposed amendment is not *clearly* futile, then denial of leave to amend is improper."  6 WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990) (emphasis added).

The First Amended Complaint, in this case, originally proposed a subclass of employee agents who did not sign the Release presented by Allstate and who, as a result, were terminated, on June 30, 2000 as part of the Mass Termination Program.  The named representative of that class was Douglas F. Gafner, who is now deceased and whose heirs settled his case on a confidential basis during the pendency of the recent appeal to the Third Circuit.  Accordingly, Plaintiffs seek to substitute in Joseph L. Benoit, another employee agent who was terminated and not permitted to continue in the service of Allstate because he would not sign the Release.

Defendants oppose this amendment on grounds of futility, arguing that the putative subclass of non-release signers that Mr. Benoit would represent will fail to meet the numerosity requirement for a Rule 23 certification given Plaintiffs' allegation in the Second Amended Complaint that over 99 percent of employee agents signed the Release and "only a handful" did

not.  (§ Am. Compl. ¶ 11-12.)  Defendants' argument, however, asks this Court to prematurely decide class certification issues without either providing a substantive showing as to precisely how many people might be involved in this class or citing any legal authority for what number is sufficient to satisfy the numerosity requirement of Rule 23.  Such averments fail to meet Defendants' burden of establishing futility.

Indeed, accepted as true, the allegations of the Second Amended Complaint reveal quite the opposite.  Plaintiffs suggest that approximately one percent of the 6,300 employee agents did not sign the Release, meaning that approximately fifty to sixty people could be part of the proposed subclass.  (Id. ¶¶ 9, 12.)  The Third Circuit has held that, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."[2]  Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001); see also In re Loewen Group Secs. Litig., 233 F.R.D. 154, 162 (E.D. Pa. 2005).  As Defendants have pointed to no evidence or legal authority to suggest that the number of members in the proposed subclass would be clearly insufficient to satisfy numerosity, the Court declines to rule, at this juncture, that the subclass is not certifiable.  In turn, the Court does not deem the substitution of Joseph Benoit for the late Mr. Gafner to be a futile amendment and grants the Motion for Leave to Amend in this respect.

--------

[2]  The Court is aware of Judge Fullam's March 30, 2004 ruling that there are only sixteen potential class members who did not sign Releases.  Aside from the fact that this Court must now re-examine such factual findings, Judge Fullam expressly indicated his intent to certify this limited group as a class and did not raise any concern as to numerosity.  Romero, 2004 WL 692231, at *4.

## B.    Undue Delay

Defendants next argue, with respect to the second and third proposed amendments, that Plaintiffs unreasonably delayed in seeking to amend the Complaint.  Notably, in the Third Circuit, delay alone does not justify denying a motion to amend.  Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001); see also Collins v. City of Gloucester, No. CIV.A.06-2589, 2008 WL 1374213, at *6 (D.N.J. Apr. 9, 2008) ("'The mere passage of time does not require that a motion to amend a complaint be denied on grounds of delay.'") (quoting Adams v. Gould, Inc., 739 F.2d 858, 868 (3d Cir. 1984)).  Rather, it is only where delay becomes "'undue,' placing an unwarranted burden on the court, or . . . 'prejudicial,' placing an unfair burden on the opposing party" that denial of a motion to amend is appropriate.  Adams, 739 F.2d at 868.  Undue delay by a movant in seeking leave to amend can alone support a denial.  Tarkett, Inc. v. Congoleum Corp., 144 F.R.D. 289, 291 (E.D. Pa. 1992).  "Implicit in the concept of 'undue delay' is the premise that Plaintiffs, in the exercise of due diligence, could have sought relief from the court earlier."  In re Pressure Sensitive Labeldstock Antitrust Litig., No. MDL.03-1556, 2006 WL 433891, at *1 (M.D. Pa. Feb. 21, 2006).  As such, the question of undue delay requires the court to focus on the movant's reasons for not amending sooner, while "bearing in mind the liberal pleading philosophy of the federal rules."  Cureton, 252 F.3d at 273; see also Lindquist v. Buckingham Twp., 106 Fed. Appx. 768, 775 (3d Cir. 2004) (noting that the question of undue delay, as well as the question of bad faith, requires that the court focus on the plaintiff's motives for not amending their complaint to assert this claim earlier).  Delay may "become[] 'undue,' and thereby create[] grounds for the district court to refuse leave [to amend], when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to

amend." Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 266 (3d Cir. 2008) (citing Cureton, 252 F.3d at 273). Moreover, "[t]actical decisions and dilatory motives may lead to a finding of undue delay." Leary v. Nwosu, No. CIV.A.05-5769, 2007 WL 2892641, at *4 (E.D. Pa. Oct. 2, 2007); see also Cureton, 252 F.3d at 271-74 (finding undue delay where plaintiffs made a tactical decision not to seek leave to amend until after they lost first argument on summary judgment). Notably, "[t]here is no presumptive period in which a motion for leave to amend is deemed 'timely' or in which delay becomes 'undue.'" Arthur v. Maersk, Inc., 434 F.3d 196, 205 (3d Cir. 2006). "Whether delay is undue depends on the facts and circumstances of the case."[3] Nat'l Recovery Agency, Inc. v. AIG Domestic Claims, Inc., No. CIV.A.05-0033, 2005 WL 1289545, at *4 (M.D. Pa. May 9, 2006).

Defendants now contend that Plaintiffs unreasonably delayed in seeking to include two of the proposed amendments in their Complaint: (1) the addition of a disparate impact claim under the ADEA; and (2) the inclusion of additional factual averments specifically alleging that Allstate made numerous misrepresentations to induce the employee agents to enter into the Release. Defendants conclude that "[t]hese years of missed opportunities are fatal to plaintiffs' present motion." (Defs.' Resp. Mot. Amend 9.) The Court separately addresses each amendment.

### 1. Addition of Disparate Impact Claim

In their second proposed amendment, Plaintiffs seek to add a claim of disparate impact under the ADEA. This claim asserts that the Mass Termination Program had a significant and

---

[3] "[T]he obligation of the district court in its disposition of the motion is to articulate the imposition or prejudice caused by the delay, and to balance those concerns against the movant's reasons for delay." Coventry v. U.S. Steel Corp., 856 F.2d 514, 520 (3d Cir. 1988).

disproportionate adverse and discriminatory impact on the protected class of employee agents who were age forty and older. Defendants, in response, argue that Plaintiff has unduly delayed in bringing this claim.

A proper analysis of whether Plaintiffs, "in the exercise of due diligence," could have sought earlier relief, requires the Court to delve further into the details of this case's complex procedural history. When the First Amended Complaint was filed in October of 2001, Count IV alleged only Allstate's disparate treatment of older workers through the Mass Termination Program. (Am. Compl. ¶¶ 158-182.) No disparate impact claim was formally asserted because prevailing Third Circuit jurisprudence at that time strongly questioned the viability of such a theory under the ADEA. See DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 732 (3d Cir. 1995) (stating that disparate impact theory should not be applied as a matter of course and suggesting that "it is doubtful that traditional disparate impact theory is a viable theory of liability under the ADEA").

In May of 2003, Plaintiffs filed a motion for partial summary judgment alleging that the Releases signed by the employee agents were not valid and, in August of 2003, Defendants responded with their first motion for summary judgment challenging Plaintiffs' substantive claims under the ADEA, ERISA, and retaliation theories. As noted previously, the district court, in March 2004, entered a Declaratory Judgment deeming the Releases voidable so long as any employee agent who wished to rescind the agreement tendered back to Allstate repayment of all benefits received in exchange for signing the Release. Romero, 2004 WL 692231, at *3-4. The district court went on to consider whether such employees would have any valid claims to assert

in the event they voided their Releases, and concluded that several of the claims were "vulnerable to dismissal." Id. at *3. Specifically, with respect to the ADEA claims, the court held:

> I have concluded that, on the undisputed facts of record, there is no basis for claims of age discrimination, for the simple reason that employees of all ages were treated alike. An employer who visits adverse consequences upon all employees, irrespective of age, cannot be held liable for age discrimination. The fact, if it is a fact, that many of the affected employees, or even a majority, are within the protected age group, is irrelevant.

Id. Ultimately, the court entered the Declaratory Judgment as described, but, despite its comments on the substantive claims, it denied Defendants' motion for summary judgment, leaving the status of Plaintiffs' ADEA claim in question. Plaintiffs timely filed a Motion for Reconsideration with respect to the "tender back" requirement imposed in the Declaratory Judgment, claiming that employee agents who wished to void the Releases should not have to repay any benefits.

Approximately a year later, in March 2005, the Supreme Court issued its decision in Smith v. City of Jackson, 544 U.S. 228 (2005), holding that, contrary to the previous Third Circuit precedent, the ADEA clearly authorizes disparate impact claims. Id. at 240. Within two weeks, Plaintiffs brought this opinion to the attention of the District Court via a Notice of Supplemental Authority, to be considered in connection with their still-pending motion for reconsideration. (Notice of Supp. Auth. 1-2, Apr. 11, 2005.) Defendants responded, however, that this case had no bearing on the motion for reconsideration, which challenged only the "tender back" requirement of the Declaratory Judgment. (Defs.' Reply to Notice of Supp. Auth. 1-2, Apr. 19, 2005.) No motion for leave to amend was filed at that time.

The following December, with no ruling on the motion for reconsideration yet issued, Defendants filed their second motion for summary judgment. This motion asserted that although the March 2004 Memorandum had commented on the viability of the ADEA claims, the accompanying Order had never officially dismissed them. Accordingly, Defendants requested that the court: (1) uphold the validity of the Release and reject Plaintiffs' and the EEOC's claims of retaliation under the ADEA, Title VII, and the ADA; and (2) enter judgment in Allstate's favor on all claims asserted in this action, including claims of discrimination under the ADEA and ERISA. (Defs.' Mem. Supp. Mot. Summ. J. 2, Dec. 7, 2000.) That motion, along with Plaintiffs' motion for reconsideration, remained undecided.

On January 16, 2007, the court issued an order summarily denying Plaintiffs' 2004 motion for reconsideration as to the tender back requirement. (Order, Jan. 16, 2007.) As a result, Plaintiffs promptly sought certification of a class who had signed the Release forms so that class counsel could send out a notice to prospective class members, indicating that, if they chose to participate in the class, they would need to void the Release and repay certain sums to Allstate.

Without addressing that issue of class certification, the court issued a Memorandum and Order, on March 21, 2007, setting out "tentative" conclusions as to the pending motion for summary judgment, including findings that: (1) any amendments to the Allstate pension plan were validly adopted and effective; (2) the Seventh Circuit case of Isbell v. Allstate Ins. Co., 418 F.3d 788 (7th Cir. 2005) warranted the conclusion that Plaintiffs' claims of ERISA violations, age discrimination, and retaliation must fail; and (3) the court's March 3, 2004 Order declaring the Releases voidable was in error and should be vacated. Romero, 2007 WL 906158, at *1.

The court gave the parties twenty days to file additional short briefs regarding these issues. Following submission of those briefs, the court, on June 20, 2007, granted Defendants' motion for summary judgment and dismissed the entirety of the case. Romero, 2007 WL 1811197, at *1. Plaintiffs filed a timely appeal and, on July 29, 2009, the Third Circuit issued its ruling vacating the district court's decision. Romero, 344 Fed. Appx. at 793-94.

In light of this lengthy, complicated, and somewhat unusual history, the Court simply cannot deem Plaintiffs' current effort to add the disparate impact claim to be unduly delayed. It is undisputed that, due to Third Circuit jurisprudence prevailing at the time of the First Amended Complaint, Plaintiffs had no valid basis for officially asserting such a claim until the Supreme Court's March 2005 Smith decision clarifying that an ADEA disparate impact claim was cognizable. Immediately after that case came out in March 2005, Plaintiffs alerted the district court, via a Notice of Supplemental Authority, of Smith' s ramifications. Although Plaintiffs could have conceivably moved for leave to amend at that point, the Court would be remiss to disregard the basis behind their decision not to do so. See United States v. Sensient Colors, Inc., No. CIV.A.071275, 2009 WL 394317, at *3 (D.N.J. Feb. 13, 2009) ("[t]he mere fact that Sensient's motion [for leave to amend] could have been filed earlier is not determinative of whether its proposed amendment should be granted."). Plaintiffs' motion for reconsideration with respect to the "tender back" requirement of voiding the Releases was still pending, meaning that Plaintiff had yet to obtain any court decision defining the requirements of a class to proceed on any of the substantive claims. Such a ruling would significantly impact who could participate in the class and, as a matter of course, whether the disparate impact claim was feasible. The parties' own recognition that the very boundaries of the case were in question was evidenced by

their seemingly mutual standstill on further discovery. In turn, any efforts by Plaintiffs to seek amendment of the Complaint would have had no practical impact at that juncture and may have further delayed the already protracted proceedings by adding another motion into an already congested docket. By December 2005, the viability of all Plaintiffs' claims under the ADEA was directly called into question by Defendants' motion for summary judgment. It was not until January 2007 when the motion for reconsideration was denied and March 2007, when Judge Fullam indicated his intent to dismiss all ADEA claims, followed by an official ruling in June 2007 that all such claims were dismissed. At that point, any window to add the disparate impact claim, if one ever existed, was closed. Plaintiffs' first valid opportunity to include the disparate impact claims into the Complaint came after the Third Circuit vacated the grant of summary judgment and remanded the case for further proceedings. Thus, although there was delay, the Court cannot find that it was "truly undue" or that Plaintiffs were unjustified in their decisions.

Defendants' contrary arguments, while reasonable in light of the extended and extraordinary nature of the proceedings, are insufficient to convince this Court to deny leave to amend. First, Defendants assert that they specifically disputed Plaintiffs' Notice of Supplemental Authority in April 2005, claiming that it was irrelevant because Plaintiffs had neither pled nor supported a claim for disparate impact. Defendants now contend that "[a]lthough plaintiffs knew Allstate disputed that plaintiffs had in fact asserted a disparate impact claim in their complaint, plaintiffs still did not attempt to resolve this dispute or address the issue squarely by seeking leave to amend their complaint to include a disparate impact claim. Instead they stood idly by." (Defs.' Resp. Mot. Leave to Amend 7.)

In light of the procedural posture of the case at that juncture, however, the Court does not deem Plaintiffs' to have acted improperly or "idly." A crucial, boundary-defining motion had been pending for approximately a year when Smith was issued and Plaintiffs alerted the district court to the new ruling. Given the virtual standstill of the litigation, their decision to not officially attempt to add a new claim at that time – despite Defendants' clear objection to such a claim – was a well-reasoned choice to ensure efficient judicial resolution of already-pending issues and not unnecessarily disrupt the case's procession. While such a decision may not suffice in a different case, the circumstances before this Court justify Plaintiffs' actions.

In an alternative argument, Defendants cite to the case of Rizzo v. PPL Serv. Co., No. CIV.A.03-5779, 2005 WL 1397217 (E.D. Pa. June 10, 2005), for the proposition that Plaintiffs should have acted more promptly after the Smith decision. In that matter, the plaintiffs sought leave to amend their complaint to include a disparate impact claim under the ADEA only one month after the issuance of the Smith decision. Id. at *4. The court denied that motion, finding that "once Smith was issued on March 30, 2005, a plaintiff would have had to deal with any ambiguity and could have filed a disparate impact claim under the ADEA. These Plaintiffs simply failed to request leave to amend their complaint in a prompt manner and have not presented any reason for that delay." Id. at *4.

That case, however, is distinguishable from the present matter. In Rizzo, the defendant's summary judgment motion was pending during the issuance of Smith and, prior to the plaintiff's motion to amend, the court granted summary judgment. The Rizzo court gave great weight to that fact, noting that both defendant and the court had expended resources in connection with the summary judgment motion, that reopening the matter to allow a brand new theory into the case

16

would result in undue prejudice to defendant, and that, in any event, the amendment was futile since the proposed amendment did not support a disparate impact claim. Id. In stark contrast, this case – despite the already lengthy proceedings that have occurred – has been returned to its early stages by direct order of the Third Circuit. This Court must allow the parties to proceed with further discovery and briefing on not only issues regarding the validity of the Releases, but also, if the Releases are deemed voidable, the substantive issues under the ADEA and ERISA. Unlike in Rizzo, allowing the addition of a disparate impact claim will not require reopening the case and will not result in any further burden on the continuance of this litigation.

Finally, Defendants take issue with Plaintiffs' contention that Allstate has "been on notice" of the disparate impact claim since the inception of the case. Specifically, Defendants argue that the disparate impact claim that Plaintiffs now seek to add is not the same disparate impact claim of which Allstate had earlier notice. The disparate impact claim described in Plaintiffs' 2005 Notice of Supplemental Authority challenged Allstate's decision to terminate its employee agent programs in favor of the independent contractor program, while, according to Defendants, Plaintiffs' current disparate impact claim focuses on Allstate's actions subsequent to the Mass Reorganization program that resulted in a disproportionate number of agents over age forty deciding to sever their relationship with Allstate.

Defendants' argument, however, misconstrues the express allegations of the Second Amended Complaint, which state that:

> Allstate was aware that over ninety (90) percent of the agents whose employment relationships were to be severed under the Mass Termination Program would be forty (40) years of age or older on the date of termination. Allstate understood and expected that a much larger percentage of the ADEA collective action

members than other class members would have their relationship with Allstate severed entirely under the Mass Termination program, rather than remain in the company's service without benefits. Allstate also understood and expected that a much larger percentage of the ADEA, collective action members than other class members who continued the relationship beyond June 30, 2000 would discontinue the relationship within a few years because of their unwillingness to remain in Allstate's service without benefits, or that Allstate itself would sever the relationship within a few years after the Mass Termination based on pretexts created through its onerous and discriminatory actions against them.

(Sec. Am. Compl. ¶ 176.) In other words, Plaintiffs continue to make the same allegation in their proposed amended pleading as made earlier in the litigation: the Mass Termination Program and Allstate's actions in connection with that Program had a discriminatory impact on older workers and the effects of that policy were felt in the years beyond the Program's implementation. Indeed, the major change effected by the Second Amended Complaint is the simple clarification, in paragraph 177, that Allstate's actions not only constituted discriminatory treatment, but also had "a significant and disproportionate adverse and discriminatory impact on employee agents who were age forty (40) and older, in violation of the ADEA" and that "[t]his discriminatory employment practice was not based on reasonable factors other than age and there was no legitimate business reason or purpose for Allstate to terminate its long-time employee agents." (Id. ¶ 177.) In short, the factual underpinning of the proposed disparate *impact* claim is almost entirely the same as that underlying the disparate *treatment* claim of the First Amended Complaint, and is identical to the disparate impact theory previously espoused in the Notice of Supplemental Authority.[4]

---

[4] To the extent that Plaintiffs intend to argue that some other actions or policies of Allstate, other than the Mass Reorganization Program and related actions, had a discriminatory impact – *i.e.* a claim that Allstate continued in the years following the Program to implement new programs to discriminate against older workers – they should be cautioned that this is not within the Court's

More importantly, by virtue of their very argument, Defendants effectively concede that they were, in fact, aware of Plaintiffs' disparate impact claim as of April 2005. (Defs.' Resp. Mot. Leave to Amend 8.)  They go on to note that "Plaintiff elucidated their disparate impact theory in their opposition to Allstate's [December 2005] summary judgment brief."  (Id.)  Although Defendants correctly note that a cause of action will not be read into a complaint when it is not properly plead, Krouse v. Am. Sterilizer Co., 126 F.3d 494, 499 n.1 (3d Cir. 1997), it is obvious in this case that "Defendant[s] [were] made aware of the nature of Plaintiffs' claims and the factual underpinnings thereof in prior pleadings and that scope remains unaltered."  Digital Encoding Factory, LLC v. Iron Mountain Info. Mgmt., Inc., No. CIV.A.06-1449, 2008 WL 3838014, at *2 (W.D. Pa. 2008).

In sum, taking in combination the interim change in law regarding the viability of a disparate impact claim under the ADEA, Defendants' early awareness of Plaintiffs' intent to assert this claim, the highly unusual procedural history that substantially limited Plaintiffs' opportunity to formally amend their Complaint, and the liberal nature of Federal Rule of Civil Procedure 15, the Court cannot find that Plaintiffs unreasonably delayed in seeking leave to amend.  Moreover, the Court suffers no undue burden from this amendment given that this case[5]

_____

understanding of the scope of the amendment and that the Court would deny leave to add any such claim as beyond the fundamental basis of this litigation as it has proceeded since 2001.

[5]  Defendants cite to a myriad of cases for proposition that the years of delay are fatal to Plaintiffs' Motion, even where a case has been appealed and remanded.  (Defs.' Resp. Mot. Leave to Amend 9-10.)  Quite contrary to Defendants' argument, however, all of these cases have recognized that mere delay is not enough on its own to deny leave to amend.  Rather, the courts in these cases all examined the factual circumstances unique to the litigation before them and found numerous other factors of bad faith, prejudice, or unwarranted burden on the trial court, which compelled denial of leave to amend.  See, e.g., Cureton, 252 F.3d at 273-74 (affirming denial of leave to amend where (1) motion was filed three years after complaint; (2) factual

information on which proposed amendment was based was known two and a half years before request for leave to amend; (3) judicial efficiency would be damaged by trying claims seriatim; and (4) summary judgment had already been granted to adverse party and the interest in the finality of proceedings would be compromised by amendment); Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993) (affirming denial of leave to amend where proposed amendment was requested three years after action was filed and nearly two years after complaint was amended for the second time, most of the facts were available to plaintiff before she filed her original complaint, plaintiff had numerous opportunities to correct deficiencies in her claims, and the amendment would be futile); Berger v. Edgewater Steel Co., 911 F.2d 911, 924 (3d Cir. 1990) (affirming denial of leave to amend where allowing amendment would inject new issues into case requiring extensive additional discovery after an already extensive period of discovery had closed, which would have put an unwarranted burden on the trial court and likely prejudiced the defendant); Goldfish Shipping, S.A. v. HSH Nordbank AG, 623 F. Supp. 2d 635, 640-41 (E.D. Pa. 2009) (denying leave to amend where plaintiff "had previous opportunities to amend" to assert the claims it now advances and yet it did not do so; (2) failed to advance defensible "'reasons for not amending sooner,'" and (3) plaintiff's delay in seeking leave to amend "place[d] an unwarranted burden on the court" and undermined the interests of judicial economy and finality; "a litigant should not be permitted to present legal theories to the court seriatim, raising a new legal theory only after the court rejects its prior one."), aff'd, 2010 WL 1576439 (3d Cir. Apr. 21, 2010); Local Union 30, United Union of Roofers, Waterproofers and Allied Workers v. D.A. Nolt, Inc., No. CIV.A.01-5344, 2008 WL 2502135, at *3 (E.D. Pa. Jun. 23, 2008) (recognizing that although delay of one year, in and of itself, did not rise to undue delay, several additional factors made delay unreasonable, including fact that plaintiff waited three years after Third Circuit rendered an opinion giving rise to claims underlying amendment and case was on verge of dispositive motions); Meyer v. Schuylkill County Prison, No. CIV.A.04-1123, 2006 WL 1094550, at *4 (M.D. Pa. Apr. 25, 2006) (denying leave to amend where discovery was over, motions for summary judgment were briefed and decided, trial was on the horizon, and plaintiff's delay was undue and unreasonable); Robert Billet Promotions, Inc. v. IMI Cornelius, Inc., No. CIV.A.95-1376, 1997 WL 827063, at *2-3 (E.D. Pa. Nov. 19, 1997) (denying leave to amend where plaintiff could have amended complaint to state new claim at any time in the two and a half year history of this case, plaintiff had not even suggested its new claim in any previous filings, and defendant would be unduly prejudiced); Merican, Inc. v. Caterpillar Tractor Co., 596 F. Supp. 697, 705-06 (E.D. Pa. 1984) (noting that allowing plaintiffs to amend complaint would result in substantial prejudice to defendant since it would be required to defend on an entirely new and different theory of liability and it would be exposed to the danger of duplicative recovery); Pennsylvania v. Local 542, Int'l Union of Operating Eng'rs, 569 F. Supp. 582, 588-89 (E.D. Pa. 1983) (denying leave to amend where amendment would require new discovery and joinder of third-party defendants, loss of essential witnesses and vital records had prejudiced defendants, and plaintiff made a tactical decision which, having lost, it was not entitled to re-think and re-litigate).

　　As noted above, whether delay is undue depends on the facts and circumstances of each case. Nat'l Recovery Agency, 2005 WL 1289545, at *84. Based on the foregoing detailed

– while pending for almost nine years – has effectively been returned to near "infancy" by the order of the Third Circuit requiring the allowance of additional discovery, the scheduling of further motion practice, and the making of new rulings on all substantive issues. See Klages v. Sperry Corp., No. CIV.A.83-3295, 1986 WL 7636, at *22 (E.D. Pa. Jul. 8, 1986) (noting that although plaintiffs' proposed new claims could have been asserted at an earlier date, the delay of more than two and a half was neither undue nor unfairly prejudicial since discovery was still continuing and no trial date had been scheduled). Accordingly, the Court rejects Defendants' claim of undue delay.

**2.      Addition of Allegations Regarding Allstate's Misrepresentations Made to Induce Plaintiffs and Other Employee Agents to Sign the Releases**

The third proposed amendment at issue involves Plaintiffs' addition of allegations concerning misrepresentations made by Allstate to induce Plaintiffs and other employee agents to sign the General Release and Waiver Agreement. Defendants argue that Plaintiffs became aware of the majority of the additional allegations they sought to include in late 2002 or early 2003 when the individuals with knowledge of these misrepresentations were deposed and the documents revealing the misrepresentations were produced. Despite Plaintiffs' having knowledge of such claims as of mid-2003, Defendants contend that they failed to ever seek leave to amend and add in these allegations.

---

discussion, the present matter is quite distinguishable from these cases and involves extraordinary circumstances that militate in favor of allowing leave to amend.

Based on the history of this case, the Court must again disagree with Defendants. The First Amended Complaint, filed in October 2001, originally alleged that Plaintiffs' execution of the Release was "neither knowing nor willful" because the Release was grossly oppressive and one-sided, presented on a take-it-or-leave-it basis with no room for negotiation, and unconscionable. (Am. Compl. ¶¶ 138, 157.) That pleading, however, made no express allegations as to any misrepresentations by Allstate. In late 2002, Allstate began producing documents and, in early 2003, Plaintiffs took depositions of five Allstate witnesses. From this discovery, Plaintiff eventually became aware of a potential claim that many of Allstate's representations to the employee agents regarding the Release were, in fact, untrue. As of May 2003, however – and before full discovery had been completed – the parties were already embroiled in their first motion for partial summary judgment filed by Plaintiffs, followed by Defendants' own motion for summary judgment in August 2003, with each party contesting the validity of the Releases. In their September 5, 2003 response to Defendants' motion for summary judgment, Plaintiffs added, for the first time, the contention that "[t]he extreme economic pressures created by Allstate's scheme were further exacerbated by inaccurate information about the persons involved in the Program and misrepresentations making it more likely that agents would sign the Release." (Pls.' Resp. Mot. Summ. J. 2, Sep. 5, 2003.) In support of this theory, Plaintiffs offered extensive argument and citation to evidence. (Id. at 18-26.) Defendants responded to these arguments without ever claiming that they were new theories not properly pled in the First Amended Complaint or that Plaintiffs needed to formally add such

allegations into its Complaint before relying on them as a basis for argument.[6]  In lieu of seeking

to amend at that point to add allegations that were seemingly already before the Court, Plaintiffs

justifiably delayed the addition of another motion into the already crowded list of pending

motions before the court.

       As noted above, on March 30, 2004, Judge Fullam granted Plaintiffs' motion for partial

summary judgment, and entered a Declaratory Judgment deeming the Releases voidable both as

violative of the Older Workers' Benefit Protection Act, 29 U.S.C. § 626 and as improper

retaliation.  Given that the issue regarding the validity of the Releases was apparently resolved,

Plaintiffs had no basis to seek amendment of the Amended Complaint for the sole purpose of

adding more allegations regarding the voidability of the Releases.  Indeed, from that date until

almost three years later, Plaintiffs had every reason to believe that the issue of the Releases'

validity had been closed by the Declaratory Judgment.  On March 21, 2007, however, the court

reversed course in a two and a half page memorandum that indicated its intention to vacate the

2003 Declaratory Judgment, and it invited the parties to provide additional briefing as to the

propriety of this decision.  Both parties submitted the allowable ten-page briefs and, in spite of

Plaintiffs' objections, the court, on June 20, 2007, vacated the Declaratory Judgment and granted

Defendants' motion for summary judgment as to the entirety of Plaintiffs' case.

---

[6]  By acknowledging Defendants' actions, the Court does not intend to suggest that Defendants
waived their current right to object to Plaintiff's amendment of the Complaint.  Rather, the Court
merely finds that because Defendants were on notice of these claims in 2003, and were able to
substantively responded to them, their present claims of undue delay and prejudice are
significantly weaker.

On appeal, the Third Circuit found that Judge Fullam's ruling should have focused more on the dispositive nature of the Releases. Romero, 344 Fed. Appx. at 793. Remanding the case to the District Court, the Third Circuit explained:

> We believe the District Court should reexamine the validity of the release, after allowing further discovery into the facts surrounding the signing of the releases. The plaintiffs had a relatively short period of class discovery, and approximately half the documents Allstate produced were from the Isbell litigation. While Isbell is certainly relevant to the plaintiffs' cases here, the plaintiffs are entitled to discovery that is responsive to their requests related to the specific release-related issues the plaintiffs raised with the District Court in their response to its March 21, 2007, Order: that the releases were part of an illegal scheme; *that they were not signed knowingly or voluntary*; and that they were unconscionable.

Id. (emphasis added).

In light of this background, this Court now finds that Plaintiffs' proposed amendment to include Allstate's misrepresentations regarding the signing of the Release is not only warranted, but indeed required by the Third Circuit.[7] Certainly, Plaintiffs had no reason to add in such

---

[7] In their Sur-reply Brief, Defendants argue that Plaintiffs' new misrepresentation claim is alleged in scant and conclusory fashion, without any supporting facts. They go on to contend that such pleading is insufficient to give Allstate notice of what facts its supposedly misrepresented and, as such, fails to satisfy federal pleading standards. (Defs.' Sur-reply Br. 5 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and Iqbal v. Ashcroft, 129 S. Ct. 1937 (2009).) In their Response, however, Defendants also complain that the sheer volume of proposed changes in the Second Amended Complaint makes the full extent of the proposed amendments unclear and that it is not their "burden to decipher" all of the changes. (Defs.' Resp. Mot. Leave to Amend 2-3.)

A full reading of the Second Amended Complaint reveals multiple allegations concerning the essence of the misrepresentations. (See Sec. Am. Compl. ¶¶ 78-79, 80, 86, 91, 97-101, 103.) Contrary to Defendants' arguments, such allegations are not subject to a heightened pleading standard because, unlike with a fraud or intentional misrepresentation claim, Plaintiffs are not seeking to impose any type of liability on Defendant due to the misrepresentations. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997) (noting that the purpose of the heightened pleading standard for allegations of fraud and intentional misrepresentation is to give "defendants notice of the claims against them, [provide] an increased measure of protection for their reputations, and reduce the number of frivolous lawsuit brought solely to

allegations until June of 2007, when Judge Fullam reversed his decision regarding the Releases' validity and then dismissed the entire case. In lieu of initiating potentially lengthy reconsideration proceedings, Plaintiffs directly appealed the decision. Recognizing the potential injustice occasioned by the lower court's sudden turnabout, the Court of Appeals directed that discovery occur as to the circumstances regarding the signing of the Release – which by its nature covers issues regarding Allstate's alleged misrepresentations. Allowing such misrepresentations now to be affirmatively included via the Second Amended Complaint will therefore result in no additional burden on this Court and will occasion no additional delay in the procession of this case. In turn, the Court declines to find that Plaintiffs engaged in any undue delay with respect to these proposed amendments.

## C.    **Prejudice**

Defendants' next effort to foreclose leave to amend asserts that Defendants will be prejudiced by the proposed amendments. Prejudice to the non-moving party is "the touchstone" for the denial of a request for leave to amend. Bechtel v. Robinson, 886 F.2d 644, 652 (3d Cir. 1989); Universal Computer Consulting, Inc. v. Pitcairn Enter., Inc., No. CIV.A.03-2398, 2005 WL 1213884, at *3 (E.D. Pa. May 18, 2005). "The issue of prejudice requires that we focus on

---

extract settlements."). Rather, Plaintiffs use these allegations solely to void the Releases that waive the class members' claims. In accordance with the notice pleading standard, the allegations as to these misrepresentations appear to have pled sufficient factual matter to make their claim plausible. Iqbal, 129 S. Ct. at 1949. The Court cannot find that such allegations are "futile" so as to warrant denial of leave to amend. See Agere Sys. Guardian Corp. v. Proxim, Inc., 190 F. Supp. 2d 726, 736 (D. Del. 2002) (stating that, in the absence of the full briefing, "the better course is to liberally allow amendments that state a colorable claim and defer judgment as to whether they survive a motion to dismiss for failure to state a claim until such time when that motion is raised.").

the hardship to the defendants if the amendment were permitted." <u>Cureton</u>, 252 F.3d at 273.

"But the non-moving party must do more than merely claim prejudice." <u>Bechtel</u>, 886 F.2d at

652. To state a cognizable claim of prejudice, the defendant must establish that it would be

"unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it

would have offered" had the allegations in the amended complaint been timely made. <u>Pegasus</u>

<u>Int'l, Inc. v. Crescent Mfg. Co.</u>, No. CIV.A.06-2943, 2007 WL 1030457, at *5 (E.D. Pa. Apr. 2,

2007) (quoting <u>Arthur</u>, 434 F.3d at 206) (further quotations omitted). A defendant may also be

burdened by being required to defend against new facts or leal theories that require entirely new

defenses. <u>See</u> <u>Tarkett</u>, 144 F.R.D. at 291. Notably, however, even when a proposed amended

complaint adds substantive allegations against a defendant, where "[t]he evidence required to

meet these new allegations is substantially similar to that which was originally required,"

prejudice does not exist. <u>Pegasus Int'l</u>, 2007 WL 1030457, at *5 (quoting <u>Dole v. Arco Chem.</u>

<u>Co.</u>, 921 F.2d 484, 488 (3d Cir. 1990)). Additionally, the need for additional discovery due to

amendment does not, without more, prejudice the non-moving party. <u>Dole</u>, 921 F.2d at 488;

<u>Amquip Corp. v. Admiral Ins. Co.</u>, 231 F.R.D. 197, 200-01 (E.D. Pa. 2005). Ultimately, the

non-moving party bears the burden of demonstrating prejudice. <u>Bechtel</u>, 886 F.2d at 652.

Defendants' claim of prejudice is sparse. Specifically, in their Response to the Motion

for Leave to Amend, Defendants argue:

> Plaintiffs' new allegations will undoubtedly result in additional discovery and
> cost. For one thing, plaintiffs seek to assert vague allegations that Allstate made
> "misrepresentations about the Release and the consequences of not signing it." . . .
> Allstate already has taken the depositions of all named plaintiffs, during which
> Allstate explored what plaintiffs relied on in deciding which option to select in the
> Preparing for the Future Group Reorganization Program and whether to sign the
> release. At the time Allstate deposed these plaintiffs, their complaint did not

assert that Allstate had made misrepresentations to plaintiffs. If plaintiffs are allowed to add these new conclusory allegations, Allstate will be required to re-take all of these depositions to inquire into each individual plaintiff's misrepresentation claims with respect to the release . . . . Likewise, plaintiffs' new theory of disparate impact also will require additional discovery of the plaintiffs. That is because plaintiffs' new, previously unasserted theory apparently focuses on events and actions occurring years *after* the Preparing for the Future program and possibly even *after* Allstate took plaintiffs' depositions.

(Defs.' Resp. Mot. Leave to Amend 12-13.) In their Sur-reply Brief, Defendants go on to contend that:

The full range of prejudice to Allstate cannot be gauged since plaintiffs have failed to explain the significance of their new and re-written allegations. What is clear, however, is that plaintiffs attempt to add (a) allegations of supposed misrepresentations by Allstate that they concede they did not allege before, and (b) a disparate impact claim that they also concede is new, that challenges events occurring years *after* the Preparing for the Future program. Both attempts will require significant additional discovery, including the re-taking of plaintiffs' depositions.

(Defs.' Sur-reply Br. 5-6.)

Under the prevailing jurisprudence, Defendants' claimed prejudice arguments are too ill-defined to meet their burden. First, as noted above, Plaintiffs, through various filings, put Defendants on clear notice that they sought to allege both a disparate impact claim and allegations of misrepresentation. The disparate impact claim was well-articulated in the Notice of Supplemental Authority. As to the misrepresentations, Plaintiffs offered a detailed argument, totaling approximately nine pages of briefing, in response to Defendants' prior motion for summary judgment. Defendants were able to sufficiently respond to these arguments without claiming unfair prejudice resulting from Plaintiffs' failure to previously plead them in the First Amended Complaint.

Second, Defendants have not shown that allowing the amendments at this juncture will deprive them of the opportunity to present facts or evidence which they would have offered if the allegations in the Second Amended Complaint had been made sooner.  As to the disparate impact claim, the additional discovery burden on Defendants will be minimal at best.  "A disparate impact violation is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer."  E.E.O.C. v. Metal Serv. Co., 892 F.2d 341, 346 (3d Cir. 1990).  Under this theory "a facially neutral employment practice may be deemed [illegally discriminatory] without evidence of the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case."  Raytheon Co. v. Hernandez, 540 U.S. 44, 52-53 (2003) (quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 645-46 (1989)).  Once the plaintiff identifies the specific employment practice that is challenged, he must show causation by offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applications for jobs or promotions because of their membership in a protected group."  Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994 (1988).  Accordingly, the discovery onus will fall on Plaintiffs to produce statistical evidence that the Mass Termination Plan disparately impacted older workers.  Only if Plaintiffs can succeed in this task will Defendants have to provide contrary evidence, possibly in the form of expert testimony.  As this case never previously proceeded to significant merits discovery, let alone expert discovery, the addition of the disparate impact claim will result in little prejudice to Defendants.

Similarly, the Court does not find that amendment of the Complaint to include the misrepresentation allegations will cause any unfair prejudice to Defendants. As noted above, the Third Circuit expressly ordered that this Court allow further discovery on precisely the issue of whether the employee agents signing of the release was "knowing and voluntary." Thus, regardless of whether the amendment is allowed, the discovery on this issue will have to occur.[8] To the extent Defendants argue that it will have to re-take all of the named Plaintiffs' depositions, the Court deems this burden unrelated to the proposed amendment. As noted by Plaintiffs, Defendants began the deposition process in late 2002, before Defendants had finished their own document production. Both parties agree that Plaintiffs did not learn of Defendants' alleged misrepresentations until after the completion of these depositions. Thus, even had Plaintiffs immediately moved for leave to amend in early to mid-2003, Plaintiffs' depositions would have already been done and Defendants would have had to repeat them.

Finally, allowing the requested amendments will not delay this case any further. As repeatedly discussed, the Third Circuit's ruling effectively voided any previous rulings made regarding the substantive issues in this case. Moreover, it mandated that discovery be reopened as to the most preliminary of the claims – the validity of the Release. For all intents and purposes, this nine-year litigation has returned to the early pre-trial stages. In light of this

---

[8] In their Reply brief, Plaintiffs state that "[i]t is not inconceivable that Plaintiffs will once again seek leave to amend their complaint after 'merits' discovery commences." (Pls.' Reply Br. 5 n.2.) The Court cautions Plaintiffs that any further amendment of the Complaint will be subject to stricter judicial scrutiny absent some showing that truly new information has come to light during discovery. At this juncture, Plaintiffs have had ample opportunity to fully think through their theories of the case.

unusual history, amendment of the Complaint will cause little, if any, delay in the progress of this case.

In short, Defendants will not suffer any *undue* prejudice from the requested amendments. Although Plaintiffs never formally amended their Complaint to include these changes prior to this time, Defendants were repeatedly put on notice of Plaintiffs' intent to argue these points. Moreover, Defendants will not be foreclosed from pursuing any necessary discovery, given that the discovery period has been effectively re-started. Finally, any delay in the case will result, not from the proposed amendment, but simply from this Court's efforts to both comply with the Third Circuit's remand instructions and place the case on an efficient course towards resolution.

   **D.    Plaintiffs' Failure to Explain the "Vast Scope" of Changes to Their Complaint**

In a last ditch effort to convince this Court to deny Plaintiffs' requested leave to amend, Defendants argue that the Second Amended Complaint effectively seeks a "re-do" of this case by requesting a vast number of amendments that would add at least 15 new paragraphs and change over 75 percent of the 189 paragraphs from the First Amended Complaint. Moreover, they claim that the full extent of Plaintiffs' proposed amendments is unclear from the red-line version of the Second Amended Complaint since there are some obvious inaccuracies in that red-lining. [9]

---

[9] For example, Defendant notes that, in the red-line version of the Second Amended Complaint, it would appear that Count IV of the Amended Complaint was entitled "Disparate Treatment and Disparate Impact," when in fact it was only entitled "Disparate Treatment." The Court finds this omission problematic, but not so prejudicial as to warrant denial of leave to amend.

Ultimately, Defendants conclude that Plaintiffs' failure to explain each and every change in the

Second Amended Complaint constitutes a failure to meet their burden under Rule 15(a) and

provides ample ground upon which the Court should deny the Motion for Leave to Amend.

Having reviewed the red-line version of the Second Amended Complaint,[10] the Court

takes note that the proposed amendments are indeed scattered over the length of the sixty-five

page document. The majority of those amendments, however, appear to relate directly to the

three broad changes discussed in this Memorandum: (1) the substitution of Plaintiff Benoit in

place of Plaintiff Gafner; (2) the addition of a disparate impact claim; and (3) the addition of

claims that Allstate made misrepresentations to the employee agents to induce them to sign the

Releases. To that extent the proposed changes are allowable.

Nevertheless, the sheer amount of proposed changes raises the question of whether some

of the amendments may not, in fact, be advancing the three aforementioned topics, but rather are

just included as a means of adding new factual averments to amplify already existing allegations.

See Freedom Med., Inc. v. Gillespie, No. CIV.A.06-3195, 2007 WL 2850589, at *6 (E.D. Pa.

Oct. 1, 2007) ("[t]o the extent . . . allegations add additional detail concerning existing claims,

they are unnecessary. Once a plaintiff has sufficiently pled a claim, there is no need to amend the

pleadings to provide additional background or support. Under the federal rules, the task of

---

[10] Plaintiffs supplied only a copy of the proposed Second Amended Complaint to the Court, without a red-line version reflecting the nature of each and every proposed change. Defendants attached a copy of the red-line version to their Response to Plaintiffs' Motion. While Defendants raise Plaintiffs' failure to provide the red-line copy with their Motion as evidence of bad faith, the Court notes that the law only requires that the Plaintiffs attach a copy of their proposed amended complaint. Johnston v. City of Philadelphia, 158 F.R.D. 352, 353 (E.D. Pa. 1994) (citing Centifanti v. Nix, 865 F.2d 1429, 1431 n.10 (3d Cir. 1989)).

defining the issues and developing facts for trial is left to discovery and summary judgment not

pleading practice.") (citing <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506, 512-13 (2002)).  While

the Court does not expect – and indeed does not desire to read – a line by line explanation of

each change made by the Second Amended Complaint, we do not blanketly approve the filing of

a document that includes amendments not expressly authorized in this decision.  As the Court

cannot, without guidance from the parties, ascertain which amendments, if any, are outside the

scope of this opinion, we hold that where the amendment either relates to one of the three topic

areas or is nothing more than a clarification of an already pled fact, and not otherwise

objectionable, the amendment is allowable.[11]


## III.     CONCLUSION

Undoubtedly, this case is mired in a web of facts, an unusual procedural history, and

complex controlling jurisprudence.  While the Court, like the parties, wishes to ensure the timely

resolution of the long-standing dispute at issue, the liberality of Rule 15 and issues of

fundamental fairness counsel this Court to permit the proposed amendment.  Given that the Third

Circuit has already directed a virtual re-litigation of many of the pertinent issues, such

amendment will neither overly burden the Court nor unduly prejudice the parties.  Accordingly,

---

[11]  For example, Defendants take issue with paragraphs 10 and 119 of the proposed Second
Amended Complaint to the extent they allege, for the first time, that, as a result of the
termination of their employment contracts, some agents "have taken their own lives."  (Defs.'
Resp. Mot. Leave to Amend 3 n.2.)  Such an allegation may indeed, as Defendants claim, be
"inflammatory," but it is nothing more than an amplification of Plaintiffs' previous averment
regarding the dilatory effects suffered by the terminated employee agents.  The Court will not
strike the averment from the Second Amended Complaint, but will consider whether such
evidence is admissible at trial during properly-timed motions *in limine*.

Plaintiffs' Motion for Leave to Amend is granted to the extent Plaintiffs seek to substitute Plaintiff Joseph Benoit in place of Douglas Gafner, add a disparate impact claim challenging the effects of the Mass Termination Program, and include allegations regarding Allstate's misrepresentations to employee agents about the Releases

      An appropriate order follows.