**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GENE R. ROMERO, et al. | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.    01-3894 |
| ALLSTATE INSURANCE COMPANY, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                        October 21, 2010

Currently pending before the Court is the Motion by Plaintiffs Gene R. Romero, et al. to

Compel Documents Related to the Release in Accordance with the Court's April 7, 2010 Case

Management Order.  For the following reasons, the Motion is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

The core of Plaintiffs' putative class action, which has been pending since August 1, 2001,

alleges that Allstate had originally employed a substantial number of insurance sales agents with the

promise that they would have a "guaranteed income" and lifetime "financial security" through a

compensation package that included a pension, profit sharing, and other employee benefit plans.

(Sec. Am. Compl. ¶ 1.)  In the 1990s, Allstate sought to get out from under the financial burden of

this promise by attempting to persuade these employee agents to convert to independent contractor

status, under the pretext that this status would give them more "entrepreneurial freedom" and a

capacity for greater earning power.  (Id. ¶ 2.)  When only a few of the employee agents voluntarily

relinquished their benefits, Allstate's President and Chief Executive Officer, Edward M. Liddy,

announced, in November 1999, that Allstate was instituting a "group reorganization program," under which approximately 6,300 employee agents would have their employment contracts terminated by June 30, 2000. (Id. ¶ 3.) These employee agents would be permitted to remain with Allstate as independent contractors only if they signed a release waiving their statutory and common law rights (the "Mass Termination Program"). (Id.) Allstate also imposed a moratorium on rehiring the employee agents to fill sales and customer service positions for the company. (Id.) This Mass Termination Program, either intentionally or in effect, allowed Allstate to replace older employee agents with younger hires. (Id. ¶ 6.) To further evade legal accountability, Allstate presented the employee agents with a choice: (a) sign a prepared General Release and Waiver Agreement ("Release") that waived the employee agents' right to challenge the legality of Allstate's conduct, and be permitted to either remain with Allstate as an independent contractor or leave Allstate and receive certain specified payments; or (b) not sign the Release and have their long-term relationship with Allstate severed entirely with none of the specified payments. (Id. ¶ 11.) Given these limited alternatives, over ninety-nine percent of the 6,300 employee agents signed the Release. (Id. ¶¶ 11-12.)

Several hundred of these employee agents, however, subsequently put Allstate on notice of allegations of class-wide age discrimination and/or retaliation by filing timely charges with the Equal Employment Opportunity Commission ("EEOC") and equivalent state agencies. (Id. ¶ 20.) The EEOC issued a ruling in which it characterized Allstate's conduct as "threats, coercion, and intimidation" and concluded that the Release was in violation of the ADEA. (Id. ¶ 12.) In light of the EEOC's finding, Plaintiffs initiated the action in federal court on August 1, 2001, and, on October 18, 2001, Plaintiffs filed their First Amended Complaint, which set forth seven Counts, as

follows: (1) a declaratory judgment deeming the Release invalid under Section 510 of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1140, the Age Discrimination in Employment Act, 29 U.S.C. § 623, and common law; (2) individual and class claims of interference with employment and retaliation in violation of Section 510 of ERISA with respect to the Plaintiffs' attainment and receipt of pensions and benefits under various employee benefit plans; (3) individual and class claims for retaliation in violation of Section 510 of ERISA; (4) "Discriminatory Termination and Retaliation in Violation of 29 U.S.C. § 623(a) and (d)" for both individuals and the class; (5) individual and class claims for breach of the R830 contract, which governed the employment relationship between Allstate and a subclass of Plaintiffs; (6) individual and class claims for breach of the R1500 contract, which governed the employment relationship between Allstate and a different subclass of Plaintiffs; and (7) individual and class claims for breach of fiduciary duty. (First Am. Compl. ¶¶ 132-189.)

Discovery began in April 2002 and, over the course of the next several years, the parties engaged in extensive motion practice, including the filing of cross-motions for summary judgment and the debate over class certification issues. On March 30, 2004, the Honorable John Fullam, of the United States District Court for the Eastern District of Pennsylvania, entered a Declaratory Judgment holding, in part, that the Releases signed by the employee agents were voidable so long as the employee agents tendered back all benefits received in connection with signing those Releases (the "tender back" requirement). Romero v. Allstate Ins. Co., Nos. CIV.A.01-3894, 01-6764, 01-7042, 2004 WL 692231, at *3-4 (E.D. Pa. Mar. 30, 2004). On June 20, 2007, however, Judge Fullam determined that he erred in his 2004 Declaratory Judgment and, as a result, vacated that decision. Romero v. Allstate Ins. Co., Nos. CIV.A.01-3894, 01-6764, 01-7042, 2007 WL 1811197,

at *1 (E.D. Pa. Jun. 20, 2007). He further granted summary judgment in Allstate's favor on the entirety of Plaintiffs' Amended Complaint. Id.

On November 26, 2007, Plaintiffs appealed this ruling to the United States Court of Appeals for the Third Circuit. Reviewing the history of this case, the Third Circuit noted that Plaintiff had not received the benefit of full discovery as to issues regarding the validity of the Releases, and noted that these issues were dispositive as to the rest of Plaintiffs' claims. Romero v. Allstate Ins. Co., 344 Fed. Appx. 785, 793 (3d Cir. 2009) ("plaintiffs had a relatively short period of class discovery, and . . . are entitled to discovery that is responsive to their requests related to the specific release-related issues the plaintiffs raised with the district court in their response to its March 21, 2007 Order."). The court went on to order that the District Court allow additional discovery and briefing, fully address whether the Releases are valid, and if necessary, decide all of the underlying claims and issues. Id. at 794.

On January 29, 2010, after remand from the Court of Appeals, this case was reassigned to the docket of the undersigned. In accordance with this remand, the Court entered a new Case Management Order, dated April 7, 2010, setting forth both discovery and motion deadlines. Plaintiffs then filed a Motion to Amend the Complaint. On July 28, 2010, this Court permitted the filing of a Second Amended Complaint, which made three distinct changes, including: (1) the substitution of Joseph L. Benoit for "holdout" plaintiff Douglas F. Gafner, Sr., who is now deceased and whose claims against Defendants were settled on a confidential basis while the matter was on appeal; (2) clarification that Plaintiffs assert a disparate impact claim under the ADEA insofar as they have alleged that over ninety percent of the employee agents subject to the Mass Termination Program were age forty or older as of November 16, 1999; and (3) amplification and correction of

certain factual averments to specifically include allegations that Defendants made misrepresentations to induce Plaintiffs and other employee agents to sign the Release. Romero v. Allstate Ins. Co., No. CIV.A.01-3894, 2010 WL 2996963 (E.D. Pa. July 28, 2010).

Just prior to the ruling on the Motion for Leave to Amend, Plaintiffs filed the present Motion to Compel Documents Related to the Release in Accordance with the April 7, 2010 Case Management Order. Defendants responded on July 23, 2010, and Plaintiffs filed a Reply Brief on August 13, 2010. The Court now turns to a discussion of this Motion.

## II.      STANDARD OF REVIEW

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that any party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). It is well settled that Rule 26 establishes a fairly liberal discovery policy. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). "As a general rule, discovery is permitted of any information that is relevant or may lead to the discovery of relevant evidence." Collins v. Derose, No. CIV.A.08-744, 2010 WL 1837803, at *1 (M.D. Pa. May 5, 2010).

Federal Rule of Civil Procedure 37 bestows upon the court enforcement powers to ensure parties' cooperation in the discovery process, by allowing a party to move for an order compelling production of documents. FED. R. CIV. P. 37(a)(3)(B). For purposes of a Rule 37 motion, "an evasive or incomplete disclosure" is treated as a failure to answer. Id. at 37(a)(4).

## III.      DISCUSSION

Plaintiffs' present Motion seeks an Order compelling Defendants to respond to the forty-five Requests for the Production of Documents served on March 5, 2010. According to Plaintiffs, Defendants have asserted boilerplate objections to each and every document request, have failed to

produce any documents for nearly half of the document requests, and have objected to producing electronic documents in native format with accompanying metadata. Although the parties engaged in a "meet and confer" in an effort to resolve this dispute, they were unable to reach any mutually agreeable solution. As such, the Court now rules on the issues raised by Plaintiffs' Motion.

### A. Document Request Nos. 1-3, 6, 10-15, 19-20, 22-24, and 33-42

Plaintiffs first move to compel Defendants' responses to Request for the Production of Document Nos. 1-3, 6, 10-15, 19-20, 22-24, and 33-42. In their supporting briefs, Plaintiffs have set forth reasonable and valid bases for making each of these discovery requests. Despite having initially objected, Defendants now make no attempt to counter Plaintiffs' arguments or otherwise substantiate the previously-lodged boilerplate objections.

It is well-established that "[t]he party opposing discovery has the burden to raise an objection, then the party seeking discovery must demonstrate the relevancy of the requested information." Corrigan v. Methodist Hosp., 158 F.R.D. 54, 57 (E.D. Pa. 1994). "Once this showing is made, the burden switches again to the party opposing discovery to show why discovery should not be permitted." Id.

Pursuant to such jurisprudence, Plaintiffs have adequately demonstrated the relevance of the above-listed Requests. In the face of such a showing, Defendants have failed to meet their opposing burden of establishing why discovery should not be permitted as to these Requests. Accordingly, to the extent Defendants have not fully responded to Request Nos. 1-3, 6, 10-15, 19-20, 22-24, and 33-42, Plaintiffs' Motion to Compel is granted.

### B. Request Nos. 4-5, 7-9, 16-17, 43-45

With respect to Request Nos. 4-5, 7-9, 16-17, and 43-45, Plaintiffs' Motion to Compel again

sets forth a detailed explanation of how such Requests are relevant to the present matter.  In

response, however, Defendants contend that all of these Requests go to Plaintiffs' theory that the

Releases signed by the employee agents were invalid as part and parcel of an illegal scheme.[1]  They

go on to argue that:  (1) the "part and parcel" doctrine is limited to antitrust cases and thus

inapplicable to an employment discrimination case; (2) the ADEA independently protects

employees from the use of Releases to further an illegal scheme; and (3) Plaintiffs have failed to

prove the operation of the "part and parcel" on the facts of this case.  Ultimately, Defendants

conclude that because the "part and parcel" theory is not legally viable, they should not be required

to respond to the above-listed Requests to the extent they are directed to that theory.

 These arguments, however, are mooted by a plain reading of the Third Circuit's mandate.

Upon vacating the district court finding that the Releases were valid, the Third Circuit expressly

stated:

> We believe the District Court should reexamine the validity of the release, ***after
> allowing further discovery into the facts surrounding the signing of the releases.***
> The plaintiffs had a relatively short period of class discovery, and approximately half
> of the documents Allstate produced were documents from the <u>Isbell</u> litigation.  While
> <u>Isbell</u> is certainly relevant to the plaintiffs' cases here, ***the plaintiffs are entitled to
> discovery that is responsive to their requests related to the specific release-related
> issues*** the plaintiffs raised with the District Court in their response to its March 21,
> 2007, Order:  ***that the releases were part of an illegal scheme***; that they were not
> signed knowingly or voluntarily; and that they were unconscionable.

<u>Romero</u>, 344 Fed. Appx. at 793 (emphasis added).  The court went on to note that:

> If, ***after discovery and briefing on these issues***, the District Court determines that
> the releases are valid, then the claims in <u>Romero I</u>, Count II of <u>Romero II</u>, and <u>EEOC</u>

---

[1]  "The part and parcel doctrine provides that a release is invalid if the release itself was
'an integral part of a scheme to violate the antitrust laws.'"  <u>Fresh Made, Inc. v. Lifeway Foods,
Inc.</u>, No. CIV.A.01-4254, 2002 WL 31246922, at *3 (E.D. Pa. Aug. 9, 2002) (quoting <u>VKK
Corp. v. Nat'l Football League</u>, 244 F.3d 114, 125 (2d Cir. 2001) (citations omitted)).

are barred.  If, however, the District Court determines that the releases are not valid, the District Court needs to address all of the underlying claims and issues that it did not decide in its June 20, 2007, Order, some of which we referred to above, namely, the common law claims of breach of contract and breach of fiduciary duty and all the claims in <u>Romero II</u>.  We are confident that on remand the parties can spell these out for the District Court, as they have done for us on appeal, including the plaintiffs' claim that discovery as to these issues and the release should be permitted.

<u>Id.</u> at 794 (emphasis added).

This unambiguous language makes clear that Plaintiffs are fully entitled to briefing on their theory that the Releases are void because they are "part and parcel" of an illegal scheme.  Although Defendants cite to the last sentence of the above paragraph for the proposition that the Third Circuit did not preclude Allstate from objecting to discovery on the grounds that the "part and parcel" doctrine has no legal applicability to this case, (Defs.' Resp. Mot. to Compel 8-9), this argument fails to read the entire opinion in context.  The Third Circuit unequivocally stated that "plaintiffs are entitled to discovery [on the issue of whether] the releases were part of an illegal scheme."  <u>Romero</u>, 344 Fed. Appx. at 793.  It then explained that only "***after*** discovery and briefing on these issues," and ***after*** any finding that the Releases are invalid, should the Court reach the underlying claims and issues, which would include the applicability of the "part and parcel" theory to the present case and whether any further discovery on that theory should be permitted.  <u>Id.</u> at 794 (emphasis added).  At no point does the Third Circuit permit Defendants to object to the very discovery that the opinion just ordered them to produce.

This Court's Case Management Order ("CMO") of April 7, 2010 full comports with such a reading of the Third Circuit's mandate.  The CMO states that "Plaintiffs shall not be required to complete discovery as to their contention that the Releases are void as 'part and parcel' of an illegal scheme until after the Court has ruled on the applicability of the 'part and parcel' doctrine to these

cases." (Case Management Order at ¶ II.C (Apr. 7, 2010).) Contrary to Defendants' claims, nothing in this provision can remotely be construed as limiting or precluding Plaintiffs' ability to take discovery on its "part and parcel" theory at this stage of the litigation. Rather, the Order expressly recognizes that after the discovery on the validity of the Releases is complete, after the Court rules on the validity of the Releases, and in the event that the Court finds that the part and parcel doctrine is applicable to this case, Plaintiffs shall have the opportunity to take *further* discovery on this theory in an effort to prove its underlying claims of an illegal scheme.

In short, the Court holds that Plaintiffs are entitled to discovery relevant to proving that the Releases are void under a "part and parcel" theory. Without offering an opinion as to whether that theory is applicable to this case, is legally viable, or has been proven by Plaintiffs, the Court grants Plaintiffs' Motion to Compel Responses to these Requests for the Production of Documents.

**C.** **Request Nos. 18 and 21**

Defendants next object to Request for the Production of Documents Nos. 18 and 21, which state as follows:

> 18. Documents Relating to the interpretation or enforcement of the non-compete, confidentiality or exclusive work provisions of the R830 Contract and R1500 Contract.

> 21. Documents Relating to Your [Allstate's] representation . . . that Allstate will treat any attempt by former Agents to contact Allstate policyholders or customers (or any person whose identity was discovered as a result of the status as an Allstate agent) in whatever form, as solicitation.

(Pls.' Mot. to Compel, Ex. C, Request Nos. 18 & 21.) Defendants objected to Request No. 18, in part, as "vague, ambiguous, overly broad, . . . unduly burdensome . . . not properly limited in time and seek[ing] information not related to the subject matter of this litigation and not reasonably

calculated to lead to the discovery of admissible evidence." (Id., Ex. D, Response to Request No.

18.) As to Request No. 21, Defendants objected to it as "overly broad and unduly burdensome to

the extent that it seeks information not related to the validity of the Release . . . [and] to the extent it

mischaracterizes [certain information]." (Id. at Response to Request No. 21.)

Defendants now challenge these Requests on the sole ground that their time frame is

unrestricted, meaning that they are seeking all documents Allstate has in its possession with respect

to Allstate's interpretation or enforcement of provisions in its contracts with thousands of agents.

Because Plaintiffs "fail to offer any explanation or justification for why documents relating to

Allstate's enforcement of contractual provisions spanning several decades are relevant to the

validity of the Release," Defendants contend that they need not respond to these Requests. (Defs.'

Resp. Mot. to Compel 18-19.)

In response, Plaintiffs offer the convincing explanation that although these Requests do not

impose a specific date range, they seek relevant documents, created over time, necessary to evaluate

specific representations made by Defendants in connection with the Releases.[2] In particular,

Plaintiffs contend that, when attempting to intimidate or induce the various employee-agents into

signing the Releases, Defendants made false representations about the nature of the contracts which

they were attempting to cancel. If Defendants had previously taken a contrary position about the

interpretation of those contracts in the past, it would tend to show that the representations made

around the time that Releases were being promoted were fraudulent inducements.

_____

[2] Plaintiffs also argue that Defendants have waived any temporal objection by failing to assert it with specificity. The Court disagrees. Defendants explicitly objected to Request No. 18 on the ground that it was "not properly limited in time." (Pls.' Mot. to Compel, Ex. D.) In addition, it asserted that Request No. 21 was "overbroad." (Id.) For purposes of the present Motion, the Court deems such objections sufficient to preserve Defendants' temporal argument.

In light of such facts, the Court deems the Requests relevant and tending to lead to discovery of admissible evidence.  Moreover, the Court cannot discern – and Defendants tellingly do not suggest – any temporal limitation on these Requests that would still result in their intended effect.  Finally, Defendants have failed to show that the amount of documents responsive to such Requests is so substantial as to be unduly burdensome.  Accordingly, the Court grants Plaintiffs' Motion to Compel as to Request Nos. 18 and 21.

   **D.      Request Nos. 25-32**

   In their objections to Request Nos. 25-32, Defendants assert that these Requests seek documents related to supposed "misrepresentations" by Allstate with request to:  (a) planned or actual reductions or changes in commission after June 2000; and (b) performance standards that would apply to agents entering the Exclusive Agent program.  Defendants now argue that such Requests should be denied since Plaintiffs do not point to any paragraph of their Amended or Second Amended Complaints alleging that Allstate made representations or misrepresentations with respect to these issues.  Without a factual predicate to support such Requests, they are, according to Defendants, nothing more than an improper "fishing expedition."

   This objection, however, is merely a rehash of an argument already rejected by both the Third Circuit and this Court.[3]  As noted above, when remanding the case, the Third Circuit dictated that "the plaintiffs are entitled to discovery that is responsive to [the allegation that the Releases] ***were not signed knowingly or voluntarily***."  Romero, 344 Fed. Appx. at 793 (emphasis added).  Following remand, this Court considered Plaintiffs' Motion to Amend its Complaint, which sought,

---

   [3]  The Court recognizes that Defendants' Response Brief on this Motion was filed five days prior to the decision on the Motion for Leave to Amend, thereby depriving Defendants of the benefit of the Court's thoughts on their "misrepresentation theory" argument.

in part, to amplify and correct certain factual averments to specifically include allegations that

Defendants made misrepresentations to induce Plaintiffs and other employee agents to sign the

Release. Citing to the Third Circuit's opinion, this Court expressly allowed such allegations, as

follows:

> In light of this background, this Court now finds that Plaintiffs' proposed amendment to include Allstate's misrepresentations regarding the signing of the Release is not only warranted, but indeed required by the Third Circuit. . . . Recognizing the potential injustice occasioned by the lower court's sudden turnabout, the Court of Appeals directed that discovery occur as to the circumstances regarding the signing of the Release – which by its nature covers issues regarding Allstate's alleged misrepresentations. Allowing such misrepresentations now to be affirmatively included via the Second Amended Complaint will therefore result in no additional burden on this Court and will occasion no additional delay in the procession of this case.

Romero, 2010 WL 2996963, at *12. In addition, the Court rejected Defendants' argument that

Plaintiffs' new misrepresentation allegations failed to put them on notice on the nature of this

argument:

> A full reading of the Second Amended Complaint reveals multiple allegations concerning the essence of the misrepresentations. (See Sec. Am. Compl. ¶¶ 78-79, 80, 86, 91, 97-101, 103.) Contrary to Defendants' arguments, such allegations are not subject to a heightened pleading standard because, unlike with a fraud or intentional misrepresentation claim, Plaintiffs are not seeking to impose any type of liability on Defendant due to the misrepresentations. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997) (noting that the purpose of the heightened pleading standard for allegations of fraud and intentional misrepresentation is to give defendants notice of the claims against them, provide an increased measure of protection for their reputations, and reduce the number of frivolous lawsuit brought solely to extract settlements). Rather, Plaintiffs use these allegations solely to void the Releases that waive the class members' claims. In accordance with the notice pleading standard, the allegations as to these misrepresentations appear to have pled sufficient factual matter to make their claim plausible. Iqbal, 129 S. Ct. at 1949.

Id. at *12 n.7.

With respect to the current Motion, the Court does not find Plaintiffs' discovery submissions to be simply a "fishing expedition" in order to expose some cause of action. Rather, Request Nos. 25-32 go directly to the misrepresentation theory expressly pled by Plaintiffs and allowed by this Court in the Second Amended Complaint. As such, Plaintiffs' Motion to Compel responses to these Requests is granted.

As a final point, however, Allstate argues, by way of a footnote, that Request Nos. 26 and 29 are objectionable on the additional grounds that they are temporally overbroad. These Requests ask for documents sufficient to show (a) the timing and amounts of reductions or changes in commission rates that Defendants have implemented since June 30, 2000 with respect to Exclusive Agents and (b) documents relating to programs Defendants have implemented or adopted since June 30, 2000 with respect to termination of Agents or Allstate agencies deemed to be low-performing or otherwise not meeting production standards, expected results, or sales quotas. (Pls.' Mot. Compel, Ex. C, Request Nos. 26, 29.) The Court agrees that to the extent these Requests seek documents from 2000 all the way to the present, they are not all relevant to the validity of the Release. Accordingly, in an effort to impose a more reasonable time limitation, the Court orders responses to Request Nos. 26 and 29 only to the extent they seek information from June 30, 2000 to December 31, 2002.

### E.    **Production of Metadata**

The next point of contention between the parties concerns the format in which Plaintiff has demanded that responsive documents be produced. Specifically, Instruction 8 to Plaintiffs' Document Requests states: "[i]f any Document is maintained in an electronic, digital or imaged

format, the Document shall be produced in 'native' format, together with all associated metadata."[4]

(Pls.' Mot. to Compel, Ex. C, Instr. 8.)  Defendants argue that such a demand is untenable for three

reasons:  (1) it is contrary to the parties' previous agreement regarding the format of electronic

discovery; (2) because Allstate's collection of Release-related documents occurred ten years ago

when Plaintiffs first requested such documents without specifying the need for metadata, Plaintiffs

are not entitled to re-production of the same documents now with metadata; and (3) neither Fed. R.

Civ. P. 34 nor prior court decisions require Allstate to produce the extensive amount of metadata

that Plaintiffs now demand without a showing of a "particularized need" for it.

The Court does not find any of Defendants' arguments convincing.  First, Defendants

contend that prior to producing any documents in this matter, the parties reached an agreement

regarding the format of electronic discovery.  Specifically, Defendants cite to an October 1, 2002

letter between counsel that states:

> This letter is to confirm our understanding of the agreement reached last Friday with
> regard to the exchange of electronic discovery.  We agreed that
>
> 1.    Each side will produce its documents in the form of single-page TIF[F]
>        images suitable for use in Concordance;
>
> 2.    The documents will have Bates numbers on each page;
>
> 3.    Each side will produce a log file in electronic form that will indicate the
>        beginning and ending Bates numbers of each document;
>
> 4.    Each side will produce the electronic images and log file for receipt by the
>        other side on Tuesday October 8, 2002;
>
> 5.    For technical questions, Geoff Garoutte . . . for the plaintiffs and Mike — . . .
>        for defendant may converse.  An attorney will participate in a conversation
>        only if the other side's attorney is also present.

---

[4] "Metadata is defined as 'information describing the history, tracking, or management of an electronic document.'" Wyeth v. Impax Labs., Inc., 248 F.R.D. 169, 171 (D. Del. 2006) (quoting Shirley Williams, et al. v. Sprint/Mgmt. Co., 230 F.R.D. 640, 646 (D. Kan. 2005) (further quotations omitted)).

(Defs.' Resp. Mot. to Compel, Ex. 19.)  Over the course of the next few months, and two more times in the ensuing three years, Allstate produced documents in accordance with this agreement. (Id. Ex. 20.)

Defendants, however, have made no showing that this "understanding" – entered into eight years ago –  was applicable to anything other than the parties' then-existing document requests.  The October 1, 2002 letter is broadly-worded with no specification as to the scope of its application. Moreover, when Plaintiffs initially made the current request for documents in "native" format with associated metadata, Defendants never referenced any previous "understanding" of how documents should be produced.[5]  Accordingly, the Court finds no basis to impose the October 2002 "understanding" on document requests served eight years later and after substantial new developments have occurred in this matter.

In their second argument, Defendants contend that nearly ten years ago, they collected and produced Release-related documents in accordance with the parties' previously-established document production agreement.  Under well-established jurisprudence, Plaintiffs are not entitled to duplicate prior discovery requests, this time requesting metadata that neither they previously sought nor Allstate agreed to produce.  (Defs.' Resp. Mot. to Compel 23.)  While the Court agrees that prevailing case law supports the notion that it is unduly burdensome for a party to effectively "redo" a production of documents as a result of a belated request for metadata, see Ford Motor Co. v Edgewood Props., Inc., 257 F.R.D. 418, 425-26 (D.N.J. 2009), this argument is mooted by Plaintiffs' concession that they are only seeking the production of metadata on a going-forward

---

[5]  Although Defendants complain that Plaintiffs did not seek to confer on this request during the parties' meet and confer on May 26, 2010, it was likely because Defendants had not objected to this formatting prior to this time.

basis and not on any documents already produced.  (Pls.' Mot. to Compel 17 & n.14.)  Thus, Defendants' argument on this ground is denied

Third and finally, Defendants argue that "neither Federal Rule of Civil Procedure 34 nor prior court decisions require Allstate to produce the extensive amount of metadata Plaintiffs now demand."  (Defs.' Resp. Mot. to Compel 24.)  They go on to argue that Plaintiffs have not shown a "particularized need," as is their burden, for the extensive metadata requested – a showing that is impossible given that most of the "essential information" highlighted by Plaintiffs is available on the face of the document.

Under Federal Rule of Civil Procedure 34, a party may specify the form of production of documents as including metadata and the responding party then must either produce it in the form specified or object.  Aguilar v. Immigration and Customs Enforcement Div. of U.S. Dept. of Homeland Sec., 255 F.R.D. 350 (S.D.N.Y. 2008) (citing FED. R. CIV. P. 34(b)).  To resolve disputes regarding the production of metadata, many courts have turned to the Sedona Principles and Sedona Commentaries thereto, which are "the leading authorities on electronic document retrieval and production."  Ford Motor Co., 257 F.R.D. at 424 (citing William A. Gross Constr. Assoc., Inc. v. Am. Mfrs. Mut. Ins. Co., 256 F.R.D. 134, 136 (S.D.N.Y. 2009) ("[t]his Court strongly endorses The Sedona Conference Cooperation Proclamation"*)*; John B. v. Goetz*,* 531 F.3d 448 (6th Cir. 2008) (following The Sedona Principles); Aguilar, 255 F.R.D. at 355-56 (S.D.N.Y. 2008) (same)).[6]

---

[6] "The Sedona Conference . . . a nonprofit legal policy research and education organization, has a working group comprised of judges, attorneys, and electronic discovery experts dedicated to resolving electronic document production issues.  Since 2003, the Conference has published a number of documents concerning ESI, including the Sedona Principles.  Courts have found the Sedona Principles instructive with respect to electronic discovery issues."  Aguilar, 255 F.R.D. at 355-56.

Appendix E to <u>The Sedona Guidelines</u> explains the importance of metadata:

> Certain metadata is critical in information management and for ensuring effective retrieval and accountability in record-keeping. Metadata can assist in proving the authenticity of the content of electronic documents, as well as establish the context of the content. Metadata can also identify and exploit the structural relationships that exist between and within electronic documents, such as versions and drafts. Metadata allows organizations to track the many layers of rights and reproduction information that exist for records and their multiple versions. Metadata may also document other legal or security requirements that have been imposed on records; for example, privacy concerns, privileged communications or work product, or proprietary interests.

<u>Williams v. Sprint/United Mgmt. Co.</u>, 230 F.R.D. 640, 647 (D. Kan. 2005) (citing THE SEDONA GUIDELINES: BEST PRACTICE GUIDELINES & COMMENTARY FOR MANAGING INFORMATION & RECORDS IN THE ELECTRONIC AGE, App. E (The Sedona Conference Working Group Series Sept. 2005 Version), *available at* http://www.thesedonaconference.org/content/miscFiles/7 05TSP.pdf.).

Principle 12 of the Sedona Principles expressly recognizes that the request for metadata is not outside the scope of normal electronic discovery:

> Absent party agreement or court order specifying the form or forms of production, production should be made in the form or forms in which the information is ordinarily maintained or in a reasonably usable form, ***taking into account the need to produce reasonably accessible metadata that will enable the receiving party to have the same ability to access, search, and display*** the information as the producing party where appropriate or necessary in light of the nature of the information and the needs of the case.

<u>Aguilar</u>, 255 F.R.D. at 356 (quoting THE SEDONA PRINCIPLES SECOND EDITION; BEST PRACTICES RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DOCUMENT PRODUCTION, Principle 12 (The Sedona Conference Working Group Series June 2007 Version), *available at* http://www.thesedonaconference.org/content/miscFiles/TSC_PRINCP_2nd_ed_607.pdf) (emphasis

added).[7] "Thus, the producing party ordinarily must take into account the need for metadata to make otherwise unintelligible documents understandable." Ford Motor Co., 257 F.R.D. at 425.

Multiple courts have found that, in light of the emerging recognition of the benefits of producing metadata, the burden falls on the party objecting to its production to show undue hardship and expense. See Camesi v. Univ. of Pittsburgh Med. Ctr., No. CIV.A.09-85J, 2010 WL 2104639, at *7 (W.D. Pa. May 24, 2010) ("Although a clear showing of undue hardship and/or expense may excuse Defendants' production in native format, the fact that such a production may be more useful or cause less expense to Plaintiffs obviously will not."); In re Netbank, Inc. Secs. Litig., 259 F.R.D. 656, 681-82 (N.D. Ga. 2009) ("Although the Defendants have listed a number of hypothetical problems with providing documents in native format, they have not asserted these to be actual problems arising in the present case. . . . The Defendants having given no good reason why they should not produce Mr. Brown's requested documents in native format, the Motion to Compel production of ESI information in native format is granted."); Ford Motor Co., 257 F.R.D. at 425 ("[T]he producing party ordinarily must take into account the need for metadata to make otherwise unintelligible documents understandable."); In re Payment Card Interchange Fee & Merchant Discount, No. MD.05-1720, 2007 WL 121426, at *4 (E.D.N.Y. Jan. 12, 2007) (granting motion to compel under Advisory Committee's proviso to Rule 26 that data ordinarily kept in electronically searchable form "should not be produced in a form that removes or significantly degrades this feature").

---

[7] Notably, in this revised version of Principle 12, the Conference eliminated the previously-imposed presumption against the production of metadata found in the first edition and "placed greater weight on the enhanced accessibility and functionality that metadata provides to the recipients of ESI." Aguilar, 255 F.R.D. at 356.

Given these principles, Defendants' claim that Plaintiff cannot show the requisite "particularized need" for metadata must fail. Primarily, although Defendants make a blanket statement that they object to the production of native documents and metadata as unduly burdensome, (Defs.' Resp. Mot. to Compel 21), Defendants never detail how such a production would impact them. Indeed, at no point do Defendants make any allegation that they will be financially burdened or prejudicially harmed by the production of metadata. This is unsurprising in light of the fact that metadata, as a general rule, must be affirmatively removed from a document. See Wyeth v. Impax Labs., Inc., 248 F.R.D. 169, 171 (D. Del. 2006) ("Removal of metadata from an electronic document usually requires an affirmative alteration of that document, through scrubbing or converting the file from its native format to an image file, for example.").

Moreover, even if the Court were to require a showing of a "particularized need," Plaintiffs have done so. As argued in their Reply Brief:

> Plaintiffs are requesting standard metadata concerning, among other things, the custodian of the document, the creation date of the document, the date the document was modified, the original path, the searchable extracted text, and all attachments to the documents. . . . This information is relevant to Plaintiffs' challenges to the Release (Count I). By way of example only, because Plaintiffs' challenges to the Release focus, in part, upon what Defendants knew and intended, including whether Defendants knew the Release was part of an illegal scheme, violated the OWBPA, or was conditioned upon duress and misrepresentations, Plaintiffs need to know when particular documents, like internal power-point presentations, emails, and drafts of the Release, were created and modified, in whose custodial files those documents exist (and existed), and any and all embedded information about who created, received, and manipulated those documents and where they were stored.
>
> Apart from its clear relevance to Plaintiffs' substantive claims, the requested metadata is also crucial for Plaintiffs to be able to search, understand, and use the documents to be produced by Defendants. . . . Thus, the requested metadata is necessary for Plaintiffs to be able: (a) to understand what attachments were attached to what emails; (b) to verify the authenticity of documents; (c) to understand when documents were actually created or modified by Defendants (or their agents); (d) to

understand what custodians possessed what documents, thereby allowing Plaintiffs to use those documents during particular depositions; (e) to sort, review, and search electronic documents by metadata fields; and (f) to understand the creation and storage context of the documents themselves. Without this essential information, Plaintiffs will not be able to search, understand, and use the documents in any meaningful way – that is, the same way Defendants can use these electronic documents as they exist in their native state.

(Pls.' Mot. to Compel 19-20 (footnotes omitted).) The Court finds these arguments particularly compelling in light of the fact that this action is styled as a nationwide class action involving potentially thousands of individuals that were employed by a large corporate defendant.[8] Metadata will provide Plaintiffs with crucial information and permit them to engage in a more effective and meaningful search and use of Defendants' extensive documentation.

---

[8] None of the cases cited by Defendants convince this Court otherwise. For example, in Covad Commc'ns Co. v. Revonet, Inc., 267 F.R.D. 14, 20 (D.D.C. 2010), the court declined plaintiff's request for metadata because the parties "have bigger fish to fry, and that it is not in the interest of judicial expediency to send defendant's counsel on what may be a futile task to find the origins of hard copy documents that have already been produced in a usable format. Moreover, [plaintiff] does not offer a word as to why it needs native format to analyze and use the 2,832 pages it already has." Id. The court did not require plaintiff to make any showing of particularized need, but simply recognized that where discovery was already produced, where defendants had alleged hardship in an already complicated case, and where plaintiff had not even suggested why they needed the metadata, the court exercised its discretion to deny the request for metadata. Id.; see also Reeves v. Case Western Reserve Univ., No. CIV.A.07-1860, 2009 WL 3242049, at *16 n.37 (N.D. Oh. Sep. 30, 2009) (cursorily noting in a tangential footnote sentence that metadata "ordinarily need not produced absent the showing of some particularized need for that data" (emphasis added)); Wyeth, 248 F.R.D. at 171 (noting under the former and unrevised version of principle 12 of the Sedona Principles that there is a presumption against the production of metadata, but also finding that "the producing party must preserve the integrity of the electronic documents it produces. . . . Failure to do so will not support a contention that production of documents in native format is overly burdensome."); Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, No. CIV.A.05-138, 2006 WL 5097354, at *8 (E.D. Ky. Dec. 18, 2006) (finding, under the first version of Principle 12 of the Sedona Principles and the circumstances of the particular case, that metadata was not necessary absent a showing of particularized need by plaintiff, but acknowledging that plaintiff could make limited requests for metadata as to specified documents).

In short, the Court finds that Plaintiffs are entitled to have documents produced in native format with their associated metadata. Notably, however, this finding is limited only to documents not already produced by Defendants in response to prior discovery requests by Plaintiff in this case. To the extent such documents are being produced for the first time, Plaintiffs' Motion to Compel is granted.

### F.    Disclosure of Prior and Current Search Methodology

Defendants also object to Plaintiffs' Request for the Production of Documents to the extent that Plaintiffs seek an order compelling Allstate to confer with Plaintiffs concerning additional relevant custodians and search terms, and what searches Allstate conducted in the past, "so that Plaintiffs receive all relevant documents concerning the Release." (Defs.' Resp. Mot. to ompel 26-27 (quoting Pl. Mot. to Compel 24-25).) Defendants argue that "Allstate is under no obligation to provide plaintiffs with a list of the search terms Allstate has employed in the past or the method by which Allstate searched for responsive materials." Id. at 27. Moreover, they claim that because such information is attorney work product, it need not be disclosed.

The Court agrees in part and disagrees in part. It is well-established that communication among counsel is crucial to a successful electronic discovery process:

> The Federal Rules of Civil Procedure, case law, and the Sedona Principles all further emphasize that electronic discovery should be a party-driven process. Indeed, Rule 26(f) requires that the parties meet and confer to develop a discovery plan. That discovery plan must discuss "any issues about disclosure or discovery of [ESI], *including the form or forms in which it should be produced.*" Fed. R. Civ. P. 26(f)(3)(C) (emphasis added). In fact, the commentary to the rule specifically notes that whether metadata "should be produced may be among the topics discussed in the Rule 26(f) conference." Fed. R. Civ. P. 26(f) advisory committee's note, 2006 amendment.

Aguilar, 255 F.R.D. at 358. Indeed, the Sedona Conference has advised that:

Cooperation . . . requires . . . that counsel adequately prepare prior to conferring with opposing counsel to identify custodians and likely sources of relevant ESI, and the steps and costs required to access that information. It requires disclosure and dialogue on the parameters of preservation. It also requires forgoing the short term tactical advantages afforded one party to information asymmetry so that, rather than evading their production obligations, parties communicate candidly enough to identify the appropriate boundaries of discovery. Last, it requires that opposing parties evaluate discovery demands relative to the amount in controversy. In short, it forbids making overbroad discovery requests for purely oppressive, tactical reasons, discovery objections for evasive rather than legitimate reasons, and "document dumps" for obstructionist reasons. In place of gamesmanship, cooperation substitutes transparency and communication about the nature and reasons for discovery requests and objections and the means of resolving disputes about them.

Trusz v. UBS Realty Investors LLC, __ F.R.D. __, 2010 WL 3583064, at *4-5 (D. Conn. Sep. 7, 2010) (quoting "The Case for Cooperation," 10 SEDONA CONF. J. 339, 344-45 (2009) (footnote omitted)). Among the items about which the court expects counsel to "reach practical agreement" without the court having to micro-manage e-discovery are "search terms, date ranges, key players and the like." Id. (quoting 10 SEDONA CONF. J. at 217 (footnote omitted)). "Moreover, '[t]he use of key words has been endorsed as a search method for reducing the need for human review of large volumes of ESI [,]' to be followed by 'a cooperative and informed process [which includes] sampling and other quality assurance techniques.'" Id. (quoting 10 SEDONA CONF. J. at 223 (alteration in original) (footnotes omitted)). Thus, counsel are generally directed to meet and confer to work in a cooperative, rather than an adversarial manner, to resolve discovery issues. SEC v. Collins & Aikman Corp., 256 F.R.D. 403, 415 (S.D.N.Y. 2009).

Considering these principles of cooperation, the Court deems it reasonable to compel the parties to confer and come to some agreement on the search terms that Defendants intend to use, the custodians they intend to search, the date ranges for their new searches, and any other essential details about the search methodology they intend to implement for the production of electronically-

stored information concerning the Release. Such a process will eliminate duplicative discovery and help ensure that the searches remain narrowly focused on the core issues present in this case. Moreover, the Court does not find that such information is subject to any work product protection, as it goes to the underlying facts of what documents are responsive to Plaintiffs' document requests and does not delve into the thought processes of Defendants' counsel. See Upjohn Co., v. United States, 449 U.S. 383, 395-96 (1981) ("Protection of the privilege extends only to communications and not to facts. The fact is one thing and a communication concerning that fact is entirely different." (quotations omitted)); see also Smith v. Life Investors Ins. Co. of Am., No. CIV.A.07-681, 2009 WL 2045197, at *7 (W.D. Pa. Jul. 9, 2009) (rejecting argument that work product doctrine protected search terms that opposing counsel used in conducting discovery); Doe v. Dist. of Columbia, 230 F.R.D. 47, 56 (D.D.C. 2005) (Rule 26(b)(1) may be construed to allow for discovery of document production policies and procedures and such information is not protected under the work product doctrine).[9]

To the extent, however, that Plaintiffs seek a retrospective view of the searches Defendants have already conducted during the course of discovery over the past eight and half years, the Court is not inclined to compel such disclosures. To require Defendants to compile a list of all search terms, custodians, and other methods of searching used in the past would result in an undue burden

---

[9] Defendants' citation to Spork v. Peil, 759 F.2d 312 (3d Cir. 1985) for the proposition that an attorney's search methods in responding to discovery is protected by the work product doctrine is not compelling. The Third Circuit, in that case, found that counsel's selection and grouping of certain documents out of the thousands produced during the litigation, in preparation for a deposition, revealed counsel's thought process about his understanding of the case. Id. at 316. To the contrary, in this case, Plaintiffs ask defense counsel to reveal not what documents they believe are relevant to the case, but rather what documents are, as a matter of fact, responsive to Plaintiffs' discovery requests.

on Defendants that is not justified by any potential benefit to Plaintiffs. Although Plaintiffs argue that "without knowing the search methodology for Defendants' previously-produced documents, [they] cannot evaluate the new searches that Defendants propose will result in the identification and production of electronic documents 'not previously produced,'" (Pls.' Reply Br. 24), the Court is confident that the parties can coordinate their efforts on a forward-going basis to share information about what has already been completed and what needs to be done in order to avoid duplicative discovery. Thus, this portion of Plaintiffs' Motion is denied.

G.    **Defendants' Certification of Preservation of Documents**

In the final section of their Motion, Plaintiffs seek to have this Court compel Defendants to submit a certification that they have complied with their discovery obligations and taken necessary steps to preserve all relevant electronically-stored information since the date that they reasonably anticipated litigation. It reasons that Defendants' scant document production to date, in a case of this magnitude, suggests that Defendants either failed to fulfill their discovery obligations in the past or failed to take necessary steps to preserve all relevant documents. Defendants object, claiming that Plaintiffs have provided no factual or legal basis for this request.

It is well-settled that "[a] party which reasonably anticipates litigation has an affirmative duty to preserve relevant evidence." Bowman v. Am. Med. Sys., Inc., No. CIV.A.96-7871, 1998 WL 721079, at *3 (E.D. Pa. Oct. 9, 1998); see also Hohider v. United Parcel Serv., Inc., 257 F.R.D. 80, 82 (W.D. Pa. 2009) (same). "Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" Chirdo v. Minerals Techs., Inc., No. CIV.A.06-5523, 2009 WL 2195135, at *1 (E.D. Pa. Jul. 23, 2009) (quoting Mosaid Techs., Inc. v. Samsung Elec. Co., Ltd., 348 F. Supp. 2d 332,

335 (D.N.J. 2004)).  "'Evidence of spoliation may give rise to sanctions [which] include:  dismissal of a claim or granting judgment in favor of a prejudiced party; suppression of evidence; an adverse inference, referred to as the spoliation inference; fines; and attorneys' fees and costs.'"  Id. (quoting Mosaid Techs., 348 F. Supp. 2d at 335).

In the present matter, Plaintiffs have yet to produce sufficient evidence of any such spoliation for this Court to require that Defendants provide any type of certification regarding its document retention policies and procedures.  Should Plaintiffs become privy to such information in the future, they will be well-protected by the available sanctions for spoliation set forth in our jurisprudence.  For the time being, however, the Court denies this portion of Plaintiffs' Motion.

## IV.   CONCLUSION

For all of the foregoing reasons, Defendants will be compelled, within twenty days from the date of the accompanying Order, to respond to all of Plaintiffs' Requests for the Production of Documents as set forth herein, produce all associated metadata, and engage in well-intentioned meet and confer sessions with Plaintiffs' counsel to discuss search strategies on a going-forward basis. Defendants, however, shall not be required to re-produce already previously-provided documents, disclose past search strategies, or provide any certification as to its document retention policies.

An appropriate Order follows.