**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GENE R. ROMERO, et al., | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | NO. 01-3894 |
| v. | : | |
| | : | CONSOLIDATED WITH |
| | : | |
| ALLSTATE INSURANCE COMPANY, et al. | : | NO. 01-6764 |
| | : | NO. 01-7042 |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                          October 6, 2014

Currently pending before the Court is the Motion for Class Certification of Plaintiffs

Gene R. Romero, et al. (collectively "Plaintiffs") and Plaintiffs' accompanying Motion to Strike

the Declaration of Martin H. Redish submitted by Defendants Allstate Insurance Company et al.

(collectively "Allstate").  For the following reasons, the Motion to Strike is granted and the

Motion for Class Certification is denied.

I.      **FACTUAL BACKGROUND**

As this Court has previously stated, the factual and procedural history of this case is long

and tortured, commencing in 1999 and continuing to the present day.  The underlying facts are

well known to the parties and were reviewed in great detail in the Court's Memorandum Opinion

dated February 27, 2014.  In lieu of rehashing this complicated history, the Court incorporates by

reference the recitation of facts set forth in the previous Memorandum.  Romero v. Allstate Ins.

Co., 1 F. Supp. 3d 319, 2014 WL 796005, at *1–27 (E.D. Pa. Feb. 27, 2014).

Nevertheless, for purposes of the Motion for Class Certification, a brief summary of the

core facts giving rise to this matter provides some instructive context.  This case revolves around

Allstate's announcement and implementation of its Preparing for the Future Group

Reorganization Program ("the Program").  Prior to November 1999, the majority of Allstate's

captive agency force acted as employee agents under either an R830 or an R1500 contract and

were entitled to a wide range of company-sponsored health, welfare, and retirement benefits.  On

November 10, 1999, Allstate announced the Program by noting that, as part of a new business

model, it was reorganizing its entire captive agency force into a single exclusive agency

independent contractor program.  With few exceptions, Allstate terminated the employment

contracts of the 6,200-plus R830 and R1500 employee agents effective no later than June 30,

2000.  While the Program applied to all agents regardless of age, productivity, or performance,

approximately ninety percent of the R830/R1500 agents were over forty years of age.

In connection with the termination of the R830 and R1500 employment contracts,

Allstate offered the agents working under those contracts four options.  The first three options

were conditioned upon the agents' agreement to execute a release of claims, while the fourth

option was not.  The first "release-based" option was the "EA Option."  According to the

Program Information Booklet, this option would allow the agent to enter into an R3001C or

R3001S Agreement, thereby converting the agent from an employee to an Exclusive Agent

("EA") independent contractor.  The agent would then be entitled to all of the benefits and

requirements of that contract, including increased renewal commissions, a conversion bonus,

earlier transferability in the agent's book of business, debt forgiveness, and reimbursement for

moving expenses if necessary.  The R3001 contract, however, did not entitle agents to the same

employee benefits.

The second option was the "Sale Option."  This option also permitted an agent to enter

into an R3001C/S Agreement with Allstate, thus converting the agent to an EA independent contractor.  In turn, the agent would receive a "conversion bonus" and Allstate would forgive any advances owed, assume certain lease and advertising obligations the agent incurred as an employee agent, and permit the agent, after thirty days' service as an EA, to sell his or her book of business written while an R830 or R1500 agent.  This option also required the agent to sign a release.

The third option was the "Enhanced Severance Option."  Under this option, Allstate would pay the agent "enhanced" severance equal to one year's pay based on the greater of 1997 or 1998 total compensation, forgive debt and/or expenses that Allstate had advanced to the agent, and relieve the agent of certain lease and advertising obligations incurred as an R830 or R1500 agent.  This option was unavailable unless the agent signed a release.

The final option was the "Base Severance Option."  If an agent elected this option, then Allstate paid him or her up to thirteen weeks of pay.  The agent electing this option did not need to enter into a release, although he/she was subject to certain additional non-compete and non-solicitation obligations.  Notably, Allstate had determined that agents affected by the Program were ineligible for the pre-existing severance or post-termination pay plans because they were not terminated for any of the reasons set forth in those plans.  Allstate also took the position that the pre-existing severance/post-termination pay plans were inapplicable because they did not apply to group reorganization programs.

The Release required by the first three options was three pages long, including a signature page.  The Release and Waiver Provision stated:

In return for the consideration that I am receiving under the Program, I hereby

3

release, waive, and forever discharge Allstate Insurance Company, its agents, parent, subsidiaries, affiliates, employees, officers, shareholders, successors, assigns, benefits plans, plan administrators, representatives, trustees and plan agents ("Allstate"), from any and all liability, actions, charges, causes of action, demands, damages, entitlements or claims for relief or remuneration of any kind whatsoever, whether known or unknown, or whether previously asserted or unasserted, stated or unstated, arising out of, connected with, or related to, my employment and/or the termination of my employment and my R830 or R1500 Agent Agreement with Allstate, or my transition to independent contractor status, including, but not limited to, all matters in law, in equity, in contract, or in tort, or pursuant to statute, including any claim for age or other types of discrimination prohibited under the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act, the Employee Retirement Income Security Act ("ERISA"), the Illinois Human Rights Act, and the West Virginia Human Rights Act as those acts have been amended, or any other federal, state, or local law or ordinance or the common law. I further agree that if any claim is made on my behalf with respect to any matter released and waived above, I hereby waive any rights I may have with respect thereto and agree not to take any payments or other benefits from such claim. I understand that this release and waiver does not apply to any future claims that may arise after I sign this Release or to any benefits to which I am entitled in accordance with any Allstate plan subject to ERISA by virtue of my employment with Allstate prior to my employment termination date.

(Allstate's Mot. Summ. J. on the Validity of the Release, Heinz Decl., ECF No. 370, Nos.

Civ.A.01-3894, 01-6764, Ex. 186 ("Release"), at ARI 004101.)

    As a result of this Program and Release, several employee agents subject to the Program

brought age discrimination charges against Allstate with the Equal Employment Opportunity

Commission ("EEOC") and subsequently initiated two federal cases against Allstate:  Romero v.

Allstate Ins. Co., No. Civ.A.01-3895 ("Romero I") and Romero v. Allstate Ins. Co., No.

Civ.A.01-6746 ("Romero II").  Shortly thereafter, the EEOC brought its own action against

Allstate, on December 27, 2001, alleging that Allstate unlawfully retaliated against all employee

agents, in violation of the ADEA and other federal employment statutes, by refusing to permit

them to continue as Allstate employees unless they signed the Release.  Via this action, the

EEOC sought a declaratory judgment that the Release is invalid.  (EEOC v. Allstate Ins. Co., No. Civ.A.01-7042 ("EEOC v. Allstate").)

On February 27, 2014, the Court issued a more than 150-page Opinion ruling on the parties' Cross-Motions for Summary Judgment as to the Validity of the Release.[1]  Romero v. Allstate Ins. Co., 1 F. Supp. 3d 319 (E.D. Pa. 2014).  In that Memorandum, the Court found that although the Release at issue satisfied the statutory prerequisites of the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1), a genuine issue of material fact existed as to whether Plaintiffs knowingly and voluntarily signed the Release under a totality of the circumstances test.  Id. at *81.  Accordingly, the Court denied both parties' Motions and directed that the issue regarding the validity of the Release be decided by a jury.  Subsequently, on March 13, 2014, the Court granted Allstate's Motion for Summary Judgment on the EEOC's claim and dismissed that action in its entirety.  Romero v. Allstate, Ins. Co., 3 F. Supp. 3d 313 (E.D. Pa. 2014).

On May 23, 2014, Plaintiffs filed the current Motion for Class Certification of Certain Release Issues Pursuant to Fed. R. Civ. P. 23(c)(4) and 23(b)(2).  Allstate responded on June 30, 2012, and Plaintiffs filed a Reply Brief on July 28, 2014, making this Motion ripe for judicial consideration.

## II.    MOTION TO STRIKE DECLARATION

As an initial matter, the Court must address Plaintiff's Motion to Strike the Declaration of Martin H. Redish.  Professor Redish is a Professor of Law and Public Policy at Northwestern

---

[1]  For purposes of brevity, the Court does not rehash the extensive procedural history of this case, much of which took place in proceedings before both another judge and the Third Circuit Court of Appeals.

University School of Law.  In addition, he is the author or co-author of sixteen books and over

100 scholarly articles, including one of the leading civil procedure casebooks in the nation, and is

one of the primary revisers of Moore's Federal Practice.  His Declaration—submitted in

conjunction with Allstate's Response in Opposition to the Motion for Class Certification—is a

lengthy, law review-like statement on the propriety of class certification in this case, and is

broken up into the following sections: (1) the benefits and risks of the modern class action; (2)

doctrinal and rule-based methods of assuring the fairness and efficiency of the class action; and

(3) application of the cost-benefit efficiency and fundamental and fairness analyses to the

Romero Plaintiff's Motion for Class Certification.  In presenting his position, Professor Redish's

Declaration relies on case law, well-known legal treatises, and various law review articles.

Plaintiffs now contend that the Declaration is nothing more than a legal opinion that is outside

the scope of permissible expert testimony.  Allstate responds that the Declaration is being

submitted only to the Court, and not to a jury, and will be helpful to the Court in deciding the

complicated issue of class certification.

       As a threshold matter, the court must determine whether Federal Rule of Evidence 702

and the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.

579 (1993), present any barriers to the court's consideration of the expert opinions of Professor

Redish.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
> or data, (2) the testimony is the product of reliable principles and methods, and (3)
> the witness has applied the principles and methods reliably to the facts of the case.

6

Fed. R. Evid. 702.  Rule 702 places district courts in the role of "gatekeeper," requiring courts to "'ensure that any and all [expert] testimony . . .  is not only relevant, but reliable.'"  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert, 509 U.S. at 589).  The party offering an expert must demonstrate, by a preponderance of the evidence, that the expert's qualifications and opinions comply with Federal Rule of Evidence 702.  See Daubert, 509 U.S. at 592–93 (citation omitted).  Rule 702 has "a liberal policy of admissibility."  Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (citation omitted).

The Third Circuit has not explicitly addressed the question of whether expert testimony must satisfy Daubert at the class certification stage.  The Supreme Court, however, has strongly suggested that a full Daubert examination may be necessary prior to class certification.  See Wal-Mart Stores, Inc. v. Dukes, ____ U.S. ___, 131 S. Ct. 2541, 2553–54 (2011) ("The District Court concluded that Daubert did not apply to expert testimony at the certification stage of class-action proceedings.  We doubt that is so . . ." (internal citation omitted)).  Furthermore, the Third Circuit has explained that "opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under Daubert or for any other reason."  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 323 (3d Cir. 2005).  "Inherent in that statement is the conclusion that a court could, at the class certification stage, exclude expert testimony under Daubert."  Behrend v. Comcast Corp., 655 F.3d 182, 215 n.18 (3d Cir. 2011) (Jordan, J., concurring in the judgment in part and dissenting in part).

Interpreting these holdings to mean that Daubert principles are relevant at the class certification stage, the Court thus reviews Professor Redish's Declaration for admissibility.  It is

well established that expert testimony that usurps the role of either the jury or the court is not

admissible.  Charles A. Wright & Victor J. Gold, Federal Practice & Procedure § 6264 (2d ed.

1997).  As explained by the Third Circuit:

> [T]he District Court must ensure that an expert does not testify as to the governing
> law of the case.  Although Federal Rule of Evidence 704 permits an expert witness
> to give expert testimony that "embraces an ultimate issue to be decided by the trier
> of fact," an expert witness is prohibited from rendering a legal opinion . . . .  Such
> testimony is prohibited because it would usurp the District Court's pivotal role in
> explaining the law to the jury.

Berckley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006) (internal citations omitted).

In the present case, Professor Redish's Declaration clearly violates the foregoing

principles.  While Allstate goes to great lengths to portray the nature of this case as excessively

complicated and Professor Redish's testimony as specialized and unique, the fact remains that

Professor Redish's Declaration is nothing more than a legal opinion.  Indeed, as noted above,

Professor Redish offers no particularized knowledge of any of the factual issues relevant to a

class certification analysis.  Rather, he puts forth his own legal analysis—based on his experience

as a legal scholar—of the factors that he believes the Court should weigh most heavily in its Rule

23 consideration and how the Rule 23 factors advocate against class certification.  His opinion is

based in case law and citation of law reviews and treatises.  In other words, Professor Redish's

Declaration can either be considered an additional brief in support of Allstate's Opposition to the

Motion for Class Certification—one not authorized by Court rules—or a proposed judicial

opinion.  While the Court acknowledges that Professor Redish likely possesses both a fine grasp

of these legal issues and an awareness that Rule 23 concerns present several unique challenges to

jurists, the Court is specifically charged with conducting its own individual analysis of the issues.

Were his Declaration to be given weight as an "expert" opinion, the Court would essentially be abdicating its duties and permitting Professor Redish to usurp the Court's role as the legal expert.[2]  Accordingly, the Court declines to consider his Declaration and strikes it.

## III.    MOTION FOR CLASS CERTIFICATION

Having disposed of this preliminary matter, the Court now turns to Plaintiffs' request for class certification with respect to specific issues in this case.  Rule 23 of the Federal Rules of Civil Procedure contains the prerequisites for class certification.  Dukes, 131 S. Ct. at 2548.  A class may be certified only if the court is satisfied after a "rigorous analysis" that the prerequisites of Rule 23 have been satisfied.  Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006).  The analysis must include separate determinations as to the suitability of each claim for certification.  See Wachtel v. Guardian Life Ins. Co. of Am., 453 F.3d 179, 187 (3d Cir. 2006).

To obtain class certification, plaintiffs must initially establish that each requirement of Rule 23(a) is met, together with one of the requirements of Rule 23(b).  Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).  Pursuant to Rule 23(a), a class may be certified only if:

---

[2]  The Court acknowledges Allstate's citation to Midwestern Machinery v. Northwest Airlines, Inc., 211 F.R.D. 562, 568 (D. Minn. 2001)—wherein the court permitted the expert opinion from a law professor concerning class certification issues—but disagrees with the conclusion reached in that case.  First, contrary to Allstate's statement in its brief, the Midwestern Machinery court did not explain that "'testimony by an attorney or legal scholar on legal issues' can be permissible in class certification proceedings."  (Def.'s Resp. Opp'n Class Cert. 6.)  Rather, the court rejected plaintiff's argument that the affidavit constituted an inadmissible legal opinion and violated local rules regarding limits on legal memoranda because, "[t]aken to the extreme, Plaintiffs' theory would argue against testimony by any attorney or legal scholar on legal issues."  Midwestern Mach., 211 F.R.D. at 568.  Second, that case arose in the District of Minnesota.  The Third Circuit—by whose dictates this Court is bound—has made clear that expert testimony that usurps the role of the court is not admissible.

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. Civ. P. 23(a).  If the requirements of Rule 23(a) are satisfied, Rule 23(b) sets forth the types of class actions which may be maintained.  Plaintiffs, in this case, move for certification under Rule 23(b)(2), which states that "[a] class action may be maintained if Rule 23(a) is satisfied and if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

The current case, however, presents somewhat of a deviation from the typical certification analysis as Plaintiffs seek only a limited certification, under Federal Rule of Civil Procedure 23(c)(4), of certain individual issues.  Rule 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."  Fed. R. Civ. P. 23(c)(4).  Certification of particular issues under Rule 23(c)(4) is only proper if the other requirements of Rule 23(a) and (b) are first met.  7A C. Wright, A. Miller, & R. Kane, Federal Practice & Procedure § 1790, at 590 (2005).  The Third Circuit has held that issue certification is a matter left to the Court's discretion, but the decision to certify a particular issue, like any other certification decision under Rule 23, "must be supported by rigorous analysis."  Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 200–02 (3d Cir. 2009).  It has reasoned that when deciding whether to certify an issue class, the trial court should consider:

the type of claim(s) and issue(s) in question; the overall complexity of the case; the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives; the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy; the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues; the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

Gates v. Rohm and Haas Co., 655 F.3d 255, 273 (3d Cir. 2011) (the "Gates factors").  This list, however, is non-exclusive.  Id.  The interplay between the requirements for class certification under Rule 23(a) and (b) and the recognition of issue classes under Rule 23(c)(4) "'is a difficult matter that has generated divergent interpretations among the courts.'"  Id. (quoting Hohider, 574 F.3d at 200 n.25).  Nevertheless, "[c]ourts frequently use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual adjudication."  Carroll v. Stettler, No. 10–2262, 2011 WL 5008349, at *4 (E.D. Pa. Oct. 19, 2011) (citing Chiang v. Veneman, 385 F.3d 236, 267 (3d Cir. 2004)).  The Third Circuit has instructed that when certifying an issue class, the issues to be tried should be clearly enumerated.  Gates, 655 F.3d at 273 (citing Wachtel v. Guardian Life Ins. Co. of Am., 453 F.3d 179, 184–85 (3d Cir. 2006)).  Likewise, the district court should explain how the remaining issues will be resolved.  Id. (citing Principles of the Law of Aggregate Litigation §§ 2.02(e) (2010)).

At issue in the present case is the validity of the Release signed by the Plaintiffs in this matter and whether it forecloses Plaintiffs' substantive claims.  Plaintiffs' Motion for Class

11

Certification presently seeks certification of a class consisting of "all employee agents whose R830 or R1500 contract with Defendant Allstate Insurance Company was involuntarily terminated as part of its 'Preparing for the Future' Group Reorganization Program (the 'Program') and who executed the Release in connection therewith." (Pls.' Mem. Supp. Mot. Class Cert. 1.)  With respect to that class, Plaintiff limits its request for class certification to four questions, as follows:

1. <u>Involuntariness Under Federal Standard</u>: Did Allstate structure and implement the Program such that employee agents could not have signed the Release voluntarily under the totality of the circumstances, thereby rendering the Release of federal claims invalid?

2. <u>Unconscionability</u>: Did Allstate Structure and implement the Program such that (a) it deprived the class of any meaningful choice but to sign the Release and/or (b) the terms Allstate presented were grossly unreasonable and favorable to Allstate, thereby making the Release unenforceable?

3. <u>Unclean Hands</u>: Did Allstate act inequitably, deceitfully, or in bad faith towards the class in structuring and implementing the Release requirement, thereby making the Release unenforceable?

4. <u>Part and Parcel</u>: Was the Release an integral or essential part of Allstate's program to involuntarily terminate the R830 and R1500 contracts of its employee agents such that Allstate would not have gone forward with the *en masse* terminations without it?

(Pls.' Mot. Class Certification 1–2.)

The Court must determine whether such questions should be certified for class treatment under Rule 23(c)(4).  Applying the <u>Gates</u> factors enumerated by the Third Circuit to each of the questions presented by Plaintiffs yields the inescapable conclusion that certification would be unmanageable in this matter.  The Court addresses each proposed issue separately.[3]

---

[3] Given that Plaintiffs are not entitled to class certification under Rule 23(c)(4), the Court need not address the parties' arguments regarding Rule 23(a) and (b).  Notably, however, the

12

A.    **Involuntariness Under Federal Standard**

The first question on which Plaintiffs seek certification asks whether Allstate structured and implemented the Program such that employee agents could not have signed the Release voluntarily under the totality of the circumstances, thereby rendering the Release of federal claims invalid.  The Court finds certification of this question to be improper on several grounds.

First, Plaintiffs rely on an incorrect theory that Allstate's conduct alone—*i.e.*, structuring the Release so as to make it impossible for any proposed class member to make a voluntary decision to release his or her claims—would invalidate the Release under the totality of the circumstances.  This argument misunderstands the nature of the "totality of the circumstances" analysis and fails to recognize that class issues are inextricably intertwined with individual questions.

As the Court noted previously, an employee may validly waive claims of discrimination against an employer if the waiver is made knowingly and willfully.  Coventry v. U.S. Steel Corp., 856 F.2d 514, 522 (3d Cir. 1988) (citing Alexander v. Gardner–Denver Co., 415 U.S. 36, 52 (1974)); Potoski v. Wilkes Univ., No. Civ.A.06-2057, 2010 WL 3811973, at *13 (M.D. Pa. Sept. 22, 2010).  In determining the validity of a waiver, courts consider general principles of contract construction; however, "[i]n light of the strong policy concerns to eradicate discrimination in employment, a review of the totality of the circumstances, ***considerate of the particular individual who has executed the release***, is also necessary."  Coventry, 856 F.2d at 522–23

_____

Court would be inclined to find that Plaintiffs have met their burden under both Rule 23(a) and (b), particularly since the questions proposed for certification focus solely on Allstate's conduct with respect to the Release and do not require consideration of issues individual to the various Plaintiffs.  The problem arises with respect to whether these particular questions are properly framed and advance the resolution of this matter under Rule 23(c)(4).

13

(emphasis added).  This totality of the circumstances inquiry is made considering the following
factors:

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and
> business experience; (3) the amount of time the plaintiff had for deliberation about
> the release before signing it; (4) whether plaintiff knew or should have known his
> rights upon execution of the release; (5) whether plaintiff was encouraged to seek,
> or in fact received benefit of counsel; (6) whether there was an opportunity for
> negotiation of the terms of the agreement; and (7) whether the consideration given
> in exchange for the waiver and accepted by the employee exceeds the benefits to
> which the employee was already entitled by contract or law.

Cirillo v. Arco Chem. Co., 862 F.2d 448, 451 (3d Cir. 1988) (citing Coventry, 856 F.2d at 523),

superseded by statute as stated in Long v. Sears Roebuck & Co., 105 F.3d 1529, 1539 (3d Cir.

1997) (holding that the Older Workers Benefit Protection Act supersedes Cirillo with respect to

the Age Discrimination in Employment Act of 1967).  "This list, however, is intended to be

illustrative rather than exhaustive."  Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 8

(1st Cir. 2007).  The court "may also consider 'whether there is evidence of fraud or undue

influence, or whether enforcement of the agreement would be against the public interest.'"

Cuchara v. Gai-Tronics Corp., 129 F. App'x 728, 731 (3d Cir. 2005) (quoting W.B. v. Matula,

67 F.3d 484, 497 (3d Cir. 1995)).  In short, "[t]he essential question is 'whether in the totality of

the circumstances, *the individual's* waiver of his right can be characterized as "knowing and

voluntary."'"  Baba v. Warren Mgmt. Consultants, Inc., 882 F. Supp. 339, 344 (S.D.N.Y.)

(quoting Laniok v. Advisory Comm., 935 F.2d 1360, 1368 (2d Cir. 1991) (emphasis added)),

aff'd, 89 F.3d 826 (2d Cir. 1995).

     Repeatedly, courts have found that the question of whether a release was knowingly and

voluntarily entered into requires investigation into individual circumstances, thus rendering it

unsuitable for class resolution.  For example, in <u>Walker v. Asea Brown Boveri, Inc.</u>, 214 F.R.D. 58 (D. Conn. 2003), the court declined to certify a class regarding whether a release—entered into at the same time the plaintiffs signed severance agreements—was knowingly and voluntarily executed.  <u>Id.</u> at 65.  The plaintiffs argued that "the circumstances under which they signed the severance agreements and releases did not provide either [plaintiff] with an opportunity to negotiate the terms of the agreement, and therefore the court could not possibly conclude that the plaintiffs knowingly and voluntarily executed the agreements."  <u>Id.</u>  The court, however, found that "a fact-specific inquiry will be necessary to determine whether either of the named plaintiffs knowingly and voluntarily waived their rights to pension benefits under the Plan."  <u>Id.</u> at 66  Similarly, in <u>Spann v. AOL Time Warner, Inc.</u>, 219 F.R.D. 307 (S.D.N.Y. 2003), the plaintiffs brought various ERISA claims which the defendant contended were barred by a release that the plaintiffs claimed was involuntarily signed.  <u>Id.</u> at 319.  Declining to certify a proposed class, the court remarked that, "[t]o the extent that the Releases could provide a defense as to recovery under the claims posed in this lawsuit, that defense requires a fact-specific inquiry into the circumstances of the execution of each individual's release . . . . The necessity for an individualized inquiry means that, so long as it is appropriate to consider the Releases at all, their existence presents an insurmountable barrier to class-wide adjudication of these claims."  <u>Id.</u>; <u>see also</u> <u>Ciarlante v. Brown & Williamson Tobacco Corp.</u>, No. Civ.A.9-4646, 1995 WL 764579, at *2 (E.D. Pa. Dec. 18, 1995) ("With respect to the employees who signed releases, however, the threshold issue of whether those releases should be declared invalid or rescinded would assume major importance.  That issue is ill-suited to class treatment, since the state of mind of each individual signer would presumably need to be explored."); <u>Romero v. Flaum Appetizing Corp.</u>,

No. Civ.A.07-7222, 2011 WL 812157, at *6 (S.D.N.Y. Mar. 1, 2011) ("[A]ssuming Plaintiffs

attack the releases, which there is no reason to believe they would not, the Court would need to

perform a detailed, fact-specific inquiry regarding whether each release was entered into

'knowingly and voluntarily.'").

In this case, the Court found that  the choice presented by Allstate appeared to be either

(a) sign the Release or (b) face likely financial ruin—a Hobson's choice.  Such circumstances, we

noted, suggested that Plaintiffs' decisions to sign the Release resulted from the Allstate-created

take-it-or-leave-it predicament that undermined a finding of voluntariness.  Nonetheless, the

Court declined to conclusively find the Release invalid based solely on that determination, noting

that:

> At the core of this analysis, the Court is left with the task of drawing inferences from
> the evidence, weighing the credibility of witnesses, and affixing a characterization
> to the events that occurred.  On one hand, a methodical analysis under a strict
> application of the enumerated totality of the circumstances factors yields a finding
> that the Release, while not necessarily desirable, was supported by some
> consideration and was the product of the educated free will of the Plaintiffs upon
> being given ample opportunity to consult with counsel and carefully read the terms
> of the Program.  On the other hand, that methodical application of a defined set of
> factors offers a short-sighted view of what occurred in this matter.  Underneath the
> impression conveyed by the more rigid analysis lies an alternate—and very
> plausible— picture that Allstate forced its employees into signing a Release with no
> real option for them other than losing their investments, their livelihood, their health
> coverage, and their retirement benefits.  While the Court is tempted to find as a
> matter of law that these circumstances deprived the Release of the requisite
> voluntariness, the competing stories offered by the parties, considered in the totality
> of the circumstances, create a genuine question of fact as to whether Plaintiffs
> voluntarily waived their rights to bring a federal claim.  Such a question is not
> properly decided by a Court as a matter of law, but rather is best resolved by a jury.

Romero, 1 F. Supp. 3d 319.  In so ruling, the Court essentially accepted the fact that Allstate

structured the Release and Program to make signing a virtually involuntary choice, but that the

mere existence of such common evidence, standing alone, was an insufficient basis on which to invalidate the Release.

While Plaintiffs now ask this Court to find that the voluntariness issue can be decided on these facts alone, (Pls.' Mem. Supp. Class Cert. 23), such a proposition is mistaken.  In the previous ruling, the Court clearly determined that a finding of involuntariness required looking at the *totality* of the circumstances and not just simply at Allstate's conduct.[4]  Indeed, it remains entirely plausible that, notwithstanding Allstate's structuring of the Program, an individual class member may have voluntarily signed the Release in order to obtain some of the lucrative benefits available to him or her under the Program.  As aptly noted by Allstate, a trier of fact simply

_____

[4]  Although Plaintiffs cite to both Coventry v. United States Steel Corp., 856 F.2d 514 (3d Cir. 1988) and Torrez v. Pub. Serv. Co. of N.M., Inc., 908 F.2d 687 (10th Cir. 1990) for the proposition that "[a] release is not signed voluntarily when it presents plaintiffs with a 'Hobson's choice,'" neither of those cases stand for such a broad proposition.  (Pls.' Mem. Supp. Class Cert. 23.)  In Coventry, the Third Circuit considered the totality of the circumstances of the single plaintiff in that case and reversed the district court's finding that the release was voluntary. Coventry, 856 F.2d 523–25.  In doing so, the court did not hold that a "Hobson's choice" scenario automatically invalidates a release.  Rather, it noted that "[t]hese circumstances *illustrate* that [plaintiff's] decision to sign the release was not the result of negotiation between him and his employer and, further, that Hallas was placed in precisely the 'take it or leave it' predicament that *supports a finding* that his decision was not knowingly and willfully made" and that these circumstances should have been "considered" by the district court in its analysis.  Id. at 524 (emphasis added).  Ultimately, the Third Circuit's reversal of the district court's voluntariness decision was based on consideration of multiple factors considered in light of the plaintiff's individual situation.  Id. at 525.  The court ruled that there were "significant indicia that [the plaintiff's] decision to execute the waiver did not result from a volitional choice between real options, and that, *for him*, the absence of counsel resulted in a decision the legal significance of which he did not understand completely."  Id. (emphasis added).
In Torrez, the Court noted that the plaintiff faced a "Hobson's choice" because he "was in the unenviable position of having to sign the release or lose his retirement benefits."  Id. at 690.  Despite the fact that, like Coventry, there was only one plaintiff involved, and despite the fact that it was clear that the release was structured as a take it or leave it proposition, the Tenth Circuit found that genuine issues of material fact  remained as to whether the release was knowingly and voluntarily signed under the totality of the circumstances test.  Id.

17

cannot decide whether it was possible for a class member to have signed the Release voluntarily, based on Allstate's conduct alone, without looking at the situation from the perspective of each individual. Multiple individual factors will bear on that analysis, including Plaintiffs' financial situations, the lucrativeness of their books of business, how much money they had invested in their agencies, their income at the time of the Program, and whether they admitted in discovery that they voluntarily signed the Release. Ultimately, a trier of fact must combine those factors, together with the common evidence regarding Allstate's conduct, in order to determine voluntariness. As the proposed class question simply cannot be separated from the multiple individual questions, certification is improper.[5]

Second, even assuming Plaintiffs' theory was correct and a jury finding of "yes" on the first proposed question could automatically invalidate the Release, the efficiencies to be gained from certification are minimal at best. Plaintiffs expressly concede that, "[i]f the named Plaintiffs win these certified questions, the Release will be invalidated as to the class as a whole. If not, then separate trials will need to be held whereby each agent who was not a plaintiff in the first trial will get to present individualized evidence about his or her unique circumstances to show that the Release is invalid." (Pls.' Reply Br. 2; see also Pls.' Mem. Supp. Class Cert. 35 ("[R]esolution of all the common Release issues *against the class* will not prevent class members from challenging the Release based on their individual circumstances") (emphasis in original).) In other words, efficiencies in resolution occur *only* if the trier of fact answers "yes"

---

[5] Allstate also argues that courts have refused to certify a class where, as here, plaintiffs contend they were provided misleading or inaccurate information, thereby making the execution of a release not "knowing." The question proposed for certification by Plaintiffs, however, does not involve any decision into whether the Release was knowingly signed. As such, the Court need not address this argument.

to the certified question.  If the trier of fact answers "no," then the Court faces the potential

scenario of having to conduct individual trials for more than 6,000 Release-signing agents who

wish to prove that, under their individual circumstances, the Release was not signed knowingly

and voluntarily.  Such trials will necessarily involve re-examination of evidence and findings

from the certified questions and will risk subsequent triers of fact reaching inconsistent

conclusions.  By not certifying this question, on the other hand, the approximately thirty named

Plaintiffs can immediately proceed to trial in small groups.  All common and individualized

evidence may be presented, and the jury will be tasked with making individual rulings on the

validity of the Release as to each Plaintiff.  While still somewhat unwieldy, such a procedural

alternative is certainly superior to the method proposed by Plaintiffs.

In sum, the Court finds that under the Rule 23(c)(4) factors, certification of the first

question proposed by Plaintiffs is improper.  Accordingly, the Motion as to that question is

denied.

### B.      Unconscionability

The second question put forth by Plaintiffs for class certification asks "[w]hether Allstate

structured and implemented the Program such that (a) employee agents had no meaningful choice

but to sign the Release and/or (b) the terms Allstate presented were grossly unreasonable and

favorable to Allstate, thereby rendering the Release unconscionable."  Plaintiffs contend that the

Release is unenforceable as to all claims if it is unconscionable, which considers both the

procedural as well as the substantive elements of the bargain—that is, whether one party lacked

any meaningful choice but to accept the terms and/or whether those terms were unreasonably

favorable to the other party.  They reason that certification of this issue will address the multiple

common issues which focus solely on Allstate's conduct, including: whether Allstate structured and implemented the Program such that employees had no meaningful choice but to sign the Release; the nature of the Release itself; and the other common evidence regarding what class members lost, to Allstate's gain, when they signed the Release.

Again, the Court disagrees with Plaintiffs for several reasons.  First, as the Court noted in its summary judgment opinion, to prove unconscionability under Pennsylvania law,[6] a plaintiff must show that a contract is both procedurally and substantively unconscionable.  Quillon v. Tenet HealthSystem Phila., Inc., 673 F.3d 221, 230 (3d Cir. 2012).  "The party challenging a contract provision as unconscionable generally bears the burden of proving unconscionability." Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999).  The Pennsylvania Supreme Court has indicated that, in examining these two prongs, "it might be appropriate to use a 'sliding-scale approach' so that 'where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required' and presumably, vice-versa." Quillon, 673 F.3d at 230 (quoting Salley v. Option One Mortg. Corp., 925 A.2d 115, 125 n.12 (Pa. 2007)).

"Procedural unconscionability examines the process leading to the formation of the contract and the form and language of the agreement." Porreca v. Rose Grp., No. Civ.A.13-1674, 2013 WL 6498392, at *7 (E.D. Pa. Dec. 11, 2013).  A procedurally unconscionable contract bears a lack of meaningful choice in the acceptance of the challenged provision. Quillon, 673 F.3d at 235.  Such contracts are typically "contracts of adhesion," which are

_____

[6] As discussed in greater detail below, it remains entirely unclear what law governs Plaintiffs' class unconscionability claim.  For the sake of some meaningful discussion at this juncture, the Court uses Pennsylvania law as a starting point.

defined as "a standard-form contract prepared by one party, to be signed by the party in the weaker position, usually a consumer, who adheres to the contract with little choice about the terms." Id. (quotation omitted).  Although unequal bargaining power is a key factor, standing alone it is insufficient to meet the standard for procedural unconscionability.  Id.  Rather, courts must consider additional factors including "the take-it-or-leave-it nature of the standardized form of the document, the parties' relative bargaining positions, and the degree of economic compulsion motivating the adhering party." Id. at 235–36.

Procedural unconscionability by itself, however, is insufficient to invalidate a contract under Pennsylvania law.  Rather, a party must prove substantive unconscionability which "refers to whether the terms of the agreement unreasonably favor the party asserting it." Porreca, 2013 WL 6498392, at *10.  "Substantively unconscionable terms are those that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." Id. (quoting Estate of Hodges, No. Civ.A.12-1698, 2013 WL 1294480, at *6 (E.D. Pa. Mar. 29, 2013)).  "To establish substantive unconscionability, the plaintiff must show that the contract terms are unreasonably favorable to the drafter and that the other party had no meaningful choice but to accept those terms." Cronin v. Citifinancial Servs., Inc., No. Civ.A.08-1523, 2008 WL 2944869, at *3 (E.D. Pa. July 25, 2008).

In the summary judgment opinion, the Court declined to rule on the unconscionability issue because it was fraught with numerous disputes of material fact.  As to the substantive unconscionability element, the Court noted that "the Plaintiffs lost substantial benefits, to Allstate's gain, when they signed the Release.  The Court also notes, however, that Plaintiffs gained in other ways through various options they received in the Program.  The question of

21

whether those gains and benefits satisfied the concept of mutuality of obligation cannot be

resolved at this juncture.  Moreover, any conclusions regarding the import of public policy are

necessarily intertwined with the resolution of the multitude of factual issues."  Romero, 1 F.

Supp. 3d 319.  Stated differently, the Court determined that, like the question of knowing and

voluntary signature under a totality of the circumstances standard, the substantive

unconscionability question turns directly on individual questions specific to each Plaintiff.

     As to the procedural unconscionability element, Plaintiffs have repeatedly argued that the

Release was unconscionable, in part, because of the large amounts of money each agent invested

in their agency and the fact that signing the Release was, for many, the only way to recoup those

investments.[7]  It is undisputed, however, that each agent's investment and financial situation

varied.  Moreover, the record reveals that the agents had a choice of one of four alternatives

under the Program and that some agents actually benefitted from opting into one of the Release-

based options.  Merely finding that Allstate acted in a particular way in structuring the Release

fails to resolve the equally important question of "the degree of economic compulsion motivating

the adhering party."  Quilloin, 673 F.3d at 235–36.  Indeed, Plaintiffs again seem to recognize

this fact because—as with the knowing and voluntary question—they argue that if the jury were

---

[7]  In their Motion for Summary Judgment, Plaintiffs argued that the Release was
procedurally unconscionable because the agents "were financially and emotionally committed to
their Allstate agencies. . . . Allstate encouraged agents to personally invest in their businesses,
under the notion that the more time and money agents spent on their businesses, the more they
would make.  Most Plaintiffs invested almost all of their money into their agency, believing it to
be the best means of providing for their family and their future.  Had Plaintiffs not signed the
Release, they would have been forced to abandon their major financial and temporal investments
in their agencies."  (Pls.' Mem. Supp. Summ. J., ECF No. 377, at 73–74.)  Subsequently,
Plaintiffs contend that the Release was substantively unconscionable because "there was a gross
disparity between what was gained by Allstate compared to what was lost by Plaintiffs."  (Id. at
76.)

to find against the class on the unconscionability question, such a finding "will not prevent class members from challenging the Release based on their individual circumstances." (Pls.' Mem. Supp. Class Cert. 35.) Thus, for the same reason the Court denies certification as to the voluntariness issue, the Court must deny certification as to the unconscionability question.[8]

---

[8] Plaintiffs rely on a series of cases for the proposition that unconscionability claims based on systematic conduct by the defendant are amenable to class certification. These cases, however, are inapposite in that (1) none of them were decided under a Rule 23(c)(4) analysis and (2) in each case, no individualized questions were inextricably intertwined with the ultimate liability issue. For example, in In re Checking Account Overdraft Litig., 286 F.R.D. 645 (S.D. Fla. 2012), the court certified an unconscionability claim based on the defendant bank's "systematic, computerized and uniform manipulation and re-ordering of debit card transactions, its development and implementation of overdraft limits, and its concealment of its overdraft practices, all to increase the number of overdraft fees imposed." Id. at 652. Unlike the present case, the plaintiffs in that case had no individualized questions affecting the basis for their claim. Rather, they alleged simply that the defendant bank "employed specially designed software programs in a systematic scheme to extract the greatest possible number of overdraft fees from Plaintiffs and similarly situated Comerica customers across the country." Id. at 649. Further, in contrast with the present case, there was no issue regarding potential gains to the plaintiffs as a result of the defendant's actions.

Similarly, in Davis v. Cash For Payday, Inc., 193 F.R.D. 518 (N.D. Ill. 2000), the class claim alleged that defendant—a company that makes high-interest consumer "payday loans," by signing a "Consumer Loan Agreement," which disclosed an interest rate of more than 600%—failed to comply with the disclosure requirements of the Truth in Lending Act and its implementing Regulation Z, and also made unconscionable loans. Id. at 520. In certifying the class, the court noted that Illinois law, which applied to the class claims, recognized separate causes of action for procedural and substantive unconscionability and allowed a plaintiff to succeed on a showing of either one. Id. at 522. It went on to note that although the procedural unconscionability question would involve individualized inquiries into any improprieties during contract formation, the substantive unconscionability claim, which concerns whether contract terms themselves are commercially reasonable, was proper for class certification.

These distinctions are likewise present in the remaining cases cited by Plaintiffs. See Evans v. Linden Research, Inc., No. Civ.A.11-1078, 2012 WL 5877579, at *12, *17 (N.D. Cal. Nov. 20, 2012) (holding that whether terms of service and general policies regarding suspension/termination of accounts imposed on proposed class of gamers in internet role-playing game were unconscionable was subject to common proof); Diense v. McKenzie Check Advance of Wis., LLC., No. Civ.A.99-50, 2000 WL 34511333, at *6 (E.D. Wis. Dec. 11, 2000) (certifying class unconscionability claim against payday lender defendant noting that there were not such great variations in the bargaining positions and the commercial experience of the parties since the defendant used standard form contracts, the terms of the contracts were not negotiable, the same

Certification of the unconscionability question, however, also fails for an independent but equally important reason—the choice of law conundrum.  Unconscionability is a question of state law.  As noted above, the class that Plaintiffs seek to certify is comprised of more than 6,000 agents or former agents of Allstate that come from forty-seven different states.  To properly decide whether the question framed by Plaintiffs will require the Court to apply the various state laws in order to resolve the issue.  Such a task is unwieldy and renders certification improper under Rule 23(c)(4).

The Court finds Plaintiffs' attempts to reason away this obstacle to be meritless.  First, Plaintiffs allege that even if different states' laws govern the unconscionability analysis, those laws "raise the same factual questions, making choice of law issues insignificant here.  If a jury resolves one or both of the common issues pertaining to unconscionability in Plaintiffs' favor . . . the legal effect of these findings can be determined by the Court under whatever state law or laws may be applicable."  (Pls.' Reply Br. 24–25.)  In other words, Plaintiffs now ask the Court to submit only *factual* determinations to the jury regarding the unconscionability of the Release, but not instruct the jury on the applicable law, thereby removing the ultimate legal question from the

---

interest rate applied regardless of the term or loan amount,, and the term of the loan does not exceed sixteen days); <u>Mick v. Level Propane Gases Inc.</u>, No. Civ.A.980959, 1999 WL 33453772, at *19 (S.D. Ohio Sept. 29, 1999) (certifying class claim of unconscionability because the plaintiffs alleged that (a) the defendant's contract violated the Equal Credit Opportunity Act and Fair Credit Reporting Act and (b) the contract is false, deceptive and misleading; "[a] ruling in favor of the named plaintiffs will affect all members of the class because [the defendant] will be required to amend its contract to conform with these laws.  Moreover, if [the defendant's] advertising strategy is found to be false, deceptive, or misleading, continued use of this strategy will be enjoined."); <u>Fogie v. Rent-A-Center, Inc.</u>, 867 F. Supp. 1398, 1403 (D. Minn. 1993) (certifying, under Minnesota law, a claim of unconscionability where the defendant allegedly uniformly misrepresented the fair market value of its goods through its value of goods formula, which was a uniform practice affecting all members of a class action which could be determined to be unconscionable regardless of representations made to individual plaintiffs).

jury's purview.  The Court would then take the factual findings and, applying each state's law, determine on a state-by-state basis whether Allstate's conduct was unconscionable.  Such a procedure would undermine all of the efficiencies sought to be gained by virtue of certification and would result in extreme waste of judicial resources.

Alternatively, Plaintiffs contend that even if a choice-of-law analysis "were actually important in the context of Plaintiffs' request for limited issue certification under Rule 23(c)(4) and 23(b)(2)," it is clear that Illinois law applies to the class unconscionability question.  (Id. at 25.)  To that end, they assert that Allstate is incorporated in Illinois, has its corporate headquarters in Illinois, and drafted and approved the Release in Illinois.  Further, two of the named Plaintiffs are Illinois residents, and approximately 500 other putative class members were Illinois residents at the time of the Program.  Finally, according to Plaintiffs, the subject matter of the Release is Allstate's liability on the allegedly-waived claims and Allstate reaps the benefit of the Release in Illinois.  Plaintiffs therefore assert that Illinois law should govern these disputes because that state has the most significant relationship to the Release under Pennsylvania choice of law rules.

This short-circuited choice of law analysis disregards the applicable case law.  It is well established in Pennsylvania that if two jurisdictions' laws are the same, then there is no conflict at all, and a choice of law analysis is unnecessary.  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007).  In this case, however, the application of potentially forty-seven states' laws, many of which differ in their unconscionability analysis, gives rise to some conflict.  Given such differences and in light of each state's potential interest in protecting its residents, a true conflict exists.  Id.  Therefore, the Court must determine which state's substantive law applies by using a

five-factor contacts analysis: "(1) the place of contracting; (2) the place of negotiation of the

contract; (3) the place of performance; (4) the location of the subject matter of the contract; and

(5) the domicile, residence, nationality, place of incorporation and place of business of the

parties." Id. at 233.

In the present matter, the class members contracted (i.e., signed the Release) in their

home state, performed the contract (i.e., waived their claims) in their home state, and are

domiciled/reside in their home state.  The fact that approximately 500 putative class members

were domiciled in Illinois means that over 5,000 putative class members were domiciled

elsewhere.  Moreover, the subject matter of the contract—the release of claims—was in each

class member's home state. There was no negotiation of the contract, making this factor

irrelevant.  Finally, although Allstate is incorporated in Illinois and drafted the contract there, that

factor is easily outweighed by the home states' contacts.  Given these factors—and absent any

convincing argument by Plaintiffs to the contrary[9]—the Court finds that the multiple laws of the

class members' home states would apply to the unconscionability[10] analysis.

Finally, Plaintiffs assert that even if more than one state law regarding unconscionability

applied, "the laws of unconscionability are not complicated and pose no manageability

problems."  (Pls.' Reply Br. 27.)  Plaintiffs, however, acknowledge that there is variation among

the states' laws and that some states only require either substantive or procedural

---

[9]  As the parties engage in the most cursory of conflict-of-laws analyses, the Court will
not magnify the issue beyond the attention the parties have given to it.

[10]  Plaintiffs' citation of a case from the District of Massachusetts applying a
Massachusetts choice of law analysis is not persuasive on the issue of what law should apply
under a Pennsylvania choice of law analysis.

unconscionability while others require both substantive and procedural unconscionability.  This distinction alone is enough to make certification on a limited issue (one that would not even finally resolve the unconscionability question) unworkable.  Allstate, on the other hand, clearly identifies unique deviations among several states that would require unique jury instructions for each particular state.

In short, Plaintiffs have failed to demonstrate that the unconscionability question is fit for certification under Rule 23(c)(4).  As indicated above, the absences f efficiencies to be gained by granting partial certification on this question, together with the various choice of law questions presented and the indivisibility of Allstate's conduct from the situations unique to the individualized class members, make this issue particularly unsuited for class resolution.  Therefore, certification on this issue is denied.

### C.     Unclean Hands

Plaintiffs next seek certification as to whether Allstate acted inequitably, deceitfully, or in bad faith towards employee agents in structuring and implementing the Release requirement, thereby rendering the Release unenforceable under the "unclean hands" doctrine.  They contend that if a jury finds that Allstate has acted with "unclean hands," that defense will operate to invalidate the Release as to the entirety of the class.

Unclean hands is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."  Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945).  It is an equitable doctrine which applies "when a party seeking relief has committed an unconscionable act immediately related to the

equity the party seeks in respect to the litigation." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 174 (3d Cir. 2001). A claim is barred under the doctrine of unclean hands when "(1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party and (5) affects the balance of equities between the litigants." Imprisoned Citizens Union v. Shapp, 11 F. Supp. 2d 586, 608 (E.D. Pa. 1998) (citation and internal quotation marks omitted), aff'd, 169 F.3d 178 (3d Cir. 1999); see also Lucey v. Workmen's Comp. Appeal Bd., 732 A.2d 1201, 1204 (Pa. 1999) (stating the doctrine of unclean heads "closes the doors of a court of equity to one tainted with inequity or bad faith relative to the matter in which he seeks relief"). The doctrine is to be applied "'only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.'" Ne. Women's Ctr., Inc. v. McMonagle, 868 F.2d 1342, 1354 (3d Cir. 1989) (quoting Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245–46 (1933)).

Allstate initially challenges the proposed certified question by arguing that the unclean hands doctrine is a defense that is available only to a party opposing a request for equitable relief. To that end, Allstate argues that only Plaintiffs seek equitable relief in this case. Allstate, on the other hand, seeks only to enforce a contract as an affirmative defense to Plaintiffs' federal and state law claims. As Plaintiffs have never otherwise pled unclean hands as a cause of action, Allstate contends that they may not now rely on it.

This argument, however, disregards prevailing Third Circuit law. In Mente v. Chevrolet Oldsmobile, Inc. v. GMAC, 451 F. App'x 214 (3d Cir. 2011), a jury awarded $4 million to the plaintiffs for the defendant's breach of contract. Id. at 217. The defendant asserted at trial that

the plaintiffs had waived their rights to sue the defendant in a Forbearance Agreement.  Id. at

216–17.  The jury found enforcement of the Forbearance Agreement was barred by the equitable

doctrine of unclean hands.  Id. at 217.  On appeal, the defendant argued that the unclean hands

doctrine did not apply because the plaintiff's claim was contractual and not equitable.  Id.  The

Third Circuit disagreed and held that "the doctrine is being invoked to defend against GMAC's

request to enforce the waiver of [the plaintiff's] breach of contract claim in the Forbearance

Agreement.  Under Pennsylvania law, a request to enforce a contractual waiver is a request for

specific performance of the contract containing the waiver."  Id. at 217–18 (citing Griest v. Pa.

State Univ. & Dickinson Sch. of Law, 897 A.2d 1186, 1186 (Pa. Super. Ct. 2006)).  As specific

performance is an equitable remedy, the Third Circuit found that it could be barred by the

doctrine of unclean hands.  Id. at 218.  The court further rejected the argument that the doctrine

of unclean hands can only be invoked by a defendant seeking to defeat a plaintiff's claim for

affirmative equitable relief.  Id. at 218 n.4.

　　　　In the present case, Plaintiffs bring multiple federal and state law claims in connection

with the enactment of the Program and Release.  Allstate has responded with the defense that the

claims were waived by the Plaintiffs' signature of the Release.  By doing so, Allstate now seeks

specific performance of the Release to enforce the waiver of Plaintiffs' claims, which is a request

that sound in equity.  In response, Plaintiffs may now properly assert the doctrine of unclean

hands.

　　　　Allstate's second challenge to certification of the unclean hands question, however, has

significantly more merit.  It argues that, like the unconscionability question, the Court will have

to apply multiple states' laws to resolve the issue.  Plaintiffs' respond with the somewhat

perplexing contention that there is no choice of law question because "the application of the unclean hands doctrine has nothing to do with a party's substantive legal rights, as much as the protection of the court's 'own integrity.'" (Pls.' Reply Br. 24 (quoting Gaudiosi v. Mellon, 269 F.2d 873, 881–82 (3d Cir. 1959)).)  Presumably, Plaintiffs are suggesting that this Court should apply Pennsylvania law.  The fact remains, however, that unclean hands is a state law doctrine and is asserted in defense to a state law claim.  In this case, Plaintiffs are asserting unclean hands in defense to Allstate's attempted enforcement of a contract under state law.  See Giordano v. Claudio, 714 F. Supp. 2d 508, 532 (E.D. Pa. 2010) ("Specific performance is an equitable remedy for breach of contract permitting the court 'to compel performance of a contract when there exists in the contract an agreement between the parties as to the nature of the performance.'") (quoting Lackner v. Glosser, 892 A.2d 21, 31 (Pa. Super. Ct. 2006) (further quotations omitted).  As such, logic demands that the state law governing the contract claim must likewise govern the unclean hands defense.  It is undisputed that "the states' formulations of the doctrine of unclean hands . . . differ significantly."  In re Grand Theft Auto Video Game Consumer Litig., 251 F.R.D. 139, 148 & n.10 (S.D.N.Y. 2008) (citing disparities among multiple states in the unclean hands doctrine and noting that "these vague, equitable formulations may receive distinct interpretations depending upon local circumstances, thereby creating further possible differences in the states' unclean-hands doctrines.").  Given the foregoing choice of law analysis,[11] it appears likely that the laws of the various class members' home states will apply, thereby creating a situation where the jury would have to be instructed on multiple states' laws

---

[11]  Notably, Plaintiffs provide no choice of law analysis with respect to the unclean hands doctrine.

and how to apply them to the facts.  Such a convoluted scenario weighs substantially against certification.

Third, even if the Court were to apply Pennsylvania law, the totality of the "unclean hands" analysis is still not subject to common proof.  In the Third Circuit, a defendant asserting an unclean hands defense must introduce "clear, convincing evidence of 'egregious' misconduct."  Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank, 383 F.3d 110, 129 (3d Cir. 2004).  "Egregious misconduct" can take the form of "fraud, unconscionability, or bad faith on the part of the plaintiff."  S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 377 n.7 (3d Cir. 1992); see also Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 174 (3d Cir. 2001).  A claim is barred under the doctrine of unclean hands when "(1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party and (5) affects the balance of equities between the litigants."  Imprisoned Citizens Union, 11 F. Supp. 2d at 608 (citation and internal quotation marks omitted).  Courts will apply the doctrine of unclean hands "only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication."  Highmark, 276 F.3d at 174 (internal citations omitted).

Under this formulation, merely examining the transaction from the perspective of Allstate's conduct disregards key issues relevant to the unclean hands analysis.  To the extent Allstate committed some egregious conduct, such conduct cannot be viewed in a vacuum without balancing the equities between the litigants.  Given the already individualized questions in this case, the Court finds that factual dissimilarities among the various class members will affect the

31

balance of equities, thereby complicating any class determination of whether Allstate acted with unclean hands.  Accordingly, the Court declines to certify this question.

  **D.**  **Part and Parcel Doctrine**

  The final issue that Plaintiffs seek to certify asks whether the Release was integral to or an essential part of Allstate's program to involuntarily terminate the R830 and R1500 contracts of its employee agents such that Allstate would not have gone forward with the mass terminations without it.  In explaining this theory, Plaintiffs cite to the U.S. Supreme Court's statement that a release is "void in its inception" when it is "part of an illegal transaction."  Radio Corp. of America v. Raytheon Mfg. Co., 296 U.S. 459, 462 (1935).  According to Plaintiffs, under this "part and parcel" doctrine, a release is invalid when the scheme "could not have proceeded without the release," when the release is executed simultaneously with the illegal conduct, or when the release is an "integral part" of an improper scheme.  (Pls' Mem. Supp. Class Cert. 27–28.)  Plaintiffs aver that, pursuant to this principle, courts have held that a released party is not entitled to judgment as a matter of law because a reasonable factfinder could find that the release was part of and tainted by the illegal conduct.

  The "part and parcel" doctrine, which had its inception and sole application in antitrust jurisprudence, holds that a release is invalid if "the release itself was an integral part of a scheme to violate the antitrust laws."  VKK Corp. v. Nat'l Football League, 244 F.3d 114 (2d Cir. 2001) (quoting Redel's Inc. v. Gen. Elec. Co., 498 F.2d 95, 100–01 (5th Cir. 1974)).  The release must be "an object of the combination or conspiracy" or "an integral part of the scheme in restraint of trade."  Dobbins v. Kawasaki Motors Corp., U.S.A., 362 F. Supp. 54, 58 (D. Or. 1973).  "[I]f the release is merely an outgrowth, rather than a cause of the violation," it is not part and parcel of

the antitrust conspiracy.  N. Oil Co., Inc. v. Standard Oil Co., 761 F.2d 699, 706 (Temp. Emer.

Ct. App. 1985).  The "part and parcel" doctrine has been "'rarely discussed and more rarely

applied.'"  Fresh Made, Inc. v. Lifeway Foods, Inc., No. Civ.A.01-4254, 2002 WL 31246922, at

*3 (E.D. Pa. Aug. 9, 2002) (quoting VKK Corp., 244 F.3d at 125).  Notably, Plaintiffs have not

cited, and this Court is not aware of, any cases applying the part and parcel doctrine outside the

antitrust context.

Assuming *arguendo* that the doctrine could apply to the present case, certification

presents fundamental problems.  As set forth above, Plaintiffs do not seek to certify the entirety

of their part and parcel theory.  Rather, they seek certification on the "narrow issue" of whether

the Release was part and parcel of the Program.  They assert that this limited issue is common to

the class and the evidence at trial will be the same for all class members because it will focus on

how Allstate structured the Program and the importance of the Release to the Program.

Such a request, however, undermines the very purpose of issue certification as it resolves

almost no part of the Release-related issues.  Plaintiffs agree that they cannot certify the latter

portion of the part and parcel theory—that the Release be in furtherance of a conspiracy or

scheme that is itself an independent violation of the law—because that inquiry is dependent on

the merits of Plaintiff's underlying claims.  In so acknowledging, Plaintiffs effectively concede

that certification of this issue will not create any efficiencies in the upcoming Release-related

trial.  In other words, even if the jury finds in favor of Allstate on the certified class question, the

parties will still need to litigate the issue of whether the Program was part of an illegal conspiracy

scheme.  Plaintiffs will then have to put on a separate case—either as part of the Release trial or

in a subsequent trial—which will, in turn, require discussion of the Release and its role in that

scheme, thereby creating circuitous and duplicative testimony.

In an effort to rebut this obvious conclusion, Plaintiffs argue that Rule 23(c)(4) issue certification need not be dispositive in order for class resolution to be appropriate.  While the Court agrees with this proposition, Plaintiffs cannot simply bypass the purpose of issue certification under Rule 23(c)(4).  Where class adjudication "would not only leave critical remaining liability issues unanswered but also fail to achieve any efficiency in the resolution of class members' claims," certification is unwarranted.  Franco v. Conn. Gen. Life Ins. Co., 299 F.R.D. 417, 433 (D.N.J. 2014).  Not only would certification of the part and parcel question not lead to the ultimate resolution of that claim, but no efficiencies would be gained because the entire theory would have to be relitigated to determine whether the Program and Release constituted an illegal scheme.  Absent some benefit to certification of this narrow question, the Court denies Plaintiffs' Motion.

## IV.    CONCLUSION

Given Plaintiffs' putative class of over 6,000 potential class members, they understandably seek to resolve as many issues common to those class members in the most efficient way possible.  Unfortunately, despite Allstate's common course of conduct towards these various agents—a fact that this Court has already recognized in its previous Opinion—too many individual issues crucial to the ultimate resolution of this case remain.  The issues surrounding the validity of the Release, which is the only question currently ready for trial, involve numerous individual inquiries that, notwithstanding Plaintiffs' arguments to the contrary, are so inextricably intertwined with the common questions as to eliminate any benefit to certification.  See McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 234 (2d Cir. 2008) (noting

34

that issue certification under Rule 23(c)(4) is not appropriate where certifying an issue "would not materially advance the litigation because it would not dispose of larger issues. . ."); <u>Kinney v. Siouxland Urology Assoc. P.C.</u>, No. Civ.A.09-4051, 2011 WL 796237, at *5–6  (D.S.D. Feb. 28, 2011) ("[T]he relevant inquiry under Rule 23(c)(4)(A) is whether the resolution of the particular common issues would materially advance the disposition of the litigation as a whole.") (quotations omitted).  As certification of the issues proposed by Plaintiffs would not materially advance the disposition of this matter or increase the efficiency of the litigation in any legally appropriate manner, the Court declines the Motion for Class Certification in its entirety.

An appropriate Order follows.