## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GENE R. ROMERO, JOSEPH L. BENOIT, JAMES T. BEVER, ROGER T. BOYD, RICHARD A. CARRIER, PAUL R. COBB, CRAIG K. CREASE, SYLVIA KELLY, A. BURTON ENGLISH (as personal representative of the Estate of Dwight F. English), RONALD W. HARPER, MICHAEL P. KEARNEY, THOMAS A. KEARNEY LARRY H. LANKFORD, SR., DAVID C. LAWSON, NATHAN R. LITTLEJOHN, II, REBECCA R.MASLOWSKI, CRAIG A. MILLISON, JAMES E. MOOREHEAD, CHRISTOPHER L. PERKINS, RICHARD E. PETERSON, MARY JANE PILCHAK (as personal representative of the Estate of James P. Pilchak), PAULA REINERIO, PAUL L. SHIRLEY, DONALD L. TRGOVICH, RICHARD S. WANDNER, TIMOTHY WEISMAN, ANTHONY T. WIKTOR, JOHN W. WITTMAN, RALPH J. WOLVERTON, | No.  01-CV-3894 CONSOLIDATED WITH: No. 01-CV-6764 **CLASS ACTION – THIRD AMENDED COMPLAINT** JURY TRIAL DEMANDED |

THOMAS ABELL
2063 W. Rousseau Drive
Coeur D'Alene, ID  83815

KATHARINE ADAMS-LOVE
5327 Siesta Cove Drive
Sarasota, FL  34242

JOHN P. AELLEN, III
180 Wroxeter Road
Arnold, MD  21012

CLYDE WILLARD ALLEN
1317B German Driveway
P.O. Box 709
Hanover, MD 21076

JOSEPH ALLEY

2386 Poors Ford Road                                      :
Rutherfordton, NC  28139

                                                          :

THOMAS PAUL ALLISON
682 Maricopa Dr.                                          :
Canyon Lake, TX  78133

                                                          :

RICHARD G. ALTIERI
82 Doreen Drive                                           :
Fairfield, CT  06824

                                                          :

ANDREW ALAN ANDERSON
5880 Barrett Road                                         :
Colorado Springs, CO  80926

                                                          :

CARL ANGELL
3909 Canby Ct.                                            :
Bellingham, WA  98229

                                                          :

EUGENIA ANNINO STEGER, as personal
representative of the Estate of Robert S.                 :
Annino
23 Mum Grace                                              :
Beaufort, SC  29906

                                                          :

DANIEL ANULARE
907 Ball Drive                                            :
Nokomis, FL  34275

                                                          :

LINDA A. ANULARE
907 Ball Drive                                            :
Nokomis, FL  34275

                                                          :

BRUCE WILLIAM ASHLEY
65 Cornell Drive                                          :
Woodland Park, CO  80863

                                                          :

RICHARD AURAND
559 Howland Wilson NE                                     :
Warren, OH  44484

                                                          :

MAXINE BACHICHA
980 Robbie View #2014                                     :
Colorado Springs, CO  80921

HAROLD E. BAKER                                    :
116 Amherst Lane
Sebastian, FL  32958                               :

ROBERT G. BARZELAY                                 :
3508 Hollow Oak Place
Brandon, FL  33511                                 :

GARY L. BAUMGARDNER                                :
1632 Bexhill Drive
Knoxville, TN  37922                               :

JAMES A. BEARD                                     :
1635 Manning Way
Colorado Springs, CO  80919                        :

DEBORAH BECKER                                     :
8003 E. Heaven Hill Lane
Mooresville, IN  46158                             :

RICHARD C. BENNETT                                 :
2020 80th Ave E
Parrish, FL  34219                                 :

COLIN T. BENT                                      :
1209 E. Yakima Street
Broken Arrow, OK  74012                            :

VERNON BENTLEY                                     :
2409 W. Driftwood Drive
Claremore, OK  74017                               :

HAROLD D. BERNSTEIN                                :
3875 Legacy Drive
Mason, OH  45040                                   :

HAROLD D. BERNSTEIN, as personal                   :
representative of the Estate of Sandi
Bernstein                                          :
3875 Legacy Drive
Mason, OH  45040                                   :

MONTELL BERRY                                      :
1115 Village Court
Palm Springs, CA  92262

```
                                              :
WALLACE BERRY
3055 W. 30th Court                            :
PO Box 15637
Panama City, FL  32406-5637                   :

LINDA BEUCHER                                 :
PO Box 129
Howey in the Hills, FL  34737                 :

STANLEY R. BINDER                             :
920 Birchwood Court
Newport News, VA  23608                       :

ANDREW BLANCHETTE                             :
217 Karen Drive
Orange, CT  06477                             :

CRAIG A. BOCK                                 :
54178 Sherwood Lane
Shelby Township, MI  48315                    :

GARY L. BOCK                                  :
1005 Wood Haven Ln. SW
Vero Beach, FL  32962                         :

DAVID P. BOHAN                                :
11399 Spyglass Hill Circle
Anchorage, AK  95515                          :

ROLAND BOISIS                                 :
250 S.E. 7th Street
Dania Beach, FL  33004                        :

JANICE BOND                                   :
9115 Clearhill Rd
Boynton Beach, FL  33473                      :

DWIGHT CHARLES BONDY                          :
161 N. 222nd Drive
Buckeye, AZ  85326                            :

ROBERT F. BORTELL, JR.                        :
6676 Easton Drive
Sarasota, FL  34238
```

**THIRD AMENDED COMPLAINT**                    - 4 -

DANIEL BOSSIO                                   :
2367 West Gate Dr.                              :
Pittsburgh, PA  15237

                                                :

JAMES L. BRACHFELD                              :
11669 SW Apple Blossom Trail                    :
Port St. Lucie, FL  34987

                                                :

ROBERTA L. BRACHFELD                            :
11669 SW Apple Blossom Trail                    :
Port St. Lucie, FL  34987

                                                :

EUGENE BRANDON                                  :
4010 River Falls                                :
San Antonio, TX  78259

                                                :

MICHAEL J. BRANTMEIER                           :
1114 Whiting Court                              :
Neenah, WI  54956

                                                :

JAY BROKER                                      :
17 Presidio Road                                :
Montgomery, TX  77356

                                                :

NEAL SWANK BROOKS                               :
83 Wood Lily Place                              :
Spring, TX 77382

                                                :

FAYE D. BROWN                                   :
4614 Alabama Hwy 227                            :
Crossville , AL  35962

                                                :

RICHARD A. BROWN                               :
1471 Carnaby Court                              :
Dunwoody, GA  30338

                                                :

LESTER BROWN, SR.                               :
8219 47th Street Circle E                       :
Palmetto, FL  34221

                                                :

WILLIAM L. BROWN, JR.                           :
19 Stefano Way Drive                            :
Missouri City, TX 77459

RICHARD A. BROWNSON                    :
1511 Walnut Street
Grand Forks, ND 58201                  :

CHARLES R. BURNS III                   :
950 McDonald Lakes Road
Springville, AL  35146                 :

THOMAS C. BUSHEY                       :
100 Mark Lane
Unit L-2                               :
Waterbury, CT 06704-2459
                                       :

DAVE BUSSELL                           :
8409 Granite Street
Wheelersburg, OH  45694
                                       :

GARY CALLAWAY                          :
801 De La Bosque
Longwood, FL  32779                    :
                                       
GEORGIANA CALLAWAY                     :
801 De La Bosque
Longwood, FL  32779
                                       :

ALBERT J. CANNIZZARO                   :
225 West Talcott Road
Park Ridge, IL  60068-5531
                                       :

LAWRENCE J. CAPOUCH                    :
1173 143rd Ave NE
Hatton, ND  58240
                                       :

RICHARD CARTER                         :
29324 N.E. 16th Place
Carnation, WA  98014
                                       :

VICTOR M. CATARISANO                   :
7711 Black Willow
Liverpool, NY  13090
                                       :

PORTIA M. CHAMBLISS                    :
8 Ewell Court
Hampton, VA  23669

MARK D. CHASE                          :
20 Louisiana Drive
Palm Coast, FL  32137                  :


AMY CHERRNAY                           :
2806 Lake Brook Court
Highland Village, TX  75077            :


JIMMY C. CHIN                          :
16 Kendrick Lane
Dix Hills, NY  11746                   :


DON C. CHRISTENSEN                     :
5600 Mt. Solo Road, #133
Longview, WA  98632                    :


JAMES CIRILLO                          :
4481 Eleuthera Court
Sarasota, FL  34233                    :


BRUCE W. CLOTFELTER                    :
P.O. Box 5038
Athens, GA  30604                      :


IRA CLOUD                              :
3527-4 Trail Ridge Road
Middleburg, FL  32068                  :


MILTON COBB                            :
P.O. Box 1082
Moxee, WA  98936                       :


MARK C. COLLIER                        :
2111 Desert Woods Dr.
Henderson, NV 89012                    :


WANDA COLLINS-SMITH                    :
26282 Buckthorn Road
Oakwood, OH  44146                     :


JOSEPH P. CONBOY                       :
P.O. Box 449
Shoreham, NY  11786                    :


RICHARD F. COOK

2537 Kinnard Avenue                                :
Henderson, NV  89074

                                                   :

JANET COOLEY
14000 McKinley Road                                :
Chelsea, MI  48118

                                                   :

JAMES CORNETT
13505 Will Rogers Lane                             :
Austin, TX  78727

                                                   :

CHARLES E. CORRY
7706 Hayfield Road                                 :
Alexandria, VA  22315-4052

                                                   :

BRUCE R. CRALLEY
3825 N Ramsey Rd, Apt. 1901                        :
Coeur d Alene, ID  83815

                                                   :

JACK J. CRAPARO, JR.
17016 Paula Lane                                   :
Lutz, FL  33558

                                                   :

JAY CRYSTAL
18227 Brighton Green                               :
Dallas, TX  75252

                                                   :

JAY CRYSTAL, as personal representative
of the Estate of Diane Crystal                     :
18227 Brighton Green
Dallas, TX  75252                                  :

LONNIE MICHAEL CURTIS                              :
3537 Fieldcrest Drive
Bowling Green, KY  42104                            :

BRENT L. DANNER                                    :
2810 Ramona Road
Reno, NV  89521                                    :

JOHN DARWISH                                       :
3044 Coral Park Drive
Cincinnati, OH  45211                              :

HAROLD E. DASKAM

14319 106th Ave Ct E
Puyallup, WA  98374                          :

                                             :

JOHN DAVENPORT
1930 E Edison                                :
South Bend, IN  46617

                                             :

LESLIE K. DAVIDSON
114 Royal Palm Blvd                          :
Panama City Beach, FL  32408

                                             :

ZACHARIAH M. DAVIDSON III
P.O. Box 369                                 :
Hiram, GA  30141

                                             :

MICHAEL L. DAVIS
109 Jacaranda Ct                             :
Royal Palm Beach, FL  33411

                                             :

MARGARET DEAN, personal
representative of the Estate of Robert T.    :
Dean
6044 Andros Way                              :
Naples, FL  34119-7515

                                             :

STEPHEN W. DELLAPINA
287 Flamingo Point South                     :
Jupiter, FL  33458

                                             :

ERNEST JACK DEMONTE
237 Melrose Drive                            :
New Stanton, PA  15672

                                             :

JAMES DEPIZZO
270 N. Bayshore Drive                        :
Columbiana, OH  44408

                                             :

JOHN ANTHONY DEVITO
1719 Pineland Court                          :
Orange City, FL  32763

                                             :

GAIL DICKMAN
778 Elizabeth Drive                          :
Florence, KY  41042

MARK L. DIVINCENZO                          :
3154 Deerfield Court
Murrysville, PA  15668                       :

MICHAEL DOHENY                              :
845 Victoria Lane
Elk Grove Village, IL  60007                 :

JEFFREY M. DOMBECK                          :
10559 Whitewind Cir.
Boynton Beach, FL 33473                      :

TERRANCE DONOGHUE                           :
1619 Battery Circle
Hebron, KY  41048                            :

VALERY DORSHIMER                            :
13645 Deering Bay Dr. Ph 163
Coral Gables, FL 33158                       :

JOYCE DOUGLAS                               :
10521 S Hale Ave Apt 1C
Chicago, IL  60643                           :

RUFUS C. DOWELL                             :
2309 River Road
Jacksonville, FL 32207                       :

SUSAN DRAPEAU                               :
P.O. Box 716
Peru, NY  12972                              :

RICHARD DROE                                :
3154 Coleridge Road
Cleveland Heights, OH 44118                  :

GEORGE F. DRUMMOND                          :
156 Indian Circle
Williamsburg, VA  23185                      :

WALTER J. DUBIEL                            :
353 Main Street
Farmington, CT  06032                        :

THOMAS R. DURAN

**THIRD AMENDED COMPLAINT**                        - 10 -

15255 W. Auburn Avenue                    :
Lakewood, CO  80228

                                          :

DENNIS R. DYKE
38458 Renwood Avenue                      :
Avon, OH  44011

                                          :

LARRY R. DYKSTRA
8500 Golden Valley Drive                  :
Maple Falls, WA  98266

                                          :

RICHARD MORRISON EARL, JR.
405 S. Cedar Bluff Road                   :
Knoxville, TN  37922

                                          :

RONALD F. EATON
4435 Black Diamond Drive                  :
Sparks, NV  89436

                                          :

MICHAEL ECONOMOS
2046 Otter Way                            :
Palm Harbor, FL  34685

                                          :

RONALD R. EDWARDS
6810 Japura Court NE                      :
Rio Rancho, NM  87144-6239

                                          :

RICHARD EIRICH
1919 4th St.                              :
Kirkland, WA  98033

                                          :

ROSLYN EISENSTARK
9660 Isles Cay Drive                      :
Delray Beach, FL  33437-5560

                                          :

BRUCE ENGERT
58 Roads End Rd.                          :
Boothbay Harbor, ME  04538

                                          :

JANE ESCHRICH-WALSH
16105 Dunblaine                           :
Beverly Hills, MI  48025

                                          :

BILL ESTES
8035 53rd Ave. West, Unit B

Mukilteo, WA  98275                          :

STEVEN EVANS                                 :
319 Mackenzie Dr.
West Chester, PA  19380                       :

SANDY K. FABRICATORE                         :
PO Box 593
Eastport, NY  11941                          :

JOSEPH FALCONI III                           :
31 Arkansas Avenue
Ocean City, NJ  8226                         :

CHRISTIAN G. FARLEY                          :
2 Raphael Court
Clifton Park, NY  12065                      :

SHEILA FARMER                                :
893 Sherwood Dr.
Macedonia, OH  44056                         :

CURTIS FARRAR                                :
920 Doral Drive
Fort Worth, TX  76112                        :

RALPH V. FAULK                               :
251 Story Road
Export, PA 15632                             :

PHILIP DEAN FEISAL                           :
2705 N Meridian Place
Oklahoma City, OK  73127                     :

CARL E. FIELDER                              :
4650 Van Kleeck Drive
New Smyrna Beach, FL  32169                  :

DORIS FIELDS                                 :
7226 S Lafayette Ave
Chicago, IL  60621                           :

LARRY D. FINLEY                              :
12509 Gaston Court
Oklahoma City, OK 73107

WILLIAM FLOOD                                    :
P.O. Box 5403
Sun City Center, FL  33571                       :

                                                 :

GERALD L. FLORES                                 :
2381 Matthew John Drive
Dubuque, IA  52002                               :

                                                 :

ERIC A. FORD                                     :
917 Field Street
Hammond, IN  46320                               :

                                                 :

JOHN R. FORREST                                  :
6330 Star Grass Lane
Naples, FL  34116-6737                           :

                                                 :

ALLEN F. FOSTER                                  :
750 Silver Cloud Circle #104
Lake Mary, FL  32746                             :

                                                 :

ROBERT FRANZ                                     :
520 Valley Stream Drive
Gevena, FL  32732                                :

                                                 :

BOSS ROBERT FRIES, III                           :
807 S. Gray
Stillwater, OK  74074                            :

                                                 :

JODENE GARDNER                                   :
15126 Douglas Circle
Omaha, NE  68154                                 :

                                                 :

ROBERT E. GARY                                   :
2811 E. 84th St.
Tulsa, OK  74137                                 :

                                                 :

LARRY O. GENTRY                                  :
625 Lakehaven Cr
Decatur, TN  37322                               :

                                                 :

SAMUEL E. GILLETTE                               :
8435 SW 48 St.
Miami, FL 33155                                  :

GARY GOELZ                               :
621 Country Vue Ct.
Cranberry Twp., PA 16066                 :

RANDOLPH GOODWIN, JR.                    :
78 Highcrest Road
Wethersfield, CT  06109                  :

JAMES A. GRADY                           :
2233 Spring Creek Cir NE
Palm Bay, FL  32905                      :

WILLIAM D. GREENE                        :
2390 Mid Pine Ct
Oviedo, FL  32765                        :

SANDRA GUTHRIE                           :
5 Hunt Drive
Belleville, IL  62226                    :

GERALD GUTZEIT                           :
6423 Parkwood Place
Florence, KY  41042                      :

FRANKLIN P. HALL                         :
4337 Sawmill Trace Drive
Charlotte, NC  28213                     :

BRENDA C. HAMMOND                        :
4670 Diann Drive
College Park, GA  30349                  :

LORETTA CAUSEY HANNON                    :
8930 Equus Circle
Boynton Beach, FL  33472                 :

FRANCIS HANRATTY                         :
8917 Litchfield Avenue
Las Vegas, NV  89134                     :

JAN HANSON                               :
2707 Huron Street
Bellingham, WA  98226                    :

CHRIS HARDESTY

P.O. Box 652                                              :
Astatula, FL  34705

                                                         :

RONALD C. HARRISON, JR
3537 Pinehurst Drive                                     :
Plano, TX   75075

                                                         :

JOHN W. HEASLEY
4069 Highlander Avenue                                   :
Lake Havasu City, AZ  86406

                                                         :

CONI HEIDLE
130 Campbell Lane                                        :
Clinton, TN  37716

                                                         :

DARLENE HEINEN
N2970 River Ridge Road                                   :
Waldo, WI  53093

                                                         :

GERALD HEINEN
N. 2970 River Ridge Road                                 :
Waldo, WI  53093

                                                         :

ROBERT HELSEL
2902 Village Square Drive                                :
Dover, PA  17315

                                                         :

JAMES LOUIS HEMPHILL
1300 Melrose Drive                                       :
Norman, OK  73069

                                                         :

GAIL ROGERS HIBBLER
1000 S. Cuyler                                           :
Oak Park, IL  60304

                                                         :

LARRY W. HICE
7910 SW 103rd Avenue                                     :
Gainesville, FL  32608-6208

                                                         :

DANNY HIGDON
1526 Circle Drive                                        :
Guntersville, AL  35976

                                                         :

PATRICIA A. HILL
8439 S. Constance Avenue

Chicago, IL  60617                          :

RICHARD D. HILL                             :
225 Leland St.
Bloomington, IL  61701                      :

JAMES HILLAN                                :
4986A S. Nelson Street
Littleton, CO  80127                        :

LEANNE HINKLE (FORMERLY                     :
MCCURLEY)
110 Stage Coach St                          :
Hemphill, TX 75948
                                            :

JOHN HLOHINEC                               :
4331 Sunniland St.
Sarasota, FL  64233
                                            :

JIMMY D. HOCK                               :
10300 Katy Line Ct.
Yukon, OK  73099
                                            :

CHARMAIN A. HORVATH                         :
464 Barwell Street
Akron, Ohio  44303
                                            :

DAN P. HOURIHANE                            :
484 Ferndale Lane
Prospect Heights, IL 60070
                                            :

STEVE HOWELL                                :
6932 Petworth Rd
Memphis, TN  38119
                                            :

GEORGE HUYE                                 :
11604 Villa Ave
Baton Rouge, LA  70810
                                            :

JOHN IAPOCE                                 :
10 Talbot Court
Bluffton, SC  29909
                                            :

SANDRA INMAN
1305 Bradford Lane

Knoxville, TN  37919                          :

CHARLES S. JACKSON                            :
PO Box 611
White Marsh, VA  23183                        :

RICK JAHNS                                    :
1427 W. Windhaven Avenue
Gilbert, AZ  85233-5143                       :

ROBERT JAYSON                                 :
14612 Barletta Way
Delray Beach, FL  33446                       :

LELAND JELINEK                                :
2476 Lawndale Road
Grand Forks, ND  58201                        :

CHARLES JOHNSON                               :
7652 Doe View Drive
West Chester, OH  45069                       :

REECE JOHNSON                                 :
7030 S.W. 82nd Avenue
Miami, FL  33143                              :

LARRY JONES                                   :
17604 Durbin Park Rd
Edmond, OK  73012                             :

RONALD R .JONES                               :
739 N. Pendleton Avenue
Pendelton, IN  46064                          :

KAREN JUNEMAN, as personal                    :
representative of the Estate of Roger
Juneman                                       :
902 Persimmon Lane - Unit B
Mount Prospect, IL  60056                     :

DAVID N. KAPEC                                :
8436 NW 6th Avenue
Gainesville, FL  32607-1406                   :

KATHLEEN KENNEY

**THIRD AMENDED COMPLAINT**          - 17 -

1147 Oak Ridge Drive                                        :
Streamwood, IL  60107

                                                            :

ROBERT J. KILLEEN
334 Rue St. Peter                                           :
Metairie, LA  70005

                                                            :

ROBERT E. KIMBLE
P.O. Box 847                                                :
Cleveland, MS 38732

                                                            :

THOMAS KROHNER
P.O. Box 269                                                :
Torrington, CT 06790

                                                            :

MARIA KRUMM, as personal
representative of the Estate of Gary J.                     :
Krumm
41062 E. Rosewood                                           :
Clinton Township, MI 48038

                                                            :

AMOS KUYKENDOLL
15123 Oak Street                                            :
Dolton, IL  60419

                                                            :

WILLIAM LANDMARK
146 Arthur Avenue                                           :
Thornwood, NY  10594

                                                            :

GREGORY LANE
P.O. Box 1676                                               :
Meridian, PA 39302

                                                            :

BRUCE LARRABEE
27 Erland Road                                              :
Stoney Brooke, NY  11790

                                                            :

JENNIFER LATHAM, as personal
representative of the Estate of Charles E.                  :
Latham
3585 Weeping Willow Lane                                    :
Loganville, GA  30052

                                                            :

CAROL E. LEBLANC
14260 W Newberry Rd STE 233

Newberry, FL  32669                          :

JOSEPH LEE                                   :
4675 South Valleyview Drive
West Bloomfield, MI  48323                   :

SHARON E. LIBBRA                             :
1815 Penina Dr.
Crosby, TX  77532                            :

TERRY GENE LIBBRA                            :
1815 Penina Dr.
Crosby, TX  77532                            :

JANET LINDSAY, as personal                   :
representative of the Estate of Ronald
Lindsay                                      :
404 Larson Dr.
Danbury, CT 06810                            :

JAMES W. LONGMAN                             :
2214 Teal Ct.
Bellingham, WA  98229                        :

JOHN LUCAS                                   :
9 Mohegan Lane
Rye Brook, NY  10573                         :

JAMES E. LYNCH                               :
3910 Donegal Drive
Bethlehem, PA  18020                         :

MICHAEL MACISCO                              :
745 Nichols Avenue
Stratford, CT  06614                         :

JOHN MALEK                                   :
781 Doctor Ave
Sebastian, FL  32958                         :

STEVEN MALLORY                               :
10256 Huntington Avenue
Omaha, NE  68122                             :

JOHN MALLOY

THIRD AMENDED COMPLAINT            - 19 -

2913 Cheyenne Drive
Bowling Green, KY  42104                          :

                                                 :

PATRICIA MARAZO
120 N. Hisbiscus Ct.                             :
Plantation, FL  33317

                                                 :

NICHOLAS S. MARINOS
248 Melrose Drive                                :
New Stanton, PA  15672

                                                 :

EUGENE MARONEY
1219 Sleepy Hollow Road - Unit 1197              :
Athens, NY  12015

                                                 :

JOHN MARSH
1054 Mildred Avenue                              :
Lorain, OH  44052-1218

                                                 :

RICHARD MASI
13837 76th Terrace North                         :
Seminole, FL  33776

                                                 :

GLEN MASON
4001 Sunflower Road                              :
New Brighton, PA  15066

                                                 :

SCOTT A. MATTINGLY
2297 Burns Road                                  :
Rineyville, KY  40162

                                                 :

THOMAS W. MATYJASIK
1180 Cedar                                       :
Birmingham, MI  48009

                                                 :

THOMAS MCCALL
1050 Starkey Rd Apt 2503                         :
Largo, FL  33771

                                                 :

RUDOLPH MCCLINON JR.
550 Alton Way, Unit 7154                         :
Denver, CO  80230

                                                 :

CASEY MCCOY
508 East Noble Ave.

**THIRD AMENDED COMPLAINT**                      - 20 -

Guthrie, OK  73044                                :

SHERRY MCDONALD                             :
PO Box 1396
Ocean Park, WA  98640                       :

THOMAS MCEVANS III                          :
22617 Avon Lane
Southfield, MI  48075                        :

JAMES P. MCGUIRE                            :
3933 Forest Avenue
Western Springs, IL  60558                   :

JOHN F. MCKENZIE                            :
172 Williamsburg Drive
Monroe, CT  06468                           :

ANTHONY MCMURRAY                          :
21373 S. Boschome Circle
Kildeer, IL  60047                           :

PETER S. MCVITTIE                           :
56 Chestnut
Chelsea, MI  48118                          :

JERREL L. MEAD                              :
56426 Elmer Ave
South Bend, IN  46619                       :

MARY MENDOZA                              :
410 Isolde Drive
Houston, TX  77024                          :

ORTON W. MESSENGER                         :
92 Bay Tree Drive
Miramar Beach, FL  32550                    :

SUSAN E. MESSINA                           :
10974 Porto Foxi Street
Las Vegas, NV  89141                        :

PHILLIP N. METCALFE                         :
1093 Balfour Circle
Phoenixville, PA  19460

RONALD METZGER                                    :
517 Winkworth Parkway                             :
Syracuse, NY  13215
                                                  :

PAMELA MEYER, as personal
representative of the Estate of Michael           :
Meyer
2324 San Gabriel Drive                            :
Plano, TX  75074
                                                  :

ARTHUR R. MILES, JR.
2711 Wynfield Road                                :
West Friendship, Maryland  21794
                                                  :

JAMES T. MILLER
1700 Helena Avenue                                :
Hartland, MI  48353
                                                  :

FRANK E. MILLER, JR.
1 Orinco Court                                    :
Port St. Lucie, FL  34952
                                                  :

JEAN MINAL
819 River Forest Court                            :
Bensenville, IL  60106
                                                  :

FRIEDA MINGA
5073 Club Vista Point                             :
Stone Mountain, GA  30088
                                                  :

BARBARA ANN MINK, as personal
representative of the Estate of Daniel Mink       :
P.O. Box 861
Crystal Beach, FL  34681                          :


                                                  :

ROBERT MINTON
615 20th Avenue West                              :
Bradenton, FL  34205
                                                  :

JOE MONTANARO
457 Dayton Road                                   :
Trumbell, CT  06611

RICHARD MOORE                                      :
5507 W Comanche Ave
Spokane, WA  99208                                 :

STAFFORD W. MOORE                                  :
546 Coble Ave
Albemarle, NC  28001                               :

DINAH MORGAN                                       :
277 Honor Drive
Kerrville, TX 78028                                :

SYLVIA E. MOSLEY                                   :
P.O. Box 3214
Suwanee, GA  30024                                 :

D. CRAIG MULLEN                                    :
14364 Autumns Avenue, SE
Monroe, WA  98272                                  :

KELLY PATRICK MULLIGAN                             :
9585 Highview Drive
Eden Prairie, MN  55347                            :

DARRELL NAMIE                                      :
1280 Chapel Road
Monaca, PA  15061                                  :

HERBERT A. NEWMAN                                  :
2448 Charney Road
University Heights, OH  44118                      :

CHESTER NOWAK                                      :
75 Cami Court Apt. 207
Walton, KY  41094                                  :

RICHARD PAUL NYDEGGER                              :
11224 SE 172nd Avenue
Happy Valley, OR 97086                             :

THOMAS A. O'DELL                                   :
5877 White Tail Drive
Ooltewah, TN  37363                                :

WALTER ORR

9 Sandlewood Circle                          :
Madison, WI 53716

                                             :

JIM OVERMILLER
1095 Millcreek Road                          :
York, PA 17404

                                             :

BARBARA OXNER (previously Jones)
837 North Cowboy Canyon Drive                :
Green Valley, AZ 85614

                                             :

MARTHA PARRY
139 Lincoln Drive                            :
Oakdale, NY 11769

                                             :

FRANK M. PATTERSON
914 S Lombard                                :
Oak Park, IL 60304

                                             :

TERRY PAULK
4317 Avenue O                                :
Galveston, TX 77550

                                             :

DANIEL T. PERRY
4794 Timberline Drive                        :
North Street, MI 48049

                                             :

KEN PHILBRICK
13300 Indian Rocks Rd #102                   :
Largo, FL 33774

                                             :

FRANK L. PHILLIPS
563 Cook Rd                                  :
Aynor, SC 29511

                                             :

STEPHEN WAYNE PIGG
12345 Highway 601                            :
Midland, NC 28107

                                             :

CLIFFORD L. PINCKNEY
8 Hilton Glen Ct                             :
Chapin, SC 29036

                                             :

RITA E. PINO
7655 West 67th Avenue, #312

Arvada, CO  80004                          :

RONALD M. PINSONEAULT                      :
129 Nicole Drive
Brooklyn, MI  49230                        :

JOHNNY A. PLEMONS                          :
2218 Canterbury Ct.
Deer Park, TX  77536                       :

ROBERT POLLOCK                             :
324 Amundson Parkway
Stoughton, WI  53589                       :

DENNIS H. PORTER                           :
702 N. Wilson St.
Greenfield, IN  46140                      :

DENNIS POWERS                              :
139 Preston Circle
Jacksboro, TN  37757                       :

BLAIR QUASNITSCHKA, as personal            :
representative of the Estate of Linda Kirbus
(formerly Quasnitschka)                    :
14 Applewood Ln.
Avon, CT 06001                             :

PAUL QUATTRONE                             :
2146 Winsley Street
Clermont, FL  34711                        :

MARZIANO P.  RAGNONE                       :
4709 Myra Lee Dr.
Auburn, MI  48611                          :

JAMES RAUEN                                :
1280 Lynrose Lane
Neenah, WI  54956                          :

DONALD P. REIMER                           :
3005 Tudor Way S.E.
Albany, OR  97322                          :

MARIA G. RESNICK

12 Washington Lane                              :
Clifton Park, New York  12065

                                                :

LINDA REYNOLDS
824 Earhart Road                                :
Ann Arbor, MI  48105

                                                :

STAN RICKS
PO Box 2524                                     :
Hammond, LA  70404

                                                :

DICK ROBERTS
4677 Aero Drive                                 :
Lewiston, ID  83501

                                                :

THOMAS ROBY
40 Bay Path Way                                 :
Branford, CT  06405

                                                :

DAVID ROMAN
4506 17th Street W.                             :
Palmetto, FL  34221

                                                :

LLOYD T. ROSENSTEEL
23 Breezy Point Way                             :
Argyle, NY  12809

                                                :

RICHARD K. ROSKOWE
2751-1 E. Aragon Blvd                           :
Sunrise, FL  33313

                                                :

RICHARD ROSSELL
1432 Marlane Drive                              :
Girard, OH  44420

                                                :

RONALD J. RUBIN
1784 Bayshore Drive                             :
Englewood, FL  34223

                                                :

ROBERT RUSSO
9822 W Indore Drive                             :
Littleton, CO  80128

                                                :

KAREN RYAN-WHITE
7901 S. Richmond Avenue

Tulsa, OK  74136-8169                        :

EDWARD M. SAAD                               :
988 Chateau Drive
Marion, OH  43302                            :

JOHN J. SANCHEZ                              :
3219 Rustic Oak
San Antonio, TX  78261                       :

JACK SANDERS                                 :
19793 Casa Verde Way
Fort Myers, FL  33967                        :

MICHAEL L. SANDERS                           :
13817 West 54th Terrace
Shawnee, KS  66216-5106                      :

SHEILA SANDERS                               :
4756 Derbyshire Drive
North Randall, OH  44128                     :

GAIL C. SANTALUCIA-DALY                      :
938 Wilson Drive
Lancaster, SC  29720                         :

PHILIP J. SARCONE                            :
23 Framingham Lane
Shoreham, NY 11786                           :

RICHARD SAULLE                               :
404 Rachael Court
Gibsonia, PA  15044                          :

MARCOS E. SAYAGO                             :
625 Tam O Shanter Dr.
Orlando, FL  32803-6928                      :

GERALD H. SCHIELE                            :
3462 East 62nd Street
Kansas City, MO  64130                       :

DOUGLAS SCHIFFMILLER                         :
2795 Strickland Avenue
Brooklyn, NY  11234

---

TIMOTHY L. SCHWARTZ                          :
6472 Marshall                                :
Canton, MI 48187
                                             :

DAVID L. SEIDEL                              :
1795 Gervais Ave. #6                         :
Maplewood, MN 55109
                                             :

ROGER SEROLA                                 :
6261 SE Winged Foot Dr.                      :
Stuart, FL 34997
                                             :

LEONARD SHAW                                 :
4152 King Richard Dr.                        :
Sarasota, FL   34232
                                             :

ROBERT G. SHEA JR.                           :
908 McKinley                                 :
Bay City, MI  48708
                                             :

SHELDON F. SHEFF                             :
9472 Southgate Drive                         :
Cincinatti, OH  45241
                                             :

WOODROW SHELTON JR.                          :
117 Calloway Lane                            :
Hendersonville, TN  37075
                                             :

DARRYL SHERMAN                               :
1011 Horseshoe Drive                         :
Sugar Land, TX  77478
                                             :

MIKE SHOBE                                   :
PO Box 577                                   :
Ft. White, FL  32038-0577
                                             :

LAWRENCE J. SIMMS                            :
5325 NW 51st Street                          :
Coconut Creek, FL  33073
                                             :

DOUGLAS A. SIMS                              :
3755 Brandi Ln.                              :
Paris, TX  75462

---

ERIC B. SIMS                                             :
705 Melissa Drive
Bolingbrook, IL  60440                                   :

CHINESTA SKIPPER SMITH                                  :
249 Ivan Church Road
Crawfordville, FL  32327                                 :

MARIE SMITH, as personal representative                 :
of the Estate of David William Smith
3802 Spruce Glen Drive                                  :
Kingwood, TX  77339
                                                        :

DENNIS Z. SMITH                                         :
3681 Cheltenham Road
York, PA  17402                                         :

                                                        :

RONALD W.  SMITH                                        :
5843 South 1050 West
Owensville, IN  47665                                   :

                                                        :

ARMANDO D.  SOLER                                       :
7061 SW 99th Avenue
Miami, FL  33173                                        :

                                                        :

DEBORAH ANN SORRELL-ULRICH                              :
673 Wellerburn Avenue
Severna Park, MD  21146                                 :

                                                        :

DAVID ST. JOHN                                          :
13306 E. 94th Place North
Owasso, OK  74055                                       :

                                                        :

SARAH ST. JOHN                                          :
13306 E. 94th Place North
Owasso, OK  74055                                       :

                                                        :

THOMAS STEIN                                            :
1241 Big Oak Lane
Sarasota, FL  34242                                     :

                                                        :

MICHAEL M. STERN                                        :
406 Briarcliff Cir.
Sebastian, FL  32958

CAROL STEVENS (formerly Stehle)                :
605 Kenwood Drive                              :
Vero Beach, FL  32968
                                               :

JOHN STOUT                                     :
1534 Kennellworth Place                        :
Bronx, NY  10465
                                               :

DONALD STRIPLIN                                :
1426 W. Castle Mesa Drive                      :
Castle Rock, CO  80109-9504
                                               :

CELESTE M. SULLIVAN                            :
755 Pine Run Drive                             :
Osprey, FL 34229
                                               :

KURT A.  SUMMERS                               :
5421 East Harmon Apt K14                       :
Las Vegas, NV  89122
                                               :

STANLEY  SUWALA                                :
2582 Mallard Ln.                               :
Gillbertsville, PA  19525-9200
                                               :

PAUL SVABEK                                     :
12800 Hibiscus Avenue                          :
Seminole, FL  33776
                                               :

EDWARD SWANSON                                 :
807 Gascon Place                               :
Temple Terrace, FL  33617
                                               :

MARILYN SWANSON                                :
4914 Ravine Court                              :
Ann Arbor, MI  48105
                                               :

MICHELLE TABLER                                :
11417 Discovery Park Drive                     :
Anchorage, AK  99515
                                               :

RUSSELL A. TAPIE                               :
1608 Disney Drive                              :
Metairie, LA  70003

**THIRD AMENDED COMPLAINT**                    - 30 -

WANDA TATUM                                              :
580 Ridgeway Rd
Jackson, GA 30233                                        :

CHARLES TAYLOR                                          :
1702 Onon Daga Drive
Geneva, FL  32732                                       :

WRIGHT B. TAYLOR, III                                  :
8913 Highway 36
Jones Creek, TX  77541                                  :

ROBERT W. TELKINS                                       :
158 Stoney Creek
Houston, TX  77024                                      :

STEPHEN THOENNES                                        :
5918 Pearson Drive
Brooklyn Center, MN  55429                              :

GARY THOMAS                                             :
8421 Lainie Lane
Orlando, FL  32818                                      :

MONTAGUE A. THOMAS III                                 :
5663 Lakeshore Village Circle
Lake Worth, FL  33463                                   :

JEFFREY TOBIN                                           :
3017 SE 5th Ave.
Cape Coral, FL 33904                                    :

JOSEPH TOMEC                                            :
23080 W. Villa Rica Road
Antioch, IL  60002                                      :

MARY.TURLEY, as personal                               :
representative of the Estate of Robert H.
Turley                                                  :
34251 N. Homestead Road
Gurnee, IL  60031                                       :

ALBERT TURNER                                           :
9754 S. Winston Avenue
Chicago, IL  60643

DAVID J. TUSKEY                                        :
380 Westchester Road                                  :
Saginaw, MI 48603
                                                      :

GEORGE F. TWOHIG                                      :
430 Lowick Drive
Colorado Springs, CO  80906                           :

CORNELL G. VANDEGRIFT                                 :
7955 W. Evelyn Ct.
Cape Canaveral, FL  32920-5129                        :

MILFORD T. VAUGHT, JR.                                :
175 Sims Circle
Waynesville, NC  28786                                :

LOUIS VEAL                                            :
5126 Springfield Ct
Westerville, OH  43081                                :

DALE A. VILLEMAIN                                     :
3501 Amberly Trail
Evans, GA  30809                                      :

CLETA VINING                                          :
641 Romohr Acres
Cincinatti, OH  45244                                 :

JOSEPH J. VIOLA SR.                                   :
2448 N. Neva
Chicago, IL  60707                                    :

RONALD WANEK                                          :
6024 South 93rd Street
Omaha, NE  68127                                      :

BRIAN J. WANLESS                                      :
4078 Delmar View Drive
Grandville, MI  49418                                 :

ARTHUR WASHINGTON                                     :
253 Belton Road
Ruston, LA  71270

TIMOTHY JACKSON WATWOOD                     :
10465 AL Highway 168
Boaz, AL 35957                              :

MARK E. WEGNER                             :
10680 S Shore Dr
Lake, MI  48632                            :

FINDLEY WEST                               :
8719 Golden Chord Circle
Houston, TX  77040                         :

NEIL WHICKER                               :
113 Nicoletti Drive
Midvale, UT  84047                         :

CHARLES L. WILLIAMS                        :
1015 Starling Way
Viera, FL  32955                           :

WALKER WILLIAMS                            :
1820 King James Road
Kissimmee, FL  34744                       :

RODNEY W. WILLIAMS SR.                     :
1383 Gasparilla Drive
Fort Myers, FL  33901                      :

BARRY WILSON                              :
7 Brookside Dr.
Traveleres Rest, SC  29690                :

ROBIN WILSON                              :
1101 Winterhawk Drive
St. Augustine, FL  32084                  :

FRANCES WISNIEWSKI                        :
358 Woodhill Drive
Carol Stream, IL  60188                   :

JAMES  MICHAEL WOOD                       :
125 Williamsburg Lane
Athens, GA  30605                         :

LINDA WOSHNER

**THIRD AMENDED COMPLAINT**          - 33 -

137 South Euclid Avenue          :
Pittsburgh, PA  15202

                                        :

ROBERT A WRIGHT, JR.
1841 Imperial Golf Course Blvd.    :
Naples, FL  34110

                                        :

BARBARA D. WRIGHT, as personal
representative of the Estate of Kevin A.
Wright
117 Crooked Creek Road
Troy, MO  63379

LEONARD YARBROUGH
33003 Pecan Hill Drive
Brookshire, TX 77423

DONALD YOUNG
1147 Oak Ridge
Streamwood, IL  60107

JAMES M. ZAHNER
1211 Covington Drive
Saline, MI  48176

RONALD D. ZARBAUGH
8426 Chamberlain Place
Oviedo, FL  32765

ROSE ZUMWINKLE, as personal
representative of the Estate of William
Zumwinkle
46 Glenview Loop
St. Cloud, MN  56303

MANUEL ZUNIGA
9707 Penn Avenue N
Brooklyn Park, MN  55444

CHARLES D. ZYBURO
7 Monterey Land
Yaphank, NY  11980

*Plaintiffs*,

_____

                    v.

ALLSTATE INSURANCE COMPANY,
THE ALLSTATE CORPORATION, and
EDWARD M. LIDDY, in his capacity as
former President and Chief Executive
Officer of The Allstate Corporation and
Allstate Insurance Company,

               *Defendants.*

_____

## INTRODUCTION

1.      This action is based on the betrayal by Allstate Insurance Company and its parent, The Allstate Corporation (referred to collectively herein as "Allstate"), of approximately 6,200 of its insurance sales agents – comprising virtually its entire work force of "captive" employee agents – whose employment contracts were terminated in 2000.  During the course of their longstanding contractual relationships with Allstate, these employee agents had brought enormous value to the company by investing at least a decade of exclusive service to Allstate and, at its behest, substantial sums of their own money and/or personal resources to expand the company's customer and revenue base.  They made these investments in a "book of business" that Allstate maintains they did not own, based upon the promise Allstate would provide them with a "guaranteed income" and lifetime "financial security," principally through a "superior" compensation package that included substantial benefits under the company's pension, profit sharing and other employee benefit plans (collectively, the "Plans") touted as the best the industry had to offer.

2.      Wishing to get out from under the financial burden of this promise, Allstate strove throughout the 1990's to persuade its employee agents to convert to so-called "exclusive agent

independent contractor" status by telling them that such status would give them even more "entrepreneurial freedom" and a capacity for much greater earning power.  Despite its best efforts, however, Allstate was unable to induce more than a tiny fraction of its employee agent work force to surrender their employment contracts and give up the generous benefit package that came with it.

3.    Having failed in a decade-long effort to persuade its employee agents to voluntarily relinquish their benefits, Allstate and its President and Chief Executive Officer, Edward M. Liddy, decided to dictate that result through coercive and unlawful measures.  To this end, Allstate announced in November 1999 that it was instituting a "group reorganization program" under which approximately 6,200 employee agents—including the plaintiffs named herein and the deceased former agents whose Estates are represented by named plaintiffs (collectively referred to as "Plaintiffs")—would have their employment contracts terminated by June 30, 2000, and would be permitted to remain with Allstate as so-called "exclusive agent independent contractors" only if they signed a standardized, non-negotiable form of release waiving their statutory and common law rights (the "Mass Termination Program").[1]  To ensure that these terminated employee agents would not be able to reacquire their pension and other benefits by obtaining reemployment with the company in some other capacity, Allstate designed and later imposed a moratorium on rehiring employee agents terminated through the Program, regardless of their ample qualifications.

4.    In its public pronouncements, Allstate justified the Mass Termination Program as a measure designed to promote "productivity" and "entrepreneurial freedom," which thereby

---

[1]    Employee agents in Montana were to be terminated as of September 30, 2000, and employee agents in Delaware were to be terminated as of December 31, 2000.

would "re-energize" its insurance sales force of more than 15,000 agents.  In reality, Allstate knew that former employee agents would continue to perform the exact same jobs they had always performed and would be subject to no less control than they had been subject to prior to the Mass Termination Program.

5.      The true reasons underlying Allstate's decision to terminate substantially all of its employee agents were different.  Allstate wished to rob nearly all of its employee agents of the pension and other benefits to which they were or might in the future become entitled under the Plans.

6.      Indeed, the Mass Termination Program was the central feature of a "field realignment" designed to save approximately $325 million in annual expenses, a significant portion of which consisted of annual savings arising out of eliminating the cost of providing pension, profit sharing and other benefits to approximately 6,200 employee agents.

7.      Allstate also instituted the Mass Termination Program was to replace older employee agents with younger hires.  Because Allstate had ceased hiring new R830 or R1500 employee agents by 1990, that segment of its workforce had grown progressively older such that, by October 1999, approximately 90 percent of the remaining employee agents were over the age of 40 and the average age of the remaining employee agents had risen to 50.  Allstate and its senior management stereotypically viewed these older agents as lacking in energy, drive, initiative and entrepreneurial spirit, and they were referred to variously as a "problem," as creating a "toxic environment" and as "bad for the morale of the younger agents."

8.      Correctly reckoning that about 2,000 employee agents would leave the company rather than accept something they had continually spurned over the preceding decade, Allstate's management saw the Mass Termination Program as a singular opportunity to replace upwards of

twenty percent of its older agents and distribute the sizable books of business these agents had been developing and servicing over the period of about a decade or more to new hires who were thought to be more "energetic" and "productive."

9.     In severing the employment contracts of about 6,200 employee agents to deprive them of benefits under the Plans and purge hundreds of older workers from the ranks of its sales force, Allstate acted in blatant violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq.* ("ADEA") and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), and as well as its myriad contractual and fiduciary obligations.

10.     As a result, the terminated employee agents have experienced a sudden and dramatic decline in income.  Many have been forced to abandon their professions, deplete their life savings, sell or mortgage their homes and file for bankruptcy.  Others have suffered from anxiety, depression, loss of self worth and such severe emotional distress that they have required medical treatment or hospitalization and, in some instances, taken their own lives.

11.     To evade accountability for conduct that it well understood to be unlawful, Allstate presented its employee agents with the following ultimatum:  if they did not sign the standardized General Release and Waiver Agreement (the "Release") that purported to waive their right to challenge the legality of the company's conduct, as well as the Release itself, they would not be permitted to continue in the service of the company, albeit as a so-called "exclusive agent independent contractor," or to attempt to sell the profitable books of business they had developed over many years of dedicated service.  In other words, Allstate would sever its ties completely with employee agents who did not sign the Release and confiscate their books of business, including the substantial investments employee agents had been pressured or induced

**THIRD AMENDED COMPLAINT**                    - 38 -

to make therein.  Faced with this "Hobson's choice," only a handful of employee agents were in a position to refuse to sign the Release.

12.     In successfully strong-arming well over 99 percent of employee agents into signing the Release, Allstate exploited the financial vulnerability of its agents and betrayed the confidence they had reposed in the company during relationships that spanned upwards of a decade.  Not only had Allstate aggressively encouraged employee agents to invest their own financial resources for the purpose of building the company's business, it also had prohibited them from selling any competing insurance and financial products, pursuing any other business venture or earning other income for retirement.  Moreover, Allstate imposed severe restrictions on the ability of its employee agents to develop any competing business in the event they ever terminated their Allstate employment.  Thus, when confronted with the Release, employee agents were left so vulnerable to overreaching by Allstate and were under such extreme duress, they had no other choice but to sign.  Not content with the pressure it placed on the agents, Allstate also made repeated misrepresentations about the Release and the consequences of signing or not signing it that had the purpose or effect of inducing reasonable employee agents to sign the Release.  Recognizing the pressures, the United States Equal Employment Opportunity Commission ("EEOC") issued a determination in which it characterized Allstate's conduct as "threats, coercion, and intimidation" and found that the Release was in violation of the ADEA and, hence, unenforceable.

13.     The plaintiffs named herein have brought this suit on behalf of themselves (or the Estates of those deceased former employee agents plaintiffs represent) and the other 5,800 or so similarly-situated employee agents to have the Release declared invalid and to otherwise vindicate their rights under the ADEA, ERISA and the common law.

## JURISDICTION AND VENUE

14.     This is a civil action over which original jurisdiction is vested in this Court by 28 U.S.C. §§ 1331 and 1343(a), and 29 U.S.C. § 626(f)(3).  This Court also is vested with exclusive subject matter jurisdiction over Plaintiffs' claims under ERISA pursuant to 29 U.S.C. § 1132(e)(1) and (f).

15.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims that are so related to claims within its original or exclusive jurisdiction that they form part of the same "case or controversy" under Article III of the United States Constitution.

16.     Venue is appropriate in this Court under 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2) as this action is brought in a judicial district in which a defendant resides or may be found at the time the action is commenced.  Further, many of the Plaintiffs and class members reside in the Commonwealth of Pennsylvania, including counties comprising the Eastern District of Pennsylvania.  The unlawful employment and other practices alleged herein were committed in the Commonwealth of Pennsylvania and throughout the United States.

## PARTIES

### A.     PLAINTIFFS

#### 1.     General Allegations As To All Plaintiffs

17.     Each of the Plaintiffs in this action was employed by Allstate as of November 1, 1999, under an "R830 Allstate Agent Compensation Agreement" ("R830 contract") or an "R1500 Agent Employment Agreement" ("R1500 contract") and had his/her employee status and employment contract terminated by Allstate as part of the Mass Termination Program.

Plaintiffs who were employed under the R830 contract and R1500 contract are referred to herein as "R830 Plaintiffs" and "R1500 Plaintiffs," respectively.

18.     All of the Plaintiffs in this action—except for Stephen Dellapina, Mark DiVincenzo, Sandy K. Fabricatore, Christian G. Farley, Samuel E. Gillette, Gail Rogers Hibbler, D. Craig Mullen, Eric B. Sims, and Dennis Z. Smith—had attained the age of forty (40) prior to the termination of their employment contracts.  Plaintiffs age 40 or older are collectively referred to herein as the "ADEA Plaintiffs."

19.     At all pertinent times, each of the Plaintiffs in this action was an "employee" of Allstate within the meaning of the 29 U.S.C. § 630 and 29 § U.S.C. § 1002(6), and a "participant" in and/or "beneficiary" of the Plans within the meaning of 29 U.S.C. § 1002(7) and (8).

20.     As an integral part of the Mass Termination Program, Allstate presented substantially all of its employee agents in the United States with the Release and instructed that the company would sever their employment and agency relationships entirely on or before June 30, 2000, if they did not sign and return it.  Allstate further instructed that employee agents who signed the Release could select from three so-called "options," two of which required the agent to convert to "exclusive agent independent contractor" status by entering into an "R3001S Allstate Exclusive Agent Agreement" or "R3001C Allstate Exclusive Agency Agreement" (collectively, the "R3001S contract"):

- "Option 1" or the "Forced Conversion Option":  enter into the R3001S contract and continue in the service of Allstate as a so-called "exclusive agent independent contractor" (the "Forced Conversion Option");

- "Option 2" or the "Forced Sale Option":  enter into the R3001S contract for a period of at least one month and then sell their entire book of business to a buyer approved by Allstate, before separating from the company's service; or

- "Option 3" or the "Forced Severance Option":  separate from the service of Allstate and receive what the company characterized as an "enhanced" severance payment payable over a two-year period.

Employee agents who did not sign the Release were instructed they would be eligible to receive "base" severance payments based on the number of years of service provided to Allstate (up to a maximum of 13 weeks of pay).

21.     Approximately 400 employee agents put Allstate on notice of allegations of class-wide age discrimination and/or retaliation by filing timely charges with the EEOC and/or equivalent state agencies.

22.     All administrative prerequisites for maintaining the ADEA Plaintiffs' ADEA claims have been met.  Any other efforts to exhaust administrative remedies would have been futile because the decision to terminate each employee agent was an integral part of a company-wide program authorized at the highest level of Allstate's management, including Richard (Rick) Cohen, the President of Allstate Property and Casualty Insurance Company, and defendant Edward M. Liddy.

**2.     Specific Allegations As To Individual Plaintiffs**

23.     Plaintiff GENE R. ROMERO ("Romero") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Romero signed the Release and left the service of Allstate under the Forced Sale Option.

24.     Plaintiff JOSEPH L. BENOIT ("Benoit") was employed by Allstate for more than nineteen (19) years under an R830 contact.  Benoit refused to sign the Release and was forced to leave the service of Allstate after his R830 contract was terminated.

25.     Plaintiff JAMES T. BEVER ("Bever") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Bever signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

26.     Plaintiff ROGER T. BOYD ("Boyd") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Boyd signed the Release and left the service of Allstate under the Forced Severance Option.

27.     Plaintiff RICHARD A. CARRIER ("Carrier") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Carrier signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

28.     Plaintiff PAUL R. COBB ("P. Cobb") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  P. Cobb signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

29.     Plaintiff CRAIG K. CREASE ("Crease") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Crease signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

30.     Plaintiff SYLVIA KELLY (formerly, Crews-Kelly) ("Kelly") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Kelly signed the Release and left the service of Allstate under the Forced Sale Option.

31.     Plaintiff A. BURTON ENGLISH ("English")[2] is suing in his capacity as personal representative for the Estate of deceased former agent Dwight F. English, who was employed by Allstate for more than eleven (11) years under an R1500 contract.  Dwight F. English signed the Release and left the service of Allstate under the Forced Sale Option.

32.     Plaintiff RONALD W. HARPER ("Harper") was employed by Allstate for more than ten (10) years under an R1500 contract.  Harper signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

33.     Plaintiff MICHAEL P. KEARNEY ("M. Kearney") was employed by Allstate for more than sixteen (16) years under an R830 contract.  M. Kearney signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

34.     Plaintiff THOMAS A. KEARNEY ("T. Kearney") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  T. Kearney signed the Release and left the service of Allstate under the Forced Sale Option.

35.     Plaintiff LARRY H. LANKFORD, SR. ("Lankford") was employed by Allstate for more than twenty-eight (28) years under an R830 contract.  Lankford signed the Release and left the service of Allstate under the Forced Sale Option.

36.     Plaintiff DAVID C. LAWSON ("Lawson") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Lawson signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

---

[2]     The Court substituted A. Burton English as the proper party for original plaintiff Dwight F. English following the former's death.  *See* Oct. 25, 2012 Order, No. 01-CV 3894, ECF Doc. No. 356.

37.     Plaintiff NATHAN R. LITTLEJOHN, II ("Littlejohn") was employed by Allstate for more than nine (9) years under an R1500 contract.  Littlejohn signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

38.     Plaintiff REBECCA R. MASLOWSKI ("Maslowski") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Maslowski signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

39.     Plaintiff CRAIG A. MILLISON ("Millison") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Millison signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

40.     Plaintiff JAMES E. MOOREHEAD ("Moorehead") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Moorehead signed the Release and left the service of Allstate under the Forced Sale Option.

41.     Plaintiff CHRISTOPHER L. PERKINS ("Perkins") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Perkins signed the Release and left the service of Allstate under the Forced Sale Option.

42.     Plaintiff RICHARD E. PETERSON ("Peterson") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Peterson signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

43.     Plaintiff MARY JANE PILCHAK ("Pilchak")[3] is suing in her capacity as personal representative for the Estate of deceased former agent James Pilchak, who was employed by Allstate for more than twenty-eight (28) years under an R830 contract.   James Pilchak signed the Release and left the service of Allstate under the Forced Sale Option.

44.     Plaintiff PAULA REINERIO ("Reinerio") was employed by Allstate for more than ten (10) years under an R1500 contract.  Reinerio signed the Release and left the service of Allstate under the Forced Severance Option.

45.     Plaintiff PAUL L. SHIRLEY ("Shirley") was employed by Allstate for more than nine (9) years under an R1500 contract.  Shirley signed the Release and left the service of Allstate under the Forced Sale Option.

46.     Plaintiff DONALD L. TRGOVICH ("Trgovich") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Trgovich signed the Release and left the service of Allstate under the Forced Sale Option.

47.     Plaintiff RICHARD S. WANDNER ("Wandner") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Wandner signed the Release and left the service of Allstate under the Forced Sale Option.

48.     Plaintiff TIMOTHY WEISMAN ("Weisman") was employed by Allstate for more than eleven (11) years under an R1500 contract.  Weisman signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

---

[3]     The Court substituted Mary Jane Pilchak as the proper party for original plaintiff James English following the former's death.  *See* Feb. 15, 2012 Order, No. 01-CV 3894, ECF Doc. No. 298.

49.     Plaintiff ANTHONY T. WIKTOR ("Wiktor") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Wiktor signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

50.     Plaintiff JOHN W. WITTMAN ("Wittman") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Wittman signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

51.     Plaintiff RALPH J. WOLVERTON ("Wolverton") was employed by Allstate for more than seventeen (17) years under an R830 contract. Wolverton signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

52.     Plaintiff THOMAS ABELL ("Abell") was employed by Allstate for more than sixteen (16) years under an R1500 contract.  Abell signed the Release and left the service of Allstate under the Forced Sale Option.

53.     Plaintiff KATHARINE ADAMS-LOVE (formerly Katharine Kroner) ("Adams-Love") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Plaintiff Adams-Love signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

54.     Plaintiff JOHN AELLEN III ("Aellen") was employed by Allstate for more than ten (10) years under an R1500 contract.  Aellen signed the Release and left the service of Allstate under the Forced Sale Option.

55.     Plaintiff CLYDE ALLEN JR. ("Allen") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Plaintiff Allen signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

56.     Plaintiff JOSEPH ALLEY ("Alley") was employed by Allstate for more than fifteen (15) years under an R830 contract.  Plaintiff Alley signed the release and continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

57.     Plaintiff THOMAS ALLISON ("Allison") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Allison signed the release and continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

58.     Plaintiff RICHARD ALTIERI ("Altieri") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Altieri signed the Release and left the service of Allstate under the Forced Sale Option.

59.     Plaintiff ANDREW ANDERSON ("Anderson") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Anderson signed the Release and continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

60.     Plaintiff CARL ANGELL ("Angell") was employed by Allstate for more than twenty-eight (28) years under an R830 contract.  Angell signed the Release and continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

61.     Plaintiff EUGENIA ANNINO is suing in her capacity as personal representative for the Estate of deceased former Allstate agent Robert S. Annino.  Robert S. Annino was employed by Allstate for more than fourteen years under an R1500 contract.  He signed the Release and left the service of Allstate under the Forced Sale Option.

62.     Plaintiff DANIEL ANULARE ("D. Anulare") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  D. Anulare signed the Release and

continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

63.     Plaintiff LINDA A. ANULARE ("L. Anulare") was employed by Allstate for approximately nineteen (19) years under an R830 contract.  L. Anulare signed the Release and left the service of Allstate under the Forced Sale Option.

64.     Plaintiff BRUCE WILLIAM ASHLEY ("Ashley") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Ashley signed the Release and left the service of Allstate under the Forced Severance Option.

65.     Plaintiff RICHARD L. AURAND ("Aurand") was employed by Allstate for more than twenty (20) years under an R830 contract.  Aurand signed the Release and left the service of Allstate under the Forced Sale Option.

66.     Plaintiff MAXINE BACHICHA ("Bachicha") was employed by Allstate for more than ten (10) years under an R1500 contract.  Bachicha signed the Release and left the service of Allstate under the Forced Sale Option.

67.     Plaintiff HAROLD E. BAKER ("Baker") was employed by Allstate for more than thirty-five (35) years under an R830 contract.  Baker signed the Release and left the service of Allstate under the Forced Sale Option.

68.     Plaintiff ROBERT G. BARZELAY ("Barzelay") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Barzelay signed the Release and left the service of Allstate under the Forced Sale Option.

69.     Plaintiff GARY BAUMGARDNER ("Baumgardner") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Baumgardner signed the Release and

continued to provide services to Allstate under the Forced Conversion Program subsequent to June 30, 2000.

70.     Plaintiff JAMES A. BEARD ("Beard") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Beard signed the Release and continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

71.     Plaintiff DEBORAH S. BECKER ("Becker") was employed by Allstate for more than twelve years under an R1500 contract.  Becker signed the Release and left the service of Allstate under the Forced Severance Option.

72.     Plaintiff RICHARD C. BENNETT ("Bennett") was employed by Allstate for more than twenty-six (26) years under an R830 or R1500 contract.  Bennett signed the Release and continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

73.     Plaintiff COLIN T. BENT ("Bent") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Bent signed the Release and continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

74.     Plaintiff VERNON BENTLEY ("Bentley") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Bentley signed the Release and continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

75.     Plaintiff HAROLD BERNSTEIN ("H. Bernstein") was employed by Allstate for more than ten (10) years under an R1500 contract.  H. Bernstein signed the Release and left the service of Allstate under the Forced Severance Option.

76.     Plaintiff H. Bernstein is also suing in his capacity as personal representative for the Estate of deceased former Allstate agent Sandra Bernstein.  Sandra Bernstein was employed

by Allstate for more than twenty-two (22) years under an R830 contract.  She signed the Release and continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

77.     Plaintiff MONTELL BERRY ("M. Berry") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  M. Berry signed the Release and left the service of Allstate under the Forced Sale Option.

78.     Plaintiff WALLACE BERRY ("W. Berry") was employed by Allstate for more than twenty-two (22) years under an R830 or R1500 contract.  W. Berry signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

79.     Plaintiff LINDA GLASS BEUCHER ("Beucher") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Beucher signed the Release and continued to provide services to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

80.     Plaintiff STANLEY R. BINDER ("Binder") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Binder signed the Release and left the service of Allstate under the Forced Sale Option.

81.     Plaintiff ANDREW BLANCHETTE ("Blanchette") was employed by Allstate for more than twenty-nine (29) years under an R830 contract.  Blanchette signed the Release and left the service of Allstate under the Forced Sale Option.

82.     Plaintiff CRAIG BOCK ("C. Bock") was employed by Allstate for more than twenty-four (24) years under an R830 contract.  C. Bock signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

83.     Plaintiff GARY L. BOCK ("G. Bock") was employed by Allstate for more than nineteen (19) years under an R830 or R1500 contract.  G. Bock signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

84.     Plaintiff DAVID P. BOHAN ("Bohan") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Bohan signed the Release and left the service of Allstate under the Forced Sale Option.

85.     Plaintiff ROLAND BOISIS ("Boisis") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Boisis signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

86.     Plaintiff JANICE D. BOND ("Bond") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Bond signed the Release and left the company's service under the Forced Sale Option.

87.     Plaintiff DWIGHT C. BONDY ("Bondy") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  Bondy signed the Release and left the company's service under the Forced Sale Option.

88.     Plaintiff ROBERT FRANCIS BORTELL ("Bortell") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Bortell signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

89.     Plaintiff DANIEL BOSSIO ("Bossio") was employed by Allstate for more than twenty-two (22) years under an R830 contract.  Bossio signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

90.     Plaintiff JAMES BRACHFELD ("J. Brachfeld") was employed by Allstate for more than thirty-two (32) years under an R830 contract.  J. Brachfeld signed the Release and left the company's service under the Forced Sale Option.

91.     Plaintiff ROBERTA L BRACHFELD ("R. Brachfeld") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  R. Brachfeld signed the Release and left the company's service under the Forced Sale Option.

92.     Plaintiff EUGENE BRANDON ("Brandon") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Brandon signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

93.     Plaintiff MICHAEL J. BRANTMEIER ("Brantmeier") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Brantmeier signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

94.     Plaintiff JAY BROKER ("Broker") was employed by Allstate for more than twenty-eight (28) years under an R1500 contract.  Broker signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

95.     Plaintiff NEAL SWANK BROOKS ("Brooks") was employed by Allstate for more than twenty-eight (28) years under an R830 contract.  Brooks signed the Release and left the service of Allstate under the Forced Sale Option.

96.     Plaintiff FAYE BROWN (F. Brown) was employed by Allstate for more than sixteen (16) years under an R830 contract.  F. Brown signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

97.     Plaintiff LESTER BROWN SR. ("L. Brown") was employed by Allstate for more than twenty (20) years under an R830 contract.  L. Brown signed the Release and left the company's service under the Forced Sale Option.

98.     Plaintiff RICHARD A. BROWN ("R. Brown") was employed by Allstate for more than twenty-two (22) years under an R830 contract.  R. Brown signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

99.     Plaintiff WILLIAM BROWN JR. ("W. Brown") was employed by Allstate for more than seventeen (17) years under an R830 contract.  W. Brown signed the Release and left the company's service under the Forced Severance Option.

100.    Plaintiff RICHARD A. BROWNSON ("Brownson") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Brownson signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

101.    Plaintiff CHARLES R. BURNS III ("Burns") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Burns signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

102.    Plaintiff THOMAS BUSHEY ("Bushey") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Bushey signed the Release and left the service of Allstate under the Forced Sale Option.

103.    Plaintiff DAVID ROSS BUSSELL ("Bussell") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Bussell signed the Release and left the company's service under the Forced Sale Option.

104.     Plaintiff GARY F. CALLAWAY ("G. F. Callaway") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  G. F. Callaway signed the Release and left the company's service under the Forced Sale Option.

105.     Plaintiff GEORGIANA CALLAWAY ("G. Callaway") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  G. Callaway signed the Release and left the company's service under the Forced Sale Option.

106.     Plaintiff ALBERT J. CANNIZZARO ("Cannizzaro") was employed by Allstate for more than thirty-three (33) years under an R830 contract.  Cannizzaro signed the Release and left the company's service under the Forced Sale Option.

107.     Plaintiff LAWRENCE J. CAPOUCH ("Capouch") was employed by Allstate for more than thirty (30) years under an R830 or R1500 contract.  Capouch signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

108.     Plaintiff RICHARD E. CARTER ("Carter") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  Carter signed the Release and left the Allstate's service under the Forced Sale Option.

109.     Plaintiff VICTOR M. CATARISANO ("Catarisano") was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  Catarisano signed the Release and continued in Allstate's service under the Forced Conversion Option subsequent to June 30, 2000.

110.     Plaintiff PORTIA M. CHAMBLISS ("Chambliss") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  Chambliss signed the Release and left the company's service under the Forced Sale Option.

111.     Plaintiff MARK D. CHASE ("Chase") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Chase signed the Release and left the company's service under the Forced Sale Option.

112.     Plaintiff AMY R. CHERRNAY ("Cherrnay") was employed by Allstate for over seventeen (17) years under an R830 contract.  Cherrnay signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

113.     Plaintiff JIMMY CHIN ("Chin") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Chin signed the Release and left the company's service under the Forced Sale Option.

114.     Plaintiff DON C. CHRISTENSEN ("Christensen") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Christensen signed the Release and continued in the company's service under the Forced Conversion Option subsequent to June 30, 2000.

115.     Plaintiff JAMES M. CIRILLO ("Cirillo") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Cirillo signed the Release and continued in the company's service under the Forced Conversion Option subsequent to June 30, 2000.

116.     Plaintiff BRUCE W. CLOTFELTER ("Clotfelter") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Clotfelter signed the Release and left the company's service under the Forced Sale Option.

117.     Plaintiff IRA CLOUD ("Cloud") was employed as an agent by Allstate for more than twenty-one (21) years under an R830 contract.  Cloud signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

118.    Plaintiff MILTON C. COBB ("M. Cobb") was employed by Allstate for more than sixteen (16) years under an R830 contract.  M. Cobb signed the Release and continued in the company's service under the Forced Conversion Option subsequent to June 30, 2000.

119.    Plaintiff MARK CLEMENS COLLIER ("Collier") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Collier signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

120.    Plaintiff WANDA COLLINS-SMITH (Collins-Smith) was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Collins-Smith signed the Release and left the service of Allstate under the Forced Sale Option.

121.    Plaintiff JOSEPH P. CONBOY ("Conboy") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Conboy signed the Release and left the service of Allstate under the Forced Sale Option.

122.    Plaintiff RICHARD F. COOK ("Cook") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Cook signed the Release and left the service of Allstate under the Forced Sale Option.

123.    Plaintiff JANET M. COOLEY ("Cooley") was employed by Allstate for more than twenty-two (22) years under an R830 contract.  Cooley signed the Release and left the company's service under the Forced Sale Option.

124.    Plaintiff JAMES REAVIS CORNETT ("Cornett") was employed by Allstate for more than ten (10) years under an R1500 contract.  Cornett signed the Release and left the company's service under the Forced Sale Option.

125.    Plaintiff CHARLES E. CORRY ("Corry") was employed by Allstate for more than twenty-five years (25) under an R830 contract.  Corry signed the Release and left the company's service under the Forced Sale Option.

126.    Plaintiff BRUCE R. CRALLEY ("Cralley") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Cralley signed the Release and continued in the company's service under the Forced Conversion Option subsequent to June 30, 2000.

127.    Plaintiff JACK J. CRAPARO, JR. ("Craparo") was employed by Allstate for more than twelve years under an R1500 contract.  Craparo signed the Release and left the service of Allstate under the Forced Sale Option.

128.    Plaintiff JAY ANDREW CRYSTAL ("J.A. Crystal") was employed by Allstate for more than twenty (20) years under an R830 contract.  J.A. Crystal signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

129.    Plaintiff J.A. Crystal is also suing in his capacity as personal representative for the Estate of deceased former Allstate agent Diane L. Crystal.  Diane L. Crystal was employed by Allstate for more than fifteen (15) years under an R830 contract.  She signed the Release and left the company's service under the Forced Sale contract.

130.    Plaintiff LONNIE MICHAEL CURTIS ("Curtis") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Curtis signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

131.    Plaintiff BRENT L. DANNER ("Danner") was employed by Allstate for more than twenty-two (22) years under an R830 contract.  Danner signed the Release and left the service of Allstate under the Forced Sale Option.

132.    Plaintiff JOHN DARWISH ("Darwish") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  Darwish signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

133.    Plaintiff HAROLD E. DASKAM ("Daskam") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Daskam signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

134.    Plaintiff JOHN DAVENPORT ("Davenport") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Davenport signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

135.    Plaintiff LESLIE K. DAVIDSON ("L. Davison") was employed by Allstate for more than eighteen (18) years under an R830 contract.  L. Davidson signed the Release and continued in the company's service under the Forced Conversion Option subsequent to June 30, 2000.

136.    Plaintiff ZACHARIAH DAVIDSON III (Z. Davidson) was employed by Allstate for more than ten (10) years under an R1500 contract.  Z. Davidson signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

137.    Plaintiff MICHAEL L. DAVIS ("Davis") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Davis signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

138.    Plaintiff MARGARET DEAN is suing in her capacity as personal representative for the Estate of deceased former Allstate agent Robert T. Dean.  Robert T. Dean was employed

by Allstate approximately thirty-four (34) years under an R830 or R1500 contract.  He signed the Release and left the service of Allstate under the Forced Sale Option.

139.    Plaintiff STEPHEN W. DELLAPINA ("Dellapina") was employed by Allstate for more than nine (9) years under an R1500 contract.  Dellapina signed the Release and left the service of Allstate under the Forced Sale Option.

140.    Plaintiff ERNEST JACK DEMONTE ("DeMonte") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  DeMonte signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

141.    Plaintiff JAMES L. DEPIZZO ("DePizzo) was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  DePizzo signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

142.    Plaintiff JOHN ANTHONY DEVITO ("Devito") was employed by Allstate for more than fifteen (15) years under an R830 contract.  Devito signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

143.    Plainitff MARK DIVINCENZO ("DiVincenzo") was employed by Allstate for more than eleven (11) years under an R1500 contract.  DiVincenzo signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

144.    Plaintiff GAIL D. DICKMAN ("Dickman") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Dickman signed Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

145.     Plaintiff MICHAEL L. DOHENY ("Doheny") was employed by Allstate for more than thirty-six (36) years under an R830 contract.  Doheny signed the Release and left the service of Allstate under the Forced Sale Option.

146.     Plaintiff JEFFERY M. DOMBECK ("Dombeck") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Dombeck signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

147.     Plaintiff TERRANCE P. DONOGHUE ("Donoghue") was employed by Allstate for more than twenty-nine (29) years under an R830 contract.  Donoghue signed the Release and left the service of Allstate under the Forced Sale Option.

148.     Plaintiff VALERY DORSHIMER (previously Valery Sandler) ("Dorshimer") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Dorshimer signed the Release and left the service of Allstate under the Forced Sale Option.

149.     Plaintiff JOYCE F. DOUGLAS ("Douglas") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Douglas signed the Release and left the service of Allstate under the Forced Severance Option.

150.     Plaintiff RUFUS C. DOWELL ("Dowell") was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  Dowell signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

151.     Plaintiff SUSAN P. DRAPEAU ("Drapeau") was employed by Allstate for more than seventeen (17) years under an R830 or R1500 contract.  Drapeau signed the Release and left the service of Allstate under the Forced Severance Option.

152.     Plaintiff RICHARD L. DROE ("Droe") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Droe signed the Release and left the service of Allstate under the Forced Sale Option.

153.     Plaintiff GEORGE F. DRUMMOND ("Drummond") was employed by Allstate for more than twenty-two (22) years under an R830 contract.  Drummond signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

154.     Plaintiff WALTER DUBIEL ("Dubiel") was employed by Allstate for more than twenty-five (25) years under an R830 contract.  Dubiel signed the Release and left the service of Allstate under the Forced Sale Option.

155.     Plaintiff THOMAS R. DURAN ("Duran") was employed by Allstate for more than sixteen years under an R1500 contract.  Duran signed the Release and continued in the company's service under the Forced Conversion Option subsequent to June 30, 2000.

156.     Plaintiff DENNIS R. DYKE ("Dyke") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  Dyke signed the Release and left the service of Allstate under the Forced Sale Option.

157.     Plaintiff LARRY R. DYKSTRA ("Dykstra") was employed by Allstate for more than ten (10) years under an R1500 contract.  Dykstra signed the Release and left the service of Allstate under the Forced Sale Option.

158.     Plaintiff RICHARD MORRISON EARL, JR. ("Earl") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Earl signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

159.    Plaintiff RONALD F. EATON ("Eaton") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  Eaton signed the Release and left the company's service under the Forced Sale Option.

160.    Plaintiff MICHAEL T. ECONOMOS ("Economos") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Economos signed the Release and left the service of Allstate under the Forced Sale Option.

161.    Plaintiff RONALD R. EDWARDS ("Edwards") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Edwards signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

162.    Plaintiff RICHARD F. EIRICH ("Eirich") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Eirich signed the Release and left the company's service under the Forced Sale Option.

163.    Plaintiff ROSLYN K. EISENSTARK ("Eisenstark") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Eisenstark signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

164.    Plaintiff BRUCE ENGERT ("Engert") was employed by Allstate for more than thirty-three (33) years under an R830 contract.  Engert signed the Release and left the company's service under the Forced Sale Option.

165.    Plaintiff JANE ESCHRICH-WALSH ("Eschrich-Walsh") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Eschrich-Walsh signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

166.    Plaintiff WILLIAM F. ESTES ("Estes") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Estes signed the Release and left the company's service under the Forced Sale Option.

167.    Plaintiff STEVEN EVANS ("Evans") was employed by Allstate for more than twenty-eight (28) years under an R830 contract.  Evans signed the Release and continued in the company's service under the Forced Conversion Option subsequent to June 30, 2000.

168.    Plaintiff SANDY K. FABRICATORE ("Fabricatore") was employed by Allstate for more than ten (10) years under an R1500 contract.  Fabricatore signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

169.    Plaintiff JOSEPH FALCONI III ("Falconi") was employed by Allstate for more than twenty-two (22) years under an R830 contract.  Falconi signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

170.    Plaintiff CHRISTIAN G. FARLEY ("Farley") was employed by Allstate for more than eleven (11) years under an R1500 contract.  Farley signed the Release and left the service of Allstate under the Forced Severance Option.

171.    Plaintiff SHEILA FARMER ("Farmer") was employed by Allstate for more than ten (10) years under an R1500 contract.  Farmer signed the Release and left the service of Allstate under the Forced Sale Option.

172.    Plaintiff CURTIS G. FARRAR ("Farrar") was employed by Allstate for more than twenty-five (25) years under an R830 contract.  Farrar signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

173.     Plaintiff RALPH V. FAULK ("Faulk") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Faulk signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

174.     Plaintiff PHILIP DEAN FEISAL ("Feisal") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Feisal signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

175.     Plaintiff CARL E. FIELDER ("Fielder") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Fielder signed the Release and left the service of Allstate under the Forced Sale Option.

176.     Plaintiff DORIS JEAN FIELDS ("Fields") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Fields signed the Release and left the service of Allstate under the Forced Sale Option.

177.     Plaintiff LARRY D. FINLEY ("Finley") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Finley signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

178.     Plaintiff WILLIAM J. FLOOD ("Flood") was employed by Allstate for more than thirty-one (31) years under an R830 contract.  Flood signed the Release and left the service of Allstate under the Forced Severance Option.

179.     Plaintiff GERALD L. FLORES ("Flores") was employed by Allstate for more than twenty-eight (28) years under an R830 contract.  Flores signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

180.    Plaintiff ERIC A. FORD ("Ford") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Ford signed the Release and left the service of Allstate under the Forced Sale Option.

181.    Plaintiff JOHN R. FORREST ("Forrest") was employed by Allstate for more than thirty-four (34) years under an R830 contract.  Forrest signed the Release and left the service of Allstate under the Forced Sale Option.

182.    Plaintiff ALLEN FOSTER ("Foster") was employed by Allstate for over thirty-one (31) years under an R830 contract.  Foster signed the Release and left the service of Allstate under the Forced Sale Option.

183.    Plaintiff ROBERT G. FRANZ ("Franz") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Franz signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

184.    Plaintiff BOSS R. FRIES III ("Fries") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  Fries signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

185.    Plaintiff JODENE S. GARDNER ("Gardner") was employed by Allstate for more than twenty (20) years under an R830 contract.  Gardner signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

186.    Plaintiff ROBERT E. GARY ("Gary") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Gary signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

187.     Plaintiff LARRY O. GENTRY ("Gentry") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Gentry signed the Release and left the service of Allstate under the Forced Sale Option.

188.     Plaintiff SAMUEL GILLETTE (formerly known as Samuel Gillott) ("Gillette") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Gillette signed the Release and left the service of Allstate under the Forced Sale Option.

189.     Plaintiff GARY J. GOELZ ("Goelz") was employed by Allstate for more than twenty-one (21) years under an R830 or R1500 contract.  Goelz signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

190.     Plaintiff RANDOLPH GOODWIN JR. ("Goodwin") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Goodwin signed the Release and left the service of Allstate under the Forced Sale Option.

191.     Plaintiff JAMES A. GRADY ("Grady") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Grady signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

192.     Plaintiff WILLIAM D. GREENE ("Greene") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Greene signed the Release and left the service of Allstate under the Forced Sale Option.

193.     Plaintiff SANDRA M. GUTHRIE ("Guthrie") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  Guthrie signed the Release and left the service of Allstate under the Forced Sale Option.

194.     Plaintiff GERALD W. GUTZEIT ("Gutzeit") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Gutzeit signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

195.     Plaintiff FRANKLIN P. HALL ("Hall") was employed by Allstate for more than thirty-one (31) years under an R830 or R1500 contract.  Hall signed the Release and left the service of Allstate under the Forced Sale Option.

196.     Plaintiff BRENDA C. HAMMOND ("Hammond") was employed by Allstate for more than eleven (11) years under an R1500 contract.  Hammond signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

197.     Plaintiff LORETTA CAUSEY HANNON ("Hannon") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Hannon signed the Release and left the service of Allstate under the Forced Sale Option.

198.     Plaintiff FRANCIS H. HANRATTY ("Hanratty") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Hanratty signed the Release and left the service of Allstate under the Forced Sale Option.

199.     Plaintiff JAN E. HANSON ("Hanson") was employed by Allstate for more than ten (10) years under an R1500 contract.  Hanson signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

200.     Plaintiff CHRISTOPHER A. HARDESTY ("Hardesty") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Hardesty signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

201.    Plaintiff RONALD C. HARRISON JR. ("Harrison") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Harrison signed the Release and left the service of Allstate under the Forced Sale Option.

202.    Plaintiff JOHN W. HEASLEY ("Heasley") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Heasley signed the Release and left the service of Allstate under the Forced Sale Option.

203.    Plaintiff CONI HEIDLE ("Heidle") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Heidle signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

204.    Plaintiff DARLENE J. HEINEN ("Heinen") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Heinen signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

205.    Plaintiff GERALD W. HEINEN ("G. Heinen") was employed by Allstate for more than thirty-one (31) years under an R830 contract.  G. Heinen signed the Release and left the service of Allstate under the Forced Sale Option.

206.    Plaintiff ROBERT HELSEL ("Helsel") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Helsel signed the Release and left the service of Allstate under the Forced Sale Option.

207.    Plaintiff LOUIS J. HEMPHILL ("Hemphill") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Hemphill signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

208.    Plaintiff GAIL ROGERS HIBBLER ("Hibbler") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Hibbler signed the Release and left the service of Allstate under the Forced Severance Option.

209.    Plaintiff LARRY W. HICE ("Hice") was employed by Allstate for more than nineteen (19) years under an R830 or R1500 contract.  Hice signed the Release and left the service of Allstate under the Forced Sale Option.

210.    Plaintiff DANNY R. HIGDON ("Higdon") was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  Higdon signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

211.    Plaintiff PATRICIA A. HILL ("P. Hill") was employed by Allstate for more than eleven (11) years under an R1500 contract.  P. Hill signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

212.    Plaintiff RICHARD D. HILL ("R. Hill") was employed by Allstate for more than ten (10) years under an R1500 contract.  R. Hill signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

213.    Plaintiff JAMES E. HILLAN ("Hillan") was employed by Allstate for more than nineteen (19) years under an R830 or R1500 contract.  Hillan signed the Release and left the service of Allstate under the Forced Sale Option.

214.    Plaintiff LEANNE HINKLE (formerly McCurley) ("Hinkle") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Plaintiff Hinkle signed the Release and left the service of Allstate under the Forced Severance Option.

215.     Plaintiff JOHN HLOHINEC ("Hlohinec") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Hlohinec signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

216.     Plaintiff JIMMY D. HOCK ("Hock") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Hock signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

217.     Plaintiff CHARMAIN A. HORVATH ("Horvath") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Horvath signed the Release and left the service of Allstate under the Forced Sale Option.

218.     Plaintiff DANIEL P. HOURIHANE ("Hourihane") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Hourihane signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

219.     Plaintiff STEVEN H. HOWELL ("Howell") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Howell signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

220.     Plaintiff GEORGE A. HUYE ("Huye") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Huye signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

221.     Plaintiff JOHN A. IAPOCE ("Iapoce") was employed by Allstate for more than thirty-four (34) years under an R830 contract.  Iapoce signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

222.    Plaintiff SANDRA INMAN (previously Sandra L. Holloway) ("Inman") was employed by Allstate for over ten (10) years under an R1500 contract.  Inman signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

223.    Plaintiff CHARLES S. JACKSON ("C. Jackson") was employed by Allstate for more than thirty-two (32) years under an R830 contract.  C. Jackson signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

224.    Plaintiff RICK JAHNS ("R. Jahns") was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  R. Jahns signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

225.    Plaintiff ROBERT JAYSON ("Jayson") was employed by Allstate for more than eleven (11) years under an R1500 contract.  Jayson signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

226.    Plaintiff LELAND T. JELINEK ("Jelinek") was employed by Allstate for more than eleven (11) years under an R1500 contract.  Jelinek signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

227.    Plaintiff CHARLES ("CHUCK") JOHNSON ("C. Johnson") was employed by Allstate for more than nineteen (19) years under an R830 contract.  C. Johnson signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

228.     Plaintiff REECE THOMAS JOHNSON ("R. Johnson") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  R. Johnson signed the Release and left the service of Allstate under the Forced Sale Option.

229.     Plaintiff LARRY DAN JONES ("L. Jones") was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  L. Jones signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000..

230.     Plaintiff RONALD R. JONES ("R. Jones") was employed by Allstate for more than nineteen (19) years under an R830 contract.  R. Jones signed the Release and left the service of Allstate under the Forced Sale Option.

231.     Plaintiff KAREN JUNEMAN is suing in her capacity as personal representative for the Estate of deceased former Allstate agent Roger Michael Juneman.  Roger Juneman was employed by Allstate for more than twenty-nine (29) years under an R830 or R1500 contract. He signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

232.     Plaintiff DAVID N. KAPEC ("Kapec") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Kapec signed the Release and left the service of Allstate under the Forced Sale Option.

233.     Plaintiff KATHLEEN KENNEY ("Kenney") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Plaintiff Kenney signed the Release and left the service of Allstate under the Forced Sale Option.

234.     Plaintiff ROBERT J. KILLEEN ("Killeen") was employed by Allstate for more than thirty-six (36) years under an R830 contract.  Plaintiff Killeen signed the Release and left the service of Allstate under the Forced Sale Option.

235.     Plaintiff ROBERT E. KIMBLE ("Kimble") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Kimble signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

236.     Plaintiff THOMAS E. KROHNER ("Krohner") was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  Plaintiff Krohner signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

237.     Plaintiff MARIA KRUMM is suing in her capacity as personal representative for the Estate of deceased former Allstate agent Gary Krumm.  Gary Krumm was employed by Allstate for more than twenty-two (22) years under an R830 contract.  He signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

238.     Plaintiff AMOS KUYKENDOLL ("Kuykendoll") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Plaintiff Kuykendoll signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

239.     Plaintiff WILLIAM LANDMARK ("Landmark") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Landmark signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

240.    Plaintiff GREGORY LANE ("Lane") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Plaintiff Lane signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

241.    Plaintiff BRUCE LARRABEE ("Larrabee") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Plaintiff Larrabee signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

242.    Plaintiff JENNIFER LATHAM is suing in her capacity as personal representative for the Estate of deceased former Allstate agent Charles Latham.  Charles Latham was employed by Allstate for more than thirty-one (31) years under an R830 contract.  Plaintiff Latham signed the Release and left the service of Allstate under the Forced Sale Option.

243.    Plaintiff CAROL LEBLANC ("LeBlanc") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  LeBlanc signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

244.    Plaintiff JOSEPH LEE ("Lee") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Plaintiff Lee signed the Release and left the service of Allstate under the Forced Severance Option.

245.    Plaintiff SHARON E. LIBBRA ("S. Libbra") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Plaintiff S. Libbra signed the Release and left the service of Allstate under the Forced Sale Option.

246.    Plaintiff TERRY LIBBRA ("T. Libbra") was employed by Allstate for more than fifteen (15) years under an R830 contract.  Plaintiff T. Libbra signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

247.    Plaintiff JANET LINDSAY is suing in her capacity as personal representative for the Estate of deceased former Allstate agent Ronald Lindsay.  Ronald Lindsay was employed by Allstate for more than nineteen (19) years under an R830 contract.  He signed the Release and left the service of Allstate under the Forced Sale Option.

248.    Plaintiff JAMES LONGMAN ("Longman") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Plaintiff Longman signed the Release and left the service of Allstate under the Forced Sale Option.

249.    Plaintiff JOHN LUCAS ("Lucas") was employed by Allstate for more than thirty-one (31) years under an R830 contract.  Plaintiff Lucas signed the Release and left the service of Allstate under the Forced Sale Option.

250.    Plaintiff JAMES E. LYNCH ("Lynch") was employed by Allstate for more than thirty-three (33) years under an R830 or R1500 contract.  Plaintiff Lynch signed the Release and left the service of Allstate under the Forced Sale Option.

251.    Plaintiff MICHAEL MACISCO ("Macisco") was employed by Allstate for more than seventeen (17) years under the R830 contract.  Plaintiff Macisco signed the Release and left the service of Allstate under the Forced Sale Option.

252.    Plaintiff JOHN G. MALEK ("Malek") was employed by Allstate for more than eleven (11) years under an R1500 contract.  Plaintiff Malek signed the Release and left the service of Allstate under the Forced Sale Option.

253.    Plaintiff STEVEN MALLORY ("Mallory") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Mallory signed the Release and left the service of Allstate under the Forced Sale Option.

254.    Plaintiff JOHN MALLOY ("Malloy") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Plaintiff Malloy signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

255.    Plaintiff PATRICIA MARAZO was employed by Allstate for more than seventeen (17) years under an R830 contract.  Plaintiff Marazo signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

256.    Plaintiff NICHOLAS MARINOS ("Marinos") was employed by Allstate for more than ten (10) years under an R1500 contract.  Plaintiff Marinos signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

257.    Plaintiff EUGENE MARONEY ("Maroney") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Plaintiff Maroney signed the Release and left the service of Allstate under the Forced Severance Option.

258.    Plaintiff JOHN MARSH JR. ("Marsh") was employed by Allstate for more than fifteen (15) years under an R830 contract.  Plaintiff Marsh signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

259.    Plaintiff RICHARD MASI ("Masi") was employed by Allstate for more than twenty-five (25) years under an R830 contract.  Plaintiff Masi signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

260.    Plaintiff GLEN MASON ("Mason") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Plaintiff Mason signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

261.    Plaintiff SCOTT MATTINGLY ("Mattingly") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Mason signed the Release and

continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

262.    Plaintiff THOMAS MATYJASIK ("Matyjasik") was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  Plaintiff Matyjasik signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

263.    Plaintiff THOMAS MCCALL ("McCall") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff McCall signed the Release and continued in the service of Allstate under the Forced Conversion Option.

264.    Plaintiff RUDOLPH MCCLINON, JR. ("McClinon") was employed by Allstate for more than sixteen (16) years under an R1500 contract.  Plaintiff McClinon signed the Release and left the service of Allstate under the Forced Sale Option.

265.    Plaintiff CASEY MCCOY ("McCoy") was employed by Allstate for approximately twenty (20) years under an R1500 contact.  Plaintiff McCoy signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

266.    Plaintiff SHERRY MCDONALD ("McDonald") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Plaintiff McDonald signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

267.    Plaintiff THOMAS MCEVANS, III ("McEvans") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Plaintiff McEvans signed the Release and left the service of Allstate under the Forced Severance Option.

268.    Plaintiff JAMES MCGUIRE ("McGuire") was employed by Allstate for more than twenty (20) years under an R830 contract.  Plaintiff McGuire signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

269.    Plaintiff JOHN F. MCKENZIE ("McKenzie") was employed by Allstate for more than ten (10) years under an R1500 contract.  McKenzie signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

270.    Plaintiff ANTHONY MCMURRAY ("McMurray") was employed by Allstate for more than thirty-six (36) years under an R830 contract.  McMurray signed the Release and left the service of Allstate under the Forced Sale Option.

271.    Plaintiff PETER MCVITTIE ("McVittie") was employed by Allstate for more than thirty (30) years under an R830 contract.  Plaintiff McVittie signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

272.    Plaintiff JERREL L. MEAD ("Mead") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Mead signed the Release and left the service of Allstate under the Forced Sale Option.

273.    Plaintiff MARY MENDOZA ("Mendoza") was employed by Allstate for more than eleven (11) years under an R1500 contract.  Plaintiff Mendoza signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

274.    Plaintiff ORTON W. MESSENGER ("Messenger") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Plaintiff Messenger signed the Release

and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

275.    Plaintiff SUSAN MESSINA ("Messina") was employed by Allstate for more than twenty (20) years under an R830 contract.  Plaintiff Messina signed the Release and left the service of Allstate under the Forced Sale Option.

276.    Plaintiff PHILIP METCALFE ("Metcalfe") was employed by Allstate for more than eighteen (18) years under an R830 or R1500 contract.  Plaintiff Metcalfe signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

277.    Plaintiff RONALD METZGER ("Metzger") was employed by Allstate for more than twenty-four (24) years under an R830 contract.  Plaintiff Metzger signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

278.    Plaintiff MICHAEL MEYER ("Meyer") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Plaintiff Meyer signed the Release and left the service of Allstate under the Forced Sale Option.

279.    Plaintiff ARTHUR MILES ("Miles") was employed by Allstate for more than eighteen (18) years under an R830 or R1500 contract.  Plaintiff Miles signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

280.    Plaintiff FRANK MILLER, JR. ("F. Miller") was employed by Allstate for more than ten (10) years under an R1500 contract.  Plaintiff F. Miller signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

281.     Plaintiff JAMES THOMAS MILLER ("J. Miller") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Plaintiff J. Miller signed the Release and left the service of Allstate under the Forced Severance Option.

282.     Plaintiff JEAN MINAL ("Minal") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Plaintiff Minal signed the Release and left the service of Allstate under the Forced Sale Option.

283.     Plaintiff FRIEDA MINGA ("Minga") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Minga signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

284.     Plaintiff BARBARA ANN MINK is suing in her capacity as personal representative for the Estate of deceased former Allstate agent Daniel Mink.  Daniel Mink was employed by Allstate for more than sixteen (16) years under an R830 contract.  He signed the Release and left the service of Allstate under the Forced Sale Option.

285.     Plaintiff ROBERT MINTON ("R. Minton") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Plaintiff R. Minton signed the Release and left the service of Allstate under the Forced Sale Option.

286.     Plaintiff JOSEPH MONTANARO ("Montanaro") was employed by Allstate for more than thirty-three (33) years under an R830 contract.  Plaintiff Montanaro signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

287.     Plaintiff RICHARD MOORE ("R. Moore") was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  Plaintiff R. Moore signed the Release and left the service of Allstate under the Forced Sale Option.

288.     Plaintiff STAFFORD WALTER MOORE ("S. Moore") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Plaintiff S. Moore signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

289.     Plaintiff DINAH MORGAN ("D. Morgan") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Plaintiff D. Morgan signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

290.     Plaintiff SYLVIA MOSLEY ("Mosley") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  Plaintiff Mosley signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

291.     Plaintiff D. CRAIG MULLEN ("Mullen") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Plaintiff Mullen signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

292.     Plaintiff KELLY PATRICK MULLIGAN ("Mulligan") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Mulligan signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

293.     Plaintiff DARRELL NAMIE ("Namie") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Plaintiff Namie signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

294.     Plaintiff HERBERT NEWMAN ("Newman") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  Plaintiff Newman signed the Release and left the service of Allstate under the Forced Sale Option.

295.     Plaintiff CHESTER NOWAK ("Nowak") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  Plaintiff Nowak signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

296.     Plaintiff RICHARD NYDEGGER ("Nydegger") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Plaintiff Nydegger signed the Release and left the service of Allstate under the Forced Sale Option.

297.     Plaintiff THOMAS O'DELL ("O'Dell") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff O'Dell signed the Release and left the service of Allstate under the Forced Sale Option.

298.     Plaintiff WALTER ORR ("Orr") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Plaintiff Orr signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

299.     Plaintiff JAMES OVERMILLER ("Overmiller") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Plaintiff Overmiller signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

300.     Plaintiff BARBARA OXNER (previously Barbara Jones) ("Oxner") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Oxner signed the Release and left the service of Allstate under the Forced Sale Option.

301.     Plaintiff MARTHA PARRY ("Parry") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Plaintiff Parry signed the Release and left the service of Allstate under the Forced Sale Option.

302.     Plaintiff FRANK PATTERSON ("Patterson") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  Plaintiff Patterson signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

303.     Plaintiff TERRY PAULK ("Paulk") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Plaintiff Paulk signed the Release and left the service of Allstate under the Forced Sale Option.

304.     Plaintiff DANIEL PERRY ("Perry") was employed by Allstate for at least twenty (20) under an R830 contract.  Plaintiff Perry signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

305.     Plaintiff KENNETH PHILBRICK ("Philbrick") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Plaintiff Philbrick signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

306.     Plaintiff FRANK LESLIE PHILLIPS, JR. ("Phillips") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Phillips signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

307.     Plaintiff STEPHEN PIGG ("Pigg") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Plaintiff Pigg signed the Release and left the service of Allstate under the Forced Severance Option.

308.     Plaintiff CLIFFORD PINCKNEY ("Pinckney") was employed by Allstate for more than twenty-eight (28) years under an R830 contract.  Plaintiff Pinckney signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

309.     Plaintiff RITA PINO ("Pino") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Plaintiff Pino signed the Release and left the service of Allstate under the Forced Sale Option.

310.     Plaintiff RONALD PINSONEAULT ("Pinsoneault") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Plaintiff Pinsoneault signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

311.     Plaintiff JOHNNY PLEMONS ("Plemons") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Plaintiff Plemons signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

312.     Plaintiff ROBERT POLLOCK ("Pollock") was employed by Allstate for more than eleven (11) years under an R1500 contract.  Plaintiff Pollock signed the Release and left the service of Allstate under the Forced Sale Option.

313.     Plaintiff DENNIS PORTER ("Porter") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Plaintiff Porter signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

314.     Plaintiff DENNIS POWERS ("Powers") was employed by Allstate for more than ten (10) years under an R1500 contract.  Plaintiff Powers signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

315.     Plaintiff BLAIR QUASNITSCHKA is suing in his capacity as personal representative for the Estate of deceased former Allstate agent Linda Kirbus (formerly Linda Quasnitschka).  Linda Kirbus was employed by Allstate for more than twenty-two (22) years under an R830 contract.  She signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

316.     Plaintiff PAUL QUATTRONE ("Quattrone") was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  Plaintiff Quattrone signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

317.     Plaintiff MARZIANO RAGNONE ("Ragnone") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Plaintiff Ragnone signed the Release and left the service of Allstate under the Forced Sale Option.

318.     Plaintiff JAMES RAUEN ("Rauen") was employed by Allstate for more than twenty-four (24) years under an R830 contract.  Plaintiff Rauen signed the Release and left the service of Allstate under the Forced Sale Option.

319.    Plaintiff DONALD REIMER ("Reimer") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Plaintiff Reimer signed the Release and left the service of Allstate under the Forced Severance Option.

320.    Plaintiff G. MARIA RESNICK ("Resnick") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  Plaintiff Resnick signed the Release and left the service of Allstate under the Forced Sale Option.

321.    Plaintiff LINDA REYNOLDS ("Reynolds") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Reynolds signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

322.    Plaintiff STAN RICKS ("Ricks") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Plaintiff Ricks signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

323.    Plaintiff DICK ROBERTS ("D. Roberts") was employed by Allstate for more than twenty-five (25) years under an R830 contract.  Plaintiff D. Roberts signed the Release and left the service of Allstate under the Forced Sale Option.

324.    Plaintiff THOMAS ROBY ("Roby") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Plaintiff Roby signed the Release and left the service of Allstate under the Forced Sale Option.

325.    Plaintiff DAVID LOUIS ROMAN ("Roman") was employed by Allstate for more than twenty-one (21) years under an R830 or R1500 contract.  Plaintiff Roman signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

326.     Plaintiff LLOYD ROSENSTEEL ("Rosensteel") was employed by Allstate for more than twenty-eight (28) years under an R830 contract.  Plaintiff Rosensteel signed the Release and left the service of Allstate under the Forced Sale Option.

327.     Plaintiff RICHARD K. ROSKOWE ("Roskowe") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Plaintiff Roskowe signed the Release and left the service of Allstate under the Forced Sale Option.

328.     Plaintiff RICHARD ROSSELL ("Rossell") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  Plaintiff Rossell signed the Release and left the service of Allstate under the Forced Sale Option.

329.     Plaintiff RONALD RUBIN ("Rubin") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Plaintiff Rubin signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

330.     Plaintiff ROBERT P. RUSSO ("Russo") was employed by Alltsate for more than thirty-three (33) years under an R830 contract.  Russo signed the Release and left the service of Allstate under the Forced Sale Option.

331.     Plaintiff KAREN RYAN-WHITE ("Ryan-White") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Ryan-White signed the Release and continued to provide service to Allstate under the Forced Conversion Option subsequent to June 30, 2000.

332.     Plaintiff EDWARD SAAD ("Saad") was employed by Allstate for more than twenty (20) years under R830 contract.  Saad signed the Release and left the service of Allstate under the Forced Severance Option.

333.    Plaintiff JOHN SANCHEZ ("Sanchez") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Sanchez signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

334.    Plaintiff JACK M. SANDERS ("J. Sanders") was employed by Allstate for more than thirty-four (34) years under an R830 contract.  J. Sanders signed the Release and left the service of Allstate under the Forced Sale Option.

335.    Plaintiff MICHAEL L. SANDERS ("M. Sanders") was employed by Allstate for more than sixteen (16) years under an R830 contract.  M. Sanders signed the Release and left the service of Allstate under the Forced Sale Option.

336.    Plaintiff SHEILA L. SANDERS ("S. Sanders") was employed by Allstate for more than eighteen (18) years under an R830 contract.  S. Sanders signed the Release and left the service of Allstate under the Forced Sale Option.

337.    Plaintiff GAIL SANTALUCIA-DALY ("Santalucia-Daly") was employed by Allstate for more than twenty (20) years under an R830 contract.  Santalucia-Daly signed the Release and left the service of Allstate under the Forced Severance Option.

338.    Plaintiff PHILIP J. SARCONE ("Sarcone") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Sarcone signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

339.    Plaintiff RICHARD L. SAULLE ("Saulle") was employed by Allstate for more than thirty-four (34) years under an R830 contract.  Saulle signed the Release and left the service of Allstate under the Forced Sale Option.

340.     Plaintiff MARCOS E. SAYAGO ("Sayago") was employed by Allstate for more than twenty-five (25) years under an R830 contract.  Sayago signed the Release and left the service of Allstate under the Forced Sale Option.

341.     Plaintiff GERALD HERBERT SCHIELE ("Schiele") was employed by Allstate for more than ten (10) years under an R1500 contract.  Schiele signed the Release and left the service of Allstate under the Forced Sale Option.

342.     Plaintiff DOUGLAS SCHIFFMILLER ("Schiffmiller") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  Schiffmiller signed the Release and left the service of Allstate under the Forced Sale Option.

343.     Plaintiff TIMOTHY L. SCHWARTZ ("Schwartz") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Schwartz signed the Release and left the service of Allstate under the Forced Sale Option.

344.     Plaintiff DAVID L. SEIDEL ("Seidel") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  Seidel signed the Release and left the service of Allstate under the Forced Sale Option.

345.     Plaintiff ROGER SEROLA ("Serola") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Serola signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

346.     Plaintiff LEONARD LEROY SHAW ("Shaw") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Shaw signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

347.     Plaintiff ROBERT G. SHEA JR. ("Shea") was employed by Allstate for more than twenty (20) years under an R830 contract.  Shea signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

348.     Plaintiff SHELDON F. SHEFF ("Sheff") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Sheff signed the Release and left the service of Allstate under the Forced Sale Option.

349.     Plaintiff WOODROW SHELTON JR. ("Shelton") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Shelton signed the Release and left the service of Allstate under the Forced Sale Option.

350.     Plaintiff DARRYL SHERMAN ("Sherman") was employed by Allstate for more than twenty-nine (29) years under an R830 contract.  Sherman signed the Release and left the service of Allstate under the Forced Severance Option.

351.     Plaintiff MIKE SHOBE ("Shobe") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Shobe signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

352.     Plaintiff LAWRENCE SIMMS ("L. Simms") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  L. Simms signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

353.     Plaintiff DOUGLAS A. SIMS ("D. Sims") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  D. Sims signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

354.    Plaintiff ERIC B. SIMS ("E. Sims") was employed by Allstate for more than eleven (11) years under an R1500 contract.  E. Sims signed the Release and left the service of Allstate under the Forced Sale Option.

355.    Plaintiff CHINESTA SKIPPER SMITH ("C. Smith") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Skipper signed the Release and left the service of Allstate under the Forced Sale Option.

356.    Plaintiff MARIE SMITH is suing in her capacity as personal representative for the Estate of deceased former agent David William Smith ("D.W. Smith").  D.W. Smith was employed by Allstate for more than eighteen (18) years under an R830 contract.  D. W. Smith signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

357.    Plaintiff DENNIS Z. SMITH ("D. Z. Smith") was employed by Allstate for more than thirteen (13) years under an R1500 contract.  D. Z. Smith signed the Release and left the service of Allstate under the Forced Sale option.

358.    Plaintiff RONALD W. SMITH ("R. Smith") was employed by Allstate for more than sixteen (16) years under an R830 contract.  R. Smith signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

359.    Plaintiff ARMANDO D. SOLER ("Soler") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Soler signed the Release and left the service of Allstate under the Forced Sale Option.

360.    Plaintiff DEBORAH SORRELL-ULRICH ("Sorrell-Ulrich") was employed by Allstate for more than eighteen (18) years under an R830 contract.  Sorrell-Ulrich signed the Release and left the service of Allstate under the Forced Sale Option.

361.     Plaintiff DAVID ST. JOHN ("D. St. John") was employed by Allstate for more than eighteen (18) years under an R830 contract.  D. St. John signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

362.     Plaintiff SARAH A. ST. JOHN (S. St. John) was employed by Allstate for more than thirteen (13) years under an R1500 contract.  S. St. John signed the Release and left the service of Allstate as an agent under the Forced Sale Option.

363.     Plaintiff CAROL P. STEVENS (formerly Carol Stehle) ("Stevens") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Stehle signed the Release and left the service of Allstate under the Forced Sale Option.

364.     Plaintiff THOMAS D. STEIN ("Stein") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  Stein signed the Release and left the service of Allstate under the Forced Sale Option.

365.     Plaintiff MICHAEL M. STERN was employed by Allstate for more than thirty (30) years under an R1500 contract.  He signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

366.     Plaintiff JOHN STOUT ("Stout") was employed by Allstate for more than twenty-seven (27) years under an R830 contract.  Stout signed the Release and left the service of Allstate under the Forced Sale Option.

367.     Plaintiff DONALD J. STRIPLIN ("Striplin") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Striplin signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

368.     Plaintiff CELESTE M. SULLIVAN ("Sullivan") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Sullivan signed the Release and left the service of Allstate under the Forced Sale Option.

369.     Plaintiff KURT A. SUMMERS ("Summers") was employed by Allstate for more than fifteen (15) years under an R1500 contract.  Summers signed the Release and left the service of Allstate under the Forced Sale Option.

370.     Plaintiff STANLEY J. SUWALA ("Suwala") was employed by Allstate for more than twenty-five (25) years under an R830 contract.  Suwala signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

371.     Plaintiff PAUL GERALD SVABEK ("Svabek") was employed by Allstate for more than twenty-two (22) years under an R830 contract.  Svabek signed the Release and left the service of Allstate under the Forced Sale Option.

372.     Plaintiff EDWARD C. SWANSON ("E. Swanson") was employed by Allstate for at least fifteen (15) years under an R1500 contract.  E. Swanson signed the Release and left the service of Allstate under the Forced Sale Option.

373.     Plaintiff MARILYN SWANSON ("M. Swanson") was employed by Allstate for more than twenty-two (22) years under an R830 contract.  M. Swanson signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

374.     Plaintiff MICHELLE M. TABLER ("Tabler") was employed by Allstate for approximately seventeen (17) years under an R830 contract.  Tabler signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

375.    Plaintiff RUSSELL A. TAPIE ("Tapie") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Tapie signed the Release and left the service of Allstate under the Forced Sale Option.

376.    Plaintiff WANDA TATUM ("Tatum") was employed by Allstate for more than sixteen (16) years under an R830 contract.  Tatum signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

377.    Plaintiff CHARLES TAYLOR ("C. Taylor") was employed by Allstate for more than eighteen (18) years under an R830 contract.  C. Taylor signed the Release and left the service of Allstate under the Forced Sale Option.

378.    Plaintiff WRIGHT B. TAYLOR ("W. Taylor") was employed by Allstate for more than twenty-nine (29) years under an R830 contract.  W. Taylor signed the Release and left the service of Allstate under the Forced Sale Option.

379.    Plaintiff ROBERT W. TELKINS ("Telkins") was employed by Allstate for more than thirty-seven (37) years under an R830 contract.  Telkins signed the Release and left the service of Allstate under the Forced Sale Option.

380.    Plaintiff STEPHEN U. THOENNES ("Thoennes") was employed by Allstate for more than twenty-six (26) years under R830 contract.  Thoennes signed the Release and left the service of Allstate under the Force Sale Option.

381.    Plaintiff GARY L. THOMAS ("G. Thomas") was employed by Allstate for more than seventeen (17) years under an R830 contract.  G. Thomas signed the Release and left the service of Allstate under the Forced Sale Option.

382.    Plaintiff MONTAGUE A. "BUD" THOMAS III ("M. Thomas") was employed by Allstate for more than twelve (12) years under an R1500 contract.  M. Thomas signed the

Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

383.    Plaintiff JEFFREY TOBIN ("Tobin") was employed by Allstate for more than ten (10) years under an R1500 contract.  Tobin signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

384.    Plaintiff JOSEPH GEORGE TOMEC ("Tomec") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Tomec signed the Release and left the service of Allstate under the Forced Sale Option.

385.    Plaintiff MARY TURLEY is suing in her capacity as personal representative for the Estate of deceased former Allstate agent Robert H. Turley.  Robert H. Turley was employed by Allstate for more than twenty-three (23) years under an R830 contract.  He signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

386.    Plaintiff ALBERT TURNER ("Turner") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  Turner signed the Release and left the service of Allstate under the Forced Sale Option.

387.    Plaintiff DAVID J. TUSKEY ("Tuskey') was employed by Allstate for more than eighteen (18) years under an R830 contract.  Tuskey signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

388.    Plaintiff GEORGE F. TWOHIG ("Twohig") was employed by Allstate for more than thirty-six (36) years under an R830 contract.  Twohig signed the Release and left the service of Allstate under the Forced Sale Option.

389.    Plaintiff CORNELL G. VANDEGRIFT ("Vandegrift") was employed by Allstate for more than twenty-three (23) years under an R830 contract.  Vandegrift signed the Release and left the service of Allstate under the Forced Sale Option.

390.    Plaintiff MILFORD T. VAUGHT, JR. ("Vaught") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Vaught signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

391.    Plaintiff LOUIS VEAL ("Veal") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Veal signed the Release and left the service of Allstate under the Forced Sale Option.

392.    Plaintiff DALE A. VILLEMAIN ("Villemain") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Villemain signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

393.    Plaintiff CLETA M. VINING ("Vining") was employed by Allstate for more than twenty (20) years under an R830 contract.  Vining signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

394.    Plaintiff JOSEPH J. VIOLA SR. ("Viola") was employed by Allstate for more than thirty-one (31) years under an R830 contract.  Viola signed the Release and left the service of Allstate under the Forced Sale Option.

395.    Plaintiff RONALD A. WANEK ("Wanek") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  Wanek signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

396.     Plaintiff BRIAN J. WANLESS ("Wanless") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  Wanless signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

397.     Plaintiff ARTHUR L. WASHINGTON ("Washington") was employed by Allstate for more than twenty-six (26) years under an R830 contract.  Washington signed the Release and left the service of Allstate under the Forced Sale Option.

398.     Plaintiff TIMOTHY J. WATWOOD ("Watwood") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Watwood signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

399.     Plaintiff MARK E. WEGNER ("Wegner") was employed by Allstate for more than sixteen (16) years under an R1500 contract. Wegner signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

400.     Plaintiff FINDLEY L. WEST ("West") was employed by Allstate for more than thirty-three (33) years under an R830 contract.  West signed the Release and left the service of Allstate under the Forced Sale Option.

401.     Plaintiff NEIL W. WHICKER ("Whicker") was employed by Allstate for more than twenty-one (21) years under an R830 contract.  Whicker signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

402.     Plaintiff CHARLES L. WILLIAMS ("C. Williams") was employed by Allstate for more than twenty-five (25) years under an R830 contract.  C. Williams signed the Release and left the service of Allstate under the Forced Severance Option.

403.     Plaintiff WALKER WILLIAMS ("W. Williams") was employed by Allstate for more than eighteen (18) years under an R830 contract.  W. Williams signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

404.     Plaintiff RODNEY WILLIAMS SR. ("R. Williams") was employed by Allstate for more than twenty-two (22) years under an R830 contract.  R. Williams signed the Release and left the service of Allstate under the Forced Sale Option.

405.     Plaintiff BARRY L. WILSON SR. ("B. Wilson") was employed by Allstate for more than fourteen (14) years under an R1500 contract.  B. Wilson signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

406.     Plaintiff ROBIN LEE WILSON ("R. L. Wilson") was employed by Allstate for more than seventeen (17) years under an R830 contract.  R. L. Wilson signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

407.     Plaintiff FRANCES C. WISNIEWSKI ("Wisniewski") was employed by Allstate for more than seventeen (17) years under an R830 contract.  Wisniewski signed the Release and left the service of Allstate under the Forced Sale Option.

408.     Plaintiff JAMES M. WOOD ("Wood") was employed by Allstate for more than twenty-five (25) years under an R830 contract.  Wood signed the Release and left the service of Allstate under the Forced Sale Option.

409.     Plaintiff LINDA ANN WOSHNER ("Woshner") was employed by Allstaet for more than thirteen (13) years under an R1500 contract.  Woshner signed the Release and

continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

410.    Plaintiff BARBARA D. WRIGHT is suing in her capacity as personal representative for the Estate of deceased former Allstate agent Kevin A. Wright.  Kevin A. Wright was employed by Allstate for more than fourteen (14) years under an R1500 contract. He signed the Release and left the service of Allstate under the Forced Sale Option.

411.    Plaintiff ROBERT A. WRIGHT JR. ("R. Wright") was employed by Allstate for more than ten (10) years under an R1500 contract.  R. Wright signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

412.    Plaintiff LEONARD M. YARBROUGH ("Yarbrough") was employed by Allstate for more than nineteen (19) years under an R830 contract.  Yarbrough signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

413.    Plaintiff DONALD A. YOUNG ("D. Young") was employed by Allstate for more than twenty (20) years under an R830 contract.  Young signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

414.    Plaintiff JAMES M. ZAHNER ("Zahner") was employed by Allstate for more than twelve (12) years under an R1500 contract.  Zahner signed the Release and continued in service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

415.    Plaintiff RONALD D. ZARBAUGH ("Zarbaugh") was employed by Allstate for more than twenty (20) years under an R830 contract.   Zarbaugh signed the Release and left the service of Allstate under the Forced Sale Option.

416.     Plaintiff ROSE ZUMWINKLE is suing in her capacity as personal representative for the Estate of her deceased husband and former Allstate agent William Zumwinkle. William Zumwinkle was employed by Allstate for more than twenty-eight (28) years under an R830 or R1500 contract. He signed the Release and left the service of Allstate under the Forced Sale Option.

417.     Plaintiff MANUEL B. ZUNIGA SR. ("Zuniga") was employed by Allstate for more than eighteen (18) years under an R830 contract. Zuniga signed the Release and continued in the service of Allstate under the Forced Conversion Option subsequent to June 30, 2000.

418.     Plaintiff CHARLES DENNIS ZYBURO ("Zyburo") was employed by Allstate for more than eleven (11) years under an R1500 contract. Zyburo signed the Release and left the service of Allstate under the Forced Sale Option.

B.     DEFENDANTS

419.     Defendant EDWARD M. LIDDY ("Liddy") is being sued in his capacity as the former President, Chief Executive Officer and Chairman of Allstate (and one or more of its subsidiaries and affiliates). Liddy served as Allstate's Chief Operating Officer from August 1994 to January 1999; Chief Executive Officer from January 1999 to May 2005; and as Chairman of the Board of Directors from January 1999 to April 2008. Defendant Liddy is a "person" within the meaning of ERISA, including 29 U.S.C. § 1140.

420.     Defendant THE ALLSTATE CORPORATION is a publicly-traded Delaware corporation, having its principal place of business in Northbrook, Illinois. The Allstate Corporation conducts business throughout the United States and abroad through its various subsidiaries and affiliates. Defendant The Allstate Corporation is a "person" within the meaning of ERISA, including 29 U.S.C. § 1140.

421.    Defendant ALLSTATE INSURANCE COMPANY is an Illinois corporation, having its principal place of business in Northbrook, Illinois.   Allstate Insurance Company conducts business throughout the United States and abroad, whether through an affiliate or subsidiary or otherwise. Allstate Insurance Company is a wholly-owned subsidiary of The Allstate Corporation and/or one or more of its subsidiaries and affiliates.  Defendant Allstate Insurance Company is a "person" within the meaning of ERISA, including 29 U.S.C. § 1140.

422.    At all times relevant hereto, Allstate Insurance Company and The Allstate Corporation were each an "employer" within the meaning of the ADEA and ERISA because they were engaged in an industry affecting commerce that had twenty (20) or more employees. Allstate Insurance Company and The Allstate Corporation constituted a "single employer" of the Plaintiffs and other similarly-situated persons.  Among other things, the operations of Allstate Insurance Company and The Allstate Corporation are interrelated and they share common directors, officers and personnel.  The Allstate Corporation was directly and integrally involved in, and exercised *de facto* control over, among other things, financing decisions, funding and personnel, culminating in the decisions at issue in this case.  Allstate Insurance Company is identified as the sponsor of the Agents Pension Plan (the "Pension Plan") and The Allstate Corporation is identified as the sponsor of The Savings and Profit Sharing Fund of Allstate Employees (the "Profit Sharing Plan").  Additionally, The Allstate Corporation made sure employees of its subsidiaries and affiliates, including Allstate Insurance Company (collectively, the "Allstate Controlled Group"), were eligible to participate in the Pension Plan, the Profit Sharing Plan and some or all of the other Plans.

# FACTUAL ALLEGATIONS

**A.**     **ALLSTATE USED THE PROMISE OF LIFETIME FINANCIAL SECURITY TO INDUCE ITS WORKFORCE OF "CAPTIVE" EMPLOYEE AGENTS TO DEDICATE THEIR CAREERS AND FINANCIAL RESOURCES TO ITS CONTINUING PROFITABILITY**

423.     Prior to October 1984, almost all of Allstate's insurance agents had been employed under the R830 contract.  This contract expressly created an "employer-employee" relationship between Allstate and the insurance sales agents hired under it and made those employee agents "captive agents" of Allstate:  they were required to devote their entire business time to the sale of Allstate's insurance and financial products and prohibited from selling insurance and financial products on behalf of competing companies.  These agents were compensated principally through commissions both on any new business they generated and on the renewal of existing business, including a commission-based "production allowance" for vacation, personal holidays, family and other illness, attending company meetings and other time away from their agencies. Additionally, Allstate provided these employee agents with a furnished office or other sales location from which they could solicit and service their "books of business" and covered standard expenses for the agent to conduct his or her business on behalf of the company.

424.     In recognition of the substantial amount of time and resources required for agents to build up a profitable "book of business," the R830 contract created an express and implied relationship of indefinite duration in which agents were afforded both substantive and procedural protections to ensure that they could be terminated only for "good cause" and in limited circumstances.  Accordingly, the R830 contract specified "unsatisfactory work" as the sole basis upon which an agent could be terminated and further provided that, prior to any termination

(other than a criminal act or an act of dishonesty such as embezzlement or fraud), the agent was to be given notice that his or her "job is in jeopardy" and a "reasonable opportunity to bring . . . performance up to satisfactory standards."  In any event, Allstate still could not terminate the R830 contract unless it complied with a specified, elaborate review and approval procedure.

425.    Apart from the protections afforded to agents from termination, the R830 contract also protected agents from having their commissions reduced or from otherwise being burdened with more onerous terms and conditions of employment by providing its terms could not be modified without the agent's written consent.

426.    Though the commission rates fixed by the R830 contract generally were lower than those paid by Allstate's competitors, Allstate enticed prospective agents into committing their futures to the company by promising them a "guaranteed income" and long-term "financial security" through a "superior" package of employee benefits that Allstate touted as the best the industry had to offer.  These benefits included, among others, normal and "beefed up" early retirement benefits available under the Pension Plan, the deferral of income and contributions through the Profit Sharing Plan, and such things as comprehensive medical insurance, dental insurance, long-term disability insurance, and life insurance under other of the Plans.

427.    By 1984, Allstate was a very profitable insurance company, selling products almost exclusively through its sales force of about 13,000 "captive" employee agents who worked out of booths located in "Sears" retail stores or, in some cases, sales offices owned or leased by the company.  Allstate's management nonetheless had concluded that it could increase its profits by cutting the net expense of the "unmatched" compensation package provided to employee agents.  As a result, Allstate instituted the Neighborhood Office Agent ("NOA") "cost sharing" program under which employee agents were encouraged to lease or buy offices in their

own names from which they could continue to solicit new customers and service their prospering "books of business." While Allstate publicly asserted the NOA program would provide its employee agents with greater "entrepreneurial freedom," and promised that employee agents would have a "proprietary interest" in their agencies, the NOA program represented the first in a series of steps that Allstate took to reduce its net expenses at the expense of employee agents.

428.    The NOA "cost sharing" program was implemented, in large part, through the R1500 contract – a form of employment contract which substantially all new employee agents hired subsequent to October 1, 1984, were required to enter into – as well as the standardized R1660 Amendment to the R830 contract (the "NOA amendment"), which Allstate encouraged its existing employee agents to sign. In many respects, the R1500 contract was similar to the discontinued R830 contract. Like the R830 contract, the R1500 contract created an "employer-employee" relationship of indefinite duration between Allstate and its agents, provided that those agents were to be compensated on a commission basis, and prohibited them from selling insurance and financial products on behalf of any competing company. Furthermore, as acknowledged "employees" of Allstate, agents hired under the R1500 contract – like their R830 counterparts – were entitled to participate in all of the Plans and receive other benefits as Allstate employees. Yet, while it preserved the essential structure of the "employer-employee" relationship between Allstate and its insurance sales agents, the R1500 contract differed from the R830 contract in at least two ways.

429.    First, under the R1500 contract (and the NOA amendment), employee agents were obligated to bear the entire expense of operating their own sales offices – generally running into tens of thousands of dollars each year for rent, support staff, marketing, advertising and utilities – whereas prior to October 1984, and under the original R830 contract, Allstate generally

had borne such expenses.   Allstate nonetheless provided an "Office Expense Allowance" or "OEA" to agents employed under the R1500 contract (and the NOA amendment) through which the company reimbursed a portion of the out-of-pocket expenditures for which agents were responsible under the NOA program. That allowance was paid in the form of an enhanced commission tied to new and renewal business production during the prior year, but was intentionally designed to only partially offset the substantial expenses associated with running an Allstate agency.   Second, even though Allstate proclaimed that the R1500 contract (but not the NOA amendment) was designed to "attract and keep aggressive, new business oriented agents," the new contract purported to reserve for Allstate the unfettered "right to increase or decrease compensation amounts," including the amount of OEA generated by sale commissions; to "change the compensation rules at any time"; to change the "nonexclusive" sales location assigned to an NOA agent at any time (notwithstanding the fact agents were required to live within "reasonable proximity" to their sales location); and to unilaterally alter its other terms and conditions.

430.   The R1500 contract expressly incorporated the provisions of the Agents Employment Procedure Manual (the "Employment Manual") and provided that it was further "governed by the rules, regulations and procedures" set forth in the Employment Manual and elsewhere. Among the provisions contained in the Employment Manual was a requirement that employee agents be given a "complete explanation of the reason for termination" and notification of the right to appeal such termination pursuant to a two-step appeal process. Accordingly, while the R1500 contract purported to make agents "at will" employees, under the express and implied terms of the Employment Manual it incorporated, agents could be terminated only on a case-by-case basis and when warranted by individual circumstances.

According to Allstate's Management Information Guide, R1500 agents were subject to the same "corrective procedures as the R830 agent," including the ability "to request an agent review board in the event of termination . . . ."  This is consistent with Allstate's acknowledged policy that it would terminate an employee agent only for "good cause" such as serious acts of dishonesty and, in all other cases, it was corporate policy to use "progressive discipline."

431.   With the launching of the NOA "cost sharing" program in 1984 and during the years that followed, Allstate publicly assured employee agents working under the R830 contract that they would not be required to participate in the new program.  Eventually, however, Allstate began to engage in a sustained effort to pressure its R830 agents to convert to the NOA program, either by executing a new R1500 contract or the NOA amendment.  Among other things, Allstate began to evaluate its managers on their ability to get employee agents to convert to the NOA program and, in the case of managers who were viewed as being "soft on agents," threatened them with termination unless they succeeded in getting agents to convert to the NOA program.

432.   When it became clear that Allstate would not be able to lure its remaining R830 agents to convert to the NOA program with false promises of future riches and "entrepreneurial freedom," Allstate resorted to more insidious measures such as scare tactics, threats, intimidation and belittlement.  To this end, employees agents were told that they "would not be around long" if they did not agree to convert to the NOA program.  In the words of Allstate management, the company was moving in a new direction and agents "could either jump on the bandwagon or fall by the wayside."  By 1990, heavy-handed tactics such as these ultimately resulted in the majority of the remaining R830 agents tying their fates to the NOA program.

**B.    ALLSTATE WAS UNSUCCESSFUL IN PERSUADING EMPLOYEE AGENTS TO CONVERT TO SO-CALLED "INDEPENDENT CONTRACTOR" STATUS AND, THEREBY, RELINQUISH THEIR EMPLOYEE BENEFITS**

433.    While the NOA program initially accomplished Allstate's objective of shifting most of the costs associated with the operation of neighborhood sales offices to its employee agents, Allstate still was bearing a substantial amount of costs itself.  Moreover, the NOA program had little impact on what had become one of the largest line-item expenses on Allstate's balance sheet: the expense of Allstate's "superior" package of employee benefits, which accounted for as much as 25 percent or more of a typical agent's compensation package.

434.    In a further effort to phase out these expenses and, thereby, improve its "bottom-line," Allstate introduced a new program which it called the Neighborhood Exclusive Agency ("Exclusive Agent") program in October 1990.  Under this Exclusive Agent program, Allstate hired new "Exclusive Agents" as employees for an initial eighteen-month training period, whereupon these newly-minted agents entered into a standardized R3001 Neighborhood Exclusive Agency Agreement ("R3001 contract"), which characterized them as "independent contractors." The term "exclusive" is synonymous with "captive" in that the R3001 contract bars Exclusive Agents from soliciting, selling or servicing insurance of any kind for any other company, agent or broker, or referring a prospect to another company, agent or broker, without the prior written approval of Allstate.

435.    In addition, Allstate announced that all of its 16,000 or so existing employee agents could participate in the Exclusive Agent program by "converting" to the new R3001 contract and becoming so-called "independent contractors."  Allstate then actively encouraged them to do so by hyping the supposed advantages of that program.  Allstate then "upped the

ante" by evaluating managers on their success in getting employee agents to convert to the Exclusive Agent program and offered them bonuses based on the number of agents who converted.

436.    While Allstate touted the R3001 contract, like the R1500 contract before it, as affording agents yet more "entrepreneurial freedom," as well as the capacity for unlimited earning potential, in truth its only advantage from the agents' perspective was a modest increase in commission rates for newly-written policies on certain lines of insurance.  These higher rates, however, were at best sufficient to offset the fact that Exclusive Agents operating under the R3001 contract did not receive commission compensation in the form of a "production allowance" and, in the case of the vast number of employee agents in the NOA program, reimbursement of some of out-of-pocket expenses from their OEA.  Because the R3001 contract also eliminated all of the benefits to which employee agents were entitled, its net effect was to dramatically reduce the overall compensation Allstate paid to its agents.

437.    Not only was the increase in commission rates provided for under the R3001 contract far too small to offset the loss of their employee benefits, OEA and production allowance, that commission rate was not guaranteed, as had been the case under the R830 contract.  Further, under the R3001 contract, Allstate retained for itself the absolute discretion to add, eliminate or alter its terms, or to terminate the agreement "at will" – that is, at any time and for any reason, or for no reason at all, upon giving at least ninety (90) days notice.  In addition, the R3001 contract did not contain any of the procedural safeguards afforded to employee agents under the R830 and R1500 contracts in the event Allstate decided to terminate the Exclusive Agent.

438.     Throughout the 1990's, Allstate used both inducements and scare tactics in an attempt to convince employee agents (other than so-called "General Agents" who were generally not permitted to convert to the Exclusive Agent program or share an office location with an NOA agent or Exclusive Agent) to sign the R3001 contract, thereby saving Allstate the expense of continuing to provide the employee benefit package to such agents.  Despite these repeated efforts by Allstate, only about 150 of the 15,000 employee agents (or one-tenth of one percent) then serving under the R830 and R1500 contracts converted to the Exclusive Agent program between 1990 and 1993.  Later efforts likewise were ineffective to convince most employee agents to convert voluntarily.  Given the value of the benefits package that would be lost and the long-term income and job security they would be denied upon becoming an Exclusive Agent, the reluctance to do so was predictable.

439.     Allstate nonetheless did not give up.  Between April 1, 1998 and May 31, 1999, it succeeded in getting 1,460 employee agents to convert to the Exclusive Agency program, of which about 622 were employed under the R830 contract, with another 295 employee agents, of which 175 were employed under the R830 contract, electing to leave the service of Allstate by retiring or quitting.  Many of these conversions and retirements were precipitated by the introduction of its "Agency Standards" as of January 1, 1999, under which NOA agents or licensed support staff had to be in the office during specified business hours – that is, from 9:00 a.m. to 6:00 p.m. on weekdays and from 9:00 a.m. to 1:00 p.m. on Saturdays.  Most solo agents encountered difficulty complying with these new requirements because, among other things, Allstate required them to attend mandatory training sessions and meetings outside of the office during working hours.

**C.   ALLSTATE FINALLY RESORTED TO UNLAWFUL MEASURES TO RID ITSELF OF THE COSTS OF PROVIDING EMPLOYEE BENEFITS AND TO PURGE ITS RANKS OF OLDER AGENTS**

440.   By 1999, Allstate had approximately 15,000 "captive" insurance agents in the United States who principally sold automobile, homeowner and other types of property and casualty (P&C) insurance on behalf of the company, of which approximately 6,200 were still working as employee agents under the R830 and R1500 contracts.  The other 8,900 or so agents were Exclusive Agents operating under the R3001 contract or short-term employee "trainees" seeking to become Exclusive Agents.

441.   Having failed in its decade-long effort to induce its employee agents to surrender their benefits and protections by converting voluntarily to so-called "exclusive agent independent contractor" status, Allstate decided that the time had come to achieve its cost-saving objectives through more coercive measures that were unlawful and otherwise violated the terms of the R830 and R1500 employment contracts.   In June 1999, Allstate charged Assistant Vice-President Barry Hutton to develop a plan to rid the company of employee agents.  After convening a team whose members worked from June to September 1999, Hutton recommended in late-September that Allstate approve a program under which employee agents would be required to leave the company unless they converted to the Exclusive Agent program and thereby relinquished their benefits and protections as employees.  This recommendation was discussed at the highest levels of Allstate's senior management team and approved by defendant Liddy.

442.   After approving Hutton's recommendation, Allstate's management presented the specifics of the Mass Termination Program to the Board of Directors on November 9, 1999.  Liddy and Allstate announced the Mass Termination Program with great fanfare the next day.

443.     Under the Mass Termination Program, Allstate told employee agents that it would be "[t]erminating all remaining R830 and R1500 Agreements and all employee agent related programs on June 30, 2000" (with the exception of employee agents located in Montana and New Jersey who, according to Allstate, would be "covered in separate program with different options available to them") and "[o]ffering all agents the ability to convert to the R3001S Exclusive Agency Agreement."   Notwithstanding this representation, Allstate subsequently decided that employee agents in Montana would be subject to the Mass Termination Program, and thus would be terminated as of September 30, 2000, while employee agents hired on or after June 8, 1984 in West Virginia, like those in New Jersey, could not be terminated – whether *en masse* or otherwise – as part of the Mass Termination Program.  In addition, it appears Allstate made at least four exceptions for employee agents in other states, who were exempted from termination.

444.     Of the 6,200 or so employee agents who were subject to the Mass Termination Program, about 3,200 were employed under the R830 contract as of November 1, 1999, almost all of whom had converted to the NOA program, while the other 3,000 or so had been hired under the R1500 contract as NOA agents.   Allstate additionally provided certain former employee agents who had previously converted to the R3001 contract with the opportunity to leave the service of the company by signing a separate form of release and either selling their entire book of business, including business generated as an employee agent under the R830 or R1500 contracts or, alternatively, receiving an "alternative" termination payment that was essentially equivalent to the "enhanced" severance offered to employee agents subject to the Program.

445.    In the case of employee agents working under the R830 and R1500 contracts, Allstate did not in a single case make an individualized determination that "good cause" existed for the termination of any employee agent subject to the Mass Termination Program, as required by both forms of employment contract and by Allstate's own policies and procedures.  Nor did Allstate follow the approval procedures mandated under the R830 contract or the review and appeal process mandated under both contracts.  Indeed, implicitly recognizing that "good cause" could not be shown for its conduct, Allstate exempted from the Mass Termination Program employee agents in jurisdictions such as West Virginia whose laws require such a showing for termination of an insurance agent.

446.    In a newsletter announcing its "newly revealed" initiatives, Allstate laid bare its motivation for terminating the employment status of its R830 and R1500 agents:  Allstate's "stock performance" was "down more than 20 percent since the beginning of [1999]" and, in the words of CEO Liddy himself, Wall Street was "look[ing] at the property-casualty companies" and was not "lik[ing] the growth prospects."  According to Liddy, companies like Allstate had to "scrutinize their expenses more rigorously."  Consistent with this requirement, Allstate promised its shareholders that the new initiatives would "reduce Allstate's expenses by some $600 million annually," which it expected to "fully realize beginning in 2001."  Allstate also predicted that such savings would amount to 36 cents per share (on a diluted basis) by the end of 2001.

447.    Allstate later explained that approximately $325 million of these savings would "come from the field realignment, including the reorganization of the employee agent programs into the [NEA] Program."  While Allstate misrepresented the savings associated with the Mass Termination Program as administrative savings resulting from the consolidation of multiple agent programs into a single nationwide structure, those supposed administrative savings

represented only a minuscule portion of the total. Even ignoring the fact that Allstate continued to employ more than 500 agents under the R830 and R1500 contracts in the United States and Canada subsequent to December 31, 2000, a significant percentage of the projected annual savings resulted from the elimination of Allstate's continuing obligation to provide about half of its agent sales force with an employee benefits package, including contributions to the Pension and Profit Sharing Plans and various government programs such as Social Security, workers' compensation and unemployment.

448.   While slashing employee benefit programs was a primary determinative factor underlying Allstate's decision to institute the Mass Termination Program, Allstate's stated desire to "re-energize" its sales force by weeding out older agents also was determinative.  With no new hires entering their ranks since 1990, the average age of employee agents had increased steadily throughout the decade.  Trying to combat this trend during the 1990s, Allstate had approached some of its most senior and experienced agents and informed them, for example, that the "unmatched" benefits program provided by the company were not intended to last "forever," that they were "too old" to comply with new sales quotas and other guidelines being imposed by the company, and that they therefore should consider retirement.

449.   Despite these efforts, by October 1999, the average age of employee agents – who comprised 23 percent of Allstate's overall employee workforce – had risen to above 50, with approximately 90 percent of those agents being 40 years of age or older by the time of their termination.  Not a single agent was under the age of thirty.  In contrast, the average age of all other Allstate employees was about 39, a difference of eleven years.

450.   Allstate and its senior management believed that the Mass Termination Program would achieve the desired "re-energizing" effect by forcing many older agents – who were

stereotypically viewed as lacking "energy," "drive," "initiative" and "entrepreneurial spirit" – to leave the company, either immediately as part of the Mass Termination Program or thereafter because of additional the obstacles to continued service that Allstate began to impose in January 1999.   Their departures would, Allstate believed, afford the company the opportunity to replace them with younger hires who Allstate believed would be more "energetic" and "productive."

451.   Shortly after the announcement of the Mass Termination Program, a "home office" vice president revealed these discriminatory attitudes to a group of employee agents, stating that Allstate expected to lose about 15 to 20 percent of its employee agents – most of whom would be "older" agents who supposedly "would not want to learn" its new system and soon-to-be-implemented computer technologies.   In another meeting with employee agents during roughly the same period, a field vice president warned that "some of you older agents won't like what's coming down the pike," or words to the effect, and predicted that they would "probably leave."   At another meeting with agents, one of Allstate's regional vice presidents stated that the purpose of the Mass Termination Program was to get rid of agents "who are like barnacles on the back of the great blue whale that need to be scraped off."   Other agents heard comments by Allstate managers to the effect that the company was "bringing up a new breed" and "getting rid of the fossils" and "dead wood."

452.   Further, during a job interview, the wife of one soon-to-be-terminated employee agent was told by an Allstate manager that the R3001S contract was not designed to favor older agents and, because older agents did not "fit in" with Allstate's newly-announced plans, they would be "discarded" as part of the Mass Termination Program.   It thus comes as no surprise that the R3001S contract, "Agency Standards" and the newly-implemented requirements relating to reimbursement of support staff and rent expenses were specifically designed to create a

relationship that was so unattractive to older employee agents that they would not want to convert to the Exclusive Agent program and, if they did, for Allstate to get rid of these agents once they had converted.

453.    In fact, more than forty percent of Allstate's employee agents left the company as a result of the Mass Termination Program, virtually all of whom were age 40 and older.  To replace these older agents and to accomplish its objective of creating a younger and more "energized" sales and workforce, Allstate hired hundreds of new employees – virtually all of whom were under 40 – to fill positions in newly-established sales and customer support roles. One Allstate manager described these new hires as "young and efficient . . . 22 and 23 year olds, straight out of college, full of enthusiasm and with a great future."  He stated further that Allstate was using a "new approach" with respect to these "young folks," such as allowing them to play computer games between customers.

## D.    ALLSTATE EXPLOITED THE FINANCIAL VULNERABILITY OF ITS EMPLOYEE AGENTS TO COERCE THEM INTO WAIVING THEIR STATUTORY AND COMMON LAW RIGHTS

454.    Shortly after announcing the Mass Termination Program, Allstate began to communicate the details of the Program by means of scripted presentations and providing affected employee agents with a box containing extensive written materials.  The contents of this "job-in-a-box" included the "Preparing for the Future" R830 and R1500 Agent Information Booklet for the Group Reorganization Program, as well as a copy of the Release and certain information that Allstate was required to disclosed pursuant to the Older Workers Benefits Protection Act ("OWBPA").

455.    The Release was the linchpin of the Mass Termination Program.  By its terms, the Release required employee agents to:

release, waive, and forever discharge Allstate . . . from any and all liability . .
. or claims for relief or remuneration of any kind whatsoever . . . arising out
of, connected with, or related to, my employment and/or the termination of
my employment and my R830 or R1500 Agent Agreement with Allstate, or
my transition to independent contractor status, including, but not limited to . .
. any claim for age or other types of discrimination prohibited under the Age
Discrimination in Employment Act of 1967, . . . the Employee Retirement
Income Security Act . . . or any other federal, state or local law or ordinance
or the common law.

456.     Upon presenting its employee agents with the Release, Allstate pressured them to

sign it and select from one of three mandatory "options," none of which was subject to

negotiation:

- the "Forced Conversion Option," under which employee agents would be
  "allowed" to continue in the service of Allstate as so-called "exclusive agent
  independent contractors" by entering into the R3001S contract (which was even
  less attractive than the unattractive option that had been available for nearly a
  decade under the R3001 contract and which each of them had repeatedly
  rejected);

- the "Forced Sale Option," under which employee agents would enter into the
  R3001S contract and leave Allstate by selling their entire book of business to a
  buyer approved by Allstate – that is, assuming the agent could find a "qualified"
  buyer and complete the sale prior to August 1, 2000 (which generally resulted in
  sales that were far below market in view of the short window in which to locate a
  buyer and the hurdles that Allstate erected for obtaining approval); and

- the "Forced Severance Option," under which employee agents would leave
  Allstate in exchange for "enhanced" severance package equal to the higher of the

agent's commission earnings in 1997 or 1998, to be paid in monthly installments over a two-year period.

Alternatively, agents who did not sign the Release would have their employment and agency relationships with Allstate severed entirely on June 30, 2000, and would receive up to thirteen weeks of severance pay, depending on years of service, payable in six monthly installments.

457.     Faced with these "choices," less than two dozen employee agents refused to sign the Release.  Of the overwhelming majority of employee agents who did sign, about 2,600 – or more than forty (40) percent – eventually left the service of Allstate under the Forced Sale or Forced Severance Options, rather than continue working without the "unmatched" benefits package that Allstate had used to lure them into investing their careers and personal financial resources in the first place and upon which they had relied to provide "financial security" after retirement.  In many cases, Allstate then contacted its policyholders to advise them that their agent had "retired."

458.     The other 4,000 or so agents continued working for Allstate as "exclusive agent independent contractors" under the Forced Conversion Option, even though they were told they would no longer be eligible for Allstate's employee benefits package.

459.     Allstate's success in strong-arming and/or inducing through misrepresentations all but a few of its employee agents into signing the Release and either accepting forced conversion or separation from the company's service is not surprising.  Those agents had worked as Allstate employees for at least a decade, during which time Allstate aggressively induced and most of them to spend many thousands of dollars to build a profitable book of business on behalf of Allstate.  At the same time, Allstate barred them from pursuing any other business opportunity in the remote event they should ever be terminated.  Thus, by November 1999, those agents were

left so vulnerable to overreaching by Allstate and were under such extreme duress that they succumbed by signing the Release, or allowed themselves to be induced by Allstate's representations to sign the Release, in the face of almost certain financial ruin.

**1.      Employee Agents Who Did Not Sign The Release Stood To Lose Their Substantial Investments And Careers**

460.    Since launching the NOA program in 1984, Allstate engaged in an aggressive campaign to pressure its employee agents to heavily invest their financial resources into building a book of business, going so far as to monitor the amount each agent invested.  Allstate was strongly motivated to do so.  The more money that agents invested in their agencies, the greater was their capacity to solicit new customers and, hence, to generate additional revenues for Allstate.  At the same time, by setting the formula for calculating the OEA so as to ensure that generally only a fraction of the actual costs of running a sales office would be reimbursed, Allstate was able to maximize its profit margin on those revenues while shifting most of the risk of loss to its employee agents.  As Jerry Choate, Allstate's former President and Chief Executive Officer, stated in explaining the NOA program, "[w]hen the allowance is depleted, the agents dig down into their own pockets" – thus sparing Allstate the expense of digging into its own.

461.    Furthermore, Allstate resorted to deception and hyperbole to induce its employee agents to invest their own money on its behalf by telling them, for example, that "there's no limit to your potential income!" and that all agents needed to do to achieve that potential was to hire more and more support staff, thereby enabling them to sell more policies, telling agents "It's as simple as that!"  Allstate further assured its employee agents that there was no need for them to worry about the escalating expenses needed to generate additional sales, because for every dollar

spent, the company trumpeted that agents would receive "double, triple, quadruple your investment."

462.    The expense for which Allstate encouraged its employee agents to make their greatest investment was support staff.  Allstate instructed agents that the best way to increase new business production was to "free up" their time by hiring more and more support staff who could take responsibility for servicing existing customers.   According to Allstate, the investment in each staff member could normally be recouped in two years or less.  In addition, to motivate its managers to reinforce the company's position, Allstate tied the compensation of its managers to the number of staff members hired by the employee agents who were under them; the larger the staff, the larger the manager's bonus.

463.    As a result of the intense pressure put on them by Allstate, most employee agents had to invest thousands of dollars per year from their own pockets and/or other personal resources and, by the time Allstate announced the Mass Termination Program in late 1999, had sunk substantial resources into developing a book of business, all in the expectation of recouping such "investments" in the promised form of increased benefits upon retirement.  When those agents did not have sufficient liquid resources to cover these increasing investments, Allstate pressured them to obtain small business loans, mortgage their homes, and borrow against retirement and college savings.

464.    At the same time it was encouraging its employee agents to "dig deep into their own pockets" to expand their book of business, Allstate officially maintained that these agents had no ownership or transferable interest in that business (though some agents found ways to transfer interests with Allstate's knowledge and acquiescence).   Thus, when employee agents left the service of Allstate, they generally were unable to recoup their investments of time and

money by selling their book of business or continuing to receive commissions upon the renewal of policies previously sold.  Rather, employee agents had to remain with Allstate until they became eligible for retirement benefits – a minimum of twenty (20) years and until age fifty-five to qualify for early retirement – in order to begin to recoup that investment.  Accordingly, for many employee agents subject to the Mass Termination Program, refusal to execute the Release meant the certain loss of the substantial investment upon which their financial security was based.

465.    Additionally, at the end of 1998, Allstate "upped the ante" by forcing employee agents to sign an "Acknowledgement of Understanding" under threat of termination.  Among other things, this document provided that Allstate had the right to control how the agents perform services for Allstate.  At the same time, Allstate required employee agents to limit the expenditures for support staff and rent to the amount of their OEA or, if they were unable to do so, to either convert to the Exclusive Agent program or increase the amount of OEA by one or two percentage points, while agreeing to reduce their commissions by a corresponding percentage.  These lower commissions would then reduce the retirement benefits that employee agents would be entitled to earn subsequent to January 1, 1999.

### 2.    Allstate Made It Virtually Impossible For Long-Time Employee Agents To Pursue Their Professions Upon Termination

466.    Not only would employee agents who refused to execute the Release face the loss of the substantial financial investments they had made in building a book of business, they also would be left with virtually no means to pursue their chosen profession as insurance agents and, given the loss of investments in their agencies, little prospect of finding a new one.  The employee agents found themselves in this unenviable position because the contracts that

governed their relationship with Allstate purported to bar them from developing any independent business, and severely restricted their ability to establish any new business in the fields of insurance and financial services for at least a year or two after that relationship ended.

467.    Under both the R830 and R1500 contracts, employee agents were required to "devote [their] entire business time" to the performance of their duties as agents and not to engage in any other type of employment, profession or business opportunity without Allstate's consent.  In particular, employee agents were absolutely barred from selling insurance or other products of any competing company.

468.    Employee agents also were inhibited by restrictive covenants "not to compete" in the event their relationship with Allstate was terminated.  Under the R830 contract, employee agents were barred for a period of two years following such termination from "solicit[ing] or sell[ing] insurance of any kind" either: (a) to any person or entity to whom they had previously sold an Allstate policy; or (b) within one mile from any Allstate location from which they had solicited or sold insurance during the two-year period immediately preceding such termination, even though the vast majority of employee agents owned or leased their own offices.  The restrictions in the R1500 contract were substantially the same, except that the temporal scope of those restrictions was limited to one year.  In any event, in designing the Agent Transition Severance Plan from which severance payments would be made to former employee agents who left the service of the company as part of the Mass Termination Program,  Allstate expressly conditioned the payment of such severance benefits on a new two-year "non-solicitation" restriction on soliciting the purchase of products or services in competition with those sold by Allstate to any person who was a customer of Allstate at the time of termination or whose identity was discovered as a result of their status as an Allstate agent, as well as a one-year

restriction on soliciting the purchase of such products or services from an office or business site located within one mile of the former agent's Allstate sales location.

469.     In the course of explaining the options available to them under the Mass Termination Program, Allstate further instructed its employee agents that it "owned" their agency telephone numbers – one of an insurance agent's most valuable business assets – even though employee agents had been required to pay the installation costs and all monthly bills in most cases.

470.     Allstate also maintained that an agent's list of customers, including the names and addresses of such customers, was proprietary to the company and strictly confidential.  Allstate represented to the agents subject to the Mass Termination Program that under the R830 and R1500 contracts, once an employee agent's relationship with the company ceased, any list comprising a book of business must be returned and the employee agent was forever prohibited from initiating contact with any former customer for "any purpose," telling them that it "will treat any attempt by a former agent to contact former customers (or any person whose identity was discovered as a result of his/her status as an Allstate Agent . . .) in whatever form as solicitation."   Allstate further warned that it would take "appropriate action" against any employee agent who used information Allstate deemed confidential or acted in any manner inconsistent with its interpretation of this "non-solicitation" restriction, including notifying the former agent's new company and filing a lawsuit against the former agent and her new company.

471.     In spite of the termination of their agency appointments and the substantial additional restrictions imposed by the Allstate, under the original terms of the Mass Termination Program that Allstate communicated to employee agents, agents who did not sign the Release remained responsible for whatever office lease or mortgage obligations and other financial

arrangements that they had entered into in the expectation of continuing their agency relationship with Allstate.

472.    The net effect of the numerous and substantial restrictions that Allstate imposed upon its employee agents was to leave them with little, if any, prospect for meaningful employment or self-employment when Allstate terminated their agency appointments and no real choice other than to sign the Release.  For the past decade or longer, they had been denied the opportunity to sell insurance products on behalf of any competing companies, to earn other income for retirement, or to gain experience in any other line of work.  Were they to attempt to reestablish themselves in the insurance business, they would have to start literally from "scratch" and face enormous obstacles as Allstate insisted that they were not permitted to sell insurance products to former customers, would have to relocate from the offices they themselves leased or owned and would have to surrender their agency telephone number to Allstate.  Any such effort to build a new business would be made all the more difficult by virtue of the fact that most of their financial resources were tied up in the investments in their Allstate agencies, investments that they would never see any part of unless they mitigated such loss by signing the Release and accepting one of the three options that Allstate had thrust upon them.

> **3.    Allstate Refused to Suspend The Mass Termination Program Despite the EEOC's Preliminary Determination that the Release Was "Unlawful"**

473.    Faced with the prospect of financial ruin versus signing a document that purported to waive their statutory and common law rights, a number of employee agents, including numerous Plaintiffs, attempted to take a third route by filing charges of age discrimination and retaliation with the EEOC. After completing an initial review of these charges, the EEOC informed Allstate, in a letter to CEO Liddy, dated May 2, 2000, of the preliminary determination

that the Release was "unlawful."  The EEOC further urged Allstate to "suspend[] the waiver requirement" until it was able to complete its investigation.

474.    Allstate wrote in response on May 15, 2000, that, among other things, signing the Release does not prevent employee agents "from challenging the validity of the release and pursuing [a] claim of discrimination."  Allstate thereafter rebuffed the EEOC by letter dated May 30, 2000.  Allstate informed the EEOC that it intended to proceed with the implementation of the Mass Termination Program, including requiring employee agents to execute the Release, despite the EEOC's preliminary determination.

475.    By the time of the deadline for executing the Release (which, in most instances, was May 31, 2000), many employee agents had become aware of the EEOC's preliminary determination, and Allstate's decision to flaunt that determination.  Accordingly, when they executed the Release, these agents were not only operating under extreme economic duress but also in the belief that the Release was unlawful.

476.    Subsequently, the EEOC issued Letters of Determination dated as of September 19, 2000, affirming its preliminary determination and concluding that Allstate had acted in violation of the ADEA, the Civil Rights Act of 1964, and the Americans with Disabilities Act of 1990 by expressly conditioning the right of employee agents to convert to so-called "independent contractor" status – and thereby recoup at least a portion of the investments that they had made at the behest of Allstate – on the execution of the Release. Characterizing Allstate's actions as "threats, coercion, and intimidation," the EEOC concluded that refusal to execute the Release constitutes protected activity within the meaning of those federal statutes, and that the Release itself was invalid and unenforceable.

**E.      ALLSTATE'S EXPLANATION THAT THE MASS TERMINATION PROGRAM WAS INTENDED TO INCREASE "ENTREPRENEURIAL FREEDOM" IS FALSE AND PRETEXTUAL**

477.      Allstate assured its soon-to-be-terminated R830 and R1500 agents that the Forced Conversion Option was in their interest because it would afford them "entrepreneurial freedom." It also promised that the R3001 contract would allow them to make more money and afford them freedom from the pervasive control exercised over them as employees, including relieving them of the obligation to attend meetings which had been mandatory for employee agents.

478.      Allstate knew better. Under the R3001S contract that agents were required to sign as part of the Mass Termination Program, Allstate retained the right to restrict "entrepreneurial freedom" in the same manner as it had prior to the Mass Termination Program and to control nearly every aspect of the manner and means through which agents solicit, market and sell insurance products and other services on Allstate's behalf.

479.      Moreover, since the Mass Termination Program was announced on November 10, 1999, Allstate has, in fact, exercised at least as much control over agents who converted to so-called "independent contractor" status under the R3001S contract as it did when those agents enjoyed employee status under their R830 and R1500 contracts.  Further, even though the R3001S contract states that agents "will have full control of [their] time and the right to exercise independent judgment as to the time, place, and manner of performing [their] duties," Allstate has compelled agents, under threat of termination, to comport with myriad requirements pertaining to the day-to-day operation of their agencies.

480.      Thus, the promise of greater "entrepreneurial freedom" was false. It was made to try to hide the true purposes of the Mass Termination Program:  to eliminate accrual and

payment of retirement and other benefits to employee agents, and to weed out older employee

agents

## F. ALLSTATE HAS HIRED THOUSANDS OF YOUNGER EMPLOYEES AND EXCLUSIVE AGENTS SINCE IMPLEMENTING THE MASS TERMINATION PROGRAM

481.    Since 2000, Allstate has replaced employee agents who left the service of the

company with thousands of younger individuals, the majority of whom are under the age of 40.

These individuals, including newly-hired Exclusive Agents, have filled sales and customer

service positions for which the terminated agents were amply qualified.  In addition to the fact

Allstate did not provide pension, medical and other benefits to newly-hired R3001 Exclusive

Agents, the cost of providing employee benefits to newly-hired employees was far less than it

would have been had a corresponding number of employee agents been rehired as employees to

staff newly-established regional call centers to solicit insurance and other products via "1-800-

ALLSTATE" and the Internet.

## G. ALLSTATE UNLAWFULLY REFUSED TO REEMPLOY TERMINATED EMPLOYEE AGENTS

482.    Under the Pension Plan, any employee agent who is rehired by Allstate within

twelve (12) months of termination is entitled to receive credit for all previous service as an

Allstate employee and for the period of "broken" service, as if he or she had never left the

employ of the company.

483.    Ordinarily, Allstate did not limit the rehiring of employees unless they were fired

for poor performance or misconduct.  However, in order to ensure that employee agents would

not be able to frustrate the company's cost-saving objectives by taking advantage of the re-

employment provisions in the Pension Plan (and its other retirement plans), Allstate adopted a

policy under which it refused to reemploy employee agents terminated as part of Mass Termination Program for a period of at least one year.  Allstate maintains this moratorium was not implemented until September 26, 2000 – that is, more than three months after the deadline it set for employee agents to sign the Release.

484.     In accordance with this policy, Allstate unlawfully denied employment to a number of employee agents who had applied for sales, customer service, claims adjustor, security and other employee positions with Allstate during the period that the moratorium was in effect.  Moreover, having learned of the rehire policy, a great many other former employee agents were deterred from applying for these employee positions because they knew that any such application would have been futile.

485.     Absent the moratorium, many former employee agents would have applied for employment positions with Allstate once their R830 and R1500 contracts had been terminated. In fact, during the year-long period in which the moratorium was in effect, Allstate hired upwards of 1,000 individuals to fill sales, customer service and claims adjustor positions for which its former employee agents were eminently qualified.

486.     As noted above, the individuals Allstate hired to staff these regional call centers were generally much younger than the employee agents subjected to the Mass Termination Program and the cost of providing benefits to these newly hired employees is far less than it would have been for a corresponding number of former employee agents.  Accordingly, through the implementation of this discriminatory and retaliatory policy, Allstate was able to serve its twin objectives of cutting employee costs and reducing the average age of its work force.

**H.    ALLSTATE'S UNLAWFUL CONDUCT HAS HAD A DEVASTATING IMPACT ON ITS FORMER EMPLOYEE AGENTS**

487.    The effect of the Mass Termination Program upon former employee agents has been devastating.  As a result of the severance of their employment contracts and the denial of their employee benefits, former employee agents have experienced a dramatic and sudden decline in their income that, in many cases, has forced them to further deplete what remains of their life savings, to sell or mortgage their homes and even to declare personal bankruptcy.

488.    As a result of the extreme economic hardship occasioned by the Mass Termination Program, many former employee agents, including many of the Plaintiffs, have suffered from emotional distress, including anxiety, depression and loss of self worth.  Indeed, in a number of cases the emotional toll on these agents has been so severe that they have required psychiatric counseling and anti-depressant drugs and, on occasion, even hospitalization.  A number have taken their own lives.

**I.    AFTER THE MASS TERMINATION PROGRAM, ALLSTATE CONTINUED TO UNDERTAKE EFFORTS TO RID ITSELF OF REMAINING FORMER EMPLOYEE AGENTS**

489.    Since 2000, Allstate has taken steps to rid itself of most of the remaining former employee agents who signed the Release and continued in the company's service as "exclusive agent independent contractors" under the Forced Conversion Option.  In fact, having swept aside the statutory protections afforded to them as employees and the procedural and other protections afforded under the express and implied terms of R830 and R1500 contracts, Allstate has singled out hundreds of former employee agents, including some of the Plaintiffs named herein, for termination, thereby leaving them with no option but to attempt to recoup their investments of time and money by attempting to sell their books of business, in many instances at a significant

discount due to the fact that there may be only a single purchaser Allstate is willing to approve, in its sole discretion.

## CLASS ACTION ALLEGATIONS

### A.   ALLEGATIONS RELATING TO ALL CLASS MEMBERS

490.   With respect to the claims set forth in COUNTS I, II and VII of this Third Amended Complaint, Plaintiffs bring this action as a class action pursuant to Rule 23(b)(1)(A) and (B), (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the presently ascertainable class comprised of all persons employed by Allstate as insurance agents pursuant to a R830 or R1500 contract whose employment contract was terminated by Allstate between November 10, 1999 and December 31, 2000, as a result of the Mass Termination Program (collectively, the "class").   Plaintiffs' claims warrant the creation of the class because the requirements of Rule 23(a) and (b) are present in COUNTS I, II and VII.

491.   <u>Numerosity</u>.  The number of individuals in the class is approximately 6,200.  It would be impracticable to bring all, or even a substantial percentage of, such individuals before the Court as individual plaintiffs through joinder.

492.   <u>Typicality</u>.  The claims of each of the named Plaintiffs are typical of the claims of all members of the class because, among other reasons: (a) they all challenge the validity of an identical release purporting to waive their statutory and common law rights; (b) the employment contract of each of them was terminated as a result of a single company-wide directive made at the most senior level of Allstate management; (c) they all assert claims based upon allegations that such directive was made substantially for the purpose of denying them benefits to which they were or might have become entitled under the Plans; and (d) they all assert claims based

upon allegations that such directive betrayed a relationship of a "special confidence" that existed between them and Allstate and, hence, violated Allstate's fiduciary duty to act in good faith and with due regard to their interests.

493.   <u>Adequacy of Representation</u>. The named Plaintiffs, or any subgroup of them, are adequate representatives of the class because: (a) they are willing and able to represent the proposed class and have every incentive to pursue this action to a successful conclusion; (b) their interests are not in any way antagonistic to those of absent members of the Class; and (c) they have engaged counsel experienced in litigating major class actions in the field of employment and other complex commercial litigation.

494.   <u>Commonality and Predominance</u>.  There are numerous questions of law and fact common to all class members, that predominate over any individual questions, including: (a) whether the Release is invalid and unenforceable, including what level of deference should be given to the EEOC's determination that it is; (b) whether a major purpose of Allstate's directive terminating their employment contracts was to interfere with the attainment of benefits to which the members of the class were or might have become entitled under the Plans; (c) whether a major purpose of Allstate's decision to create a one-to-two-year moratorium on rehiring the employee agents was to interfere with the attainment of benefits to which the members of the class were or might have become entitled under the Plans; (d) whether, by virtue of the relationship between them, class members reposed a "special confidence" in Allstate which, in turn, gave rise to certain fiduciary duties on the part of Allstate to act in good faith and with due regard to their interests; and (e) whether Allstate's directive terminating the employment contracts of all class members violated those fiduciary duties.

495.    <u>Propriety Of Class Certification Under Rule 23(b)(1)(A) and (B)</u>.    Class

certification for COUNTS I and II is appropriate under Rule 23(b)(1)(A) and (B).    As set forth

above, COUNTS I and II present numerous common issues.    A substantial number of separate

actions almost certainly would be brought against the defendants in the absence of a class action.

The design and implementation of the Mass Termination Program, including the requirement of

signing the Release, were uniform with regard to all class members.    Accordingly, Plaintiffs have

sought broad declaratory and injunctive relief which would affect the entire class.    If individual

class members were independently to bring suits against the defendants, and if courts were to

grant relief in some actions and not in others, any conflicting declaratory and injunctive relief

could make Allstate's compliance impossible.    Moreover, inconsistent judgments regarding

Allstate's conduct and remedial relief would affect the interests of all class members, because:

(a) they all were required to sign the Release to continue their agency relationship with Allstate

or receive a form of enhanced severance benefits; (b) they all had their employment contracts

terminated under the Mass Termination Program; (c) they were all participants in, beneficiaries

of and/or covered by the Plans, and (d) the rights of all of the class members to benefits under the

Plans were affected by Allstate's conduct and the Mass Termination Program. Consequently, any

inconsistent judgments would result in prejudice to absent class members who are unable to

protect their interests.

496.    <u>Propriety Of Class Certification Under Rule 23(b)(2)</u>.    Class certification is

appropriate for COUNTS I and II under Rule 23(b)(2) because Allstate has acted and/or refused

to act on grounds generally applicable to the class, thereby making declaratory and final

injunctive relief appropriate.    Such generally applicable grounds consist of Allstate's conduct in:

(a) conditioning the right of all class members to pursue their careers and livelihoods and to

preserve their investments on their executing an invalid and unenforceable release of their statutory and common law rights; and (b) terminating the employment contracts of all class members for purposes of interfering with their attainment of benefits to which they were or might have become entitled under the Plans.

497.   Propriety Of Class Certification Under Rule 23(b)(3).   Class certification is also appropriate for COUNTS II and VII of this Third Amended Complaint under Rule 23(b)(3). As set forth above, questions of law and fact common to the class predominate over questions affecting only individual members. Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Inasmuch as all members of the class allege violations of ERISA Section 510 and that Allstate breached a fiduciary duty arising out of the "special confidence" employee agents had placed in Allstate, requiring each class member to pursue his or her claim individually would entail needless duplication, would waste the resources of the parties and the Court, and would risk inconsistent adjudications.

## B.   ALLEGATIONS RELATING TO MEMBERS OF EACH SUBCLASS

498.   As set forth below, in addition to seeking certification of a class, Plaintiffs seek certification of three subclasses for which certification is warranted because each subclass satisfies the threshold requirements of Rule 23(a) and (b).

### 1.   The R830 and R1500 Agent Subclasses

499.   With respect to the claims for breach of contract set forth in COUNTS V and VI of this Third Amended Complaint, the R830 Plaintiffs—including, among others, Benoit, Bever, Carrier, Crease, Kelly, Gafner, M. Kearney, T. Kearney, Lankford, Maslowski, Millison, Moorehead, Perkins, Peterson, Pilchak, Trgovich, Wandner, Wiktor, Wittman and Wolverton—

seek certification of the following presently ascertainable subclass (the "R830 subclass") pursuant to Rule 23(c)(4):

> All persons employed by Allstate as insurance agents pursuant to an R830 contract whose employment contract was terminated by Allstate between November 10, 1999 and December 31, 2000, as a result of the Mass Termination Program.

500.    With respect to the claims for breach of contract set forth in COUNTS V and VI, R1500 Plaintiffs—including, among others, Boyd, P. Cobb, English, Harper, Lawson, Littlejohn, Reinerio, Romero, Shirley and Weisman—seek certification of the following presently ascertainable subclass (the "R1500 subclass") pursuant to Rule 23(b)(4):

> All persons employed by Allstate as insurance agents pursuant to an R1500 contract whose employment contract was terminated by Allstate between November 10, 1999 and December 31, 2000, as a result of the Mass Termination Program.

501.    <u>Numerosity</u>. The number of individuals in the R830 and R1500 subclasses is approximately 3,200 and 3,000 respectively. With respect to both subclasses, it would be impracticable to bring all, or even a substantial percentage of, such individuals before the Court as individual plaintiffs through joinder.

502.    <u>Typicality</u>. The claims of the named R830 and R1500 Plaintiffs are typical of the claims of the R830 and R1500 subclasses because, among other reasons: (a) the relationship between the named R830 and R1500 Plaintiffs and the R830 and R1500 subclasses they seek to represent were governed by the same forms of R830 and R1500 contract; and (b) the named R830 and R1500 Plaintiffs and the R830 and R1500 subclasses they seek to represent all allege that Allstate breached its express and/or implied obligations under the R830 and R1500 contracts by terminating them without "good cause," and without affording them a reasonable period to make good on their continuing investments.

503.  <u>Adequacy of Representation</u>. The named R830 and R1500 Plaintiffs, or any subgroup of them, are adequate representatives of the R830 and R1500 subclasses, respectively, because:  (a) they are willing and able to represent the proposed subclasses and have every incentive to pursue this action to a successful conclusion; (b) their interests are not in any way antagonistic to those of the other subclass members; and (c) they have retained counsel experienced in litigating major class actions in the field of employment and other complex commercial litigation.

504.  <u>Commonality and Predominance</u>.  There are numerous questions of law and fact common to the R830 and R1500 subclasses that predominate over any individual questions including: (a) whether Allstate was obligated under the R830 and R1500 contract not to terminate their employment without "good cause"; (b) whether Allstate terminated them without "good cause"; (c) whether Allstate followed its rules, regulations and procedures in terminating their employment; and (d) whether, by virtue of their continuing investments and other ties to Allstate arising out of their contractual relationship with Allstate, Allstate was obligated under the R830 and R1500 contracts not to terminate them and threaten to confiscate their investments without affording them a reasonable period to make good on those investments.

505.  <u>Propriety of Class Certification Under Rule 23(b)(3)</u>.  Class certification for COUNTS V and VI is appropriate under Rule 23(b)(3).  As set forth above, questions of law and fact common to the R830 and R1500 subclasses predominate over questions affecting only individual members.  Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Inasmuch as all members of each of the subclasses allege that they were subjected to the same wrongful decision to terminate their employment in breach of the R830 and R1500 contracts, requiring each member of the R830 and R1500

subclasses to pursue his or her claim individually would entail needless duplication, would waste the resources of both the parties and the Court, and would risk inconsistent adjudications.

### 2.     The Holdout Subclass

506.     With respect to the claims set forth in COUNT III (and in COUNTS II, V and VII if the Court finds that the Release is valid and enforceable), plaintiff Benoit seeks certification of the following presently ascertainable subclass (the "Holdout subclass") pursuant to Rule 23(c)(4):

> All persons employed by Allstate as insurance agents pursuant to an R830 or R1500 contract who refused to sign the Release and whose employment contract was terminated by Allstate between December 1, 1999 and December 31, 2000, as a result of the Mass Termination Program.

507.     Numerosity.  The number of individuals in the Holdout subclass is approximately twenty (20) and they are scattered throughout the United States.  It would be impracticable to bring all such individuals before the Court as individual plaintiffs through joinder.

508.     Typicality.  The claims of plaintiff Benoit in COUNT III are typical of the claims of all members of the Holdout subclass because, among other reasons: (a) each refused to sign the Release; and (b) all of their claims are based upon allegations that in retaliation for such refusal, Allstate severed their agency relationships and thereafter confiscated their investments by refusing to allow them to enter into the R3001 contract, in accordance with a single company-wide directive that was made at the most senior level of Allstate management.  The claims of plaintiff Benoit are typical of the claims of all members of the Holdout subclass as to COUNTS II, V and VII for the reasons set forth in paragraphs 492 and 502 above.

509.     Adequacy of Representation.  Plaintiff Benoit is an adequate representative of the Holdout subclass because: (a) he is willing and able to represent the proposed subclass and has

every incentive to pursue this action to a successful conclusion; (b) his interests are not in any way antagonistic to those of the other subclass members; and (c) he has retained counsel experienced in litigating major class actions in the field of employment and other complex commercial litigation.

510.    <u>Commonality and Predominance</u>.  There are numerous questions of law and fact arising out of the claims in COUNT III common to the Holdout subclass that predominate over any individual question, including whether, in retaliation for their refusal to sign the Release and in accordance with a company-wide directive, Allstate severed their agency relationships and thereafter confiscated their books and business and investments therein by refusing to allow them to enter into the R3001 contact, refusing to allow them to sell their books of business, and refusing to rehire them for a period of at least one year.  There are numerous questions of law and fact arising out of the claims in COUNTS II, V and VII common to the Holdout subclass that predominate over any individual question, including the questions identified in paragraphs 494 and 504 above.

511.    <u>Propriety Of Class Certification Under Rule 23(b)(1)(A) and (B)</u>.  Class certification is appropriate under Rule 23(b)(1)(A) and (B).  This case presents numerous common issues, including those identified in paragraph 510 above.  Multiple Holdout plaintiffs probably would bring an action against the defendants in the absence of a class action.  Allstate's retaliatory conduct toward plaintiff Benoit and absent Holdouts was identical.  Accordingly, Plaintiffs have sought broad declaratory and injunctive relief which would affect all of the Holdout subclass members.  If absent Holdouts were to independently bring suits against the defendants, and if courts were to grant relief in some actions and not in others, any conflicting declaratory and injunctive relief could make Allstate's compliance impossible. Moreover,

inconsistent judgments regarding Allstate's retaliatory conduct and remedial relief would affect the interests of all of the absent Holdout subclass members because: (a) they all had their agency relationships with Allstate severed because they refused to sign the release; (b) they all were subject to the one-year rehiring moratorium; and (c) they all suffered losses as a result of Allstate's actions in violation of statutory and contractual protections.   Consequently, any inconsistent judgments would result in prejudice to absent Holdouts who are unable to protect their interests.

512.   <u>Propriety Of Class Certification Under Rule 23(b)(2)</u>.  Class certification is also appropriate for COUNTS II and III under Rule 23(b)(2) because Allstate has acted and/or refused to act on grounds generally applicable to the Holdout subclass, thereby making declaratory and final injunctive relief appropriate. Such generally applicable grounds consist of Allstate's conduct in terminating the agency relationship and confiscating the book of business of each and every member of the Holdout subclass for the purpose of interfering with their attainment of benefits to which they were or might have become entitled under the Plans and in retaliation for their refusal to sign the Release.

513.   <u>Propriety Of Class Certification Under Rule 23(b)(3)</u>.  Class certification is also appropriate under Rule 23(b)(3).  As set forth above, questions of law and fact common to the class predominate over questions affecting only individual members.  Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Inasmuch as all members of the Holdout subclass allege that Allstate violated ERISA Section 510 in terminating his or her employment for refusing to sign the Release, and for the reasons set forth in paragraphs 497 and 505, requiring each class member to pursue his or her claim

individually would entail needless duplication, would waste the resources of both the parties and the Court, and would risk inconsistent adjudications.

## C.    ALLEGATIONS RELATING TO MEMBERS OF THE COLLECTIVE ACTION

514.    With respect to their claims for age discrimination and retaliation in violation of the ADEA, all ADEA Plaintiffs seek certification of COUNT IV of the following presently ascertainable subclass (the "ADEA subclass") pursuant to 29 U.S.C. § 216(b) (which is incorporated into the ADEA by reference):

> All persons employed by Allstate as insurance agents pursuant to an R830 or R1500 contract whose employment contract was terminated by Allstate between November 10, 1999 and December 31, 2000, as a result of the Mass Termination Program, who were age forty and over as of the date of their termination and who file a consent to join this action with the Court.

515.    ADEA Plaintiffs' claims under the ADEA warrant the creation of a collective action because the named ADEA Plaintiffs, who were age forty (40) and over at the time of the termination of their employment through the Mass Termination Program, are similarly situated to the class of persons they seek to represent in this collective action.   All had positions as employee agents of Allstate and were terminated as a result of a single discriminatory program designed and implemented at the highest levels of Allstate's management, and all are seeking the same relief.   Some of the ADEA collective action members, including one of the ADEA Plaintiffs, also have a claim that Allstate retaliated against them in violation of the ADEA by terminating their employment because they refused to sign the Release.

## CLAIMS

### COUNT I

### DECLARATORY JUDGMENT: INVALIDITY OF THE RELEASE
### UNDER ERISA, THE ADEA AND COMMON LAW
### (On Behalf Of All Plaintiffs And The Class[4] Against Allstate)

516.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 to 515 of this Third Amended Complaint as though set forth here in full.

517.    As employees of Allstate, class members had a right not to be terminated from employment: (a) on the basis of their entitlement or anticipated entitlement to employee benefits under Section 510 of ERISA ("Section 510"), 29 U.S.C. § 1140; (b) on the basis of age once they attained the age of forty (40) under the ADEA; and/or (c) without "good cause" and without being afforded a reasonable time to make good on their investments in accordance with the express and implied terms of their employment agreements with Allstate.

518.    Prior to the implementation of the Mass Termination Program, class members had devoted the prime of their professional careers to obtaining and servicing customers on Allstate's behalf, invested substantial personal resources to create a profitable book of business, and executed a non-compete covenant which effectively prevented them from pursuing their profession upon termination from Allstate.

519.    As part of its Mass Termination Program, Allstate informed class members that it would terminate their employment status by June 30, 2000, and presented them with the Release under which they would have to relinquish, among other rights, their rights to challenge the termination of their employment on the ground that it violated Allstate's statutory obligations

---

[4]    The class claim on the invalidity of the Release is retained for appeal purposes.  Plaintiffs acknowledge the Court has denied certification of a class of Release-signers for purposes of proving the invalidity of the Release on certain theories.

under the ADEA and ERISA, as well as its contractual and fiduciary obligations.  Allstate further informed class members that they could sign the Release and, thereby, either: (a) continue in the service of Allstate as "captive" agents but as so-called "independent contractors" who were not eligible for pension and other employee benefits; or (b) cease providing service to Allstate upon selling their books of business or in exchange for certain severance payments.  Alternatively, class members had the "option" of refusing to sign the Release, whereby they would be left with no means to make good on their investments or to continue practicing their profession as insurance agents.

520.    The EEOC determined that the Release was unlawful and retaliatory and informed certain class members of its preliminary determination prior to the June 1, 2000 deadline for executing the Release.

521.    Faced with these alternatives (and many believing that the Release was invalid and unenforceable), all but about 20 or so of the 6,200 or so employee agents subject to the Mass Termination Program – or more than 99.7 percent – ultimately signed the Release.

522.    The Release was part and parcel and in furtherance of an unlawful scheme to interfere with the attainment of rights to which employee agents were entitled or may have become entitled under the Plans, to rid the company of older employees and to otherwise retaliate against the 6,200 or so employee agents who had refused to convert to the R3001 contract since October 1990.

523.    In view of the dire economic consequences that would result from a failure to execute the Release, Allstate's repeated misrepresentations concerning the rights and consequences of agents who chose to leave Allstate's service as opposed to those who continued in that service, the preliminary determination of the EEOC and the totality of the circumstances,

the decision of class members to sign the Release was made under duress, and was neither knowing nor voluntary and, hence, is invalid and unenforceable under the ADEA, ERISA and the common law.

524.    Inasmuch as class members received no consideration in addition to anything of value to which they already were entitled in exchange for executing the Release, it is invalid and unenforceable under the ADEA, ERISA and the common law.[5]

525.    In conditioning the continuance of their service and agency relationship with Allstate on the waiver by class members of their rights under federal remedial statutes such as the ADEA and ERISA, the Release is in violation of public policy and, hence, invalid and unenforceable.

526.    In view of the vast disparity in bargaining power between Allstate and class members, the grossly oppressive and one-sided terms of the Release, the fact that the Release was presented to class members on a "take-it-or-leave-it" basis without any opportunity for negotiation, Allstate's repeated misrepresentations concerning the rights and consequences of agents who chose to leave Allstate's service as opposed to those who continued in that service, and considerations of public policy, the Release is unconscionable and, hence, invalid and unenforceable under the ADEA, ERISA and the common law.

527.    In threatening to terminate the agency relationships of its employee agents and to confiscate their capital investments in the company unless they signed the Release waiving their rights to pursue their claims under the ADEA and ERISA and refrained from bringing such claims, Allstate has engaged in retaliatory conduct in violation of 29 U.S.C. §§ 623(d) and 1140.

---

[5]    This allegation is retained for appeal purposes.  Plaintiffs acknowledge the Court has rejected their argument that the Release is invalid as a matter of law for lack of consideration.

**THIRD AMENDED COMPLAINT**            - 142 -

Inasmuch as they were procured by means of such unlawful retaliatory conduct, the Releases are invalid and unenforceable under the ADEA and ERISA.[6]

528.    The Release also is invalid and unenforceable because it does not satisfy the requirements set forth in the OWBPA, including, but not limited to, the requirement that any release that purports to waive ADEA rights inform employees who are subject to a termination program of the job titles and ages of all individuals in the same "job classification" or "decisional unit" who are not subject to that program.  In particular, Allstate failed to provide the requisite information prescribed by the OWBPA to class members concerning agents in West Virginia, who were not subject to the Mass Termination Program, and agents in Montana who were subject to the Mass Termination Program, and the more then 8,000 agents who had been hired as "exclusive agent independent contractors" under the R3001 contract since October 1990.[7]

## COUNT II

### INTERFERENCE WITH EMPLOYMENT AND RETALIATION IN VIOLATION OF SECTION 510
### (On Behalf Of All Plaintiffs And The Class Against All Defendants)

529.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 to 528 of this Third Amended Complaint as though set forth here in full.

530.    Allstate designed and implemented the Mass Termination Program with the intention of interfering with the attainment and receipt of benefits under the Plans.  As part of its unlawful scheme, Allstate informed class members that it would terminate their status as

---

[6]    This allegation is retained for appeal purposes.  Plaintiffs acknowledge the Court has rejected the argument—also advanced by the EEOC—that Allstate's use of the Release constituted unlawful retaliation.

[7]    This allegation is retained for appeal purposes.  Plaintiffs acknowledge the Court has rejected their argument that the Release is invalid as a matter of law for failing to strictly comply with the OWBPA.

employees, and its agency relationship with them entirely, unless each of them signed the Release and entered into an R3001S contract.

531.    By implementing the Mass Termination Program, Allstate severed its employment relationship with approximately 6,200 of its employee agents, the class members. Allstate permitted those class members who agreed to become so-called "exclusive agent independent contractors" and who signed the Release to continue providing service to Allstate under the R3001S contract, but without pension and other employee benefits.  With respect to those class members who refused to sign the Release, and were unwilling to perform the same job as so-called "independent contractors," Allstate refused to permit them to remain in its service and terminated its employment and agency relationships with them entirely.

532.    Almost immediately after terminating the employment status of all class members, Allstate implemented a company-wide policy barring rehiring and employment of any former agents who were subject to the Mass Termination Program for a period of at least one year.

533.    Both in discharging each of the class members and in imposing a moratorium on rehiring them, Allstate and Liddy acted with the specific intent of interfering with the attainment of rights to which class members were entitled or may have become entitled under the Plans.

534.    Both the discharge of each of the class members and the imposition of the rehiring policy constitute acts of retaliation against class members for exercising the rights to which they were entitled under the Plans and ERISA.

535.    The conduct of Allstate and Liddy as set forth in this COUNT II is in violation of ERISA Section 510.

536.    As a result of the unlawful conduct of Allstate and Liddy as set forth in this COUNT II, class members have suffered losses, including but not limited to, termination of employment and loss of benefits.

## COUNT III[8]

### RETALIATION IN VIOLATION OF SECTION 510
**(On Behalf Of The Holdout Plaintiff And Subclass Against All Defendants)**

537.    The Holdout Plaintiff, Benoit, restates and realleges the allegations contained in paragraphs 1 through 536 of this Third Amended Complaint as though set forth here in full.

538.    In implementing the Mass Termination Program, Allstate informed all of the class members that it would terminate their status as employees and its relationship with them entirely unless each of them signed the Release and agreed to become so-called "exclusive agent independent contractors."

539.    Class members who signed the Release were given the option of remaining in the service of Allstate as so-called "exclusive agent independent contractors" under the Forced Conversion Option, converting to the R3001S contract and selling their entire books of business under the Forced Sale Option, or receiving certain severance benefits under the Forced Severance Option.  Allstate terminated its employment and agency relationships with class members who did not sign the Release, including Plaintiff Benoit, on or before December 31, 2000.

540.    As a result of the refusal of the Holdout subclass members to sign the Release, Allstate and Liddy have denied them the right to remain in the service of Allstate, whether as so-

---

[8]    Count III is retained for appeal purposes.  Plaintiffs acknowledge the Court has rejected the argument—also advanced by the EEOC—that Allstate retaliated against Hold-outs by terminating their agency relationship for failing to sign the Release.

called "exclusive agent independent contractors" or employees, and to recoup the investments they made in the company and their agencies.

541.    In severing the agency relationship of the Holdout subclass members and confiscating the book of business and other investments each made in the company in retaliation for refusing to sign the Release, Allstate and Liddy have violated ERISA Section 510.

542.    As a result of the unlawful conduct of Allstate and Liddy as set forth in this COUNT III, the Holdout subclass members have suffered losses, including but not limited to, termination of employment and loss of benefits.

## COUNT IV

### DISCRIMINATORY TERMINATION AND RETALIATION
### IN VIOLATION OF 29 U.S.C. § 623(a) and (d)
### (Disparate Treatment and Disparate Impact)
### (On Behalf Of ADEA Plaintiffs And The ADEA Collective Action Against Allstate)

543.    ADEA Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 542 of this Third Amended Complaint as though set forth here in full.

544.    As part of its Mass Termination Program, Allstate informed all of the class members that it would terminate their employment status and gave each class member the alternative of remaining in Allstate's service under the R3001S contract or of ending his or her agency relationship with Allstate entirely.

545.    Allstate was aware that over ninety (90) percent of the agents whose employment relationships were to be severed under the Mass Termination Program would be forty (40) years of age or older on the date of termination. Allstate understood and expected that a much larger percentage of the ADEA collective action members than other class members would have their relationship with Allstate severed entirely under the Mass Termination Program, rather than

remain in the company's service without benefits.  Allstate also understood and expected that a much larger percentage of the ADEA collective action members than other class members who continued the relationship beyond June 30, 2000, would discontinue the relationship within a few years because of their unwillingness to remain in Allstate's service without benefits, or that Allstate itself would sever the relationship within a few years after the Mass Termination Program based on pretexts created through its onerous and discriminatory actions against them.

546.    Allstate did, in fact, terminate the employment contracts under which each of the ADEA collective action members had been hired.  Allstate's actions also did, in fact, result in ADEA collective action members disproportionately leaving the company's service entirely. Allstate's actions had a significant and disproportionate adverse and discriminatory impact on employee agents who were age forty (40) and older, in violation of the ADEA.   This discriminatory employment practice was not based on reasonable factors other than age and there was no legitimate business reason or purpose for Allstate to terminate its long-time employee agents.

547.    Allstate desired to get rid of ADEA collective action members because of its stereotypes about them and replace them with younger individuals who were subsequently hired as employees in sales and customer service roles or as "exclusive agent independent contractors."  This purpose was a substantial factor in its decision to terminate the employment status of ADEA collective action members.

548.    Allstate's termination of the ADEA collective action members' employment and agency relationships with the company constitutes a discriminatory employment practice in willful violation of 29 U.S.C. § 623(a)(1) and in violation of 29 U.S.C. § 623(a)(2).

549.    Moreover, in severing the employment and agency relationships of each of the ADEA collective action members who refused to sign the Release, and in confiscating the investments they made in the company in retaliation for their refusal to sign the Release, Allstate violated 29 U.S.C. § 623(d).

550.    Allstate's decision to impose the R3001S contract, with its less favorable terms than the R3001 contract used prior to November 10, 1999, on the ADEA collective action members who decided to continue their relationship with Allstate after the Mass Termination Program, also constitutes a discriminatory employment practice in willful violation of 29 U.S.C. § 623(a).

551.    As a result of Allstate's discriminatory conduct as set forth in this COUNT IV, ADEA collective action members have suffered losses, including but not limited to, termination of employment, loss of investment capital, loss of income and loss of benefits.

## COUNT V
## BREACH OF THE R830 CONTRACT
### (On Behalf Of The R830 Plaintiffs And R830 Subclass Against Allstate)

552.    The R830 plaintiffs restate and reallege the allegations contained in paragraphs 1 through 551 of this Third Amended Complaint as though set forth here in full.

553.    The employment relationship between Allstate and the R830 subclass members is governed by Allstate's standardized R830 contracts, all or almost all of which were entered into on or before September 30, 1984.

554.    The R830 subclass members fully performed all of their obligations under their R830 contracts with Allstate.

555.    Under the express and implied terms of the R830 contract, Allstate could not terminate the R830 subclass members except for "good cause" and in accordance with the procedures governing termination that are set forth in the R830 contract.

556.    In order to minimize its costs and maximize its profits, Allstate compelled, encouraged and otherwise induced the R830 subclass members to invest substantial personal resources in Allstate's insurance business since at least October 1, 1984, and continuing for the duration of their employment relationship.

557.    In accepting the financial and other benefits of such investments, Allstate obligated itself, as a matter of law, to continue its employment relationship with the R830 subclass members for at least a reasonable period of time for them to make good on their continuing investment in light of all the circumstances.  These circumstances include, but are not limited to, the amount of the investments the R830 subclass members made in Allstate's insurance business and the duration of the period over which such investments were made.

558.    In implementing the Mass Termination Program, Allstate terminated the employment status of each of the R830 subclass members without "good cause," without regard to the procedural safeguards set forth in the R830 contract, and without affording them a reasonable period of time to make good on their investments.  Such termination was in material breach of Allstate's express and implied obligations under the R830 agreement.

559.    As a result of Allstate's breaches of its contractual obligations, the R830 subclass members have suffered losses, including but not limited to, termination of employment, loss of investment capital, loss of income and loss of benefits.

**COUNT VI**

**BREACH OF THE R1500 CONTRACT**

**(On Behalf Of The R1500 Plaintiffs And R1500 Subclass Against Allstate**

560.    The R1500 plaintiffs restate and reallege the allegations contained in paragraphs 1 through 559 of this Third Amended Complaint as though set forth here in full.

561.    The employment relationship between Allstate and the R1500 subclass members is governed by Allstate's standardized R1500 contracts, which were entered into between the approximate dates of October 1, 1984 through September 30, 1990.

562.    The R1500 subclass members fully performed all of their obligations under their R1500 contracts with Allstate.

563.    Under the express and implied terms of the R1500 contract, Allstate could not terminate the R1500 subclass members except for "good cause" and in accordance with the procedures governing termination that are expressly or impliedly incorporated into the R1500 contract.

564.    In order to minimize its costs and maximize its profits, Allstate compelled, encouraged and otherwise induced the R1500 subclass members to invest substantial personal resources in Allstate's insurance business throughout the duration of the existence of their employment relationship.

565.    In accepting the financial and other benefits of such investments, Allstate obligated itself, as a matter of law, to continue its employment relationship with the R1500 subclass members for at least a reasonable period of time for them to make good on their continuing investments in light of all the circumstances. These circumstances include, but are not

limited to, the amount of the investments made by the R1500 subclass members and the duration of the period over which such investments were made.

566.   In implementing the Mass Termination Program, Allstate terminated the employment status of each of the R1500 subclass members without "good cause," without regard to the procedural safeguards governing termination that are expressly or impliedly incorporated into the R1500 contract, and without affording them a reasonable period of time to make good on their continuing investments. Such termination was in material breach of Allstate's express and implied obligations under the R1500 contract.

567.   As a result of Allstate's breaches of its contractual obligations to the R1500 subclass members, those members have suffered losses, including but not limited to, termination of employment, loss of investment capital, loss of income and loss of benefits.

## COUNT VII
## BREACH OF FIDUCIARY DUTY
### (On Behalf Of All Plaintiffs And The Class Against Allstate)

568.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 567 of this Third Amended Complaint as though set forth here in full.

569.   Under the employment relationship created between class members and Allstate under the R830 and the R1500 contracts, class members devoted the better part of their professional careers to obtaining and servicing customers on Allstate's behalf, invested substantial personal resources to create a book of business owned by Allstate, were barred from selling insurance or other products on behalf of any of Allstate's competitors, and executed a "non-compete" covenant which effectively prevented them from pursuing their profession

independent of Allstate.  As a result, class members were at the mercy of Allstate in that they could not leave the service of the company without losing their investments and livelihoods.

570.    In view of the grossly inequitable relationship Allstate had foisted upon them, class members had no choice but to repose a "special confidence" in Allstate that it would not use its superior power to exploit their vulnerability and unfairly deprive them of the value of their investments and livelihoods.  By virtue of that special confidence reposed in Allstate by class members, Allstate owed those class members a fiduciary duty of good faith and fair dealing and was required to act with due regard to their interests.

571.    In terminating the employment status of each of the class members without "good cause" and for purposes of denying them the value of their investments and livelihoods, Allstate has exploited its relationship with class members in violation of its fiduciary duty of good faith and fair dealing.

572.    The conduct of Allstate, as set forth in this Count, is intentional, deliberate, oppressive and/or in reckless and callous disregard for the rights of class members.

573.    As a result of Allstate's breach of its aforementioned fiduciary duties, Plaintiffs and class members have suffered losses, including but not limited to, termination of employment, loss of investment capital, loss of income and loss of benefits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectively pray as follows:

A.    That this case be certified as a class action pursuant to Rule 23 and/or a collective action pursuant to 29 U.S.C. § 216(b) on behalf of the proposed Class, subclasses, and collective action, and that their counsel be designated as Class Counsel for the Class and each subclass;

B. That a declaratory judgment be issued declaring that the Release is invalid and unenforceable under the ADEA, ERISA and/or the common law, pursuant to 29 U.S.C. §§ 626(f)(1) and 1132(a)(3) and 28 U.S.C. §§ 2201 and 2202;

C. That all equitable relief as may be appropriate be issued, including a permanent injunction compelling Allstate to offer all Plaintiffs (other than those solely suing as personal representatives for a deceased former agent's Estate) and the class, subclass and collective action members the opportunity to be reinstated under the same terms and conditions which existed prior to the termination of their employment status and restoration to participant status under the Plans, pursuant to 29 U.S.C. §§ 626(b) and 1132(a)(3).

D. That judgment be entered in favor of Plaintiffs and the class and subclass members and against Allstate and Liddy restoring to them all benefits and other forms of compensation lost between the dates of the termination of their employment and the date of judgment, together with interest or an appropriate inflation factor, pursuant to 29 U.S.C. § 1132(a)(3);

E. That judgment be entered in favor of Plaintiffs and the collective action members and against Allstate for lost benefits, future benefits, back pay (including interest or an appropriate inflation factor), front pay, lost investment capital, and liquidated damages, pursuant to 29 U.S.C. § 626(b);

F. That judgment be entered in favor of Plaintiffs and class and subclass members and against Allstate for all direct, incidental, and consequential damages arising out of Allstate's breaches of contract;

G. That judgment be entered in favor of Plaintiffs and class and subclass members and against Allstate for all direct, incidental, and consequential damages, including non-financial injuries, arising out of Allstate's breaches of fiduciary duty, and for punitive damages in amounts to be determined at trial;

H. That a constructive trust or equitable lien in restitution be imposed over Allstate's assets sufficient to cover all losses suffered by the class members as a result of the violations of ERISA;

I. That Plaintiffs and class, subclass and collective action members be awarded such other and further legal and equitable relief as may be found just and appropriate;

J. That Plaintiffs and class, subclass and collective action members be granted their attorneys' fees, experts' fees, and the costs and expenses of this litigation, pursuant to applicable law; and

K. That the Court retain jurisdiction over all defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law.

## **JURY TRIAL DEMANDED**

Plaintiffs request a jury trial on all questions of fact raised by this Third Amended Complaint, as well as on all claims so triable.

Respectfully submitted,

| | |
|---|---|
| Michael D. Lieder (*admitted pro hac*) | /s/ Coleen M. Meehan |
| SPRENGER & LANG, PLLC | Coleen M. Meehan (ID No. 39765) |
| 1400 Eye Street, N.W. | John V. Gorman (ID No. 80631) |
| Washington D.C.  20005 | Brian M. Ercole (ID No. 91591) |
| Telephone:  (202) 265-8010 | K. Catherine Roney (ID No. 94312) |

Facsimile:  (202) 332-6652

Marisel Acosta (ID No. 89696)
Jacqueline C. Gorbey (ID No. 312041)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
Telephone: (215) 963-5000
Facsimile:  (215) 963-5001

Paul Anton Zevnik (ID No. 140986)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Telephone:  (202) 739-3000
Facsimile:  (202) 739-3001

Mary Ellen Signorille (admitted *pro hac vice*)
AARP Foundation Litigation
601 E Street, N.W.
Washington, D.C.  20049
Telephone:  (202) 434-2060
Facsimile:  (202) 824-0955

*Counsel for Plaintiffs*