## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GENE R. ROMERO**, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 01-3894** |
| | : | |
| | : | **CONSOLIDATED WITH** |
| **ALLSTATE INSURANCE COMPANY**, | : | |
| *et al.*, | : | **NO. 01-6764 (Romero II)** |
| | : | **NO. 03-6872 (Romero III)** |
| Defendants. | : | **NO. 15-1017 (McLaughlin)** |
| | : | **NO. 15-1049 (Abell)** |
| | : | **NO. 15-1190 (Harris)** |
| | : | **NO. 15-2602 (Tabor)** |
| | : | **NO. 15-2961 (Siegfried)** |
| | : | **NO. 15-3047 (Anzivine)** |

**KEARNEY, J.**                                                                                           **April 27, 2017**

## MEMORANDUM with FINDINGS of FACT and CONCLUSIONS OF LAW following our PHASE I NON-JURY TRIAL ON ERISA'S ANTI-CUTBACK RULES

Employers offering pension benefits may not amend or interpret their pension plan to cutback on accrued benefits without ensuring a plan participant does not lose the accrued benefits. Following our bench trial where we evaluated the credibility of conflicting lay and expert witness testimony, reviewed thousands of pages of exhibits, heard extensive legal argument from experienced counsel and studied proposed post-trial findings of fact, we now enter findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1) in determining whether Defendants Allstate Insurance Company, The Allstate Corporation, the Allstate Agents Pension Plan, and the Allstate Agents Pension Plan Administrative Committee (collectively "Allstate") violated the anti-cutback rules of Employee Retirement Income Security

Act ("ERISA")[1] when it amended the Allstate Agents Pension Plan in November 1991 retroactive to January 1989 to eliminate an early retirement subsidy known as the "beef-up" benefit or when it later interpreted the term "retire" in its pension plan.

We find Allstate's November 1991 amendments eliminating the beef-up subsidy did not violate ERISA's anti-cutback rules because Allstate guaranteed participants in the Plan on December 31, 1988 the greater of two alternatives with a baseline of their beef-up subsidy as of the amendment. The participant could only do better after the amendment. We disagree with the Plaintiff agents' claim the safe harbor failed to protect against a cutback because Allstate locked-in, without "truing up," the dollar amount for the beef-up subsidy based on 1988 compensation rather than the final full year of compensation before early retirement. We also find the retroactivity of Allstate's November 1991 amendments to January 1989, given the uniqueness of awaiting Internal Revenue Service guidance after the Tax Reform Act of 1986, does not violate the anti-cutback rules, including for the sound reasons announced by the Court of Appeals for the Eleventh Circuit in reviewing Allstate's November 1991 amendments.[2]

But after evaluating witness credibility and admitted deposition testimony and exhibits, we find Allstate's interpretation of the term "retire" in its Plan denying beef-up eligibility to agents with the requisite service years at the time they became exclusive agent independent contractors and who <u>later</u> ceased exclusive agent service at the age of at least 55, but less than age 63, is a cutback prohibited by ERISA. Allstate wrongly adds the word "simultaneously" to misinterpret its Plan language defining "retire" so to deprive eligibility for any agent electing to become an independent contractor agent but not immediately terminating his service with Allstate. As a result of this interpretation, agents who became independent contractors after

meeting the requirements for the early retirement beef-up subsidy but who did immediately terminate their services for Allstate did not receive the safe harbor protections in Allstate's Plan.

In the accompanying Order and to remedy this cutback for exclusive agents who may have a loss after being provided with the safe harbor calculations, we require the parties promptly confirm and calculate the safe harbor benefit for exclusive agent Plaintiffs affected by this improper interpretation and promptly report the comparison so we can determine the greater of the two alternatives offered to the exclusive agents under Allstate's safe harbor.

## I.    Introduction

Approximately thirty Allstate insurance agents filed two putative class actions against Allstate in 2001: *Romero, et al. v. Allstate Ins. Co., et al.*, No. 01-3894 ("*Romero I*") and *Romero, et al. v. Allstate Ins. Co., et al.*, No. 01-6764 ("*Romero II*"). In 2015, after years of litigation including two appeals, over 400 additional agents intervened or became named plaintiffs in *Romero I*.  Upon reassignment to us in 2016, we consolidated[3] all actions to resolve common issues under ERISA and the Age Discrimination in Employment Act (ADEA).[4]  We ordered Plaintiffs to file a consolidated amended complaint ("Complaint"), setting a case management and discovery schedule, and dividing the common federal question issues into two trial phases: "Phase I" to address cutback claims under ERISA section 204(g)[5] and "Phase II" to address remaining federal common federal questions under ERISA § 510[6] and ADEA disparate impact claims.[7]

Plaintiffs in Phase I are all former Allstate employee insurance agents who became participants in Allstate's Agents Pension Plan (the "Plan"), and claim Allstate violated ERISA's anti-cutback provision by amending its Plan to eliminate the beef-up subsidy, an accrued benefit.

Plaintiffs identify a total of 118 individuals who have, or may have, a cutback claim.[8] At trial, the parties disputed which of these 118 Plaintiffs have standing to assert a cutback claim.

We analyze whether Allstate improperly cut back accrued benefits by (1) plan amendments to the early retirement subsidy; and (2) interpreting employee agents who converted to "Exclusive Agents" as ineligible for the early retirement subsidy.

## II.    Findings of Fact

1.      Plaintiffs are all former employee agents of Allstate and participants in the Allstate Agents Pension Plan (the "Plan"), a defined benefit plan.[9]

2.      Before 1990, Allstate sold its insurance products through its employee agents employed under employment contracts.[10]

3.      All employee agents between the ages of 21 and 63 automatically became participants in the Plan on January 1 of the first year in which he or she completed one year of "Credited Service" and remained "in the employ of an Employer as an Agent."[11]

4.      Membership in the Plan "is mandatory and automatic" for all eligible "Agents" and "[e]very Agent who becomes a member in the Plan shall continue to be a member as long as he continues as an Agent."[12]

5.      The Plan year runs from January 1 through December 31.[13]

6.      An administrative committee consisting of a chairman and at least two other members appointed by the pension committee of Allstate's board of directors administers the Plan.[14]

7.      Allstate's Administrative Committee is the "named fiduciary" under ERISA with the "exclusive right to interpret the terms and provisions of the Plan and to determine any and all questions arising" under the Plan.[15]

**A. Allstate's early retirement beef-up subsidy in its 1989 Plan.**

8.      Allstate's Agents Pension Plan, as amended effective January 1, 1989, ("1989 Plan") provided for retirement benefits upon "normal retirement," "later retirement," "early retirement," and "termination before normal retirement."[16]

9.      Section 2.1 of the 1989 Plan provided retirement benefits for "normal retirement" at age 63 and included a formula for calculating "Retirement Pay."[17] A normal retirement benefit is computed by taking 2.5% of the Agent's "Annual Compensation," as defined by Plan, less a Social Security offset.

10.      Section 2.3(A) provided an early retirement subsidy for eligible agents known as the "beef-up."[18] Allstate calculates this early retirement benefit by first determining the normal retirement benefit under Section 2.1 and adding up to eight years of "beef-up" for the years between the participant's early retirement and age 63, the normal retirement date, reduced for each year the participant retired early:

> If an Agent shall retire prior to his Normal Retirement Date after having attained age 55 and, at his actual retirement date, having completed 20 years of continuous service with the Employers and controlled group members, and in accordance with the Company's voluntary early retirement policy, he shall become entitled to receive Retirement Pay commencing on the first day of the month next following his actual retirement date. The amount of such Retirement Pay, subject to the limitations hereafter stated in the Plan, shall be (i) the amount of Retirement Pay which he would receive if he continued in employment to Normal Retirement Date at his same level of Annual Compensation as in the most recent full calendar year, (ii) reduced by 0.4% for each full month by which the commencement of his Retirement Pay shall precede his Normal Retirement Date. [19]

11.      Allstate provided the beef-up to encourage early retirement by increasing a participant's benefit to the level it would have been if the participant continued to work until his

Normal Retirement Date at age 63, subject to reduction for each year the participant retires early.[20]

12.     An Agent became eligible to receive the beef-up subsidy upon satisfying certain eligibility requirements; an "Agent" must retire prior to the Normal Retirement Date of age 63; attain the age 55; complete 20 years of continuous service with the "Employers and controlled group members," as defined by the Plan, and retire in accordance with the Allstate's "voluntary early retirement policy."

13.     Assuming an Agent elects early retirement upon meeting eligibility conditions, his "Retirement Pay" is "beefed-up" to include years of pay (based on his last year of pay) he would have received had he worked to Normal Retirement Age, age 63 under the 1989 Plan. An Agent who retired at age 55 with 20 years of continuous service would receive a maximum eight years of "beef-up" added into the calculation of his "Retirement Pay" reduced by 4.8% per year for each year the participant retires before age 63. An Agent who retired at age 56 with 20 years of continuous service would receive seven years of "beef-up;" an Agent who retired at age 57 with 20 years of continuous service would receive six years of "beef-up" and so forth until reaching age 63.

**B.  Allstate introduces its "Exclusive Agent independent contractor" program.**

14.     In 1990, Allstate introduced its Exclusive Agent ("EA") program. Employee agents who converted to EA entered into Exclusive Agent Agreements, and Allstate hired all agents into the EA program under such Exclusive Agent Agreements.[21]

15.     Under the EA program, an Agent either operated under (a) an eighteen-month provisional R3000 employee contract before entering into an R3001 EA agreement or (b) under an R3001 EA agreement designating him as an independent contractor.[22]

### C. Allstate freezes the Plan in response to the Tax Reform Act of 1986.

16.     In 1986, Congress passed the Tax Reform Act of 1986 ("TRA '86" or the "Act"), Publ. L. 99-514, 100 Stat. 2085.

17.     Among other changes to the tax code, TRA '86 changed the treatment of employer sponsored retirement plans such as qualified pension plans. "One of the principal purposes of the Act, with respect to pension plans, was to eliminate perceived discrimination in favor of highly compensated employees. One of the most common instances of the discrimination Congress wanted to eliminate was the Social Security offset."[23] To retain the tax advantages of a qualified pension plan, the Act required employers to adopt non-discriminatory benefit formulas by January 1, 1989.

18.     To prepare for the changes required by TRA '86, Allstate engaged the consulting firm Mercer Meidinger Hansen ("Mercer") to recommend plan amendments to bring the Plan into compliance with the new law as well as to meet Allstate's business objectives.[24]

19.     Mercer told Allstate TRA '86 precluded the use of a Social Security offset in the Plan's benefit formula because it may discriminate in favor of highly compensated employees.[25]

20.     Allstate's Pension Committee concluded it was both necessary and sensible to amend the Allstate Agents Pension Plan to eliminate the Social Security offset from the Plan benefit formula.[26]

21.     The Act required the Secretary of the Treasury to issue regulations providing guidance to plan sponsors. By late 1988, the Internal Revenue Service ("IRS") failed to issue such regulatory guidance.

22.     On December 27, 1988, the IRS issued Notice 88-131.[27] The stated purpose of Notice 88-131 "is to provide relief to sponsors of qualified pension . . . plans . . . in order to

provide time to review regulations and make decisions about benefit program redesign without incurring impractical costs in order to comply with [TRA '86]."[28]

23.     Notice 88-131's Purpose and Background section provided: "Regulations issued pursuant to section 401(b) of the Code have been amended to include provisions of TRA '86 within the definition of disqualifying provisions, thus permitting plan sponsors an extended remedial amendment period in which to amend their plans to comply retroactively with TRA '86."[29]  Section 401 of the tax code, 26 U.S.C. § 401, pertains to qualified pension plans.

24.     The extended remedial amendment period notwithstanding, Notice 88-181warned Code section 401(b) "does not permit plan sponsors to retroactively reduce or eliminate benefits protected by section 411(d)(6)."[30]

25.     Section 411(d)(6), 26 U.S.C. § 411(d)(6), is the Internal Revenue Code's counterpart to ERISA's section 204(g) anti-cutback provision and, like section 204(g), prohibits the decrease of an accrued benefit by plan amendment.

26.     Notice 88-131 states section 411(d)(6) of the Code provides, in general, "a plan amendment . . . may not decrease a participant's accrued benefit determined as of the later of the date of adoption or the effective date of the amendment" and because neither TRA ' 86 nor section 401(b) of the Code provide an exception to the anti-cutback provision in section 411(d)(6), "the prohibition applies with respect to plan amendments made to comply with TRA '86 after the first accruals of the 1989 plan year."[31] Compliance with section 411(d)(6) requires a participant's accrued benefit "immediately after the later of the adoption or effective date of an amendment not be less than the greater of (1) the participant's accrued benefit calculated without regard to the amendment or (2) the participant's accrued benefit calculated in accordance with the amendment."[32]

27.     Notice 88-131 offered relief to employers in the form of "Model Amendments" allowing time to "study new regulations and other interpretive guidance requisite to their decisions with respect to plan design and benefit structure, and in view of the requirements of section 411(d)(6) of the Code and the nondiscrimination requirements of TRA '86."[33]

28.     Model Amendment 3 was "designed for plan sponsors that anticipate substantially revising the plan's provisions, limits additional benefit accruals of all plan participants from the effective date of the amendment until the end of the 1989 plan year."[34]

29.     Model Amendment 3 allowed "a plan, subject to certain time limitations, [to] suspend post-1988 benefit accruals for plan participants until after the adoption of a benefit formula in compliance with TRA '86. Under Model Amendment 3, plan participants' benefits during the period of suspension would be determined at a later date using the benefit formula adopted by their plan sponsor to comply with TRA '86."[35]

30.     Model Amendment 3 provided in part:

> Notwithstanding any other contrary provision of the plan, in calculating the accrued benefit . . . of any participant, such participant shall accrue no additional benefit under the plan on or after [insert the effective date of this model amendment, which shall be no earlier than the date this amendment is adopted] to the extent that such additional benefit accrual exceeds the benefit which would otherwise accrue in accordance with the terms of the plan as subsequently amended to comply with those qualification requirements described in [TRA '86]."[36]

31.     Notice 88-131 required plan sponsors adopting Model Amendment 3 to do so by March 31, 1989.[37]

32.     On March 13, 1989, Allstate adopted Model Amendment 3 and amended the Plan to add a new Section 3.9 entitled "Temporary Limitation on Benefit Accrual." Section 3.9 recites the language of Model Amendment 3.[38]

33.     Section 3.9 "froze" Plan participants' benefits after 1988 and, in accordance with Model Amendment 3, provided a participant's accrued benefit "shall not be less than what the participant had accrued as of the last day of the last plan year beginning before January 1, 1989," that is, as of December 31, 1988.

34.     By its terms, Model Amendment 3, "shall be effective until the last day of the first plan year commencing in 1989 and shall be effective for such period if any only if the subsequent TRA '86 amendment is made on or before the last day of the first plan year commencing in 1989," that is, until December 31, 1989.[39]

35.     Model Amendment 3 was not subject to notice requirements of ERISA section 204(h), 29 U.S.C. § 1054(h).[40]

36.     ERISA Section 204(h), 29 U.S.C. §1054(h), prohibits amendment of a pension plan "significant[ly] reduc[ing] . . . the rate of future benefit accrual" unless the plan administrator provides notice to plan participants written in a manner "calculated to be understood by the average plan participant" and providing sufficient information to allow participants to understand the effect of the plan amendment.

37.     In February 1989, before adopting Model Amendment 3, Allstate advised its employees of changes to the Plan as a result of TRA '86:

> a.   Plan change effective January 1, 1988 regarding the accrual of benefits for employees who work past age 65;
>
> b.   Plan changes effective January 1, 1989 regarding vesting; the payout of pension benefits for participants who reach age 70 ½; and compensation used in the calculation of pension benefits is limited to $200,000;
>
> c.   TRA '86 requires modification of the way benefits are earned in plans with a social security offset, and while the IRS had not yet published guidelines on how benefits should be calculated, Allstate "would like to share some important facts" highlighted in bullet points: benefits earned in the Plan through December 31, 1989 will not be affected; there will be no gap in Plan

participation and pension benefits will continue to earn credit in 1989; Plan participants retiring or terminating in 1989 and eligible for payment at that time will be paid benefits earned through December 31, 1988 and credits earned between January 1, 1989 and the date of termination will be paid out later in the year when the new benefit calculations are known; Allstate will be unable to provide benefit estimates for retirements after January 1, 1989; and Annual Statement of Benefits due for distribution in April 1989 will provide benefits earned through December 31, 1988, but projected benefits will not be shown.

d. Once the IRS provides specific guidelines, Allstate "will communicate to all employees complete information on Pension Plan changes."[41]

38. Continued delay in the issuance of IRS regulations resulted in IRS Revenue Procedure 89-65 published in November 1989.[42]

39. Revenue Procedure 89-65 extended the application of Model Amendment 3 under Notice 88-131 to "allow plan sponsors to continue the suspension of benefit accrual beyond the end of the 1989 plan year."[43] Under Revenue Procedure 89-65, plan sponsors such as Allstate could continue the suspension of benefit accruals under Model Amendment 3 until (a) December 31, 1990 or (b) December 31, 1991 as long as the plan sponsor provided the notice described in ERISA section 204(h).[44]

40. On December 29, 1989, Allstate amended Section 3.9 of the Plan changing the effective date of the provision from "the last day of the first plan year commencing in 1989" to "the last day of the first plan year commencing in 1990" and provided it "shall be effective for such period if any only if the subsequent TRA '86 amendment is made on or before the last day of the first plan year commencing in 1990."[45]

41. In December 1989, Allstate sent a letter to "Allstate Associate[s]." The December 1989 letter referred to the February 1989 letter, advised Allstate still awaited IRS guidance and it "has been developing a new pension plan design in anticipation of the final regulations." Recognizing the "plan design" will not be completed for several months, the December 1989

letter advised pension benefits earned through December 31, 1988 will not be affected; current "methods" of receiving pension benefits will continue to be available; there is no gap in plan participation and participants will continue to earn credit toward pension benefits in 1989 and beyond; and the Social Security offset will be eliminated.[46]

42.     In April 1990, Allstate sent another letter to "Allstate Associates." The April 1990 letter "reemphasize[d]" the points in the December 1989 letter; repeated the same bulleted points as the December 1989 letter; and additionally advised employees to "review all your benefits information."[47]

43.     In September 1990, Allstate sent out a fourth letter to "Allstate Associates." The letter advised of the release of regulations implementing TRA '86, and, as a result, Allstate made Plan changes and meetings with all associates will be held to review changes to the Plan.[48]

44.     In November 1990, the IRS issued Notice 90-73, again extending the period for compliance with TRA '86 and the freezing of benefits through the end of 1992.[49] The IRS extended the remedial amendment period again in Notice 92-36 to the end of 1994.[50]

### D.   Allstate's October 1990 Pension Committee Resolution.

45.     As of September 1990, Allstate sent out four letters to employees; February 1989, December 1989, April 1990, and September 1990 regarding changes to the Plan but had not yet amended the Plan to comply with TRA '86.

46.     On October 26, 1990, Allstate's Pension Committee adopted a resolution to amend the Plan:

> BE IT RESOLVED, That the officers of Allstate Insurance Company (the "Company'"),acting on behalf of this Committee, be and they are hereby authorized and directed to amend the Agents Pension Plan (the "Plan"), and the trust agreement forming a part of the Plan (the "Trust"), to provide full vesting after five years of service; to modify the benefit formula for service after 1988 to 2% times eligible annual compensation for each year of credited service; to raise

the normal retirement age to 65, to comply with the applicable requirements of the Tax Reform Act of 1986 and Internal Revenue Service rulings and regulations, and to effect such additional changes in the Plan and Trust as they deem necessary or desirable as a result of the provisions of said Act, rulings and regulations; provided that the annual cost to the Company for the Plan and Trust, as so amended, is substantially similar to the level outlined and described to this Committee by the officers.[51]

47.     Allstate did not address the beef-up in the October 1990 Resolution.

48.     In the *Scott* litigation, the Court of Appeals held the October 1990 Resolution did not constitute a plan amendment.[52]

49.     Although Allstate did not amend the Plan by the October 1990 Resolution, Allstate distributed a booklet around the time of the October 1990 resolution addressed to Allstate Agents entitled "Shaping Your Future Financial Security . . . Today" (the "Booklet").[53]

50.     In the Booklet section entitled "What's New?" Allstate highlighted some changes to the Plan, but did not mention eliminating the beef-up.  In the "How the Plan Works Now" section for "Service Before January 1, 1989," Allstate stated "the current 'beef-up' feature in the Pension Plan will continue until 1999. Prior eligible compensation and service beef-up provisions will continue until 1) you turn age 63, or 2) December 31, 1999, whichever occurs first."[54]

### E. Allstate's November 1991 Plan Amendment eliminating the beef-up benefit and providing a "safe harbor."

51.     On November 15, 1991, Allstate's Pension Committee amended several sections of the Plan, including a new post-1988 benefit formula eliminating the Social Security offset and amending Section 2.3(A) beef-up subsidy ("November 1991 Amendments").[55] Allstate made amendments to Sections 2.1, 2.2, 2.3, and 2.4 retroactively effective as of January 1, 1989.

52.     Section 2.3(A) of the amended Plan eliminated, as of December 31, 1999, the beef-up subsidy. The new Section 2.3(A) had the same eligibility requirements; an Agent must retire prior to his Normal Retirement Date; attain the age of 55; complete 20 years of continuous service; and retire in accordance with Allstate's voluntary early retirement policy.  However, under the newly amended Plan, Agents meeting the eligibility requirements received a beef-up subsidy "until the earlier of (a) the last day of the month in which his 63rd birthday occurs, or (b) December 31, 1999; (ii) reduced as provided in Section 2.3(B) . . .."[56]

53.     The 1991 Amendments also included a Special Minimum Benefit Provision, also referred to as a "safe harbor," in Section 2.3(C) which Allstate claims protects participants' beef-up subsidy accrued before the effective date of January 1, 1989. The safe harbor provided:

> In no event shall the amount of such Retirement Allowance be less than the Agent's Early Retirement Benefit, computed under the terms of the Plan as in effect on December 31, 1988 as though the Agent had retired on that date, but commencing at his Early Retirement Date.[57]

54.     The safe harbor guaranteed an individual who was a participant on December 31, 1988 and who became eligible for the beef-up either before or after the November 1991 Amendments, would receive the greater of two alternatives: (i) the early retirement benefit calculated as though the participant had retired on December 31, 1988 under the terms of the pre-amendment Plan ("Alternative #1"); or (ii) the early retirement benefit calculated on the participant's actual date of retirement under the terms of the post-amendment Plan ("Alternative #2").[58]

55.     Alternative #1 is calculated as follows: Step 1: First determine the normal retirement benefit a participant would receive if he or she retired under Section 2.1 on December 31, 1988 (*i.e.,* the normal retirement benefit based on Annual Compensation for each year of Credited Service from date of hire through 1988). Step 2: Add the normal retirement benefit plus

up to eight years of beef up based on the last full year of Annual Compensation (*i.e.*, 1988 compensation) for the period between the participant's age on December 31, 1988 and his or her 63rd birthdate. Step 3: Reduce the sum from Step 2 (*i.e.*, the normal retirement benefit plus the beef up) by 4.8% a year for each year the participant retires before the Normal Retirement Date. The result is the annual amount of the early retirement benefit under Alternative #1.[59]

56.     Alternative #2 is calculated as follows: Step 1: First determine the normal retirement benefit a participant would receive if he or she retired under Section 2.1 on his or her actual date of retirement (*i.e.*, the normal retirement benefit based on Annual Compensation for each year of Credited Service from date of hire through the participant's last year of Credited Service). Step 2: Add the normal retirement benefit to any beef up based on the last full year of Annual Compensation for the period between the participant's actual date of retirement and the earlier of (i) his or her 63rd birthdate and (ii) December 31, 1999. Step 3: Reduce the sum from Step 2 (*i.e.*, the normal retirement benefit plus any beef up) by 4.8% a year for each year the participant retires before the Normal Retirement Date. Because the normal retirement age increased from 63 to 65 in 1989, the Pre-1988 Benefit and the Post-1988 Benefit are reduced separately. The Pre-1988 Benefit is reduced by 4.8% a year for each year the participant retires before age 63, and the Post-1988 Benefit is reduced by 4.8% a year for each year the participant retires before age 65. The result is the annual amount of the early retirement benefit under Alternative #2.[60]

57.     Alternative #1 is calculated based on a participant's accrued normal retirement benefit as of December 31, 1988 and credited the participant with the maximum eight years of beef-up subsidy regardless of when the participant retired.

58.     Alternative #2 is calculated based on the Plan as amended in November 1991.

59.     After the November 1991 Amendment, Participants younger than 55-years old by December 31, 1991 would not receive the eight years of beef-up provided in the pre-amended Plan. For example, a participant who turned 55 in 1995 with the requisite years of continuous service would receive only 4 years of beef-up rather than the eight years of beef-up because the amended Plan eliminated the beef-up as of December 31, 1999.  Participants who turned 55-years old after December 31, 1999 received no beef-up under the amended Plan.

### F.  Allstate's "Preparing for the Future" Program.

60.     On November 10, 1999, Allstate announced its "Preparing for the Future" Program (the "Program"). Under the Program, Allstate planned to terminate all agent employees by no later than June 2000.[61]

61.     Through the Program, employee agents could either convert to EA status or leave Allstate either by selling their book of business to Allstate ("sale option") or taking severance ("severance option").[62]

### G.  Identification of Plaintiffs

62.     Allstate employed Plaintiffs as employee agents who, at the time of the Program, could either convert to EA or leave the company.

63.     There is a total of 118 Plaintiffs in this Phase I trial who allege a violation of ERISA's anti-cutback provision:

> (a) 75 Plaintiffs, broken into Groups One through Four, have a cutback claim regardless of whether Allstate properly classified them as employees or independent contractors;

> (b) 43 Plaintiffs may have a cutback claim if they show, in later, individual proceedings, Allstate improperly classified agents under the R3001 Agreement as independent contractors.[63]

64.     All 118 Plaintiffs were Plan participants by December 31, 1988, except Brenda Hammond, who became a participant on January 1, 1989. Plaintiffs' employment contracts terminated either on December 31, 1999 or between January 1 and June 30, 2000.[64]

65.     At trial, Plaintiffs' counsel categorized 75 of the 118 Plaintiffs into four groups.

### *Group One and Group Two Plaintiffs*

66.     Group One consists of eight (8) individuals who met the age and service criteria for early retirement and "retired" from Allstate because they neither converted to EA nor elected the sale option, thereby satisfying the requirements of the pre-amended Section 2.3(A) beef-up provision.[65]

67.     Trial exhibits calculated the safe harbor for each of the eight Group One Plaintiffs.  As confirmed by Plaintiffs' exemplar summary chart relating to Group One Plaintiff O'Connor,  there is no evidence any Group One Plaintiff lost any early retirement subsidy by comparing the Alternatives #1 and #2 assuming we compared, under today's Findings, the 1988 compensation and compensation in the last year of service.[66]

68.     Group Two consists of 31 individuals who in 2000 elected the sale option, selling their book of business to Allstate having met the age and years of continuous service eligibility criteria for the beef-up.[67]

69.     Upon electing the sale option, Allstate required Group Two Plaintiffs to execute an EA contract and wait one month before Allstate processed the sale. Plaintiffs contend the only relevant difference between Group One and Group Two is Allstate's requirement those in Group Two sign an EA contract for one month for "purely administrative reasons" and then used the signing of the EA contract to deprive them of beef-up eligibility.

70.     Allstate contends Group Two Plaintiffs converted to EA and did not "retire" from Allstate. Allstate's Administrative Committee interpreted the term "retire" for purposes of the early retirement beef-up eligibility as requiring an Agent to have incurred both a termination of employment and a separation from service and an Agent converting to EA as having incurred a termination of employment but not a separation of service.[68]

71.     Plaintiffs assert Group Two Plaintiffs met the age and service criteria for beef-up eligibility and "retired" from Allstate, thereby satisfying all the pre-amendment conditions for the beef-up. Plaintiffs assert those in Group Two are eligible for the early retirement beef-up benefit regardless of whether they are properly classified as independent contractors under the EA contract.

72.     Plaintiffs contend those in Group One and Group Two (a total of 39 Plaintiffs) retired from Allstate at the time of the Program at the age of at least 55, but less than age 63, with at least 20 years of continuous service and were denied any beef-up subsidy because it had been eliminated as of December 31, 1999.

### Group Three and Group Four Plaintiffs

73.     Group Three consists of 33 Plaintiffs who converted to EA under the Program with at least 20 years of continuous service and were between the ages of 55 and 63 ***after*** 2000.

74.     Group Four consists of three (3) Plaintiffs who converted to EA and are currently active EAs with the requisite 20 years of continuous service when they converted to EA and are now at least 55 years old but not yet 63 years old.

75.     Plaintiffs assert Group Three and Four Plaintiffs have met, or could still meet, all pre-amendment conditions for the beef-up even assuming they are properly classified as independent contractors under the EA contract.

76.     There are 75 Plaintiffs in Groups One, Two, Three, and Four. The remaining 43 of the 118 total Plaintiffs are those who converted to EA and, under our summary judgment opinion, will need to show in a later proceeding their service as an EA meets the definition of a common law employee not an independent contractor so as to have their service as an EA count towards the 20 years of continuous service for early retirement beef-up eligibility.

77.     Allstate does not dispute the eight Plaintiffs in Group One have standing, but argues none of the eight suffered damage.

78.     Allstate argues Plaintiffs in Groups Two, Three, and Four all converted to EA, and EAs are, and always have been, ineligible for the beef-up subsidy in Section 2.3.

79.     Plaintiffs seek the following remedies:

   a. The Court determine and adjudge Allstate and the violated the Plaintiffs' anti-kickback rights under 29 U.S.C. § 1132(a)(3);

   b. The Court issue a permanent injunction under 29 U.S.C. § 1132(a)(3) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, compelling Allstate and the Administrator to repeal or set aside the November 1991 and December 1994 plan amendments relating to early retirement and the "beef-up" retroactively to the dates those amendments were adopted;

   c. The Court enter judgment in favor of Plaintiffs against the Pension Plan and the Administrator under 29 U.S.C. § 1132(a)(3) for "make whole" or other appropriate equitable relief;

   d. The Court enter judgment in favor of Plaintiffs against the Pension Plan under 29 U.S.C. § 1132(a)(1)(B) after the Court has provided the relief set forth above;

   e. The Court award such other and further relief as may be found just and appropriate;

   f. The Court award Plaintiffs attorneys' fees, experts' fees and the costs and expenses of this litigation; and

   g. The Court retain jurisdiction over Allstate, the Pension Plan and the Administrator until such time as it is satisfied the practices complained of are remedied and in full compliance with the law.

## III.  Conclusions of Law

80.     We have jurisdiction under Section 502(e)(1), (f) of ERISA, 29 U.S.C. § 1132(e)(1), (f).

### A.  ERISA's anti-cutback provision.

81.     ERISA is a remedial statute and "should be liberally construed in favor of protecting the participants in employee benefit plans."[69]

82.     Our Court of Appeals consistently recognizes protection of retirement benefits "reflects the underlying policy goals of ERISA," and "Congress's chief purpose in enacting the statute was to ensure that workers receive promised pension benefits on retirement."[70]

83.     In 1984, Congress amended ERISA by adding section 204(g)(2) to protect early retirement benefits and retirement-type subsidies from reduction or elimination by plan amendment.

84.     Section 204(g), known as the anti-cutback rule, provides in relevant part:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan  . . .

(2) For purposes of paragraph (1), a plan amendment which has the effect of - (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or (B) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy . . . .[71]

85.     To state a claim for a violation of the anti-cutback rule, Plaintiffs must show (1) a plan amendment and (2) the amendment decreased an accrued benefit.[72]

86.     There is no dispute the beef-up subsidy is an accrued benefit. In this Circuit, "[t]here is no question but that a standard early retirement benefit, provided exclusively upon the

satisfaction of certain age and/or service requirements, is an accrued benefit" protected by section 204(g).[73]

87.    A plan sponsor may eliminate prospectively an early retirement benefit by amendment, but the amendment cannot "adversely affect that portion of an early retirement benefit already had accrued to a plan participant who satisfie[s] the pre-amendment conditions for the benefit either before or after the amendment."[74]

88.    If an amendment reduces or eliminates an early retirement benefit or retirement-type subsidy, the amendment must allow participants to "grow into" the benefit.[75]

**B.    Comparing the Plan's Section 2.3(A) beef-up subsidy before and after the November 1991 Amendments.**

89.    Under Section 2.3(A) of the pre-amended Plan, Agents could elect to retire early at age 55, but before age 63, with 20 years of continuous service and "in accordance with the Company's voluntary early retirement policy." If eligible, Agents were credited with a beef-up subsidy of up to eight years as if the Agent worked to age 63 at the same level of compensation as in the most recent full calendar year preceding retirement, subject to reduction for each year the participant retired early.

90.    When each Plaintiff became a Plan participant, each earned a right to the beef-up contingent upon each Plaintiff satisfying the eligibility requirements – retiring from Allstate at age 55 with 20 years of continuous service – protected by section 204(g).[76]

91.    The November 1991 Amendments changed Section 2.3(A). The amended Section 2.3(A) had the same eligibility requirements; an Agent must retire before his Normal Retirement Date; attain the age of 55; complete 20 years of continuous service; and retire in accordance with Allstate's voluntary early retirement policy. However, under the amended Plan, Agents meeting the eligibility requirements received a beef-up subsidy "until the earlier of (a) the last day of the

month in which his 63rd birthday occurs, or (b) December 31, 1999; (ii) reduced as provided in Section 2.3(B) . . ..”

92.     The November 1991 Amendments added a safe harbor provision in Section 2.3(C) which Allstate contends protects the pre-amendment beef-up benefit.

93.     Section 2.3(C) provides: “in no event shall the amount of [the] Retirement Allowance [provided by Section 2.3] be less than [an amount equal to] the Agent’s Early Retirement Benefit, computed under the terms of the Plan as in effect on December 31, 1988 as though the Agent had retired on that date, but commencing at his Early Retirement Date.”

**C.  Section 2.3(C) protects against a cutback.**

94.     Under Section 204(g) of ERISA and its companion in the Internal Revenue Code, 26 U.S.C. § 411(d)(6)(A), a plan participant’s accrued benefit may not be decreased by plan amendment.

95.     ERISA’s section 204(g) prohibits a cutback of an accrued benefit “with respect to benefits attributable to service before the amendment.”[77]

96.     The parties agree Plan participants must be permitted to “grow into” eligibility for the beef-up subsidy, an accrued benefit, by satisfying the eligibility requirements after the date of the amendment.

97.     The amended Section 2.3(A) eliminating the beef-up subsidy, without more, would constitute an impermissible cutback.

98.     However, if the safe harbor provision in Section 2.3(C) protected the beef-up subsidy, then there is no cutback. Thus, the key question is whether Section 2.3(C) in the amended Plan protects against a cutback.

99.     Plaintiffs argue Section 2.3(C) did not prevent a cutback because it protected only benefits accrued through the end of 1988 and benefits continued to accrue between 1988 and the 1991 Amendments; Plaintiffs' accrued benefit is the right to a beef-up subsidy based on the final full year of compensation, not 1988; Allstate's Plan amendments to the beef-up subsidy cannot be properly retroactive to January 1, 1989 because they were not required for TRA '86 compliance; and Allstate failed to provide Section 204(h) notice of the amendment eliminating the beef-up, a condition for Allstate's freezing the Plan and retroactive amendment under TRA '86, Notice 88-131, and later Revenue Procedures.

100.     Allstate responds it complied with Notice 88-131 and subsequent Revenue Procedures by freezing the Plan under Model Amendment 3; properly amended the Plan retroactively to comply with TRA '86 and provided the safe harbor to protect accrued benefits; and Allstate provided sufficient Section 204(h) notice of the November 1991 Amendment.

101.     Allstate argues Section 2.3(C) protected against a cutback because it guaranteed every Plan participant received the full eight year beef-up as if he retired early on December 31, 1988, allowing the participant to "grow into" the benefit after the amendment. Allstate contends Section 2.3(C) guaranteed the participant would receive the greater of the two alternatives; the early retirement benefit calculated as though the participant retired on December 31, 1988 with the full eight years of beef-up under the terms of the pre-amended Plan (Alternative #1) or the early retirement benefit calculated on the participant's actual date of retirement under the terms of the post-amended Plan (Alternative #2).

102.     Treasury regulation § 1.411(d)-3, 26 C.F.R. § 1.411(d)-3, implements the Internal Revenue Code's counterpart to ERISA's section 204(g).[78]  Section 1.411(d)-3(a)(1) provides the general rule a plan amendment may not decrease an accrued benefit. A plan amendment

"includes any changes to the terms of a plan" and the protection of section 411(d)(6) "applies to a participant's entire accrued benefit under the plan *as of the applicable amendment date*, without regard to whether  entire accrued benefit was accrued before a participant's severance from employment or whether any portion was the result of an increase in the accrued benefit of the participant pursuant to a plan amendment adopted after the participant's severance from employment."[79]

103.    Section 1.411(d)-3(g)(14) defines the term "section 411(d)(6) protected benefit" as "the accrued benefit of a participant *as of the applicable amendment date* described in section 411(d)(6)(A) and any section 411(d)(6)(B) protected benefit."[80]

104.    Similarly, section 1.411(d)-3(g)(15) defines the term "section 411(d)(6)(B) protected benefit" as "the portion of an early retirement benefit, a retirement-type subsidy, or an optional form of benefit *attributable to benefits accrued before the applicable amendment date*."[81]

105.    Section 1.411(d)-3(a)(4) provides examples illustrating the application of section 1.411(d)-3(a).  In Example 1, a Plan provides an annual benefit of 2% of career average pay times years of service commencing at normal retirement age. The Plan is amended in November 2006, effective January 2007, changing the benefit formula to an annual benefit of 1.3% of final pay times years of service, with final pay computed as the average of a participant's highest 3 consecutive years of compensation. The multiplier (2% versus 1.3%) and what is multiplied (career average pay verses the average of a participant's highest 3 consecutive years of compensation) is changed by plan amendment.

106.    As of the effective date of the amendment, Participant M's accrued benefit is calculated under both the pre-amended and post-amended formula; Participant M's accrued

benefit calculated under the post-amended formula as of the applicable amendment date is increased under the post-amendment formula. There is no cutback for Participant M. However, when Participant N's accrued benefit is calculated under the pre-amended and post-amended formula, N's accrued benefit as of the applicable amendment date is decreased under the post-amended formula. There is a cutback for Participant N. The plan amendment fails to satisfy the requirements of section 411(d)(6)(A) – the IRC's anti-cutback provision – "because the amendment decreases the accrued benefit of Participant N *below the level of the accrued benefit of Participant N immediately before the applicable amendment date*."[82]

107.    In Example 2, the facts are the same as in Example 1 except the Plan includes a provision under which Participant N's accrued benefit cannot be less than what it was immediately before the applicable amendment date – similar to the safe harbor here. In this example, there is no cutback by plan amendment because Participant N is guaranteed his accrued benefit immediately before the applicable amendment date.[83]

108.    Here, Section 2.3(C) protects against a cutback because as of January 1, 1989, the effective date of the 1991 Amendments, the safe harbor in Section 2.3(C) guaranteed participants in the Plan on December 31, 1988 who became eligible for the beef-up either before or after November 1991 the greater of Alternative #1 or Alternative #2.

109.    We disagree with Plaintiffs' claim Section 2.3(C) failed to protect against a cutback because Allstate locked-in, without "truing up," the dollar amount for the beef-up subsidy based on 1988 compensation rather than the final full year of compensation.

110.    If we accepted Plaintiffs' argument, Allstate could never have amended the Plan to eliminate the beef-up subsidy for anyone who was a Plan participant as of January 1, 1989. We find no authority for such a conclusion. To the contrary, the language of § 1.411(d)-3 defines

a protected benefit as the portion of a subsidy "attributable to benefits accrued before the applicable amendment date." Plan participants' compensation as of December 31, 1988 is the benefit accrued before the January 1, 1989 effective date.

111. ERISA's anti-cutback provision requires a participant the ability to "grow into" eligibility for a retirement-type subsidy such as the beef-up by satisfying the eligibility requirements before or after the date of amendment. Section 2.3(C) allowed Plaintiffs to do so, guaranteeing the beef-up to each participant who satisfied the eligibility requirements – age 55 with 20 years of continuous service - either before or after January 1, 1989.

**D. Amending Section 2.3 retroactive to January 1, 1989 is not a cutback.**

112. Although we conclude the 1991 Amendments to Section 2.3 did not constitute a cutback, we must determine whether the retroactive effective date of 1991 Amendments is a cutback.

113. There is no dispute Allstate did not amend the Plan until November 15, 1991.[84]

114. Plaintiffs argue Allstate did not have the right to amend the Plan to eliminate the beef-up subsidy with retroactive effect because elimination of the beef-up is unrelated to the TRA '86.

115. Employers may make prospective plan changes without violating Section 204(g). "[E]mployers are perfectly free to modify the deal they are offering their employees, as long as the change goes to the terms of compensation for continued, future employment: a plan 'may be amended to eliminate or reduce section 411(d)(6) protected benefits with respect to benefits not yet accrued . . . .'"[85]

116.     TRA '86 required compliance by January 1, 1989 and, in subsequent IRS Notice and Revenue Procedures, permitted retroactive plan amendment so long as the plan sponsor provided sufficient 204(h) notice.[86]

117.     Allstate provided the February 1989, December 1989, April 1990, and September 1990 notices to employees. The Eleventh Circuit in *Scott* held these notices complied with section 204(h) permitting, under Revenue Procedure 89-65, the 1991 Amendments to be retroactive to January 1, 1989.[87]

118.     The Court of Appeals examined the four Allstate notices in 1989 and 1990 and concluded the "average Plan participant would clearly understand that the old benefits accrual formula would apply through December 31, 1988, that thereafter benefits would continue to accrue but that there would be a change in the formula which could not be determined until the IRS published its guidelines."[88]

119.     Plaintiffs argue the Court of Appeals' decision in *Scott* has no bearing on this case for two reasons. First, the amendments at issue in *Scott* were those necessary to bring Allstate's Plan into compliance with TRA '86 and the beef-up amendments had nothing to do with TRA '86 and none of Allstate's notices before 1991 sufficiently informed Plan participants about the beef-up amendment. Second, unlike the TRA-related amendments addressed in *Scott*, Allstate determined elimination of the beef-up was a change that "should be made" for business reasons on March 13, 1989, the day it adopted Model Amendment 3. Plaintiffs argue Allstate could have given Section 204(h) notice regarding the beef-up amendment at least as of March 13, 1989 (which it failed to do), distinguishing changes to the beef-up from changes to the formula for benefit accruals the Eleventh Circuit found Allstate could not have known prior to final IRS guidance.

120.     We disagree with Plaintiffs' arguments. We do not read the Court of Appeals'

decision in *Scott* to apply only to Plan amendments required by TRA '86. The Court of Appeals

explained its holding:

> [E]very Plan participant was given written notice that there would be changes in the
> formula for benefit accruals because of the new tax law; that such changes would not
> affect benefits earned through December 31, 1988, and conversely that benefit
> accruals after January 1, 1989, would be affected; and, that there would continue to
> be some benefit accruals after January 1, 1989, but that a new formula for calculating
> same would not be known until the IRS published guidelines. Thus, although all
> participants did not know the precise change in the formula, nor the precise difference
> it would mean with respect to each, they did know that the formula for benefit
> accruals was to be changed effective January 1, 1989. Indeed, they knew substantially
> everything that it was possible for defendants to have communicated as of the time
> that Rev. Proc. 89–65 required the notice to be sent to them (i.e., before December
> 31, 1990). Moreover, the failure of some participants to have actual advance
> knowledge of the precise change in the formula or the precise amount by which their
> own benefit would increase or decrease (as compared to pre–1989) could not have
> harmed them (in a manner out of harmony with the law) because the change was
> permitted by law to be retroactive.[89]

121.     This finding applied to the 1991 Amendments identified by the district court – the

reduction in the rate of benefit accruals from 2 ½% to 2%, increasing the retirement age from 63

years to 65 years, and eliminating the Social Security offset.[90]

122.     We question whether the amendment increasing the retirement age from 63 to 65

is TRA-related. At trial, Plaintiffs' expert Ian Altman admitted the increase in normal retirement

age from 63 to 65 was not a requirement of the TRA.

> Q. Was Allstate Pension Plan required under TRA '86 to increase the normal
> retirement age under the Plan from 63 to 65?
>
> A. That was not a requirement of TRA '86, to increase the retirement age. I have
> plans that continued with retirement ages younger than 65, but that issue is part of
> what TRA '86 addresses, which is how to determine nondiscrimination of benefits
> payable at retirement that's outside of the early retirement subsidy area.[91]

123.     When questioned by the Court, Mr. Altman qualified his answer, testifying:

Court: So, sir, are you saying that the age is within the scope but the early retirement subsidy is not within the scope?

Witness: Very different. The age at which you can commence your full benefit, that is something which is addressed or touched on by TRA '86. The provision of eight years of additional credit if you retire early, that is not something addressed in TRA '86.

Court: TRA '86 specifically talks about raising the retirement age to 65?

Witness: It talks about how to calculate the benefits that you provide to people, normal and early retirement benefits.

Court: It does?

Witness: It does touch on that, yes.

Court: So if it talks about how to calculate benefits for early retirement, why isn't this within the scope of it?

Witness: Because the subsidy is different. It says nothing about subsidies. This is giving up to eight years of additional credit if you go out early – if you go out in certain provisions, not addressed.

Court: But by raising the age to 65 – I don't know if this argument was made in other courts - are you then taking away a right, now certain people have to, for early retirement benefits, you now have to wait until age 65?

Witness: If a plan were to make that change, right, they would then need to be careful to protect what everyone had accrued payable at 63. They could not take that away, but going forward they could change it to 65.

Court: So you think that is within the scope but taking away the eight years is outside the scope?

Witness: Yes.[92]

124.     Considering Mr. Altman's testimony, Plaintiffs provide no convincing argument why we should limit the Court of Appeals' broad holding in *Scott* to apply only where amendments necessary to bring Allstate's Plan into compliance with TRA '86, particularly where the Court of Appeals did not make such a distinction.

125.     Plaintiffs' cases in support of arguing the Plan Amendments must be TRA-related to be permissibly retroactive are distinguishable. For example, Plaintiffs cite *Costantino v. TRW*.[93] In *Costantino*, a class of retirees claimed retroactive application of interest rates established by TRA '86 was unconstitutional. Alternatively, the retirees claimed even if retroactive application of TRA '86 rates was constitutional, the company, TRW, improperly calculated their benefits in violation of ERISA's anti-cutback rule, section 204(g).  The Court of Appeals for the Sixth Circuit, affirming the district court, found the retroactive application of TRA '86 interest rates constitutional. The Court of Appeals then turned to the issue of whether TRW's plan amendment eliminating an early retirement subsidy from the recalculation of lump sum distributions violated section 204(g). The Court of Appeals found retirees – who became eligible for the plan's early retirement subsidy before the plan amendment  - were entitled to both the early retirement subsidy and application of an interest rate provided by TRA '86.[94] The Court of Appeals affirmed the district court's holding TRW's plan amendment violated the anti-cutback rules by eliminating a subsidy for which plaintiffs, who retired **before** the plan amendment, already qualified.[95]

126.     The passage from *Costantino* cited by Plaintiffs does not support their argument plan amendments must be TRA-related to be properly retroactive. In the passage cited by Plaintiffs, the Court of Appeals disagreed with TRW's argument a particular IRS Revenue Ruling allowed, without violating the anti-cutback rules, changes in the actuarial basis used to determine early retirement benefits so long as the change did not decrease an accrued benefit. The Court of Appeals distinguished the Revenue Ruling, finding the plan amendment made by TRW eliminated an accrued early retirement subsidy for participants who already qualified for

the subsidy pre-amendment, in that case, plaintiff retirees who retired before the plan amendment.[96] There is no discussion about TRA-related retroactivity.

127.    We find the reasoning of *Brody v. Enhance Reinsurance Co. Pension Plan* persuasive.[97] There, the district court rejected plaintiff's argument a safe harbor provision extended only to amendments required by TRA '86, citing the "plain language" of Notice 88-131 and the *Scott* decision applying the safe harbor protection of Notice 88-131 to the full plan amendment.[98]

128.    While Plaintiffs cite other authorities reviewing amendments to pension plans from other companies, we are most persuaded by the Court of Appeals' analysis of Allstate's November 1991 amendment in *Scott*.   For the reasons above, we find no material basis to distinguish the Court of Appeals' reasoning.

129.     Because we find the 1991 Amendments properly retroactive, we need not decide Plaintiffs' arguments regarding impermissible freeze on benefits as of December 31, 1988, the adequacy of notice, and Plaintiffs' argument the November 1991 Amendments are void *ab initio*.

### E.   Allstate's interpretation of the Plan denying the beef-up to all Plaintiffs converting to exclusive agent status is a cutback.[99]

130.    In defense of Plaintiffs' cutback claims at trial, Allstate argued only the eight Plaintiffs in Group One are eligible for the beef-up but have no claim because the safe harbor protected them from any loss in a beef-up subsidy.

131.    Upon review of the trial exhibits, the Group One Plaintiffs, although eligible for the beef-up subsidy, have no claim based on the safe harbor comparisons in Alternatives #1 and #2.   Five of the Group One Plaintiffs received less compensation in the last year of service and the remaining three enjoyed greater compensation but the difference did not alter the more attractive subsidy as of December 31, 1988.

132. But Allstate considers Group Two, Three and Four Plaintiffs who converted to EA and <u>later</u> terminated their services ***ineligible*** for the beef-up and cannot have suffered a cutback.

133. At issue are Groups Two, Three, and Four Plaintiffs who had 20 years of continuous service ***at the time they signed an EA contract*** (the R3001 contract) as part of the Program.[100]

134. Group Two Plaintiffs – those that sold their book of business but signed EA contracts for one month - had at least 20 years of continuous service at termination of employment and separation from Allstate through the Program in 2000 and were between age 55 and 63.

135. Group Three Plaintiffs had at least 20 years of continuous service at termination of employment in 2000 when they converted to EA and were between age 55 and 63 at the time they separated from Allstate's service after 2000.

136. Group Four Plaintiffs are still active EAs and had at least 20 years of continuous service when they converted to EA and are currently between the ages of 55 and 63.

137. Groups Two, Three, and Four Plaintiffs claim they met the 20 years of continuous service at the time they signed an EA contract, and satisfied or may still satisfy the condition of "retiring" ***when they ceased, or will cease, EA service*** between age 55 and 63.

138. Allstate argues only participants who became ***eligible*** for the beef-up are guaranteed the Section 2.3(C) safe harbor provision; because all but eight (Group One) of the 118 Plaintiffs asserting Count VIII anti-cutback claims converted to EA, not one is eligible or can become eligible for the beef up; and all Plaintiffs (except for the eight Group One Plaintiffs) asserting cutback claims lack standing because under Allstate's interpretation of the Plan,

participants who converted to EA contracts are ineligible for the beef-up because they can neither retire under Section 2.3 nor qualify under Allstate's voluntary early retirement policy. [101]

139.    Section 2.3(A) provided the early retirement beef-up benefit: "If an Agent shall ***retire*** prior to his Normal Retirement Date after having attained age 55 and, at his actual retirement date, having completed 20 years of continuous service with the Employers and controlled group members, ***and in accordance with the Company's voluntary early retirement policy***, he shall become entitled to receive Retirement Pay commencing on the first day of the month next following his actual retirement date."[102]

### *Allstate's interpretation of "retire" is a cutback.*

140.    Because Allstate considers Plaintiffs in Groups Two and Three eligible for the benefits under Section 2.4, ***but not*** Section 2.3 providing for the beef-up, none of the Plaintiffs in Groups Two or Three have the benefit of the Alternative #1 calculation provided by the safe harbor provision in the amended Plan.[103]

141.    For example, Andrew Blanchette is a Plaintiff in Group Two. Mr. Blanchette's last day of employment was June 30, 2000, at age 56 with 29.6 years of continuous service.[104] In June 2000, the beef-up had already been eliminated, but Allstate does not consider Mr. Blanchette eligible for the beef-up because he signed an EA contract and, in fact, calculated his pension benefit assuming he converted to "Independent Contractor status."[105] Allstate calculated Mr. Blanchette's accrued benefit as of a November 1, 2008 Normal Retirement Date.[106] Allstate did not calculate the beef-up benefit (also called the "VER Benefit" or "voluntary early benefit") as of December 31, 1988 – the calculation under Alternative #1 – because it considered him "Not Eligible."[107]

142.     Wallace Berry is a Plaintiff in Group Three. Mr. Berry's last day of employment was June 30, 2000, with 22.6 years of continuous vesting service. Mr. Berry converted to EA and terminated his EA contract on January 1, 2003 at age 55.[108] As with Mr. Blanchette, Allstate eliminated the beef-up as of December 31, 1999, and, in any event, Allstate does not consider Mr. Berry eligible for the beef-up because he signed an EA contract. Allstate calculated Mr. Berry's pension benefit assuming he converted to "Independent Contractor status" as of November 1, 2012 Normal Retirement Date, the first day of the month after his 65th birthday.[109] Allstate did not calculate the beef-up benefit as of December 31, 1988 – the calculation under Alternative #1 – because it considered him "Not Eligible."[110]

143.     Consistent with ERISA's goal of protecting retirement benefits, our Court of Appeals takes a broad view of what constitutes an amendment to a pension plan.[111] "An erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an 'amendment' for the purposes of § 1054(g)."[112]

144.     In *Cottillion*, the plaintiff left his job at the defendant company after benefits vested under the company's 1980 plan but not yet old enough to receive benefits. The company advised plaintiff of his eligibility for a deferred retirement benefit at any time after turning age 60. The company calculated his monthly retirement benefit at age 60, but failed to state the amount of plaintiff's benefit depended on whether he elected to receive it at age 60 or later.[113] Years later, after plaintiff began receiving benefits, the company amended the plan including a provision actuarially reducing benefits taken before age 65.[114] The company then advised plaintiff pension benefits paid to him before age 65 must be actuarially reduced to the earlier payment date, eliminated his pension benefit, and requested he make payment to the Plan in the amount exceeding the actuarially reduced benefit.[115]

145.     Plaintiff and other employees sued the company, alleging a denial of benefits under ERISA section 502(1)(1)(B), 29 U.S.C. § 1132(a)(1)(B) and ERISA section 204(g) anti-cutback rule.[116] Our Court of Appeals concluded the pre-amended plans and the company's early interpretations of the plans entitled employees a benefit without actuarial reduction for years taken before age 65.[117] The court found the company's later, second interpretation requiring actuarial reduction conflicted with the plain meaning of the plans and denied benefits in violation of section 502(a)(1)(B) notwithstanding the plan administrator's discretion in interpreting the plan.[118] Significantly, the court found the company's second interpretation also violated ERISA's anti-cutback rule, citing its decisions in *Battoni* and *Hein* for the court's broad view of "amendments" to a pension plan.[119] The court identified the "critical question in this case, in light of the absence of a formal plan amendment, is whether [the plan administrator's] 'interpretation of the Plan improperly denied accrued benefits to' the Employees," and found it did.[120]

146.     Following *Cottillion's* paradigm, we begin our analysis with the language of the Allstate Plan itself. Our Court of Appeals directs only the words of a plan itself can create an entitlement to benefits and we are required to enforce the plan as written unless we can find a provision of ERISA containing a contrary directive.[121]

147.     The parties agree as of 1989 the Plan did not define the terms "retire" or "retirement."[122]

148.     Allstate's Administrative Committee is the "named fiduciary" of the Plan and is charged with administering the plan, and has the "exclusive right to interpret the terms and provisions of the Plan and to determine any and all questions arising" under the Plan.[123]

149. On September 14, 1992, Allstate's Administrative Committee adopted Administrative Rule 28 "to define and interpret the terms retire and retirement for the purpose of eligibility for retirement benefits under Sections 2.1, 2.2 and 2.3 of the Plan" determining:

    a.    "An Agent shall be considered to have retired for purposes of Sections 2.1., 2.2 and 2.3 of the Plan only if he has incurred both a termination of employment and a separation from the service."

    b.    "An Agent shall be considered to have incurred a termination of employment for purposes of this Administrative Rule #28 if he is no longer an employee of either an Employer . . . or a controlled group member . . ."

    c.    "An Agent shall be considered to have incurred a separation from the service for purposes of this Administrative Rule #28 if his termination of employment constituted a separation from the service under Section 402 of the Internal Revenue Code, as in effect on (and subject to the rulings and interpretations make prior to) the date of this Administrative Rule #28."[124]

    d.    "An Agent who converts to Independent Contractor/Exclusive Agent status has incurred a termination of employment, but has not incurred a separation from the service. Therefore, such an Agent shall not be considered to have retired for purposes of Sections 2.1, 2.2 and 2.3 of the Plan, and his benefits shall be computed under Section 2.4 of the Plan."[125]

150. Under Administrative Rule 28, Allstate considers an agent to have "retired" for purposes of Section 2.3 only if he simultaneously incurs both a termination of employment ***and*** a separation from service and, an agent who converts to EA incurs a termination of employment, but not a separation from service and is not considered "retired" for purposes of beef-up eligibility under Section 2.3 and instead receives benefits under Section 2.4 of the Plan.

151. By comparison, Section 2.4, "Upon Termination Before Normal Retirement," provides: "An Agent whose employment terminates before Normal Retirement Date for reasons other than death, and who does not qualify for Early Retirement under the provisions of Section 2.3 . . . shall be entitled at his Normal Retirement Date to begin receiving his accumulated

Retirement Pay determined as of the date of the Agent's termination . . ." without a beef-up.[126] Eligibility for "deferred Retirement Pay" under Section 2.4(A) is determined by Section 2.4(B).

152.    Under Section 2.4(A), an agent whose employment terminates – and Administrative Rule 28 determined an agent who converted to EA incurred a termination of employment – before the Normal Retirement Date does not qualify for the early retirement beef-up benefit in Section 2.3, but may begin receiving his retirement benefit at the Normal Retirement Date.

153.    Under Section 2.4(B), an agent with 20 years of credited service at the date of termination and age 55 or older became eligible for a "deferred Retirement Allowance" under Section 2.4(A). Then, the agent could begin his Section 2.4(A) benefit (essentially his normal retirement benefit) at age 55, subject to reduction for each year prior to the Normal Retirement Date.[127] Again, no beef-up is provided under Section 2.4.

154.    Plaintiffs argue because Administrative Rule 28's defined the terms "retire" and "retirement" to mean an employee agent who converted to EA status incurs a termination of employment, but not a separation from service and cannot have "retired" for purposes of beef-up eligibility, it necessarily follows an EA "retires" when he separates from Allstate's service at the termination of the EA contract. At that point, the EA becomes eligible for the beef-up benefit providing he met the age and service requirements. Any other interpretation, Plaintiffs argue, is inconsistent with the Plan.

155.    Allstate disagrees. It argues a participant who converts to EA, by definition, cannot "retire" as an employee under Section 2.3 and "that always has been the rule and interpretation," citing Administrative Rule 28 and other internal Allstate documents and notices.[128]

156. For example, an Allstate June 1990 memo to Regional Human Resource Managers regarding EA benefits contained a section entitled "Agent Pension Plan Clarification."[129] The section stated:

> Agents who qualify for early retirement *at the time they convert to the EA program* will be eligible to receive their deferred early retirement pension benefit *when they terminate their EA agreement if under age 63*. *This benefit will be reduced from age 63 to the agent's age at EA contract termination date*. *These agents will not be eligible for the "beef up" provision as provided in The Agents Pension Plan booklet at page 6.* The "beef up" was designed as an incentive to get people to retire early and is made solely at the Company's discretion. Since the EA program was designed strictly for those agents who intend to continue a business relationship with the company, the "beef-up" provision is not applicable.[130]

157. In another example, Allstate cites to a notice, dated February 18, 1992, regarding Plan benefits upon conversion to EA status.[131] The notice states conversion to EA "does not constitute a retirement from the service of Allstate under the Plan or Allstate's voluntary retirement policy" and advises, upon conversion to EA, a participant will not accrue further pension benefits under the Plan, the participant's accrued benefit will not earn interest, the participant is not eligible for the beef-up benefit, the accrued benefit will be calculated on the day of conversion to EA, and the accrued benefit will be payable under three conditions.[132]

158. Allstate additionally argues courts have agreed with its interpretation EAs are never eligible for the beef-up, citing the district court's opinion in *Scott* and *Sharp v. Allstate Ins. Co.*[133] We disagree.

159. First, Plaintiffs do not argue Administrative Rule 28 itself is an improper interpretation creating a cutback. Plaintiffs contend Allstate's interpretation is a cutback because it denied beef-up eligibility to EAs who ended their EA contracts and later incurred a separation from service. Administrative Rule 28 is not ambiguous. It does not cutback; rather it finally

defines "retire" to mean a termination of employment and a separation of service. Nothing in Administrative Rule 28 requires these distinct events happen simultaneously.

160. Second, neither the district court in *Scott* nor the Court of Appeals for the Sixth Circuit in *Sharp* considered the issue of separation of service at the time an EA contract eventually ended. In *Scott*, the court found the Administrative Committee acted in good faith in determining those who converted to EA were not retiring, and therefore not entitled to the beef-up. We agree. The issue in *Scott* was beef-up eligibility at the time of conversion to EA, ***not*** when the EA contract ended. Scott elected to become an EA in August 1992.[134] The district court identified the issue as "whether his ***conversion*** to that status constituted an 'early retirement' under the plan thereby entitling him to the so-called 'beef-up' benefit."[135] The district court noted Allstate paid Scott a lump sum benefit at conversion from employee agent to EA status because conversion to EA constituted a termination but not a separation from the service of Allstate and not a "retirement" for purposes of the beef-up.[136]

161. There were no anti-cutback claims in *Sharp*. Instead, the court of appeals affirmed the district court's entry of summary judgment in Allstate's favor on Sharp's age discrimination, constructive discharge, and ERISA retaliation claims. Sharp voluntarily converted to EA in 1990. He was given the option to convert to EA; continue to work at his current job; or retire and accept early retirement benefits. At the time Sharp entered into the EA agreement, he met the qualifications for early retirement which the court of appeals, interestingly, found only to be "attainment of 55 years of age and 20 years of continual service in the company."[137] Allstate told Sharp he could begin to receive retirement benefits only if he terminated his employment with the company and did not enter into an EA agreement and, further, "upon entering into the [EA] contract, his pension benefits under the Plan would cease to accrue, and he could not collect the

past benefits *until he retired*. Thus, **he would have to wait until he actually terminated his working relationship with Allstate before he could obtain a distribution of benefits**."[138]

162.     While *Sharp* is factually inapposite, we find it is consistent with a finding those who qualified for early retirement benefits at the time of EA conversion could not receive benefits at the point of conversion, but could later receive such benefits at the time the EA relationship ended assuming they met the age and service requirements.

163.     Allstate's interpretation the word "retire" in Section 2.3 (A), compounded by its interpretation of "retire" in Administrative Rule 28 adds language not in the Plan or the Administrative Rule so as to cutback on EAs who do not simultaneously convert to EA and immediate terminate service for Allstate.  Specifically, Allstate prejudicially reads its Administrative Rule 28 to include an immediate simultaneous conversion and termination by inserting the word "simultaneously" in its definition of "retire" for purposes of the early retirement beef-up subsidy under Section 2.3 but not for the early retirement benefits under Section 2.4 (B).   If we were to accept Allstate's interpretation of "retire" for Section 2.3 beef up subsidy, we would need to add the word "simultaneously" as noted in bold below:

> An Agent shall be considered to have retired for purposes of Sections 2.1, 2.2 and 2.3 of the Plan only if he has [**simultaneously**] incurred both a termination of employment and a separation from the service.

164.     We decline to accept Allstate's interpretation adding words to the Plan <u>and</u> its internal interpretation of "retire" to meet its present argument. We are required to enforce the Plan as written unless we can find a provision in ERISA containing a contrary directive.[139] Allstate offers no evidence of Plan language or interpretation allowing it to insert a temporal mandate allowing beef up subsidy for only those who simultaneously convert to EA and leave Allstate's service.

165.    A more faithful reading of the Plan and Allstate's Administrative Rule 28 requires we interpret the words as written and allow Agents who convert to EA status (i.e. terminate) and who later separate from service as EAs to have the benefit of the safe harbor of Section 2.3 (C). Allstate's interpretation of its Plan resulted in the improper denial of the benefit and violation of the anti-cutback rule of Section 204(g).[140]

166.    While we have no present evidence of whether any Group Two, Three or Four Plaintiff (all of whom elected EA status and later separated from service) would benefit with the comparative calculations in Alternatives #1 and #2, we must allow these Agents the same safe harbor afforded to those in Group One.

### *Allstate's voluntary early retirement policy does not preclude safe harbor eligibility.*

167.    Allstate further argues retiring "in accordance with the Company's voluntary early retirement policy" is an independent eligibility requirement for Section 2.3(A).[141] Citing the district court's decision in *Scott*, Allstate asserts there are four conditions to beef-up eligibility: retirement before age 63; attaining age 55; completing 20 years of continuous service; and retire "in accordance with the Company's voluntary early retirement policy."[142] We find the district court's factual finding in *Scott* distinguishable. While it articulated four conditions for beef-up eligibility, the court in *Scott* did not determine what Allstate's "voluntary early retirement policy" actually is.

168.    In a circuitous argument, Allstate explains its voluntary early retirement policy requires "an employee must, among other things, (i) be at least 55 years of age, (ii) have at least 20 years of continuous service with Allstate, and (iii) voluntarily retire from Allstate," citing *Scott*. The age and service factors are clear, but what about the requirement an employee must "voluntarily retire from Allstate"? We cannot find evidence of what Allstate's "voluntary early

retirement policy" means other than "retiring" as defined in Administrative Rule 28 and satisfying the age and service requirements in the Plan.

169.     Plaintiffs contend reference to retiring "in accordance with the Company's voluntary early retirement policy" in Section 2.3(A) did not create an independent or additional eligibility requirement, but only meant separating from Allstate's service between the ages of 55 and 63 with at least 20 years of continuous service.

170.     Plaintiffs argue neither the pre-amended nor post-amended Plan includes any language suggesting retiring "in accordance with the Company's voluntary early retirement policy" meant anything other than separating from service at the age of at least 55, prior to the normal retirement date, with at least 20 years of continuous service.

171.     Plaintiffs argue ERISA's anti-cutback rule prohibits the imposition of new conditions or restrictions on a participant's protected benefits and Allstate cannot use its "voluntary early retirement policy" to deny the beef-up benefit to any eligible participant upon retiring from Allstate's service as an EA. Plaintiffs in Groups Two, Three, and Four claim they are entitled to the beef-up at the time their EA contracts ended or, in the case of Group Four, will end at some time in the future.

172.     Allstate has not shown an evidentiary basis for us to find a voluntary early retirement policy bars eligibility for the safe harbor under Section 2.3 (C).   There are inconsistencies regarding whether a specific document defines Allstate's "voluntary early retirement" policy. Allstate's witness Mario Rizzo testified he has not seen a specific document setting out Allstate's "voluntary early retirement policy" referred to in Section 2.3(A).  Rizzo testified his understanding of the voluntary early retirement policy in 1989 or 1990 is attaining age 55 with 20 years of continuous service.[143]

173.    Plaintiffs cite Allstate's 1991 Human Resource Policy Manual containing a section entitled "Retirement Policies." A subsection of "Retirement Policies" is "Voluntary Retirement" which in turn contains a heading in bold face "20 Years of Continuous Service and Age 55" providing "An employee who has 20 or more years of continuous service may request early retirement at any time after reaching age 55." [144]

174.    Plaintiffs also point to an Allstate document entitled "Agents Pension Plan Important Points" prepared by Mario Rizzo. [145] The document contains a page entitled "Retirement" providing, in relevant part:

> The following points regarding retirement from Allstate, retiree benefits, and converting to NEA must be understood:
>
> . . .
>
> **● The Agents Pension Plan will distribute vested benefits to agents in accordance with plan provisions. If agents convert to the NEA program, the following will apply:**
>
> - **They will be eligible to receive their pension benefit on the earlier of the following:**
>
>   **Termination of their R3001 agreement and qualifying for normal or early retirement,**
>                               **or**
>
>   **On April 1 following the calendar year they reach age 70 ½.**
>
> - **They will not be eligible for an early retirement benefit while the R3001 agreement is in effect.**
>
> - **Their years of service under the R3001 contract will not count towards their pension benefit.**[146]

175.    Consistent with the document he prepared, Mr. Rizzo testified specifically to the bolded language and items in "dashed points":

Q. And the first one [dash point], which is prefaced by the language, "If agents convert to the NEA program, the following will apply." It says, "They will be eligible to receive their pension benefit on the earlier of the following," and the first is "termination of their R3001 agreement and qualifying for normal or early retirement." Do you see that?

A. Yes.

Q. If an agent converted to the R3001 and then sometime later stopped service, is it correct that they could still qualify for early retirement?

A. *If an agent had met the service requirements prior to converting and then terminated their – their R3001 agreement and had 20 years of service, they would have qualified for payment of their benefit at early retirement.*[147]

176.    When questioned about the eligibility requirements of Section 2.3(A) – the beef-up provision – in the 1989 Agents Pension Plan,[148] with particular regard to EAs who ended their R3001 contract, Mr. Rizzo testified:

Q. So are you saying that if an employee-agent had attained age 55 and at least 20 years of continuous service, *then converted after reaching that and two years later, for instance, left the R3001 contract, that the person could still get the early retirement benefit?*

A. *They would have been entitled to payment of their* - - of their early - - of their retirement ben – their *early retirement benefit at that point.*

. . .

Q. Okay. So where it says "at his actual retirement date," *is that referring to the date of conversion or the date of leaving the service of the* - - *Allstate entirely, including under the EA contract*?

A. My understanding is that they would refer to the date that they're actually terminating - - *their actual retirement date is the date that they're terminating their R3001 agreement*. Because prior to that, during the period of time that they were an R3001 agent, they hadn't yet separated from service from Allstate.

Q. So the reference to 20 years of continuous service would be a reference to the 20 years of continuous service while the agent was an employee-agent?

A. Yes.

Q. And the requirement of 20 years of continuous service did not have to encompass the period of while he was an R3001 agent?

A. Service - - the period of time as an R3001 agent would not have been considered service for purposes of the pension plan, because the agent wasn't an employee.

Q. Okay. But then the employee – the agent would not have had 20 years of continuous service at his actual retirement date. Is that correct?

A. The agent would have had to have had 20 years of continuous service *at the point of conversion.*[149]

177.    Rizzo testified EAs "retire" upon "terminating their R3001 agreement" and a document he prepared states agents converting to EA *will be eligible* to receive pension benefits on the earlier of *termination of their EA contract* (the R3001 agreement) and qualifying for normal or early retirement *or* April 1 following the calendar year they reach age 70 ½ and is contrasted with the warning agents converting to EA will *not* be eligible for an early retirement benefit while the R3001 agreement is in effect.

178.    In 1994, Allstate amended its Plan and included an "Appendix A" stating, in the first line, "an employee who has 20 or more year of continuous service may request early retirement at any time after reaching age 55."[150] Appendix A further states:

The purpose *of the Voluntary Early Retirement policy*, since its inception in the early 1970's, has been to provide a financial enhancement to long-service employees who wish to cease accepting responsibilities, or performing duties or services, for the Company substantially similar to the responsibilities that the individual had accepted, or the duties or services that the individual had performed, prior to terminating employment with the Company before reaching normal retirement age. Consequently, t*he request of an employee for Voluntary Early Retirement will be denied if, at the time of terminating employment and applying for Voluntary Early Retirement, the employee enters into an agreement with the Company pursuant to which he or she will continue to receive*, directly or indirectly, *compensation from the Company* f*or accepting responsibilities, or performing duties or services, substantially similar to the responsibilities that the individual had accepted, or the duties or services that the individual had performed for the Company, prior to terminating employment with the Company*.[151]

179.     We find this Appendix further evidences Allstate's "voluntary early retirement policy" requires an employee who has 20 years of service at age 55 to "retire" as construed by Administrative Rule 28 by terminating employment, but leaves open the issue of EAs who separate from service when the EA contract ends.

180.     Based on our evaluation of the evidence and credibility of witnesses, we find Allstate's interpretation of the Plan to deny beef-up eligibility to EAs who had 20 years of service at the time they signed EA contracts and who later ceased EA service at the age of at least 55, but less than age 63, is a cutback. Allstate's Administrative Committee interpreted the term "retire" to mean both a termination of employment and separation from service regardless of when these distinct events occurred. When Plaintiffs converted to EA with 20 years of continuous service and then separated from Allstate's service at the termination of their EA contracts having reached age 55, but less than 63, they "retired" and became eligible for the beef-up.

181.     In the accompanying Order, we require Allstate and the Plaintiffs calculate Alternative #1 (the beef-up benefit as of December 31, 1988) for all EAs in Groups Two, Three, and Four. Based on Plaintiffs' exemplars at trial, it appears likely after Allstate calculates Alternative #1 and compares it to Alternative #2, some, if not all, Plaintiffs received, or will receive, a greater benefit under Alternative #2. As we found earlier, the 1991 Amendments retroactive to January 1, 1989 do not create a cutback.

## IV.     Conclusion

Following trial, we find Allstate's 1991 Amendments, with a safe harbor, do not improperly cutback on benefits. But Allstate's interpretation of "retire" acts as a cutback for certain Group Two, Three and Four Plaintiffs who converted to exclusive agent status with 20

years of continuous service and then <u>later</u> separated from Allstate's service upon terminating their exclusive agent status between the ages of 55 and 63. These Plaintiffs are entitled to the protections of the safe harbor and now entitled to know whether they would have received the benefit of their early retirement subsidy as of December 31, 1988. We require the prompt disclosure of this relatively straightforward calculation as this determination must precede the individual trials. We need to know if a Group Two, Three or Four Plaintiff has a loss based on a cutback claim, and for how much, before setting case management for resolving the individual issues.[152]

---

[1] 29 U.S.C. § 1001 *et seq.*

[2] *Scott v. Admin. Comm. of the Allstate Agents Pension Plan*, 113 F.3d 1193 (11th Cir. 1997).

[3] May 2, 2016 Consolidation Order (ECF Doc. No. 851).

[4] 29 U.S.C. § 621, *et seq.*

[5] 29 U.S.C. § 1054(g).

[6] 29 U.S.C. § 1140.

[7] May 2, 2016 Scheduling Order (ECF Doc. No. 852). Plaintiffs filed their Complaint on May 20, 2016 (ECF Doc. No. 864). Allstate subsequently filed a motion for summary judgment on Plaintiffs' ERISA anti-cutback claims and breach of fiduciary duty claim. Following oral argument, we granted summary judgment in Allstate's favor on the breach of fiduciary duty claim (Count X). We also granted Allstate's motion for summary judgment as to any argument the 1993 Plan amendment to the term "Credited Service" constitutes a violation of ERISA's anti-cutback provision and denied Allstate's motion on Plaintiffs' alternative claim they are employees, not independent contractors, to be resolved in later individual proceedings under the varying state laws (Count IX). We denied Allstate's motion as to Plaintiffs' anti-cutback claim relating to the elimination of the early retirement beef-up subsidy (Count VIII). *See* November 22, 2016 Memorandum and Order (ECF Doc. No. 960, 961). After our summary judgment order, the only claim at the Phase I trial is whether Allstate violated ERISA's anti-cutback provision by eliminating the beef-up subsidy (Count VIII).

[8] *See* Amended Notice of Plaintiffs at Issue in the Phase I Trial Beginning December 2, 2016 (ECF Doc. No. 971).

[9] Stipulated Facts for the December 2016 Phase I Trial at ¶¶ 5, 12 (ECF Doc. No. 972) ("Stipulation").

[10] *Id.* at ¶ 6. Employee contracts were known as either R830 or R1500 Agreements. There is no dispute these Agreements are employee contracts and all Plaintiffs in the consolidated actions were, at some point, employees of Allstate under an R830 or R1500 Agreement. *Id.* at ¶¶ 7-9.

[11] *Id.* at ¶ 8.

[12] 1989 Plan at ¶¶ 1.1(B), 1.2 (Joint Exhibit ("JX.") 22). The Plan defines "Agent" as "any employee who is classified as an Agent under the Company's human resources policy." *Id.* at ¶ 9.2.

[13] Stipulation at ¶ 14.

[14] 1989 Plan at § 4.1(A).

[15] 1989 Plan at § 4.1(A), (B).

[16] 1989 Plan at §§ 2.1, 2.2, 2.3, 2.4.

[17] The 1989 Plan defines "Normal Retirement Date" as the "last day of the month coincident with or next following the date an Agent attains age 63 years (his "normal retirement age")." *See* 1989 Plan at § 9.9. Section 9.14 of the 1989 Plan defines "Retirement Pay" as "an annual amount payable for the lifetime of the retired Agent entitled thereto." *Id.* at § 9.14.

[18] 1989 Plan at § 2.3(A).

[19] 1989 Plan at § 2.3(A).

[20] Stipulation at ¶¶ 23, 24.

[21] EAs entered agreements with Allstate known as R3000 or R3001 Agreements. Stipulation at ¶ 10.

[22] Stipulation at ¶ 10.

[23] *Scott v. Admin. Comm. of the Allstate Agents Pension Plan*, 113 F.3d 1193, 1195 (11th Cir. 1997) (footnote omitted).

[24] Stipulation at ¶ 29.

[25] *Id.* at ¶ 31.

[26] *Id.* at ¶ 32.

[27] JX 100; Notice 88-131, 1988-2 C.B. 546, 1988 WL 561201 (Dec. 13, 1988) ("Notice 88-131").

[28] *Id.*, 1988 WL 561201 at *1.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.* at *2.

[34] *Id.* at *4.

[35] *Scott,* 113 F.3d at 1196 (footnote omitted). In *Scott*, the Court of Appeals for the Eleventh Circuit explained the use of the term "freeze" and "frozen" are "somewhat of a misnomer" because "benefit accruals after December 31, 1988, were not 'frozen' in the sense of total cessation. Rather, benefit accruals would continue pursuant to the new formula to be set out in the subsequent amendments in compliance with the IRS guidelines to be promulgated. The new formula was permitted to be retroactive." *Id.* at 1196, n.6.

[36] Notice 88-131, 1988 WL 561201 at *4.

[37] *Scott*, 113 F.3d at 1196, n. 8 (citing Notice 88-131).

[38] JX 29 at ARI 320258.

[39] Notice 88-131, 1988 WL 561201 at *5.

[40] *Id.* at *10.

[41] JX 26 (emphasis in original).

[42] Rev.Proc. 89-65, 1989-2 C.B. 786, 1989 WL 519075 (Nov. 21, 1989) ("Rev. Pro. 89-65").

[43] Rev. Pro. 89-65, 1989 WL 519075 at *1.

[44] Rev. Pro. 89-65, 1989 WL 519075 at *5; *Scott*, 113 F.3d at 1196.

---

[45] JX 53, 54.

[46] JX 37.

[47] JX 56.

[48] JX 59.

[49] JX 101; Notice 90-73, 1990-2 C.B. 353, 1990 WL 690002 (Nov. 30, 1990).

[50] JX 102; Notice 92-36, 1992-2 C.B. 36, 1992 WL 189314 (Aug. 7, 1992).

[51] JX 71.

[52] *Scott*, 113 F.3d at 1199.

[53] JX 63.

[54] *Id.* at ARI 306413.

[55] JX 76.

[56] *Id.* at § 2.3(A).

[57] *Id.* at § 2.3(C).

[58] Stipulation at ¶ 39.

[59] *Id.* at ¶¶ 40-42.

[60] *Id.* at ¶¶ 43-45.

[61] *Id.* at ¶ 11. Under the Program, Allstate intended to terminate all R830 and R1500 employee contracts.

[62] *Id.*

[63] Amended Notice of Plaintiffs at issue in the Phase I Trial Beginning December 2, 2016 (ECF Doc. No. 971).

[64] JX 374.

[65] *Id.*

[66] Exhibits JX 249 (Brown), 262 (Flood), 289 (O'Connor), 290 (Pigg), 297 (Sand), 304 (Stedman), 315 (Williams), and 320 (Sherman).

[67] *Id.*

[68] *See* Conclusions of Law at ¶¶ 139-165.

[69] *Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89, 98 (3d Cir. 2011) (quoting *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986)).

[70] *Bellas v. CBS, Inc.*, 221 F.3d 517, 522 (3d Cir. 2000) (citations omitted).

[71] 29 U.S.C. § 1054(g).

[72] *Battoni v. IBEW Local Union No. 102 Employee Pension Plan*, 594 F.3d 230, 233 (3d Cir. 2010) (citation omitted).

[73] *Cottillion v. United Refining Co.*, 781 F.3d 47, 57-58 (3d Cir. 2015) (quoting *Bellas*, 221 F.3d at 524) (footnote omitted).

[74] *Bellas*, 221 F.3d at 524 (citations omitted).

[75] *Bellas*, 221 F.3d at 524 (citing *Dade v. N. Am. Philips Corp.*, 68 F.3d 1558, 1562 (3d Cir. 1995)). *See also, Alcantara v. Bakery and Confectionery Union and Industry Int'l Pension Fund Pension Plan*, 751 F.3d 71, 78 (2nd Cir. 2014) (joining other circuits in recognizing a participant may "grow into" eligibility for retirement-type subsidy benefit under anti-cutback rule by satisfying eligibility requirements after amendment date); *Ahng v. Allsteel, Inc.*, 96 F.3d 1033, 1036-37 (7th Cir. 1996) (employees who satisfy, either before or after the plan amendment, relevant eligibility requirements in place at the time of the amendment state a claim under section 204(g)).

[76] *Bellas*, 221 F.3d at 524.

[77] 29 U.S.C. § 1054(g)(2).

[78] "Regulations prescribed by the Secretary of the Treasury under section [ ] . . . 411 . . . of Title 26 [of the Internal Revenue Code] . . . shall also apply to the minimum participation, vesting, and funding standards set forth in [ERISA]" and section 411(d)(6) of the Internal Revenue code and section 204(g) of ERISA "are meant to be interpreted consistently." *Bellas*, 221 F.3d at 523, n.3 (citing 29 U.S.C. § 1202(c)). *See also Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 746-747 (2004) (the anti-cutback rule of ERISA §204(g) "show[s] up in substantially identical form as 26 U.S.C. § 411(d)(6)") (footnote omitted); *Battoni*, 594 F.3d at 236, n.4 (citing *Bellas*); *Alcantara,* 751 F.3d at 76, n. 2 (under regulations issued by Secretary of Labor, IRS regulations are applicable to the interpretation of ERISA section 204).

[79] 26 C.F.R. § 1.411(d)-3(a)(1) (emphasis added).

---

[80] 26 C.F.R. § 1.411(d)-3(g)(14) (emphasis added).

[81] 26 C.F.R. § 1.411(d)-3(g)(15) (emphasis added).

[82] 26 C.F.R. § 1.411(d)-3(a)(4) (Example 1) (emphasis added).

[83] *Id.* (Example 2).

[84] *Scott*, 113 F.3d at 1199. In *Scott*, Allstate contended its October 1990 Resolution constituted a Plan amendment. The district court found, as a matter of fact and law, Allstate's October 1990 Resolution did not constitute an amendment of the Plan, a finding affirmed by the Court of Appeals.

[85] *Heinz*, 541 U.S. at 747 (quoting 26 C.F.R. § 1.411(d)-4, A-2(a)(1)).

[86] *See* Findings of Fact at ¶¶ 16-44.

[87] *Scott*, 113 F.3d at 1201.

[88] *Id.*

[89] *Scott*, 113 F.3d at 1202-1203 (footnotes omitted).

[90] *Scott v. Admin. Comm. of the Allstate Agents Pension Plan*, No. 93-1419, 1995 WL 661096, *7 (M.D. Fla. Sept. 15, 1995).

[91] Trial Testimony, December 5, 2016, at pp. 149-150 (ECF Doc. No. 1074).

[92] *Id.* at pp. 150-151.

[93] 13 F.3d 969 (6th Cir. 1994).

[94] *Id.* at 978.

[95] *Id.*

[96] *Id.*

[97] No. 00-9660, 2003 WL 1213084 (S.D.N.Y. Mar. 17, 2003).

[98] *Id.* at *14.

[99] All 118 Plaintiffs assert cutback claims in Count VIII. A defense asserted by Allstate to the cutback claims is ineligibility for the beef-up.

[100] Having completed 20 years of continuous service at the time Plaintiffs signed an EA contract in 2000 is important because these Plaintiffs need not show their service as EA should count toward the years of service requirement necessary for beef-up eligibility, a showing dependent on resolving the question of whether EAs are common law employees instead of independent contractors to be determined in later, individual proceedings.

[101] *See* Allstate's Proposed Findings of Fact at ¶¶ 78, 106 and Conclusions of Law at ¶ 173 (ECF Doc. No. 982).

[102] JX 22 at ¶ 2.3(A) (1989 Plan); JX 76 at ¶ 2.3(A) (1991 Amendment) (emphasis added).

[103] This applies to Plaintiffs in Group Four who are currently active EAs.

[104] JX 240.

[105] *Id.*

[106] *Id.* Under Section 2.4(B) of the amended Plan, Blanchette having completed 20 years of service and attained age 55 became "entitled to request that the Administrative Committee commence his Retirement Allowance on the first day of any month thereafter prior to his Normal Retirement Date." *See* JX 76, 1991 Amendments at § 2.4(B). Allstate calculated his accrued benefit as of a November 1, 2008 Normal Retirement Date, the first day of the month after Blanchette reached age 65, the amended normal retirement age.

[107] JX 240 at ARI 396112, ARI 396113.

[108] JX 239; 374.

[109] JX 239.

[110] *Id.* at ARI 396953

[111] *Cottillion,* 781 F.3d at 58 (quoting *Battoni*, 594 F.3d at 234).

[112] *Id.* (quoting *Hein v. F.D.I.C.*, 88 F.3d 210, 216 (3d Cir.1996)) (footnote omitted).

[113] *Cottillion*, 781 F.3d at 51.

[114] *Id.*

[115] *Id.* at 52.

[116] *Id.* at 53. ERISA § 502(a)(1)(B) permits a civil action by plan participant or beneficiary to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of

the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

[117]*Cottillion*, 781 F.3d at 57.

[118] *Id.* (citing *Epright v. Envtl. Res. Mgmt., Inc. Health & Welfare Plan*, 81 F.3d 335, 342-43 (3d Cir. 1996)).

[119] *Id.* at 57-58.

[120] *Id.* at 58.

[121] *Hein*, 88 F.3d at 215 (citing *Dade,* 68 F.3d at 1562).

[122] Stipulation at ¶ 26.

[123] *See* Stipulation at ¶ 4; 1989 Plan at §4.1(A)(B).

[124] Section 402 of the Internal Revenue Code defines "separation from service" as "only upon the employee's death, retirement, resignation, or discharge, and not when the employee continues in the same job for a different employer as a result of liquidation, merger, consolidation, etc. of the former employer." *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1146 (3d Cir. 1993) (quoting Internal Revenue Service Revenue Rulings).

[125] JX 108.

[126] JX 22, 1989 Plan at § 2.4(A)(1); JX 76, November 1991 Amendments at § 2.4(A)(1).

[127] JX 76 at § 2.4(B).

[128] *See* Allstate's Response at p. 4 (ECF Doc. No. 988) citing JX 58, 93, 109, 148.

[129] JX 58.

[130] *Id.* at ARI 325209 (emphasis added).

[131] JX 93.

[132] *Id.* at ¶¶ 1-5.

[133] 100 F.3d 957 (6th Cir. 1996).

[134] *Scott*, 1995 WL 661096 at * 2.

[135] *Id.* (emphasis added).

[136] *Id.* at n. 1.

[137] *Sharp*, 100 F.3d at *1.

[138] *Id.* (emphasis added). The passage of *Sharp* in the parenthetical quoted by Allstate relates to the issue of constructive discharge. *See* Allstate Proposed Conclusions of Law at ¶ 136.

[139] *Hein*, 88 F.3d at 215 (citing *Dade,* 68 F.3d at 1562).

[140] *Cottillion*, 781 F.3d at 57-58.

[141] Allstate argues because EAs cannot "retire" under Section 2.3, we need not even address the voluntary early retirement policy.

[142] *Scott*, 1995 WL 661096, at *9.

[143] Rizzo deposition at pp. 77-78.

[144] JX 77.

[145] Plaintiffs identify Mr. Rizzo as Allstate's Senior Vice President and Chief Financial Officer without citation to the record. Mr. Rizzo testified at his September 16, 2016 deposition he began his career at Allstate as an accountant in pension administration, became a senior accountant in the same area at some point before 1995, and then became a supervisor on the Allstate retirement plan administrative team. Rizzo deposition at pp. 10-12.

[146] JX 46 (emphasis in original).

[147] Rizzo deposition at pp. 140-141 (emphasis added).

[148] JX 23 at ARI 311888. The November 1991 Amendments did not change the eligibility requirements in Section 2.3(A).

[149] Rizzo deposition at pp. 142-145 (emphasis added).

[150] JX 166.

[151] *Id.* (emphasis added).

[152] We recognize certain exhibits (out of hundreds) may have described these calculations for one or more exemplars in Groups Two, Three and Four. In an abundance of caution to ensure we address any potential Plaintiff with a cutback claim under this Memorandum and avoid speculation, we direct Plaintiffs to present these calculations which should not be the subject of dispute as to dollars.