# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GENE R. ROMERO,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 01-3894** |
| | : | |
| | : | **CONSOLIDATED WITH** |
| **ALLSTATE INSURANCE COMPANY,** | : | |
| *et al.*, | : | **NO. 01-6764 (Romero II)** |
| | : | **NO. 03-6872 (Romero III)** |
| **Defendants.** | : | **NO. 15-1017 (McLaughlin)** |
| | : | **NO. 15-1049 (Abell)** |
| | : | **NO. 15-1190 (Harris)** |
| | : | **NO. 15-2602 (Tabor)** |
| | : | **NO. 15-2961 (Siegfried)** |
| | : | **NO. 15-3047 (Anzivine)** |

## MEMORANDUM

**KEARNEY, J.**                                                                   **April 27, 2017**

Employers seeking to transition their sales model to e-commerce and direct sales supplemented by independent contractors rather than employees must focus their transition plans on a studied business model. They must ensure the transition is not motivated by either the age or pension eligibility of their valued employees who will lose their employment with attendant pension benefits. Employers recognize the likely challenge when an employee loses a job with ongoing pension accruals but gains the touted independence and increased earnings of an independent contractor. Federal law has long prohibited employers from contriving an independent contractor transition to eliminate older employees or stop pension accruals. Consistent with other federal courts reviewing Allstate Insurance Company's November 1999 decision to terminate its remaining employee sales agents and offer them independent contractor status, and for several additional reasons based on Allstate's overriding and well-documented need to transition to an internet and direct sales distribution model to align with its long-

established business goals, we hold there are no genuine issues of material fact and the employee insurance agents cannot show Allstate decided to terminate its remaining employee agents regardless of age or pension status to eliminate older sales agents or stop pension accruals. While Allstate's November 1999 business decision may have surprised the remaining employee agents given Allstate's over nine year fight with third parties to maintain an employee agent status, and Allstate's transition may not be a model of employer communications, we find, as a matter of federal law, there is no evidence its business decision is a pretext to conceal a motivating reason to discriminate based on age or to eliminate future pension benefits.

## I. Facts[1]

Allstate Insurance Company sells insurance and related products and services.[2] The Plaintiff insurance agents challenge Allstate's November 1999 decision to transition over 6,200 employee agents to independent contractor status for alleged business reasons, leaving those independent contractors without employee benefits including pension and health and welfare benefits as of June 2000.

### A. Allstate transitions retail employee agents to a Neighborhood Office Agent program in 1984.

Before 1984, Allstate sold its insurance products primarily through employee agents in retail stores such as Sears or in Allstate-owned sales offices.[3] These employee agents signed an at-will employment contract known as an R830.

In 1984, Allstate began selling its insurance products through a Neighborhood Office Agent ("NOA") program.[4] Allstate designed the Neighborhood Office Agent program in part to reduce office support costs.[5] Allstate introduced the Neighborhood Office Agent program to respond to flat productivity and to maintain a competitive position in a marketplace which used independent contractor agents.[6] By moving agents into neighborhood offices, the agents could

invest in their insurance business by selecting support staff or expanding advertising with increased management responsibility over their day-to-day business and seeking approved reimbursements from Allstate.[7] While the Neighborhood Office Agent program assisted in attempting to meet the competitors' use of independent agents, Allstate did not offer these Neighborhood Office agents an interest in the book of business.[8] Rather, the Neighborhood Office Agent program allowed the Neighborhood Office agents to find their own location, select their own help and have "unlimited income potential."[9] The Neighborhood Office agents leased or secured their location in their own names subject to Allstate's approval.[10] Under this Neighborhood Office Agent program, the employee agents paid for their own operating costs, including rent, utilities, support staff, salaries and benefits, office equipment and supplies, telephone lines and marketing.[11]

Allstate reimbursed certain expenses from an office expense allowance.[12] The Neighborhood Office agents enjoyed discretion to manage office expenses but this expense allowance did not cover some types of office expenses and Allstate became aware many of their Neighborhood Office agents incurred expenses in operating their agencies in excess of their reimbursements.[13] Allstate viewed these extra expenses as their Neighborhood Office agents' investments in the business while reminding them of their employment terminable at will.[14] Some agents claimed these expenditures as business expenses on their tax returns, notwithstanding their known employee status.[15]

At the same time it introduced the Neighborhood Office Agent Program, Allstate introduced the R1500 agreement.[16] Starting on October 1, 1984, Allstate required newly hired agents to work under the R1500 agreement as employees.[17] The existing R830 employee agents could remain working under their existing R830 agent program or voluntarily enter the

Neighborhood Office Agent program.[18]  The agents signed standardized Allstate employment contracts not subject to individual negotiation.[19] These captive employee agents received industry leading benefits touted by Allstate as the best in the industry.[20]  Nothing in these promises concerning Allstate's benefits guaranteed lifetime employment. To the contrary, all the employee agents served at will.[21] Allstate-sponsored health and welfare plans offered to employee agents included group medical and dental insurance coverage, vision care coverage, group basic life and accidental death and dismemberment insurance, group supplemental and dependent life insurance coverage, group long-term care insurance, group long-term disability insurance, flex accounts for health independent care expenses, group legal service benefits and fully subsidized counseling services.[22] Allstate maintained a defined benefit pension plan offered to eligible employee agents.[23]

### B.  Allstate begins the Exclusive Agent program.

In October 1990, Allstate introduced the Exclusive Agent program,[24] which Allstate proclaimed as a departure from its "historical reliance on employee agents in favor of independent contractors."[25] This October 1990 decision to introduce an Exclusive Agent program marked the first time in Allstate's history it deviated from an all-employee captive agency force.[26]

There were two types of agents under the Exclusive Agent program: (1) agents classified as employees for a temporary term (R3000 agents); and (2) agents classified as independent contractors (R3001 agents).[27] Allstate classified R3000 agents as employees with an 18-month term after which they could agree to become R3001 independent contractor agents.[28] Allstate provided R3000 agents with training opportunities not available to other employee agents with the aim of converting them to R3001 independent contractors upon the successful completion of

their 18-month employee term.[29] Allstate also directly hired new agents as R3001 agents without first requiring them to work as temporary R3000 agents.[30]

The R3000 employee agents were similar to R830 and R1500 employee agents in some respects. These employee agents sold and serviced the same Allstate products, and could sell and service only Allstate-authorized products.[31] All of these agents had to follow Allstate's underwriting rules[32] and they were eligible for some measure of employee benefits.[33] However, while R3000 agents had a temporary 18-month term, agents with R830 and R1500 agreements had indefinite contract durations but no promise of continued employment.

Throughout the 1990s, Allstate did not require its agents to convert to exclusive agents but allowed the agents to apply for conversion.[34] Allstate wanted as many agents as possible to become independent contractors to have its goals aligned with its sales force beginning in 1990.[35]

These independent contractors remained captive agents who could only sell and service Allstate products.[36] Regardless of whether the Allstate agents were employee agents or independent contractors, Allstate required agents to build and maintain a profitable book of business.[37] The roles of the employee agents and the exclusive agents otherwise differed as exclusive agents could: receive higher commissions than employee agents; choose between operating as a sole proprietorship or other entity; accrue an economic interest in business developed which could be sold to an Allstate approved buyer; sell their economic interest in the book of business allowing them to receive a termination payment; avoid the same limits on deducting unreimbursed business expenses; expand business by purchasing other agents' economic interest; conduct non-Allstate business outside their agencies; and, not have to physically be present at their agencies and not attend company meetings in person. In exchange

for the independent contractor status, these exclusive agents could not become participants, accrue benefits or earn service under employee benefit plans but could participate in compensation plans designed for independent contractors such as a stock bonus plan.

### C. Allstate's developing problems with agent employees in neighborhood offices.

Since its inception in 1990, Allstate considered its Exclusive Agent program through independent contractors as its best agent program.[38] By contrast, Allstate Neighborhood Office Agent program created multiple business, litigation and qualified pension plan issues.[39]

Allstate's problems with controlling the Neighborhood Office agents can be traced, in some part, to two class actions filed in California in the mid-1990s alleging Allstate violated California's labor code by not ensuring reimbursement of all business expenses.[40] Allstate settled these lawsuits by, among other things, offering California agents the choice between converting to an independent contractor or leaving Allstate.[41]

Aside from the California class actions, other Neighborhood Office agents obtained tax court rulings showing, for tax purposes, a professional relationship as independent contractors and their continued participation in Allstate's tax qualified employee benefit plans could lead to Allstate losing their tax qualified status.[42] Beginning in the mid-1990s, Allstate engaged in protracted negotiations with the Internal Revenue Service to ensure the agents' pension plan retained its tax qualified status and to address the proper employee classification of Neighborhood Office agents.[43] Allstate intended and informed its employee agents of its intent to protect the tax qualified status of Allstate's pension benefit plans including having to either end the Neighborhood Office Agent program or modifying it as consistent with Allstate's classification of these agents as employees. Consistent with its earlier stated intent, Allstate reassured the employee agents of its interest in not forcing conversion to an independent

contractor status. Allstate intended to keep conversion to independent contractors as a voluntary option and allow the agent to choose to remain an employee or convert to an independent contractor.[44] Allstate expended funds to preserve this choice but continually ran into Internal Revenue's concerns of the pension plan being disqualified because of Neighborhood Office agents acting as independent contractors including in deducting non-reimbursable expenses and failing to strictly conform their sales behavior to Allstate's guidelines.[45]

In June 1997, Allstate evidenced its opposition to converting all agents to independent contractors by rejecting the Internal Revenue Service's proposal to convert all of the Neighborhood Office agents to independent contractors.[46] Allstate argued changing the status of these employee agents would "undoubtedly lead to litigation" and significantly damage Allstate's relationship with its agents.[47] Allstate recognized, as late as June 1997, the severe economic consequences to the Neighborhood Office agents in stopping the employee status.[48] Allstate remained particularly concerned with any plan which would instantly require Neighborhood Office agents become independent contractors without changing their contracts and without options for a smooth transition to independent contractor status.[49] At the same time, Allstate continued to buttress the employee status of its Neighborhood Office agents by working to reduce agents' unreimbursed expenses and by imposing increased behavioral controls over the Neighborhood Office agents.[50]

The Plaintiffs also cite a June 1997 initiative known as the "Sales Organization of the Future" prepared by outside consultant McKinsey & Company.[51] This June 1997 initiative, while apparently prepared by a third-party consultant, addressed potential changes to the sales agent and distribution system to allow marketing and technology processes to create the "Sales Organization of the Future."

Plaintiffs have not adduced competent evidence of a connection between the 1997 consultant plans and the November 1999 transition of the employee agents to independent contractors. If anything, the June 1997 representations to the Internal Revenue Service and the alleged efforts made by outside consultants confirm Allstate's interest in the continued treatment of its Neighborhood Office agents as employees as opposed to independent contractors and a search for a program in which Allstate could control its employee agents while competing with other insurers who required independent contractors to sell their product.

By October 23, 1997, Allstate told the Internal Revenue Service of new compensation and expense options available to increase the expense allowance and reduce the possibility of a Neighborhood Office agent having unreimbursed expenses.[52] By March 1998, Allstate announced effective January 1, 1999, employee agents could not pay out of pocket for office rent and support staff, but had to limit those types of expenses to their office expense account expenses and, if insufficient to cover expenses, agents could reallocate one or two commission percentage points to cover the expenses.[53] Employee agents could convert to independent contractors without having to meet productivity or performance requirements.[54] The employee agents would still need to have acceptable updated business plans to pay back Allstate's advances and be current on outstanding amounts as well as completing a seven-step conversion process.[55]

Over the course of nine years from 1990 through 1999, Allstate's agents repeatedly made clear the loss of employee benefits was a key barrier to voluntarily converting to independent contractor status.[56] By 1999, fewer than 5% of the employee agents each year had decided to convert to independent contractors.[57] Allstate, continuing to believe independent contractors was the best program for it and its agents, began eliminating production performance criteria once

necessary to convert to independent contractor status.[58]

By September 1998, Allstate reached a closing agreement with the Internal Revenue Service with a termination date of December 31, 2005.[59] Allstate and the Internal Revenue Service agreed if the United States Supreme Court or at least two final, nonappealable decisions concluded a Neighborhood Office agent must be properly classified as an independent contractor, Allstate agreed to discontinue the Neighborhood Office agents and their active participation in tax-qualified plans.[60] Allstate advised all of its agents of this final agreement.[61]

But Allstate continued to represent, including in a September 11, 1998 letter, its continued effort to preserve and continue the Neighborhood Office Agent program and provide tax qualified employee benefits for the employee agents.[62] Allstate went so far as to require its employee agents in fall 1998 to sign an Acknowledgment of Understanding through which the employee agents agreed to file their income taxes consistent with their employee classification.[63] As undisputed, regardless of this Acknowledgement, not all agents strictly followed the requirements necessary to remain classified as an employee. Despite multiple efforts, Allstate repeatedly addressed issues with employee agents over whom they could not ensure continued employee status necessary for a qualified pension plan. [64]

### D. Allstate and Edward Liddy focus on the direct insurance sales market and transitioning to a sales force of independent contractors.

In January 1999, Edward Liddy became Chairman of Allstate's Board of Directors after Allstate enjoyed four consecutive years of record profits.[65]  Mr. Liddy stridently focused on the need to change Allstate's old model of selling insurance through Neighborhood Office agents and focusing on becoming direct marketers to the insurance consumer.[66]

Consistent with Allstate's competitors, Mr. Liddy began focusing on Allstate entering the emerging direct insurance sales market.[67] By June 1999, Allstate began the work leading up to

the "Preparing for the Future Program," (the "Program") assigning senior personnel to create a "Channel Integration Project" or "Early Bird" team to examine: "moving to a single agency program"; "looking at underperforming agencies and what could be done to help them or do something"; and, "look[ing] at our agent compensation system to see if it could be better aligned with company objections, to align the agents with us."[68] This Early Bird team began focusing on moving to a single agency program under the R3001 program as "the only viable program that we have."[69] An Allstate senior executive expressed specific concern with having so many differing agent contracts.[70]

Also in June 1999, Allstate began focusing on Mr. Liddy's plan for direct marketing, call centers and internet sales, including steps necessary to pay for the additional $2 billion transition expense.[71] Allstate's $2 billion in anticipated costs included $556 million in technology costs, $1.14 billion in call center operations and $471 million in marketing expenses.[72] Plaintiffs adduce no competent evidence of the $2 billion necessary for the technology costs as being a determining motivator in Allstate's decision to adopt a program converting the remaining employee agents to independent contractors.

Allstate cites internal records confirming it intended to offset costs by restructuring service commissions to reflect reduced servicing demands on agents.[73] Allstate recognized direct customer access would cost it substantial money under its new business model including offering attractive pricing and establishing call centers and internet e-commerce capability. While there is limited evidence of Allstate's mentioning reducing commissions and its almost forced business decision to finally transition its employee agents to independent contractors, there is substantial and almost overwhelming evidence Allstate's decision to transition its employee agents to independent contractors finally addressed almost ten years of issues with

maintaining employee Neighborhood Office agents, concerns with the Internal Revenue Service, California class actions and mindful of its long-held belief the best program to meet future development needs involved independent contractors and not employee agents.

Allstate undertook expense reduction efforts to allow it to expand into direct access for its insurance products as well as fund the technology, call center and marketing expenses.[74] By July 12, 1999, Allstate began reviewing an "agent transition" program acknowledging the potential reality of legal and fairness issues with moving all agents to independent contractors.[75] These legal and fairness issues were nothing new to Allstate, as it argued the same points to the Internal Revenue Service in negotiating over the potential loss of qualified benefits.

Plaintiffs adduced no evidence Allstate's July 1999 discussion, however, addressed the specific terms of the later November 10, 1999 plan to transition employee agents to independent contractors through a Release and options. The "Channel Integration Project" or "Early-Bird" team explored and abandoned the idea of removing low performing agents but continued to analyze moving all agents to independent contractor status.[76] Allstate evaluated several "Benefits of Change" to better align agents with its goals and improve efficiency including: better alignment of agent commission/bonus structure; allowing agents to invest in their business without the restrictions of the Neighborhood Office Agent program; hiring and managing a support staff without those restrictions; a sense of ownership possibly improving performance; avoiding micromanaging agent activities; improving management's ability to provide agents with support; and, provide increased efficiency to reduce/reassign internal Allstate administrative costs on the expense reimbursement for employee agents and vendor management.[77]

While Allstate identified its cutting administrative expenses, the Plaintiffs did not adduce evidence of Allstate specifically considering reducing pension benefits and the attendant savings

in mid-1999. Allstate recognized its obligations of financial disclosure in analyzing the financial impact of this transition and hired an outside actuary to provide consulting services.[78]

While the Plaintiffs now argue Allstate's documents confirm its intent to eliminate future pension accruals to save expense on their transition, Plaintiffs do not adduce evidence of actual savings. Allstate instead cites records demonstrating the expense reduction efforts in all aspects of the company's business were intended to be reinvested in the technology and the other support defined by Mr. Liddy.[79] Allstate estimated net expenses from this business transition in excess of $27 million in 1999 and 2000.[80]

By September 30, 1999, Allstate recognized the independent contractor status would be the only program without the problems of herding cats in ensuring employee classification necessary for a qualified pension plan.[81] Allstate began to focus on a plan transitioning the approximately 6,200 remaining employee agents and Neighborhood Office agents to independent contractors. Allstate's senior executive team recommended Allstate approve a program where the employee agents program would be discontinued with an opportunity for all agents to become independent contractors reasoning: "we cannot continue to maintain five different captive agent programs including six versions of the NOA Program if we are going to effectively compete in the marketplace."[82]

Allstate based this recommendation on, among other things, a study showing the cost of making changes to each of the contracts in dealing with agents including Allstate's expense in maintaining the differing agent contracts.[83] The Plaintiffs argue the administrative expense savings to process agent support consisted of less than $1 million.[84] Even assuming these calculations to be the "only" administrative expense savings in a certain document, there is no evidence contrary to Allstate's repeated reasoning of saving a substantial amount of money by

not having several different agent contracts as it had experienced since 1990.

Consistent with the recommendation, on September 30, 1999, Allstate outlined the plan going forward.[85] Allstate would eliminate its employee agent programs, including the 18-month R3000 agreements.[86] All employee agents (other than the existing R3000 agents) would be offered the opportunity to become R3001 agents under a modified version of the R3001 contract.[87]

In late October 1999, Mr. Liddy and Allstate's President Richard Cohen made the final decision to move forward with the Program.[88] By November 9, 1999, Allstate decided to move forward with the transition projecting annual savings of $175 million from transitioning employee agents to independent contractors and recognizing an additional $98 million one-time pension curtailment gain.[89] Plaintiffs show this $98 million gain as a motivating factor. While this is undoubtedly a large number, it pales in comparison to the $2 billion expense anticipated in transition.

Allstate described its transition to align agents' interests with company objectives through one independent contractor program, focusing on the independent contractor as the only program offered to new agents since 1990 and, most significantly, the independent contractor agents substantially outperformed employee agents following the modifications required by the Internal Revenue Service.[90] Allstate described its need for change to compete effectively in the marketplace, allow agents to be free to invest in their agencies to maximize growth and income opportunities, avoid the administrative, support and management costs and allow greater flexibility and lower administrative costs with less complexity.[91]

**E. Allstate's November 10, 1999 termination of R830 and R1500 employee agents with options, upon signing a Release, to become independent contractors.**

By November 1999, Allstate had approximately 15,200 agents with approximately 54% of them operating as employees and 46% operating as independent contractors.[92]

On November 10, 1999, Allstate announced the Program ("Preparing for the Future Program") with the stated goal of transitioning "approximately 6,500 of its captive agents from a number of different contracts and programs to one independent contractor exclusive agency program."[93] As part of its Program, Allstate offered the employee agents other than the 18 month temporary employee agents under the R3000 contract the opportunity to convert to independent contractors.[94] Allstate claimed it valued its employee agents and invested in them over the years. Mr. Liddy testified as to the value of these former employee agents and not wanting to lose a single agent.[95]

Allstate further described its business reasons for the Program as, among other things, leveraging the local presence of all of its over 15,200 member sales force to allow it to service agents and customers more nimbly and cost effectively.[96] Allstate intended "to have larger, more efficient and more entrepreneurial agencies . . . moving to one program across the country will enable us to simplify our support system so we can do a better job for our agents and respond to the changing needs of the marketplace faster."[97] Allstate also announced an initiative to reduce current expenses by $600 million annually to fund the investment in this direct access and Internet channels and represented these "cost savings" would come in part from eliminating thousands of non-agent employee positions through office closings and by reorganizing the employee agent programs into independent contractors.[98] Allstate further described its plan to reinvest the savings of $600 million annually in more competitive prices where necessary,

technology, marketing and advertising, including specifically describing approximately $325 million in savings coming from field realignment including reorganizing the employee agent programs into exclusive agents, underwriting design, regional office realignment and changes in claims.[99] Allstate's internal records projected reducing expenses of $105.8 million in employee welfare and benefits for 2001 but not for later years.[100] Allstate also projected a $222.2 million increase in compensation for the independent contractors to be paid in 2001.[101]

Under the Program, employee agents with R830 and R1500 agreements could remain with Allstate under independent contractor R3001 agreements after they agreed to release claims against Allstate.[102] Allstate announced it would terminate an agent who did not sign a release, with the termination effective June 30, 2000.[103]

Allstate treated the existing R3000 employee agents (those with 18-month temporary contracts) differently than the R830 and R1500 employee agents. The R3000 agents would continue to work the remainder of their 18-month contracts, after which they could become R3001 agents or leave Allstate.[104] Allstate did not include the existing R3000 agents in the Program because, under its rationale, "R3000 agents were on a career path to become an R3001 agent and they had no other option prior to the program. There was nothing for them to have to do differently in that regard."[105]

Allstate provided all of the employee agents, regardless of their age, a release forever discharging Allstate from any and liability arising out of, connected with, or related to, employment and/or termination of employment and the R830 and R1500 Agreements including claims under ADEA or ERISA. Allstate offered four options to the employee agents:

- Sign the Release and continue working as independent contractors under a revised independent contractor agreement;

- Sign the Release and sign another agreement agreeing to work as an Allstate

independent contractor until they sell their book of business by August 1, 2000 to an Allstate-approved buyer ;

- Sign the Release and sign another agreement to leave Allstate in exchange for an "enhanced" severance equal to the higher of the agent's commission earnings in 1997 or 1998 paid over twenty-four monthly installments and subject to a two year non-compete/non-solicitation restriction and unlimited confidentiality obligation; or,

- If they did not sign a Release, leave Allstate entirely as of June 30, 2000 with a base severance of up to thirteen weeks compensation paid over six months and subject to a two year non-compete/non-solicitation restriction and unlimited confidentiality obligation.[106]

Almost all of the employee agents signed the Release and elected one of the first three options. More than 40% of the remaining employee agents left Allstate by selling their book of business to an approved buyer or accepting an enhanced severance. More than half of the current agent Plaintiffs elected to become independent contractors and continued as Allstate agents after 2000.[107] The rest left Allstate's service and some of the agent Plaintiffs are among the 19 of the approximately 6,200 employee agents who left Allstate without signing a release.[108] The remaining agent Plaintiffs left Allstate's service under the sale option, the enhanced severance option, or the base severance option.[109]

### F. Allstate offers to rehire terminated agents.

Almost a year later on September 26, 2000, Allstate implemented a special rehire policy for employee agents who elected to be terminated.[110] Allstate would not rehire former employee agents until they reached the one-year anniversary of their termination or stopped receiving enhanced severance payments which were spread over twenty-four months, whichever was longer.[111] This rehire policy allowed departed agents to be eligible for reemployment after their one year anniversary.

Allstate's prohibition on rehiring derived from business reasons including not allowing

an agent to double-dip by simultaneously receiving severance pay while at the same time drawing a salary; the effect on employee morale of immediately rehiring the agent who chose to leave Allstate rather than continuing as an independent contractor; rehiring employee agents within one year of their termination could raise issues under non-compete provisions; and, immediately rehiring employee agents terminated under the program into non-agent positions might confuse customers.

Allstate based its one-year time period on the precedent set by its 1994 and 1995 policy.[112] While the agent Plaintiffs raise fair suspicions as to terminating service to affect pension payments, we find no evidence Allstate considered the effect of the September 2000 rehire policy might have on the former employee agents' benefits.

Allstate realized significant savings from eliminating the employee agents. But these expense reductions came from across the entire company as well as costs associated with the transition. Allstate claims its reduction expenses came from field realignment, the reorganization of employee agents into a single exclusive agency independent contractor program, the closing of field support center and four regional offices, and from a reduced employee related expenses and professional services as a result of reduction in force, attrition, and consolidations.[113] By 2001, Allstate announced a $69 million restructuring liability during the fourth quarter of 1999 for certain employee termination costs and qualified exit costs.[114]

## II.    Procedural background

Approximately thirty Allstate insurance agents filed two putative class actions against Allstate in 2001. This Court denied class action status several years ago and wrestled with hundreds of motions while the agent Plaintiffs proceeded with appeals and individual claims.[115] In 2015, after fourteen years of litigation including two appeals, over 450 additional agents from

over forty states intervened or became named plaintiffs in *Romero I*. Less than thirty Plaintiffs can now claim appropriate venue in this District outside of ERISA's broad allowance of venue.

Upon Judge Buckwalter's retirement and the random reassignment of this case to us in 2016, we approached this amalgam as we would a multi-district litigation given the great number of similar federal questions under ERISA and ADEA applying to all individual Plaintiffs, followed by individual issues on liability and defenses (such as validity of releases) which require applying differing state laws. We met with all counsel and, after discussion and consent, consolidated all actions with 497 agent plaintiffs to resolve the common issues under ERISA and ADEA.[116] We ordered Plaintiffs to file a consolidated amended complaint ("Complaint"), setting a case management and ample discovery schedule on the federal question issues, and dividing the common federal question issues into two trial phases: "Phase I" to address cutback claims under ERISA section 204(g)[117] and "Phase II" to address remaining federal common federal questions under ERISA section 510[118] and ADEA disparate impact claims.[119]

This Memorandum explaining our Orders addresses the Phase II issues under ERISA section 510 and ADEA disparate impact claims.[120] We are also issuing today our findings of fact and conclusions of law following our non-jury trial on the Plaintiffs' Phase I ERISA anti-cutback claim.

This Phase II memorandum addresses the legality under ADEA and ERISA of Allstate's November 1999 Program to transition away from employee agents by terminating existing employee agents and, upon them signing a release, offering these employee agents an ability to become an independent contractor agent. In our July 21, 2016 Order, we clarified Plaintiffs' ADEA disparate *treatment* claims, as they require individual agent analysis, would be resolved after the Phase II trial as part of resolving the individual state law claims possibly varying by the

state law of each of the Plaintiff's residences.[121] We also do not address Allstate's affirmative defense of failure to exhaust administrative remedies because this defense similarly involves individualized issues.

Focusing on the issues today, former employee agent Plaintiffs seek relief under ADEA challenging Allstate's adoption and implementation of the Program under a disparate impact theory as compared to the R3000 temporary employee agents. The Plaintiffs also seek relief under ERISA section 510.

Allstate moves for partial summary judgment on the Plaintiffs' ADEA disparate impact and ERISA section 510 claims and the Plaintiffs cross-move for partial summary on their ERISA section 510 claim. Mr. Liddy also moves for summary judgment on the only remaining claim against him under ERISA section 510. In the accompanying Orders, we granted Allstate's and Mr. Liddy's motions for partial summary judgment and denied the Plaintiffs' motion for partial summary judgment on their ERISA section 510 claim.

### III.  Analysis[122]

#### A.  We grant Allstate's motion for summary judgment as to Plaintiffs' ADEA disparate impact claims.

Plaintiffs claim Allstate's decision not include the temporary R3000 employee agents in the Program, while including the other employee agents with R830 or R1500 contracts, created a disparate impact upon this 18-month employee group which tended to be younger. The Plaintiffs' expert, David W. Griffin, Ph.D., compared the age differences between the R3000 agents and the R830/R1500 agents.[123] Relying upon two sources of information for his analysis—an ADEA waiver form and a excel file provided by Allstate—Dr. Griffin formed two alternative definitions of the R3000 agent group active on October 1, 1999.[124] After excluding agents from New Jersey and California, and ensuring the remaining employees were not

terminated before October 1, 1999, he reviewed the "Agent Type Description" field in the Allstate excel file for references to R3000, R830, and R1500 agents.[125]

Dr. Griffin defined the R3000 group in two ways: (a) 1,044 agents whose "Agent Type Description" field stated "R3000 agent"; and (b) 1,044 agents plus an additional 179 agents similarly described as R3000 agents but whose "Hire Date" post-dated October 1, 1999.[126] Dr. Griffin created two charts for these separately defined R3000 groups, which compared each R3000 group against the R830/R1500 groups.[127]

Dr. Griffin compared the percentage of agents in the R3000 groups which are "older" than the R830/R1500 groups using seven alternative definitions of "older," starting at "40+" and increasing by five-year increments until "70+".[128] Dr. Griffin found 38% of the two R3000 groups were each older than forty years old, while over 89% of the R830/R1500 agents were over forty.[129] According to Dr. Griffin, 12% of the two R3000 groups were older than fifty years old, while over 54% of the R830/R1500 agents were over fifty.[130] He found a statistically significant difference between these groups of agents among all seven definitions of "older" and in each of the two definitions of the R3000 group.[131] Overall, the median age of R3000 agents was thirty-seven, while the median age of R830/R1500 agents was fifty.[132]

The R830/R1500 employee agents argue the program violated ADEA by creating a disparate impact between the younger R3000 temporary employee agents and them. Under the ADEA's disparate-impact provision, it is unlawful for an employer "to adversely affect [an employee's] status . . . because of such individual's age."[133] A disparate impact claim does not require proof of discriminatory intent, but instead focuses on whether a facially neutral employer policy imposes a statistically significant burden on older workers.[134] To establish a *prima facie* case for disparate impact under the ADEA, the Plaintiffs must "(1) identify a specific, facially

neutral policy, and (2) proffer statistical evidence that the policy caused a significant age-based disparity."[135] If the Plaintiffs do so, Allstate may argue "the challenged practice was based on 'reasonable factors other than age'—commonly referred to as the 'RFOA' defense."[136]

The Plaintiffs contend Allstate's decision to exclude R3000 agents from the November 1999 Planning for the Future Program had a disparate impact on older employees, as demonstrated by expert evidence showing a statistically significant difference between the ages of the agents in these two groups. Allstate responds the R3000 agents do not constitute a comparable population because, unlike the full-time employees with indefinite R830 and R1500 agreements, the R3000 agents had temporary 18-month employment contracts.

"Statistical comparisons, if they are to have any value, must be between comparable groups and free from variables which would undermine the reasonableness of discrimination inferences to be drawn."[137] For example, in the context of a failure to hire case, our Court of Appeals rejected the plaintiff's argument the qualified applicant pool for a highway maintenance job as including "unrelated jobs" such as clerical workers.[138]

Similarly, in *Sperling v. Hoffman-La Roche*, plaintiffs in a reduction-in-force case argued their employer terminated older workers at a higher rate than younger workers.[139] The employer terminated its employees based upon their rank in their respective work group.[140] The plaintiff's expert, however, analyzed the companywide age disparities in the termination rate, not the rates within each work group.[141] The court found the companywide analysis had "little probative value" because it could not speak to the existence of age-based disparities at the work group level.[142]

The R3000 agents and the R830/R1500 agents constitute comparable populations. Although R3000 agents had temporary 18-month contracts, they were responsible for selling and

servicing the same Allstate products as R830 and R1500 agents. All of these agents had to follow the same underwriting rules, and all were entitled to some measure of employee benefits. Given these similarities between the two groups, we find they constitute comparable populations for the purposes of the Plaintiffs' disparate impact claim.

The Plaintiffs also provide sufficient statistical evidence demonstrating a significant age disparity between the R3000 agents and the R830/R1500 agents. Plaintiffs' expert found a statistically significant difference between these two groups of agents.[143] The median age of R3000 agents was thirty-seven, while the median age of R830/R1500 agents was fifty.[144] Plaintiffs demonstrate a *prima facie* case of disparate impact.

Although Plaintiffs established a *prima facie* case, their disparate impact claim fails because Allstate demonstrates it based its differentiation on reasonable factors other than age. "[T]he RFOA defense imposes a relatively light burden on employers."[145] This defense "significantly narrows" ADEA coverage by allowing employers to implement policies having a disparate impact on older workers where the policy "is based on reasonable factors other than age."[146] This defense focuses not on whether Allstate could have achieved its stated goal using other less impactful methods, but on the reasonableness of the criteria relied upon by Allstate.[147] In fact, "a reasonable factor may lean more heavily on older workers, as against younger ones, and an unreasonable factor might do just the opposite."[148]

Congress granted the Equal Employment Opportunity Commission ("EEOC") the authority to "issue such rules and regulations as it may consider necessary or appropriate for carrying out" the ADEA.[149] Exercising this authority, the EEOC issued 29 C.F.R. § 1625.7, which explains, "A reasonable factor other than age is a non-age factor that is objectively reasonable when viewed from the position of a prudent employer mindful of its responsibilities

under the ADEA under like circumstances."[150] To establish the RFOA defense, Allstate must show its employment practice was (1) "reasonably designed to further or achieve a legitimate business purpose" and (2) "administered in a way that reasonably achieves that purpose in light of the particular facts and circumstances that were known, or should have been known, to the employer."[151] Allstate carries the burden of production and the burden of persuasion on this affirmative defense.[152]

Allstate satisfies its burden. Allstate instituted the Program to end indefinite employment arrangements in favor of independent contractor agreements. Absent the Program, R830 and R1500 agents would have continued working as employees indefinitely. Allstate explains it did not subject R3000 agents to the Program because, unlike R830 and R1500 agents, R3000 agents had temporary 18-month employment agreements, after which they could seek to become R3001 agents. Allstate provided training opportunities to R3000 agents with the goal of transitioning them to R3001 agents if they performed successfully under the R3000 agreement. Including R3000 agents in the Program would have been counterproductive because these agents were already on the path to becoming R3001 agents. Allstate's decision to exclude R3000 agents from the Program is reasonable because R3000 agents, at the conclusion of their 18-month term, would either part ways with Allstate or convert to R3001 agents. Rather than prematurely forcing R3000 agents to become R3001 agents before the end of their temporary employment agreements, Allstate chose to wait. This decision is reasonable.

Instead of challenging the reasonableness of Allstate's decision to exclude R3000 agents from the Program, the Plaintiffs challenge the reasonableness of Allstate's decision to adopt and implement the Program.[153] These arguments miss the point. Because the Plaintiffs contend the unlawful practice was Allstate's decision to exclude R3000 agents from the Program, their

arguments should be directed at the reasonableness of Allstate's decision to exclude the R3000 agents. The reasonableness of Allstate's decision to adopt and implement the Program is not relevant to this issue.

### B. We grant Allstate's and Mr. Liddy's Motion dismissing the ERISA section 510 claim.

The Plaintiffs allege the November 1999 decision to transition all of its agents to independent contractors violates section 510 of ERISA, 29 U.S.C. § 1140. Plaintiffs contend Allstate's termination of their employment contracts through the Program constitutes an adverse employment action depriving them of pension and other benefits to which they would otherwise be entitled under Allstate's ERISA plans.

Section 510 makes it "unlawful for any person to discharge . . . or discriminate against a participant . . . for exercising any right which is entitled under the provision of employee benefit plan . . . for the purpose of interfering with the attainment of any right to which the participant may become entitled under the plan . . .." "Congress enacted section 510 primarily to prevent 'unscrupulous employers from discharging or harassing employees in order to keep them from obtaining vested pension benefits.'"[154]

Our Court of Appeals has defined the legal standards for a section 510 claim as "very clear."[155] This clear standard requires the Plaintiffs to state a *prima facie* case demonstrating "(1) employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled."[156] If the Plaintiffs succeed in establishing each of these elements, they have established a rebuttable presumption Allstate violated section 510.[157]

The standard requires the Plaintiffs demonstrate Allstate had the "specific intent" to violate section 510.[158] Proof of incidental loss of benefits as a result of termination does not

violate section 510.[159] Thus, our Court of Appeals instructs the Plaintiffs "must show that the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or addition of benefits."[160] As in this case, when the Plaintiffs cannot adduce "smoking gun" evidence of specific intent to discriminate, we allow the Plaintiffs to satisfy their evidentiary burden of specific intent by introducing circumstantial evidence.[161] We allow evidence of specific intent by drawing on the case law defined in other aspects of employment discrimination, including the shifting burdens of *McDonnell-Douglas*.[162]

Once the Plaintiffs meet their *prima facie* case by preponderance of the evidence, Allstate must show a legitimate non-discriminatory reason for the Program.[163] Under a *McDonnell-Douglas* shifting, if Allstate articulates a legitimate reason, the burden returns to the Plaintiffs to show Allstate's business reason is pretext for discriminatory intent violative of section 510 to deprive the Plaintiffs of their pension benefits.[164]

Our decision today must also be mindful of the 2005 decision of the United States Court of Appeals for the Seventh Circuit finding Allstate's same decision did not violate section 510. In *Isbell v. Allstate Insurance Co.*,[165] the court of appeals, affirming the district court, found Allstate offered legitimate nondiscriminatory reasons for eliminating its employee agent force in favor of an independent contractor force. The court of appeals, whose views are persuasive in this Court, examined the same conduct at issue before us.[166] The court of appeals concluded by describing Allstate's legitimate non-discriminatory reasons: "Chief among these was the higher productivity of independent contractors (and, notably, the even higher productivity for former employee agents who had voluntarily converted to independent contractors.) The independent contractors were paid higher commissions than the employee agents and no doubt, like many companies, Allstate believed paying its sales force primarily through commissions spurs the

salesman to sell more. This is a legitimate business reason for Allstate's decision. Allstate was entitled to summary judgment."[167]

The United States Court of Appeals affirmed Judge Herndon's extensive analysis in the district court of Allstate's reasons and finding an employee agent could not proceed to trial on a section 510 claim against Allstate. Judge Herndon specifically found the employee agents "were dismissed as part of restructuring of its agent sales force – a legitimate non-discriminatory reason. Plaintiffs have offered no evidence to show Allstate's decision was impermissibly motivated by desire to deprive those agents of their healthcare benefits.  Indeed, the documents offered by Plaintiffs suffer from the same infirmities as those offered in support of their ADEA claim, namely Plaintiffs fail to show how they even remotely relate to the employment decision in question. None of the documents Plaintiffs presented were created in connection with or refer to the Program. Nor were the documents shared with those initiating the Program. In short, Plaintiffs' evidence neither establishes the *prima facie* case nor demonstrates that Allstate's legitimate non-discriminatory business reason for implementing the Program was pretextual. No action for ERISA lies where, as here, an alleged loss of a right is a mere consequence of the employment termination."[168]

Having the benefit of full discovery over a dozen years after *Isbell*, we agree with Judge Herndon and the court of appeals affirming his findings of no pretext in Allstate's business reason for implementing the Program. The Plaintiffs strive to distinguish Judge Herndon's opinion in *Isbell* by largely focusing on the effect of the decision from the agents' perspective. We agree Allstate changed course after having invested over nine years defending the employee agent programs. We also agree with the Plaintiffs as to Allstate saving some money by terminating employee agents and offering independent contractor positions after signing a

release. As Allstate recognized, this transition would not be easy and likely result in litigation and morale issues. Allstate correctly predicted this litigation responsive to the employee agents' losing their jobs.

But even after over years of discovery, we have little or no evidence of Allstate deciding to proceed with the Program in fall 1999 to eliminate pension benefits. Allstate's internal documents instead describe almost a decade of opposing a transition to an exclusive sales force of independent contractor agents even though Allstate knew the independent contractor agent worked better with Allstate's goals. For years, Allstate fought two California class actions and disputed a need to change their employee agents to independent contractors with the Internal Revenue Service. It settled the California class actions by terminating the employee agents and offering them positions as independent contractors. As late as eighteen months before announcing the Program in November 1999, Allstate worked with the Internal Revenue Service on a Final Agreement and again attempted to create behavior modifications for the employee agents to ensure they do act like independent contractors. The overwhelming evidence confirms Allstate did not want to transition to an exclusive independent contractor agent sales force.

When Mr. Liddy became Allstate's Chairman and CEO in 1999, his leadership team announced a business transition to allow direct access to the consumer through, among other channels, call centers, internet sites and advanced technology. These steps would, almost by definition of "direct" access to consumers, result in a new hands-on role for agents. Allstate estimated costs of $2 billion for this transition due to the technology needs. Even assuming the agent Plaintiffs' best argument is accurate, the amount of savings in future pension benefits would not come close to setting off this expense. Under Mr. Liddy's leadership, Allstate decided to focus on new channels of distribution. As part of this new direct access business model,

Allstate decided to change its decades of employee agents to better align the sales goals.

Plaintiffs offer no smoking gun of Allstate's conscious decision to interfere with the employee's attainment of pension eligibility or benefits. To this extent, we agree with Judge Herndon in *Isbell* reviewing this same Allstate decision. But even assuming the Plaintiffs established evidence Allstate documented and considered the effect of the Program as impairing benefits after June 30, 2000, and given our findings of Allstate's several legitimate business reasons, we find no evidence Allstate's business reasons are pretext for illegally interfering with the attainment of pension or other benefits.

This is not a situation where an employer fires one employee or all employees to save money alone. Saving money can be a legitimate business reason but invites more scrutiny if the decision is entirely reactive or most of the savings are through eliminating the pension. Instead, we review an undisputed history of Allstate incurring considerable expense in fighting the transition of employee agents to independent contractors for over nine years.  Mr. Liddy testified as to his desire to retain Allstate's decades of investment in the employee agents. Allstate identified several business reasons related to the transition of its business model. It made a business decision to move to a direct access model which, incidental to this $2 billion investment, required Allstate to finally move to an exclusive independent contractor sales force. We have no evidence the elimination of the pension benefits approached setting off the $2 billion expense on this business initiative. Hopefully also applying some common sense, Allstate made this decision after four years of record profits with its different agent forces. This is not a failing company in 1999 seeking to save itself on the backs on its pensioners. All the evidence points in the opposite direction: a new business model focused on e-commerce and direct sales which, incidental to this business model, made sense to transition agents out of employment and the

recurring control issues and allow them to work as independent contractors.

We find no basis to disregard the *Isbell* analysis based on new evidence adduced by the agent Plaintiffs concerning Allstate's interest in reducing costs to pay for the direct access efforts. Allstate's business reasons found by a district court and court of appeals as non-pretextual ten years ago have as much persuasive effect today. Further, the great weight of the evidence adduced for our consideration confirms Allstate's several legitimate business reasons tied to its business plans in 1999.

## IV.    Conclusion

We grant Allstate's motion for partial summary judgment as to the Plaintiffs' ADEA disparate impact claim. We decline to address the parties' arguments regarding Plaintiffs' ADEA disparate treatment claims or Allstate's affirmative defense of failure to exhaust administrative remedies, as these issues are not readily capable of common resolution among all Plaintiffs.

We also grant Allstate's and Mr. Liddy's motion for partial summary judgment dismissing the Plaintiffs' ERISA section 510 claims. As the only issues triable in Phase II of our common federal issues protocol are now resolved, the parties and counsel are no longer attached for the Phase II trial.

---

[1] Our Policies require a Statement of Undisputed Material Facts be filed in support of a Rule 56 motion, as well as an appendix of exhibits. Allstate filed a Statement of Undisputed Material Facts in support of its Motion for summary judgment on the ADEA claim (ECF Doc. No. 1008) and appendix (ECF Doc. Nos. 1008-1 through 1008-57). Plaintiffs responded to Allstate's Statement of Undisputed Material Facts and submitted an Additional Statement of Material Facts (ECF Doc. No. 1061-1), as well as supplementing the appendix (ECF Doc. Nos. 1060 through 1060-204). Allstate responded to Plaintiffs' Statement of Undisputed Material Facts (ECF Doc. No. 1065) and supplemented the appendix (ECF Doc. Nos. 1065-1 through 1065-61).

The parties filed cross-motions for summary judgment on the ERISA section 510 claims. In their moving brief, the Allstate Defendants filed a Statement of Undisputed Material Fact (ECF Doc. No. 1036). Plaintiffs responded and submitted a Statement of Additional Material Facts (ECF Doc. No. 1071-1). Plaintiffs, in support of their moving brief, filed a Statement of Undisputed Facts (ECF Doc. No. 1042), later amended (ECF Doc. No. 1052). The Allstate Defendants

responded to Plaintiffs' Amended Statement of Undisputed Facts and submitted Additional Facts (ECF Doc. No. 1057). Plaintiffs responded to the Allstate Defendants' Additional Facts (ECF Doc. No. 1073). The parties submitted a Joint Appendix supporting their cross-motions for summary judgment (ECF Doc. No. 1040, 1053, and 1072). Allstate supplemented the Joint Appendix (ECF Doc. No. 1057-1 through 1057-42).

Because the parties separately briefed the ADEA and ERISA section 510 claims, we have separate appendices. For ease of reference, we refer to exhibits relating to Allstate's motion on the ADEA claim as "ADEA Appx." and to exhibits in the ERISA section 510 claims, including Allstate's supplement to the Joint Appendix, as "Joint Appx."

[2] ECF Doc. No. 1061-1 at p. 4, ¶ 1. The Allstate Corporation is a Delaware corporation with a principal place of business in Northbrook, Illinois. *Id.* at p. 4, ¶ 2.

[3] *Id.* at p. 5, ¶ 5.

[4] ECF Doc. No. 1057 at ¶¶ 3–4.

[5] ECF Doc. No. 1-61-1 at pp. 5-6, ¶ 6; ADEA Appx. 4203.

[6] ECF Doc. No. 1-61-1 at pp. 5-6, ¶ 6.

[7] ECF Doc. No. 1057 at ¶¶ 51 52-54; ECF Doc. No. 1061-1 at ¶¶ 7-9.

[8] ECF Doc. No. 1071-1 at ¶ 13.

[9] ECF Doc. No. 1057 at ¶ 53.

[10] *Id.* at ¶ 54.

[11] *Id.* at ¶ 56.

[12] *Id.*

[13] *Id.* at ¶ 58.

[14] Joint Appx. 3457; *EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 446 (3d Cir. 2015).

[15] Joint Appx. at 6498, 6524.

[16] ECF Doc. No. 1061-1 at p. 14, ¶ 10.

[17] *Id.*; ADEA Appx. 2396.

[18] ADEA Appx. 2395.

[19] ECF Doc. No. 1057, at ¶ 5.

[20] *Id.* at ¶ 22.

[21] *EEOC*, 778 F.3d at 446.

[22] ECF Doc. No. 1057 at ¶ 23. There is no dispute the various Allstate-sponsored health and welfare plans are subject to ERISA. ERISA defines an "employee welfare benefit plan" and "welfare plan" as: "any plan, fund, or program . . . established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions)." 29 U.S.C. § 1002(1).

[23] *Id.* at ¶¶ 27-29. Employee agents between the ages of 21 and 63 became participants in the Allstate Agents Pension Plan as of January 1 of the year in which they completed one year of "Credited Service," as defined by the Plan, and remained an agent as of the end of that year. *Id.* at ¶ 27. It is undisputed the Allstate Agent's Pension Plan is a defined benefit pension plan, maintained under a written plan document, and subject to ERISA. ERISA defines the terms "employee pension benefit plan" and "pension plan" as: "any plan, fund, or program . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, . . ." 29 USCA § 1002(2)(A).

[24] ECF Doc. No. 1061-1 at p. 15, ¶ 12.

[25] ADEA Appx. 2396. In the Phase I trial, the parties stipulated Exclusive Agents all became independent contractors. *See* Stipulated Facts for the December 2016 Phase I Trial at ¶ 10 (ECF Doc. No. 972).

[26] ECF Doc. No. 1057 at ¶ 7.

[27] *Id.*

[28] *Id.*

[29] ADEA Appx. 5012.

[30] ECF Doc. No. 1061-1 at p. 19, ¶ 13.

[31] ADEA Appx. 4674d–4674f.

[32] ADEA Appx. 4674e.

[33] ADEA Appx. 4668a, 4674d.

[34] ECF Doc. No. 1057, at ¶ 8.

[35] Joint Appx. 534.

[36] ECF Doc. No. 1057, at ¶ 9.

[37] Joint Appx. 1548–49.

[38] ECF Doc. No. 1057, at ¶ 60.

[39] *Id.* at ¶¶ 64-65.

[40] *Id.* at ¶ 62.

[41] *Id.*

[42] *Id.* at ¶ 64.

[43] *Id.* at ¶ 65.

[44] Joint Appx. 6152

[45] Joint Appx. 6553.

[46] ECF Doc. No. 1057 at ¶ 69.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at ¶¶ 70–71.

[51] ECF Doc. No. 1057, at ¶ 75.

[52] *Id.* at ¶ 82.

[53] *Id.* at ¶ 83.

[54] *Id.*

[55] *Id.*

[56] *Id.* at ¶ 85.

[57] *Id.* at ¶ 86.

[58] *Id.* at ¶ 87.

[59] *Id.* at ¶¶ 89-90.

[60] Joint Appx. 661–663.

[61] Joint Appx. 3765-3769.

[62] Joint Appx. 3766.

[63] ECF Doc. No. 1057 at ¶ 92; Joint Appx. 5735.

[64] ECF Doc. No. 1057 at ¶ 92.

[65] ECF Doc. No. 1057 at ¶¶ 11–12.

[66] ECF Doc. No. 1057 at ¶ 103; Joint Appx. 3822–23.

[67] *Id.* at ¶ 93.

[68] *Id.* at ¶¶ 94-95.

[69] *Id.* at ¶ 95; Joint Appx. 6097, 6570.

[70] Joint Appx. 6570.

[71] ECF Doc. No. 1057 at ¶ 99.

[72] Joint Appx. 4761.

[73] Joint Appx. 3822, 4761.

[74] ECF Doc. No. 1057 at ¶¶ 105-106.

[75] ECF Doc. No. 1057 at ¶ 109; Joint Appx. 3880–81.

[76] ECF Doc. No. 1057 at ¶ 110.

[77] Joint Appx. 4844–45.

[78] Joint Appx. 1560, 4051–52, 4094–95.

[79] Joint Appx. 803.

[80] Joint Appx. 4204.

[81]  Joint Appx. 6097, 6570.

[82] Joint Appx. 789.

[83] ECF Doc. No. 1057 at ¶ 121.

[84] *Id.* at ¶ 123.

[85] Joint Appx. 789.

[86] *Id.*

[87] *Id.*

[88] ECF Doc. No. 1057 at ¶ 124.

[89] Joint Appx. 4243, 4266; Joint Appx. at ¶ 126.

[90] Joint Appx. 4236, 4239, 4262.

[91] *Id.*

[92] *Id.* at ¶¶ 14–15.

[93] ADEA Appx. 4 at ¶ 11, 4509-12.

[94] ECF Doc. No. 1057 at ¶ 128.

[95] Joint Appx. 6172b.

[96] Joint Appx. 1576.

[97] Joint Appx. 1577.

[98] Joint Appx. 1576, 1581.

[99] Joint Appx. 1576, 1581, 6278–79.

[100] Joint Appx. 1603, 5944-45.

[101] Joint Appx. 1603.

[102] ADEA Appx. 4920–21.

[103] ADEA Appx. 782, 4920–21.

[104] ADEA Appx. 5186–87.

[105] ADEA Appx. 5187.

[106] ECF Doc. No. 1061-1 at p. 57, ¶ 33; ECF Doc. No. 1057 at ¶ 128.

[107] ECF Doc. No. 1057 at ¶ 131.

[108] *Id.*

[109] *Id.*

[110] ECF Doc. No. 1057 at ¶ 132; Joint Appx. 1345.

[111] Joint Appx. 1345.

[112] ECF Doc. No. 1057 at ¶ 143; Joint Appx. 946.

[113] Joint Appx. 4398–99.

[114] *Id.*

[115] We are particularly mindful of the direction in our Court of Appeals' July 29, 2009 Opinion vacating and remanding a June 20, 2007 district court summary order which dismissed the Plaintiffs' claims under ADEA and ERISA. *See Romero v. Allstate Ins. Co.*, 344 F.App'x 785, 790 (3d Cir. 2009) *vacating and remanding Romero v. Allstate Ins. Co.,* Nos. 01-3894, 01-6764, 01-7042, 2007 WL 1811197 (E.D.Pa. June 20, 2007). Following our Court of Appeals' guidance, we allowed extensive discovery on the common federal questions under ADEA and ERISA. This Court, through the Honorable Ronald L. Buckwalter (retired), held a jury trial on whether ten of the named plaintiffs (when we had only thirty plaintiffs) released their claims. The individual issues, including the release defense, will be resolved in separate cases in appropriate venues.

[116] May 2, 2016 Consolidation Order (ECF Doc. No. 851).

[117] 29 U.S.C. § 1054(g).

[118] 29 U.S.C. § 1140.

[119] May 2, 2016 Scheduling Order (ECF Doc. No. 852). Plaintiffs filed their Consolidated Amended Complaint on May 20, 2016 (ECF Doc. No. 864). Allstate subsequently filed a motion for summary judgment on Plaintiffs' ERISA anti-cutback claims and breach of fiduciary duty claim. Following oral argument, we granted summary judgment in Allstate's favor on the breach of fiduciary duty claim (Count X). We also granted Allstate's motion for summary judgment as to any argument the 1993 Plan amendment to the term "Credited Service" constitutes a violation of ERISA's anti-cutback provision and denied Allstate's motion on Plaintiffs' alternative claim they are employees, not independent contractors, to be resolved in later individual proceedings under the varying state laws (Count IX). We denied Allstate's summary judgment motion as to Plaintiffs' anti-cutback claim relating to the elimination of the early retirement beef-up subsidy (Count VIII). *See* November 22, 2016 Memorandum and Order (ECF Doc. No. 960, 961). After our summary judgment order, the Phase I trial only addressed whether Allstate violated ERISA's anti-cutback provision by eliminating the beef-up subsidy (Count VIII).

[120] ECF Doc. Nos. 1122, 1123.

[121] ECF Doc. No. 883.

[122] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). On a motion for summary judgment, "we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Mancini v. Northampton Cnty.*, 836 F.3d 308, 313 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their care for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

The standard does not change on cross-motions for summary judgment. *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). We "consider cross-motions for summary judgment separately and apply the appropriate burden of production to each motion." *Beenick v.LeFebvre*, No. 16-3855. 2017 WL 1325690, *3 (3d Cir. Apr. 11, 2017) (citing *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008)); *Auto-Owners Ins. Co*, 835 F.3d at 402 (quoting 10A Charles Alan Wright *et al*., Federal Practice & Procedure § 2720 (3d ed. 2016)).

[123] ADEA Appx. 3455.

[124] ADEA Appx. 3455–56.

[125] ADEA Appx. 3456–57.

[126] ADEA Appx. 3457.

[127] ADEA Appx. 3459–60.

[128] ADEA Appx. 3458–60.

[129] ADEA Appx. 3459–60.

[130] ADEA Appx. 3459–60.

[131] ADEA Appx. 3460.

[132] ADEA Appx. 3460.

[133] 29 U.S.C. § 623(a)(2).

[134] *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 69, 79 (3d Cir. 2017).

[135] *Id.* at 69.

[136] *Id.* (quoting 29 U.S.C. § 623(f)(1) and 29 C.F.R. § 1625.7).

[137] *Mazus v. Dep't of Transp., Com. of Pa.*, 629 F.2d 870, 875 (3d Cir. 1980) (citing *Swint v. Pullman-Standard*, 539 F.2d 77, 97 (5th Cir. 1976)).

[138] *Id.*

[139] *Sperling v. Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346, 1382 (D.N.J. 1996).

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] ADEA Appx. 3460.

[144] ADEA Appx. 3460.

[145] *Karlo*, 849 F.3d at 80.

[146] *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005).

[147] *Karlo*, 849 F.3d at 84 ("When a defendant proffers a RFOA, the plaintiff can rebut it by showing that *the factor relied upon* is unreasonable, not by identifying twenty *other* practices that would have been reasonable instead."); *see also Smith*, 544 U.S. at 233 ("Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement.")

[148] *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 96 (2008).

[149] 29 U.S.C. § 628.

[150] 29 C.F.R. § 1625.7(e)(1).

[151] *Id.* The regulations set forth factors we may consider, including but not limited to: (i) the extent Allstate's factor is related to its stated purpose; (ii) the extent Allstate accurately defined the factor and fairly and accurately applied the factor; (iii) the extent Allstate limited supervisors' discretion to assess employees subjectively; (iv) the extent Allstate assessed the adverse impact of its practice on older workers; and, (v) the degree of harm to the protected group and the extent Allstate took steps to reduce harm in light of the burden of taking such steps. *Id.* § 1625.7(e)(2). "No specific consideration or combination of considerations need be present for a differentiation to be based on reasonable factors other than age. Nor does the presence of one of these considerations automatically establish the defense." *Id.* § 1625.7 (e)(3).

[152] *Meacham*, 554 U.S. at 87.

[153] ECF Doc. No. 1061 at p. 29 ("Allstate claims that [productivity of non-employee agents] is one of the reasonable factors other than age that caused Allstate to adopt the program."); *Id.* at p. 30 ("A jury reasonably could conclude that Allstate did not adopt and implement the Program for any of these reasons.").

[154] *Dewitt v. Penn-Del Directory Corp.,* 106 F. 3d 514, 522 (3d Cir. 1997) (citing *Haberern v. Kaupp Vascular Surgeons Ltd.,* 24 F 3d. 1491, 1501 (3d Cir. 1994) (citations omitted)).

[155] *DiFederico v. Rolm Co.,* 201 F 3d. 200, 204 (3d. Cir. 2000).

[156] *Dewitt,* 106 F. 3d at 521 (citing *Gavalik v. Continental Can Co.,* 812 F 2d. 834, 852 (3d Cir.) *cert. denied*, 484 U.S. 979 (1987)).

[157] *Gavalik,* 812 F 2d. at 853.

[158] *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 785 (3d Cir. 2007) (citing *Gavalik*, 812 F.2d at 851).

[159] *Gavalik*, 812 F.2d at 851 (citing *Tisch v. Reliance Group, Inc.,* 548 F. Supp. 983, 985 (S.D.N.Y. 1982) *aff'd*, 742 F 2d. 1441 (2d Cir. 1983)).

[160] *Dewitt*, 106 F.3d at 523 (citing *Gavalik,* 812 F 2d. at 860).

[161] *Gavalik,* 812 F 2d. at 851 (citing *Maxfield v. Sinclair Int'l,* 766 F 2d. 788, 791) (3d Cir. 1985) *cert. denied*, 474 U.S. 1057 (1986)).

[162] *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

[163] *Hendricks v. Edgewater Steel Co.*, 898 F 2d. 385, 389 (3d Cir. 1990) (citing *Gavalik*, 812 F. 2d. at 853).

[164] *Id.*

[165] 418 F. 3d. 788 (7th Cir. 2005), *cert. denied*, 547 U.S. 1021 (2006).

[166] *Id.* at 796.

[167] *Id.*

[168] *Isbell v. Allstate Insurance Company Ins. Co.,* No. 01-252, 2003 U.S. Dist. Lexis 21412 at *46 (S.D. Ill. Nov. 25, 2003) (citing *Lindeman v. Mobile Oil Corp.,* 141 F. 3d 290, 296 (7th Cir. 1998) and *Meredith v. Navistar Int'l Transp. Corp.*, 935 F. 2d 124, 127 (7th Cir. 1991)).